UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In Re:                                          Case No.  13-20853-PGH
                                                Chapter 11
TLO, LLC,

      Debtor.

_____/

**DEBTOR'S MOTION FOR ENTRY OF ORDER: (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (OTHER THAN ASSUMED LIABILITIES), (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

TLO, LLC, (the "Debtor" or "Seller"), by and through its undersigned counsel and pursuant to sections 105, 363 and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), (c), (i) and (k), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 6004-1, moves this Court for the entry of an order, substantially in the form attached hereto as Exhibit A (the "Approval Order"), (i) authorizing the sale of substantially all of the debtor's assets free and clear of all liens, claims, encumbrances and other interests (other than Assumed Liabilities (as defined herein)) (the "Sale"), (ii) approving the assumption and assignment of certain Assigned Contracts (as defined herein), and (iii) granting related relief, pursuant to the terms of the Asset Purchase Agreement attached hereto as Exhibit B (the "Stalking Horse APA")[1] or pursuant to such other asset purchase agreement with a better and higher bidder as determined in accordance with this Court's Bidding Procedures Order (defined below).  In support of this motion (the "Motion"), the Debtor states as follows:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse APA.

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the Debtor's Chapter 11 case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## CASE BACKGROUND

2.      On May 9, 2013 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  Since that time, the Debtor has operated as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtor is a leading data fusion, Big Data Analytics, and information services firm, regarded as a premier provider of highly-accurate risk information for research and investigative needs.  Headquartered in Boca Raton, Florida, the Company was formed in March 2009 by Hank Asher, a legendary entrepreneur and pioneer in the data fusion industry.   In January 2013, Mr. Asher passed away unexpectedly.

4.      As of the date hereof, no trustee or examiner has been appointed.

5.      No previous application for the relief sought herein has been made by the Debtor to this Court or any other court.

6.      On October 31, 2013, the Debtor filed the Debtor's Plan of Liquidation [ECF #377] (the "Plan") and the Debtor's Disclosure Statement [ECF #378] (the "Disclosure Statement").  The Plan proposes to pay holders of allowed claims and interests from the proceeds derived from the sale of the Debtor's assets, the recoveries from litigation involving or related to the life insurance policy of the Debtor's founder, Hank Asher, and certain other litigation claims as described in the Plan.

## THE SALE PROCESS

7.    On October 15, 2013, the Debtor filed its Bidding Procedures Motion.[2]  This Court held a hearing on the Bidding Procedures Motion on October 22, 2013, and entered its Order Approving the Bidding Procedures Motion (as amended and modified, the "Bidding Procedures Order") [ECF #351] on October 24, 2013.[3]  The Debtor incorporates the Bidding Procedures Motion and Bidding Procedures Order herein by reference as though fully set forth herein.

8.    As more fully set forth in the Certificate of Service [ECF # 369] filed on October 29, 2013, and the Certificate of Service (Supplemental) [ECF # 372] filed on October 30, 2013, in accordance with the Bidding Procedures Order, the Debtor caused Notice Of Bid Deadline, Auction, And Sale Hearing In Connection With The Sale Of Substantially All Of The Debtor's Assets (the "Sale Notice" ) (which included the Bidding Procedures and Bidding Procedures Notice) to be served on all parties required be served by the Bidding Procedures Order, including, without limitation, all creditors of the Debtor, all parties asserting a lien in assets of the Debtor, governmental agencies, parties known to be interested in acquiring the Debtor's assets, all persons who have filed a request for notice under Bankruptcy Rule 2004, and all customers of the Debtor.[4]

---

[2] The *Debtor's Motion For Entry Of Order: (i) Approving Procedures In Connection With The Sale Of Substantially All Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests, (ii) Authorizing The Payment Of Breakup Fee And Expense Reimbursement, (iii) Setting Bid Deadline, Auction And Sale Approval Hearing Dates, (iv) Establishing Notice Procedures And Approving Forms Of Notice, And (v) Approving Procedures Related To Assumption And Assignment Of Executory Contracts And Unexpired Leases* [ECF #291] (the "Bidding Procedures Motion").

[3] The *Order (i) Approving Procedures In Connection With The Sale Of Substantially All Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests, (ii) Authorizing The Payment Of Breakup Fee And Expense Reimbursement, (iii) Setting Bid Deadline, Auction And Sale Approval Hearing Dates, (iv) Establishing Notice Procedures And Approving Forms Of Notice, And (v) Approving Procedures Related To Assumption And Assignment Of Executory Contracts And Unexpired Leases* [ECF #351].  This Court entered the *Ex Parte Order Amending the Bidding Procedures Order* on October 25, 2013 [ECF #365], amending paragraph 5 to reflect that the Debtor may serve its existing clients by E-mail and Correcting Exhibit 2, the Bidding Procedures.

[4] The Debtor mailed the Sale Notice to the vast majority of required parties within three days of entry of the Bidding

9.      In accordance with the Bidding Procedures, the Debtor will cause Notice of Assignment and Cure (as defined in the Bidding Procedures Order) to be served on all parties to the Assigned Contracts on or before November 7, 2013 and will cause evidence of such service to be filed with this Court.  The Notice of Assignment and Cure will list, among other things, the proposed Cure Costs, if any, to be paid in connection with the assumption and assignment of the Assigned Contracts pursuant to the Stalking Horse APA.

10.      Pursuant to the Bidding Procedures Order, service of the Sale Notice constituted service of this Motion and the proposed Sale pursuant to the Stalking Horse APA.

11.      Pursuant to the Bidding Procedures Order, the proposed Sale pursuant to the Stalking Horse APA is subject to higher and better offers.  An auction (the "Auction") may be held on November 20, 2013, if competing and Qualified Bids (as defined in the Bidding Procedures Order) are submitted in accordance with the Bidding Procedures Order.  This Court has scheduled a hearing to consider the Sale and the relief requested in this Motion (the "Sale Hearing") for November 22, 2013, at 9:30 a.m.

## MARKETING EFFORTS

12.      On July 24, 2013, the Debtor retained Bayshore Partners, LLC ("Bayshore") as its investment banker to assist the Debtor in evaluating its strategic and financial alternatives with respect to a possible merger, sale or recapitalization of its business and related assets as a going concern outside of bankruptcy. In this regard, Bayshore began a process to identify potential buyers of the Debtor's business (the "Sale Process").

13.      Bayshore, and the Debtor's own management, have since conducted an extensive

---

Procedures Order, as provided for in the Bidding Procedures Order. The Debtor did not mail Sale Notice to some non-Debtor parties to non-disclosure agreements until five days after entry of the Bidding Procedures Order. The Debtor submits that this short delay did not prejudice any such parties.

marketing process, focused on identifying both strategic and financial buyers for the Debtor's business.  Bayshore contacted approximately 223 parties, 50 of which signed confidentiality agreements and reviewed a Confidential Information Memorandum ("Memorandum") which contained detailed information regarding the Debtor's business, historical and projected financial performance, strategy, and growth potential.

14.      Eleven parties subsequently submitted written indications of interest to purchase the assets of the business.  TransUnion Holding Company, Inc. ("TransUnion") presented a written indication of interest to purchase (through an affiliate) substantially all of the Debtor's assets.  The Debtor's Board of Managers, in its discretion, and in consultation with Bayshore, determined that this proposal was the highest and best offer received, to date, resulting in the most benefit to creditors and the estate.

15.      The Debtor and TransUnion diligently and at arms-length negotiated the terms of an asset purchase agreement, which has resulted in the execution of the Stalking Horse APA.

16.      The Debtor has continued to engage other potential bidders in accordance with the terms of the Bid Procedures Order.

## SUMMARY OF THE STALKING HORSE APA[5]

17.      **The Stalking Horse APA does not contemplate the sale of personally identifiable consumer information within the meaning section 363(b) of the Bankruptcy Code.**

18.      A summary of the Terms of the Stalking Horse APA are as follows:

---

[5] The summaries in this Motion of the Stalking Horse APA, including all schedules and exhibits thereto, the Bidding Procedures Order, and any other documents, orders, or agreements referenced in this Motion (the "Transaction Documents") are qualified in their entirety by the actual terms of the Transaction Documents.  Reference should be made to the actual terms and conditions of the Transaction Documents, and in the event of any inconsistency between the summaries in this Motion and the terms of the Transaction Documents, the terms of the Transaction Documents shall govern.

a.      **The Acquired Assets—Section 1.1(a)**. Upon and subject to the terms and conditions of the Stalking Horse APA, TransUnion Acquisition Corp. (the "Buyer") shall purchase from the Seller, and the Seller shall sell, transfer, convey, assign and deliver to the Buyer, at the Closing (as defined in Section 1.5(a)), free and clear of all Interests other than the Assumed Liabilities and for the Aggregate Purchase Price, all of the Seller's right, title and interest throughout the world in and to all of the assets of the Seller existing as of the Closing, whether tangible or intangible, real, personal or mixed, with the sole exception of the Excluded Assets (collectively, the "Acquired Assets").   The Acquired Assets shall include, without limitation, all of the Seller's right, title, and interest in and to the following:

i.      All machinery, equipment, furniture, furnishings, fixtures, leasehold improvements and other tangible personal property including, without limitation, such of the foregoing set forth on the fixed asset property listing provided by Seller to the Buyer which is set forth as Schedule 1.1(a)(i) to the Stalking Horse APA, including the tangible personal property owned by TLO/CB, LLC to be transferred to Seller prior to Closing pursuant to Section 4.15.

ii.     All (A) patents, patent applications, patent disclosures and all related continuation, continuation-in-part, divisional, reissue, re-examination, utility model, certificate of invention and design patents and patent applications, design registrations and applications for design registrations, (B) trademarks, service marks, logos, tradenames and corporate names and registrations and applications for registration thereof, (C) copyrights and registrations and applications for registration thereof, including moral rights of authors, (D) computer software and documentation, including all source code, object code and works-for-hire, (E) trade secrets and confidential business information, whether patentable or non-patentable and whether or not reduced to practice, know-how, manufacturing and product processes and techniques, research and development information, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information, Data (defined below), internet domain name registrations, and internet protocol addresses, (F) other proprietary rights relating to any of the foregoing (including, without limitation, remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions), and (G) copies and tangible embodiments thereof, including all books or records related thereto (collectively, "Intellectual Property").   The Intellectual Property shall include, but not be limited to, the items set forth on Schedule 1.1(a)(ii) to the Stalking Horse APA (the "Intellectual Property Listing") which lists each patent, copyright registration, trademark, service mark, trade name and registration of a trademark, service mark or trade name and any other registration which has been issued to or is otherwise owned by the Seller with respect to any of its Intellectual Property, identifies each pending patent, copyright, trademark, service mark or trade name application which the Seller has made or is otherwise owned by the Seller with respect to any of its Intellectual Property, identifies all computer software owned by the Seller, including names and functional descriptions of each software system and of each material

6

component or module thereof, and identifies each license or other agreement pursuant to which the Seller has granted any rights to any third party with respect to any of its Intellectual Property.

       iii.     Any right that the Seller has to sue for past, present or future infringement, misappropriation or violation of rights relating to the Intellectual Property and to retain any damages and profits due or accrued (the "Intellectual Property Claims").

       iv.     Any right that the Seller has (a) to collect royalties and other payments under or on account of any of the Intellectual Property and (b) to collect or receive royalties pursuant to 11 U.S.C. §365(n) (the "Acquired Royalties").

       v.     All invention assignment agreements.

       vi.     All books and records related to the Intellectual Property.

       vii.     All rights to assert any attorney-client privilege and attorney work-product protection of Seller or associated with the Acquired Assets.

       viii.     Any and all data and information (collectively, the "Data") licensed, obtained, or otherwise received, developed, generated or recorded, by Seller, including but not limited to any and all copies, reproductions, embodiments or versions of any information or data (whether in electronic, human or machine readable or executable form or any other format) in the possession, custody or control of the Seller or its representatives, or that the Seller or its representatives otherwise has the right to access.

       ix.     The rights under all (A) agreements and other contracts, (B) instruments, (C) licenses and sublicenses and (D) leases (for real and personal property) of the Seller, in each case, that are set forth on Schedule 1.1(a)(ix) to the Stalking Horse APA as of the Closing (collectively, the "Assigned Contracts").

       x.     All rights under any contract under which the counterparty or counterparties agree or have agreed not to compete with the operations or property of the Seller, agree or have agreed not to solicit the employees of the Seller, or agree or have agreed to maintain the confidentiality of confidential information regarding the Seller, without regard to whether any such contract is an Excluded Asset (defined below).

       xi.     All guaranties, warranties, representations, indemnities and similar rights in favor of Seller to the extent related to any Acquired Asset.

       xii.     All causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by Seller related to the Acquired Assets, the Assumed Liabilities (defined below) or the ownership, use, function or value of any Acquired Asset, whether arising by way of counterclaim or otherwise (the "Acquired Causes of Action"), including without limitation any such Acquired

Causes of Action against any counterparties to any of the Assigned Contracts, customers of the Seller, and vendors or suppliers to the Seller.

xiii.    All permits, licenses, registrations, certificates, orders, approvals, franchises, variances and similar rights used by the Seller (collectively, "Permits") issued by or obtained from any governmental, regulatory or administrative authority or agency, court or arbitrational tribunal (a "Governmental Entity") to the fullest extent such Permits are transferable under applicable law.

xiv.    All accounts receivable and other rights to payment from customers of the Seller, counterparties to the Assigned Contracts, or any other third party, for work in progress, goods sold, or services rendered from and after the Closing Date (the "Acquired Receivables").

xv.    All books, records, files, documents, correspondence, lists (including customer and prospect lists), procedural manuals, Intellectual Property records, engineering drawings or specifications, advertising and promotional materials, studies, reports and other printed, written or recorded materials (whether in electronic, human or machine readable or executable form or any other format) relating to any of the Acquired Assets or any of the Assumed Liabilities (collectively, the "Books and Records").

xvi.    All goodwill of the Seller relating to any of the Acquired Assets.

xvii.    Any other assets of the Seller (other than (A) contracts and agreements, (B) instruments, (C) licenses and sublicenses and (D) leases (for real and personal property) that are not otherwise Assigned Contracts as set forth in clause (ix) above) used or useful in the conduct of the Business or the CPS Services (as defined below).  "Business" means the Seller's business as currently conducted or currently proposed to be conducted except for the CPS Services, including, but not limited to, providing investigative and risk management tools for uses including due diligence, threat assessment, identity authentication, location services, asset identification, asset recovery, fraud prevention and detection, legislative compliance, and debt recovery through third party and proprietary database access and proprietary linking and assessment algorithms, including the TLOxp® Online Investigative System, and any other for-profit business of the Seller as currently conducted or currently proposed to be conducted.

b.    **The Excluded Assets—Section 1.1(b)**.  The Acquired Assets do not include the following assets (collectively, the "Excluded Assets"):

i.    the limited liability company articles of organization and operating agreement, qualifications to conduct business as a foreign limited liability company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, Tax returns, seals, minute books, membership interest transfer books and other documents relating to the

8

organization and existence of the Seller or its direct or indirect subsidiaries ("Subsidiaries");

ii.     all of the rights of the Seller under the Stalking Horse APA or the Ancillary Agreements (for purposes of this Agreement, "Ancillary Agreements" shall mean the bill of sale and other instruments of conveyance referred to in Section 1.5(b)(ii), and the instrument of assumption and other instruments referred to in Section 1.5(c)(iii), and all other agreements, instruments and other documents executed in connection with the Stalking Horse APA);

iii.     all avoidance actions of Seller's bankruptcy estate arising under the Bankruptcy Code, including §§542 through 550 of the Bankruptcy Code, and any claims or causes of action available to the Seller's bankruptcy estate or parties in interest against Technology Investors, Inc. ("Tech. Inc.") including for re-characterization of debt to equity; provided, however, that on and after the Closing, Seller and its bankruptcy estate shall not prosecute, or continue the prosecution of, any avoidance action against (a) Buyer or any employee, officer, director or Affiliate (as defined in Section 2.13) of Buyer, (b) any counter-party to any Assigned Contract, or any customer of, or supplier or vendor to, the Business, or (c) any other person or entity where that Buyer reasonably determines that the avoidance action could interfere with Buyer's peaceful and profitable enjoyment of the Acquired Assets;

iv.     any and all capital stock or other equity interest owned by the Seller in any direct or indirect Subsidiary, except as provided in Section 6.10;

v.     any and all refunds or rights to refunds from any federal, state, local or foreign taxing authority arising out of the Seller's operations and activities at any time prior to the Closing;

vi.     all contracts, agreements, instruments, licenses, sublicenses or leases that are not Assigned Contracts;

vii.     all originals and copies of the items set forth in Section 1.1(a)(xv) to the Stalking Horse APA to the extent they relate solely to the Excluded Assets or the Retained Liabilities or, except in the case of Intellectual Property, are the subject of attorney-client privilege between the Seller and its attorneys or work-product protection or privilege (the Seller specifically reserving and not waiving any and all such attorney-client privileges or work-product protection or privilege), all employee-related or employee benefit-related files or records, and any other books and records that Seller is prohibited from disclosing or transferring under applicable law or is required by applicable law to retain;

viii.     all insurance policies on the life of Hank Asher and all claims and rights thereunder, including, without limitation, all rights to proceeds thereunder;

ix.     all insurance policies of Seller;

x.      all cash and cash equivalents owned by Seller;

xi.      all accounts receivable and other rights to payment that are not Acquired Receivables;

xii.      all claims of the Seller against Seller's officers, directors and professional advisors, except for any such claims against any of Seller's officers or directors that become officers, directors or employees of Buyer; and

xiii.      all additional causes of action, lawsuits, judgments, claims and demands available to or being pursued by Seller, other than those set forth in Section 1.1(b)(xii) and the proviso to Section 1.1(b)(iii)), to the extent relating to any Excluded Assets or Retained Liabilities including, without limitation, the pending lawsuit relating to the insurance policy on the life of Hank Asher.

c.      **Assumed Liabilities—Section 1.2**.  Upon and subject to the terms and conditions of the Stalking Horse APA, the Buyer shall assume and become responsible for, from and after the Closing, all of the Assumed Liabilities set forth in Section 1.2, which include, *inter alia*, the following:

i.      all obligations and liabilities of the Seller under any Assigned Contract set forth on <u>Schedule 1.1(a)(ix)</u> that accrue and are required to be performed from and after the Closing, provided that as of the date such Assigned Contract is assigned to the Buyer, the Seller has not breached (with or without notice or lapse of time, or both) and is not in default thereunder (other than because of a provision of the type set forth in 11 U.S.C. § 365(e)), or any such breach or default, as applicable, has been cured by the Seller as of the Closing;

ii.      the liabilities and obligations set forth on Schedule 1.2(a)(iii), provided, that the Office Lease with BRE/Boca Corporate Center, dated August 18, 2008, as amended (the "BRE Lease"), is assumed by, and assigned to, Buyer at Closing as an Assigned Contract;

iii.      those trade accounts payable of the Seller relating to products or services provided by the Seller following the filing of the Bankruptcy Case by any counterparty to an Assigned Contract and set forth on Schedule 1.2(a)(iv) (the sum of the amounts of such accounts payable, the "<u>Assigned AP Amount</u>"), which Schedule 1.2(a)(iv) shall be mutually agreed by the Parties and delivered at Closing; and

iv.      any out-of-pocket costs or expenses incurred in connection with deinstalling and removing Data at the leased premises located in Boca Raton, Florida not purchased by Buyer.

d.      **Aggregate Purchase Price—Section 1.3.**  The aggregate purchase price (the "Aggregate Purchase Price") to be paid by the Buyer to the Seller for the Acquired Assets shall be:

       i.     $105,000,000, which is comprised of the sum of (x) $94,000,000, payable in cash at the Closing from the Buyer plus (y) $10,000,000 payable in cash at the Closing from the Deposit[6], in each case by wire transfer or other delivery of immediately available funds to the Seller, plus (z) $1,000,000 that Buyer will deposit (the "AP Reimbursement Escrow") in cash into an interest-bearing escrow account established pursuant to the terms of the Escrow Agreement attached as Exhibit A to the Stalking Horse APA ("Escrow Agreement") among Buyer, Seller and Wells Fargo Bank, National Association, a national banking association, as escrow agent (the "Escrow Agent") (the "Cash Purchase Price"), *provided, however*, notwithstanding anything to the contrary contained in the Stalking Horse APA, Buyer shall be entitled to a credit against the Cash Purchase Price equal to the sum of the Assigned AP Amount and the Deferred Revenue Amount[7], and Seller shall be entitled to an upward adjustment to the Cash Purchase Price equal to the AP Credit[8]; and

       ii.    the assumption by the Buyer at Closing of the Assumed Liabilities, including, without limitation, the Assigned AP Amount and the obligations arising after the Closing Date under the Assigned Contracts.

     e.    **Assigned Contracts—Section 1.6**.  The Assigned Contracts are set forth on Schedule 1.1(a)(ix).  The Approval Order will provide for the assumption by Seller and the sale and assignment to Buyer, effective upon the Closing, of the Assigned Contracts such that as of the Closing, Seller shall assume pursuant to Section 365(a) of the Bankruptcy Code, and sell and assign to Buyer pursuant to Sections 363(b), (f) and (m) and Section 365(f) of the Bankruptcy Code, each of the Assigned Contracts.  All Cure Costs, as finally determined by the Bankruptcy Court, shall be paid by the Seller (except as provided in Section 6.7 with respect to executory contracts or unexpired leases not listed as on Assigned Contract on Schedule 1.2(a)). Buyer will use commercially reasonable efforts to provide, to the extent necessary, evidence of its ability to provide adequate assurance of future performance to the other party to each Assigned Contract, whether or not there has been a default under the Assigned Contract, as may be required by Section 365 of the Bankruptcy Code.

---

[6] Contemporaneously with the execution of the Stalking Horse APA, Buyer deposited $10,000,000 in cash into an interest-bearing escrow account established pursuant to the terms of the Escrow Agreement (defined below).

[7] "Deferred Revenue Amount" means as of the Closing, the amount, if any, equal to the aggregate Deferred Revenue (as defined below) attributable to the Assigned Contracts that are fully assigned to the Buyer at Closing, which Deferred Revenue is set forth on Schedule 1.3(a), as amended by Seller as of the Closing, and consented to by Buyer.  "Deferred Revenue" means cash received by the Seller on or before the Closing for products or services not provided or rendered prior to the Closing (which for products or services billed as a fixed amount for any period that begins prior to and ends after the Closing shall be determined by reference to the number of days in such period prior to the Closing in proportion to the number of days in such period).

[8] "AP Credit" means, as of the Closing, the amount, if any, equal to the aggregate of all deposits held by, and all prepayments attributable to periods on or after the Closing paid to, any counterparty to an Assigned Contract that is assigned to the Buyer at Closing, which AP Credit is set forth on Schedule 1.3(b), as amended by Seller as of the Closing, and consented to by Buyer (which for prepayments with respect to products or services billed as a fixed amount for any period that begins prior to and ends after the Closing shall be determined by reference to the number of days in such period on or after the Closing in proportion to the number of days in such period).

     f.    **Closing Conditions—Sections 5.1 and 5.2**.  The conditions to Buyer's obligations to close are set forth in Section 5.1.  The conditions to Seller's obligations to close are set forth in Section 5.2.

     g.    **Transfer for Child Protection Services—Section 1.12**.  Certain of the Acquired Assets are not currently used in the operation of the Business and are used solely by the Seller to make available to law enforcement agencies certain internet monitoring services currently offered by Seller without charge to law enforcement to identify and investigate offenders who victimize children or use the Internet to distribute child pornography (the "CPS Services").  In order to allow such CPS Services to continue, within five (5) business days following the Closing, the Buyer shall execute in favor of a newly created limited liability company to be formed prior to Closing (the "CPS LLC"), a bill of sale in substantially the form attached as Exhibit F to the Stalking Horse APA, including completed exhibits identifying the specific assets used exclusively in the CPS Services (the "CPS Assignment").  The CPS Assignment shall convey from the Buyer to the CPS LLC all right, title and interest Buyer may acquire from Seller with respect to the assets used exclusively in the CPS Services.  The Parties agree that the CPS Assignment shall not transfer any ownership rights in any software or system that is not used exclusively in the CPS Services.  In connection with the CPS Assignment the Buyer will also provide a limited use license to CPS LLC to use the software identified on Schedule 1.12 solely for the purpose of supporting the CPS Services (the "CPS License").  The Buyer consents that CPS LLC may, at any time, license the assets used in the CPS Services (including granting a one-time sublicense of the CPS License) to a newly-created non-profit organization to provide the CPS Services going forward.

## FORM OF APPROVAL ORDER

19.    The Debtor requests that this Court enter the Approval Order in the form attached hereto. Among other things, Debtors seeks entry of an order approving the sale of all the Acquired Assets by the Seller to the Buyer and the assumption and assignment by the Seller of all the Assigned Contracts to the Buyer, free and clear of any and all Interests and other liabilities of any kind or nature whatsoever (other than the Assumed Liabilities), however imposed, with any such Interests to attach only to the proceeds of the Sale of the Acquired Assets with the same priority, validity, force, and effect as they now have in or against the Acquired Assets.

20.    The form of Approval Order also provides two specific findings with respect to the Asher Estate (defined below) and Ole Poulsen, and the Debtor requests that this Court include such findings in the Approval Order.  The applicable provisions of the proposed form of

Approval Order provide in relevant part as follows:

> a.      Technology Investors Inc. ("<u>Tech. Inc.</u>") and Michael Kuzy, as the personal representative of the estate of Hank Asher (the "<u>Personal Representative</u>" of the "<u>Asher Estate</u>") (to whom notice of the Sale Motion was provided in accordance with the Bidding Procedures Order and paragraph C above), have acknowledged that all intellectual property or any of the other assets used or useful by the Debtor in the conduct of the Business of the Debtor (the "<u>Business Assets</u>"), which Business Assets were ever owned by Tech. Inc. or Hank Asher, were intended to be contributed to the Debtor, and were so contributed.    Tech. Inc. and the Personal Representative have further acknowledged that neither Tech. Inc. nor the Personal Representative, respectively, have any claim or interest whatsoever in any Business Assets.   Accordingly, the sale of all Business Assets to the Buyer as a component of the Acquired Assets shall be free and clear of all and any interests of Tech. Inc. or the Asher Estate.

> b.      To the extent that Ole Poulsen holds or asserts any interests of any kind in the [BParser code converter software] used or useful by the Debtor in the conduct of the Business (the "<u>BParser Code</u>") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided notice of and an opportunity to object to and be heard with respect to the Sale and [he did not timely file an objection][any timely filed objection has been withdrawn or overruled].

21.      Such provision are appropriate because the Debtor will cause all parties who allege an Interest in the Acquired Assets, including but not limited to the Asher Estate and Ole Poulsen, to be served with a copy of this Motion and the form of Approval Order.  All such interested parties have also been provided notice of the Sale Hearing and all relevant deadlines for objecting to the relief requested in this Motion.

### DIP LENDER OPTION

22.      Contemporaneously with the execution of the Stalking Horse APA, TransUnion and The Eliza Desiree Asher Trust under Agreement dated February 4, 1999 and The Caroline J. Asher Trust under Agreement dated February 4, 1999, as lenders (together, the "<u>DIP Lenders</u>") under (i) the Super Priority Debtor in Possession Credit Agreement, dated as of May 14, 2013 (the "<u>May 2013 Credit Agreement</u>") with the Seller and (ii) the Super Priority Debtor in

Possession Credit Agreement, dated as of August 20, 2013 (the "August 2013 Credit Agreement") (as amended by that certain Amendment to Super Priority Debtor in Possession Credit Agreement, dated as of October 23, 2013 (the "October 2013 Amendment")) with the Seller, pursuant to which the DIP lenders have made loans available to Seller (collectively, the "DIP Loan"), have entered into an Option Agreement (the "Option Agreement").  A copy of the Option Agreement is attached to this Motion as Exhibit C.

23.    Pursuant to the Option Agreement, TransUnion has provided to the DIP Lenders an option to acquire shares of TransUnion common stock, par value $0.01 per share ("TransUnion Common Stock") on the terms and subject to the conditions set forth in the Option Agreement.  As more fully described in the Option Agreement, TransUnion grants to the DIP Lenders an option to purchase TransUnion Common Stock, exercisable following the Closing under the Stalking Horse APA for a period of ten business days commencing upon the satisfaction of both (a) the consummation of the Closing and (b) the payment in full of the DIP Loan and all amounts owed by Seller to the DIP Lenders in connection with the DIP Loan; provided that this option may not be exercised in any event later than January 31, 2014.  This option shall be exercisable for up to that number of shares of TransUnion Common Stock equal to the quotient obtained by dividing (x) the principal amount of the DIP Loan (but not to exceed $6,000,000 in any event) by (y) the Market Value of the TransUnion Common Stock (with any fraction of a share so determined rounded up to the next whole share), at an exercise price per share of TransUnion Common Stock equal to the Market Value (as defined in the Option Agreement).

## RELIEF REQUESTED

### A.  SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS

24.     The Debtor seeks approval and authorization from this Court to sell "free and clear" of any claims, interests, encumbrances, except for those specifically assumed in the Stalking Horse APA, substantially all of the Debtor's assets.

25.     This Court has statutory authority to authorize the sale of substantially all of the Debtor's assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code.  The trustee (i.e., the Debtor) may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--

> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 365(f)(5); *In re Bryan*, 2013 WL4716194, *1 (Bankr. M.D.Ala. 2013)("Pursuant to 11 U.S.C. § 363(f) the trustee may sell property of the estate 'free and clear of any interest in such property of an entity other than the estate,' *provided any one of the five disjunctive conditions are satisfied*…")(emphasis added).

26.     Section 363(b)(1) of the Bankruptcy Code authorizes a Trustee to "use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing.  11 U.S.C. §§ 363(b)(1), 704(a)(1).  The standard applicable to a motion under Section 363(b)(1) of the Bankruptcy Code is whether the proposed sale serves a sound business purpose.

*In re BDK Health Management*, 1998 WL 34188241, *5 (Bankr. M.D.Fla. 1998). Courts have held that this standard is satisfied where: (1) any improper or bad faith motive, (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest. *In re Gulf States Steel Inc. of Alabama*, 285 B.R. 497, 514 (Bankr. N.D.Ala. 2002). In this instance each of the factors are met.

27.     Subject to the terms and conditions of the Stalking Horse APA, the Debtor, in the sound exercise of its business judgment, has concluded that consummation of the Sale to the Proposed Buyer (or to the highest and best bidder) will best maximize the value of the Debtor's estate for the benefit of the Debtor's creditors.

28.     To date, the purchase price offered by the Proposed Buyer is the highest and best offer for the Acquired Assets. In order to ensure the highest possible recovery for the Debtor's estate, the Debtor has required that its obligation to proceed under the Stalking Horse APA be subject to the receipt of higher and better offers through a competitive Auction of the Acquired Assets, as set forth in the Bidding Procedures Order. Accordingly, the Debtor respectfully asserts that ample business justification exists for the Sale.

29.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor will sell the Acquired Assets free and clear of all liens, claims, interests and encumbrances, except those specifically assumed in the Stalking Horse APA.

30.     The Proposed Buyer and the Debtor have negotiated the Stalking Horse APA and the transactions contemplated thereby in good faith. The Debtor requests that the Approval Order find that the Proposed Purchaser is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code. The Debtor further requests that, after the Sale Hearing

and provided that the Debtor does not deem any other Qualified Bids to be higher or better than the Qualified Bid of the Proposed Buyer (as set forth in the Bidding Procedures), this Court enter the Approval Order authorizing and approving the Stalking Horse APA and the Debtor's execution of, entry into and consummation of the Stalking Horse APA. Finally, given the Debtor's and the Proposed Buyer's interest in proceeding expeditiously, the Debtor requests that the Court waive the fourteen-day stay of the effectiveness of the Approval Order consistent with Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and the Proposed Buyer may elect to close the sale even prior to the Approval Order becoming final and non-appealable.

**B. APPROVAL OF THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

31.    This Debtor, in compliance with the Bidding Procedures Order, has served or will serve the approved Notice of Assignment and Cure on all counterparties to the Assigned Contracts.

32.    The Proposed Buyer and Debtor seek authorization from this Court to assume and assign the Assigned Contracts, subject to any timely filed objections not withdrawn, resolved or overruled at the Sale Hearing or such later date set by the Court, retaining their rights and being resolved pursuant to the terms set forth in the Bidding Procedures Order.

WHEREFORE, the Debtor, TLO, LLC respectfully request that his Honorable Court enter an order, substantially in the form of the Approval Order attached hereto granting the relief requested herein, and granting such other and further relief as this Court deems just and proper.

17

Dated: November 1, 2013

Respectfully submitted,
**FURR AND COHEN, P.A**
*Attorneys for Debtor In Possession*
2255 Glades Rd., #337 W
Boca Raton, Florida 33431
Phone: (561) 395-0500
Fax:  (561)  338-7532

By: */s/ Jason S. Rigoli*
    Robert C. Furr, Esq.
    Florida Bar No. 210854
    Email:  rfurr@furrcohen.com
    Alvin S. Goldstein, Esq.
    Florida Bar No. 993621
    E-mail:  agoldstein@furrcohen.com
    Jason S. Rigoli, Esq.
    Florida Bar No. 91990
    E-mail: jrigoli@furrcohen.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In Re:                                          Case No.  13-20853-PGH
                                                Chapter 11

TLO, LLC,

        Debtor.
_____/

**ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (OTHER THAN ASSUMED LIABILITIES), (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

Upon the *Motion For Entry Of Order: (i) Approving The Sale Of Substantially All Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances And Other Interests (Other Than Assumed Liabilities), (ii) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (iii) Granting Related Relief* (the "Sale Motion"), dated [November 1], 2013, of TLO, LLC, as debtor and debtor in possession (the "Debtor"), in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105(a), 362, 363, and 365 of title 11 of the United States Code (such title, the "Bankruptcy Code"), Rules 2002,

EXHIBIT "A"

6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>")
and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern
District of Florida (the "<u>Local Rules</u>"), for, *inter alia*, approval of (i) the sale (the "<u>Sale</u>"), free
and clear of Interests (as defined below), of substantially all assets of the Debtor (the "<u>Acquired
Assets</u>," as such term is defined in that certain asset purchase agreement, dated as of October 31,
2013 (the "<u>Stalking Horse APA</u>")[1] by and between the Debtor and TransUnion Acquisition
Corp. (the "<u>Buyer</u>")), (ii) the assumption and assignment of the Assigned Contracts, and (iii)
ancillary relief; and this Court having conducted a hearing on October 22, 2013 (the "<u>Bidding
Procedures Hearing</u>"), and having entered the "<u>Bidding Procedures Order</u>" [Docket No. 351, as
amended by Docket No. 365] approving, *inter alia*, (x) the procedures (the "<u>Bidding
Procedures</u>") used in connection with the Sale and Auction (as defined below), attached as
Exhibit 2 to the Bidding Procedures Order, (y) the form and manner of notice of the Auction and
the Sale Hearing (the "<u>Sale Notice</u>") in the form attached as Exhibit 1 to the Bidding Procedures
Order, and (z) the manner in which the notice of the assignment and proposed cure amounts for
the Assigned Contracts (the "<u>Notice of Assignment and Cure</u>") would be provided, as well as the
procedures related to the assumption and assignment of the Assigned Contracts to the Buyer;
[and this Court having held a hearing (the "<u>Stalking Horse APA Objection Hearing</u>") on
November 5, 2013 regarding any objection that the Stocking Horse APA restricted or limited
competitive bidding for the Acquired Assets (a "<u>Stalking Horse APA Objection</u>"), and having
overruled any such objection;] and the Debtor having conducted an auction ("<u>Auction</u>") on
November [20], 2013 in accordance with the terms and conditions of the Bidding Procedures and
Bidding Procedures Order; and this Court having conducted a hearing on the Sale Motion on

---

[1] Each capitalized term not defined herein shall have the meaning ascribed to such term in the Stalking Horse APA,
which has been filed on the docket of the Debtor's Chapter 11 Case as an exhibit to the Sale Motion [Docket No.
___].

November [22], 2013 (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard; and the Court having reviewed and considered the Sale Motion, the arguments of counsel, and the evidence adduced, at the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing, and all of the proceedings before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[2]

A.      This Court has jurisdiction over the Sale Motion and the Sale contemplated thereunder pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue of the Chapter 11 Case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Sale Motion are Bankruptcy Code sections 105, 362, 363 and 365, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1.

C.      The Debtor has provided timely, adequate, and sufficient notice of the Sale Motion and the relief sought therein (including, without limitations, service of the Sale Notice and the Notice of Assumption and Cure, including notice of the amount required to cure any monetary defaults and pay all actual pecuniary losses under the Assigned Contracts ("Cure Amounts"), in accordance with the Bidding Procedures Order), the Auction, the Sale Hearing, and the deadlines for filing Stalking Horse APA Objections, objections to the Bidding Procedures, the Sale and the Sale Motion by U.S. mail (or by electronic mail to TLO's

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Bankruptcy Rule 7052.

customers), in accordance with the Bidding Procedures Order.[3]  No further notice is necessary or required.  The Debtor also published, on October 28, 2013, notice of the Sale in accordance with the Bidding Procedures Order in the National Edition of *The Wall Street Journal*, the *Sun Sentinel* and the *Miami Herald*.  A reasonable opportunity to object or be heard regarding the Sale and the relief requested in the Sale Motion has been afforded to all interested parties, persons and entities.  Such notice was good and sufficient and appropriate under the circumstances, and no other or further notice is necessary or shall be required.

     D.     A Notice of Assignment and Cure has been provided to each non-Debtor party to each of the Assigned Contracts that the Debtor proposes to be assumed and assigned to the Buyer, in accordance with, and as provided by, the Bidding Procedures Order.  The service of the Notices of Assignment and Cure was sufficient under the circumstances and no further notice is necessary or shall be required in connection with the assumption and assignment of the Assigned Contracts (including establishing any cure amounts).  The non-Debtor party (or parties) to each Assigned Contract has had an adequate opportunity to object to assumption and assignment of the Assigned Contract, the cure amount set forth on the Notice of Assignment and Cure, and the provision of adequate assurance of future performance.

     E.     The Debtor has demonstrated a sufficient basis and compelling circumstances requiring it to enter into the Stalking Horse APA and assume and assign the Assigned Contracts.  Such actions constitute an appropriate exercise of the Debtor's business judgment and are in the best interests of the Debtor, its estate and creditors.  Such business reasons include, but are not limited to, the facts that (i) there is substantial risk of deterioration of the value of the Acquired

---

[3] The Debtor mailed the Sale Notice to the vast majority of required parties within three days of entry of the Bidding Procedures Order, as provided for in the Bidding Procedures Order.  To the extent that the Debtor did not mail such Sale Notice to some non-Debtor parties to non-disclosure agreements until five days after entry of the Bidding Procedures Order, this short delay did not prejudice any such parties.  The Court finds that the such notice was good, sufficient and appropriate under the circumstances.

Assets if the Sale is not consummated quickly; (ii) the Aggregate Purchase Price to be paid by the Buyer constitutes the highest or otherwise best offer for the Acquired Assets; and (iii) the Sale presents the best opportunity for the Debtor to realize the value of its business on a going concern basis and to avoid decline and decay of the Debtor's business.  Entry of this Order and all provisions hereof is a necessary condition precedent to the Buyer entering into the Stalking Horse APA.

F.      The Debtor, through its investment banker, Bayshore Partners, LLC ("Bayshore"), and own management, extensively marketed the acquired assets, both before and after the Court entered the Bidding Procedures Order.   The Debtor and its professionals conducted the marketing and sale process for the Acquired Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.   The Auction was conducted in accordance with the Bidding Procedures and the Bidding Procedures Order and afforded a full and fair opportunity for any entity to make a higher or otherwise better offer to purchase the Acquired Assets.   All creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to conduct due diligence and bid for the Acquired Assets.

G.      The Auction was conducted at arm's length, without collusion, and in good faith. After conclusion of the Auction, the Buyer was declared to have made the highest or otherwise best offer for the Acquired Assets, and the Aggregate Purchase Price to be paid by the Buyer to the Debtor constitutes the highest or otherwise best offer received by the Debtor.   Accordingly, the Buyer is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures and Bidding Procedures Order.   The Buyer has complied in all respects with the Bidding Procedures and Bidding Procedures Order.

H.     The Stalking Horse APA has been negotiated by the Debtor and the Buyer (and their respective affiliates, professionals and representatives) in good faith, at arm's length and without collusion or fraud.  The terms and conditions of the Stalking Horse APA are fair and reasonable, and the Sale is in the best interest of the Debtor, its creditors and estate.  The Buyer is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code with respect to the Sale of the Acquired Assets.

I.     The Stalking Horse APA was not controlled by an agreement between potential or actual bidders within the meaning of sections 363(n) of the Bankruptcy Code.  The Debtor and the Buyer have not engaged in any conduct that would cause or permit the Stalking Horse APA or the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

J.     The Debtor has filed on the docket of the Chapter 11 Case [Docket No. XXX] the option agreement (the "Option Agreement") between the Buyer and the lenders (the "DIP Lenders") under that certain Super Priority Debtor in Possession Credit Agreement dated May 14, 2013, as approved by this Court's orders dated May, 17, 2013 and July 15, 2013 [Docket No.'s 57, 149, 303 and 364] (as amended, the "DIP Agreement" governing the "DIP Loan").  The Option Agreement is reasonable, appropriate and in the best interests of the Debtor, its estate and creditors, and all other parties in interest, and no further notice of the Option Agreement is necessary or required.

K.     No part of the Acquired Assets constitute personally identifiable information within the meaning of sections 101(41A) and 363(b) of the Bankruptcy Code, and the appointment of a consumer privacy ombudsman is not required pursuant to section 363(b) of the Bankruptcy Code.

L.      The Buyer will be acting in good faith in consummating the Sale at any time following entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

M.      The Buyer is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

N.      Subject to entry of this Order, the Debtor has full corporate power and authority to execute and deliver the Stalking Horse APA, and to perform all of its obligations thereunder, and the Sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts has been duly and validly authorized by all corporate authority necessary for the Debtor to undertake such actions.  No consents or approvals, other than as expressly provided for in the Stalking Horse APA and the entry of this Order, are required by the Debtor to undertake such actions.

O.      The transfer of the Assumed Liabilities to the Buyer (as set forth in the Stalking Horse APA) is integral to the Stalking Horse APA and is in the best interests of the Debtor, its estate and creditors, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.  Accordingly, such transfer is reasonable, enhances the value of the Sale to the Debtor's estate and does not constitute unfair discrimination.

P.      The Assigned Contracts are integral to the Acquired Assets, and, accordingly, the assumption and assignment of the Assigned Contracts is integral to the Stalking Horse APA and Sale, and is in the best interests of the Debtor, its estate and creditors, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.  Accordingly, such assumption and assignment is reasonable, enhances the value of the Debtor's estate and does not constitute unfair discrimination.

Q.    No provision of any Assumed Contract that purports to prohibit, restrict or condition the use, consideration or assumption and assignment of any such Assigned Contract in connection with the Sale shall have any force or effect.  Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision of any Assigned Contract or other restriction purporting to prohibit such assignment or transfer.

R.    The Debtor and Buyer have met all of the requirements of section 365(b) of the Bankruptcy Code with respect to each of the Assigned Contracts.  Pursuant to the Stalking Horse APA, on or before the Closing, the Debtor shall have cured or provided adequate assurance of cure of any default existing prior to the Closing under any of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(B).    The Buyer has provided adequate assurance of its future performance of, and under, each of the Assigned Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(C).  Each non-Debtor party (or parties) to each Assigned Contract was given notice and the opportunity to object the Sale Motion and the proposed assumption and assignment of the Assigned Contract, including but not limited to, by virtue of notice of the Notice of Assumption and Cure (including without limitation, to the assignability of the Assigned Contract, to the proposed Cure Amount (if any), and adequate assurance of future performance by the Buyer) and all such non-Debtor party (or parties) are deemed to have consented to such assumption and assignment.  The Cure Amounts set forth on Exhibit [XX] hereto with respect to each Assigned Contract on such Exhibit are the sole amounts necessary

under the Bankruptcy Code sections 365(b)(1)(A) and (B) and section 365(f)(2)(A) to cure all monetary defaults and pay all actual pecuniary losses under such Assigned Contracts, subject to Buyer's rights to add or delete Assigned Contracts as provided in the Stalking Horse APA.

S.    The Debtor is the sole and lawful owner of the Acquired Assets.  The Acquired Assets constitute property of the Debtor's estate, and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.  The Sale of the Acquired Assets to the Buyer will be, as of the Closing, a legal, valid and effective transfer of such assets, and shall, at Closing, vest the Buyer with all right, title and interest to the Acquired Assets, with any Interests to attach to the consideration to be received by the Debtor in the same priority and subject to the same defenses and avoidability, if any, as of the Closing.  The Buyer would not enter into the Stalking Horse APA to acquire the Acquired Assets if the sale of the Acquired Assets were not free and clear of all Interests (other than the Assumed Liabilities), or if the Buyer would, or in the future could, be liable on account of any such Interests.  A sale of the Acquired Assets other than one free and clear of Interests would adversely impact the Debtor's estate, and would yield substantially less value for the Debtor's estate, with less certainty than the Sale. Therefore, the Sale contemplated by the Stalking Horse APA is in the best interests of the Debtor, its estate and creditors, and all other parties in interest.

T.    The Debtor may sell, convey and assign the Acquired Assets to the Buyer free and clear of all Interests, because, with respect to each creditor or entity that holds an Interest in the Acquired Assets, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)-(5) has been satisfied.  Those holders of Interests who did not object or who withdrew their objections to the Sale are deemed to have consented to the Sale Motion and Sale of the Acquired Assets to the Buyer pursuant to Bankruptcy Code section 363(f)(2).  Those holders of

- 9 -

Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f), which subsections the Debtor has satisfied.

U.      Without limiting the generality of the foregoing, Technology Investors Inc. ("Tech. Inc.") and Michael Kuzy, as the personal representative of the estate of Hank Asher (the "Personal Representative" of the "Asher Estate") (to whom notice of the Sale Motion was provided in accordance with the Bidding Procedures Order and paragraph C above), have acknowledged that all intellectual property or any of the other assets used or useful by the Debtor in the conduct of the Business of the Debtor (the "Business Assets"), which Business Assets were ever owned by Tech. Inc. or Hank Asher, were intended to be contributed to the Debtor, and were so contributed.   Tech. Inc. and the Personal Representative have further acknowledged that neither Tech. Inc. nor the Personal Representative, respectively, have any claim or interest whatsoever in any Business Assets.  Accordingly, the sale of all Business Assets to the Buyer as a component of the Acquired Assets shall be free and clear of all and any interests of Tech. Inc. or the Asher Estate.

V.      Without limiting the generality of the foregoing, to the extent that Ole Poulsen holds or asserts any interests of any kind in the [BParser code converter software] used or useful by the Debtor in the conduct of the Business (the "BParser Code") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided notice of and an opportunity to object to and be heard with respect to the Sale and [he did not timely file an objection][any timely filed objection has been withdrawn or overruled].

W.    The Sale contemplated under the Stalking Horse APA does not amount to a consolidation, merger or de facto merger of the Buyer and the Debtor and/or the Debtor's estate, there is not substantial continuity between the Buyer and the Debtor, there is no common identity between the Debtor and the Buyer, there is no continuity of enterprise between the Debtor and the Buyer, the Buyer is not a mere continuation of the Debtor or its estate, and the Buyer does not constitute a successor to the Debtor or its estate.   Other than the Assumed Liabilities expressly assumed under the Stalking Horse APA, and to the maximum extent permitted by section 363 of the Bankruptcy Code, the buyer shall acquire the Acquired Assets at Closing free and clear of all liens, claims, encumbrances, liabilities and other obligations and interests (collectively, "Interests"), and the Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, directors, officers, principals and shareholders (or equivalent) shall have no obligations with respect to any liabilities of the Debtor, including, without limitation, all "Retained Liabilities" as set forth in the Stalking Horse APA, and all "claims" (as defined in section 101(5) of the Bankruptcy Code), liens or other security interests, liabilities, interests, rights and encumbrances, mortgages, restrictions, hypothecations, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, rights of offset, contract rights, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, regulatory violations, decrees of any court or foreign or domestic governmental or quasigovernmental entity, charges or any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, reclamation rights and claims, demands, guaranties, and all other matters of any kind and nature, whether known or

unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Case and whether imposed by agreement, understanding, law, rule, equity or otherwise, and including, without limiting the foregoing: (1) any labor agreements, rights or claims; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitations, any pension plan of the Debtor; (3) any other employee, workers' compensation, occupational disease or unemployment or temporary disability related claim, including, without limitations, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988 or any similar state law, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Child Online Privacy Protection Act and Health Information Technology for Economic and Clinical Health Act, (k) state discrimination laws, (l) state unemployment compensation laws or any other similar state laws, or (m) any other state or federal benefits or claims relating to any employment with of the Debtor or any of its predecessors, affiliates or subsidiaries; (4) any bulk sales or similar law; (5) any privacy or consumer protection law (and any possible claim against the Debtor for violation thereof), (6) any federal or state tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (7) any theories of successor

- 12 -

liability, including any theories on product liability or tort grounds; (8) any environmental or other liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature arising from existing conditions on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or other state statute; (9) the Federal Trade Commission Act and the Fair Credit Reporting Act; and (10) any interests referenced in paragraphs U and V of this Order.

X.      The Buyer would not have acquired the Acquired Assets but for the foregoing protections.

Y.      The Sale is not intended to hinder, delay or defraud creditors under the Bankruptcy Code or under the laws of any state, territory, possession or the District of Columbia. Neither the Debtor nor the Buyer are or will be entering into the Sale fraudulently.

Z.      The Aggregate Purchase Price constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code or any similar state or federal law), and fair consideration under the Bankruptcy Code and under the laws of any state, territory, possession or the District of Columbia. The Stalking Horse APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Debtor's Chapter 11 Case.

AA.    The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including without limitation Bankruptcy Code

sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been or will be complied with in respect of the Sale as of the Closing.

BB.    The Debtor's sale of the Acquired Assets outside of a plan of reorganization pursuant to the Stalking Horse APA neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a chapter 11 plan of reorganization for the Debtor.  The Sale does not constitute a *sub rosa* chapter 11 plan.

CC.    Time is of the essence in consummating the Sale.  In order to maximize the value of the Debtor's assets, it is essential that the Sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts occur within the time constraints set forth in the Stalking Horse APA.  Specifically, the Sale must be approved and consummated promptly in order to preserve the viability of the business subject to the Sale as a going concern, to maximize the value to the Debtor, its estate, creditors, and all other parties in interest.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006 and the Buyer may (but in its discretion is not required) to close the Sale before this Order is final and non-appealable, in accordance with the Stalking Horse APA.

DD.    The Sale contemplated by the Stalking Horse APA is in the best interests of the Debtor and it estate, creditors, interest holders and all other parties in interest herein; and it is therefore,

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Sale Motion is granted in its entirety.

2.    All objections and responses to the Sale Motion, this Order or the relief requested (including the assumption and assignment of all Assigned Contracts) herein that have not been

overruled, withdrawn, waived, settled or otherwise resolved, are hereby overruled and denied on the merits with prejudice.

3.       Notice of the Sale Motion, the Auction, and the Sale Hearing (including without limitation, the notice provided by the Sale Notice (including without limitation the timing of such notice, as specified in footnote 3 above), and Notice of Assumption and Cure) was fair and equitable under the circumstances and complied in all respects with Bankruptcy Code sections 102(1), 363 and 365, Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007 and Local Rule 6004-1.

4.       This Court's findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures Hearing and Stalking Horse APA Objection Hearing, are incorporated herein by reference.

5.       The Stalking Horse APA and the Sale pursuant to the Stalking Horse APA are hereby approved and authorized in all respects.  The Debtor is hereby authorized and empowered and directed to enter into, and to perform its obligations under, the Stalking Horse APA and to execute and perform such agreements or documents, and take such other actions, as are necessary or desirable to effectuate the terms of the Stalking Horse APA, including, without limitation, the execution of deeds, assignments, stock powers, transfers of membership interests and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to its possession, any or all of the Acquired Assets, without any further corporate or limited liability company action or orders of this Court.

6.       The Buyer is a good faith purchaser of the Acquired Assets, free and clear of Interests, and is hereby granted and entitled to all of the protections provided to such a good faith

purchaser under section 363 of the Bankruptcy Code, and shall be entitled to such protection even before this Order becomes final and non-appealable.  Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of the Sale or any sale, transfer or assignment under the Stalking Horse APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing), and notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment shall be governed in all respects by the original provisions of this Order or the Stalking Horse APA, as the case may be.

7.      The Sale approved by this Order is not subject to avoidance or any recovery or damages pursuant to section 363(n) of the Bankruptcy Code.

8.      No part of the Acquired Assets constitute personally identifiable information pursuant to section 363(b) of the Bankruptcy Code, and no consumer privacy ombudsman need be appointed.

9.      The Debtor is authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Stalking Horse APA, any related agreements and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtor may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

10.     The Buyer shall have no obligation to proceed with the Closing until all conditions precedent to its obligations to do so have been met, satisfied or waived in accordance with the terms of the Stalking Horse APA.

11.     Upon the Closing, and to the extent provided in the Stalking Horse APA, the Debtor shall be, and hereby is, authorized, empowered, and directed, to sell the Acquired Assets and assume the Assigned Contracts and assign them to the Buyer, and this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Acquired Assets, including, without limitation, the assumption and assignment of the Assigned Contracts and/or a bill of sale or assignment transferring indefeasible title and interest in the Acquired Assets, including the Assigned Contracts, to the Buyer upon the Closing.

12.     The Sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts to the Buyer shall vest the Buyer with all right, title and interest of the Debtor to the Acquired Assets free and clear of any and all Interests and other liabilities of any kind or nature whatsoever (other than the Assumed Liabilities), however imposed, with any such Interests to attach only to the proceeds of the Sale of the Acquired Assets with the same priority, validity, force, and effect as they now have in or against the Acquired Assets.

13.     The Option Agreement is approved in its entirety, to the extent the Court's approval of the Option Agreement is necessary or required.  Notwithstanding any prior order of this Court to the contrary, at the Closing, (i) the DIP Lenders shall execute all such documents reasonably requested by the Buyer to release all liens, claims, interests and encumbrances of the DIP Lenders in, on or to the Acquired Assets, and (ii) the DIP Lenders shall be paid from the proceeds of the Cash Purchase Price paid by Buyer an amount equal to the outstanding and

unpaid obligations due and owing to them under the DIP Agreement, **provided**, **however**, that nothing contained herein shall have any impact on the $1,000,000 Carve Out (as defined in the *Order Granting Debtor's Motion to Compromise Controversy and Approve Settlement Agreement* [Docket No. 239] (the "Carve Out Order") and as provided therein) granted in favor of the holders of allowed general unsecured claims against the Debtor, with such Carve Out to be paid from the proceeds of the Cash Purchase Price paid by the Buyer to the Debtor in accordance with the terms of the Carve Out Order.

14.    The filing of the Sale Motion and the service of the Sale Notice and the Notice of Assignment and Cure in accordance with the Bidding Procedures Order shall be deemed to provide sufficient notice as to the Sale of the Acquired Assets free and clear of all Interests in accordance with Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1.  Following the Closing, no holder of any Interest with respect to the Acquired Assets may interfere with the Buyer's use and enjoyment of the Acquired Assets based on or related to such Interest, or any actions that the Debtor may take in the Chapter 11 Case and, after the Closing, no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale or other transactions contemplated by this Order.

15.    The Debtor and its estate are hereby permanently enjoined from prosecuting and continuing to prosecute and permanently waive any avoidance actions of the Debtor's bankruptcy estate arising under the Bankruptcy Code, including sections 542 through 550 of the Bankruptcy Code, against such parties and to the extent provided for in the Stalking Horse APA.

16.    The provisions of this Order authorizing the Sale of the Acquired Assets free and clear of Interests shall be self-executing, and neither the Debtor nor the Buyer shall be required

to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

17.     Notwithstanding the forgoing, as of the Closing, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to confirm the release of its liens or other security interests in the Acquired Assets, if any.  If any person or entity that has filed financing statements, mortgages, mechanics liens, *lis pendens* or other documents, instruments, notices or agreements evidencing any lien or other security interest against or in the Acquired Assets shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Acquired Assets, (a) the Debtor and/or the Buyer are authorized to execute and file such termination statements, releases, instruments of satisfaction or other documents on behalf of the person or entity with respect to the Acquired Assets, and (b) the Debtor and/or Buyer are authorized to file, register or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens or other security interests against the Acquired Assets. This Order shall be deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

18.     Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other persons and entity who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets, is hereby authorized and

- 19 -

directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse APA and this Order. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded liens or other security interests against the Acquired Assets from their records.

19.     All persons or entities, presently or after the Closing, in possession or control of any of the Acquired Assets, are directed to surrender possession or control of such Acquired Assets to the Buyer as of the Closing or at such time thereafter as the Buyer may request.

20.     To the extent provided in the Stalking Horse APA and as permitted under applicable law, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and any other governmental authorization or approval of the Debtor with respect to the Acquired Assets and the Assigned Contracts, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing. To the extent any license or permit necessary for the operation of the Debtor's business is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code, the Buyer shall apply for and obtain any necessary license or permit promptly after the Closing and such licenses or permits of the Debtor shall remain in place for the Buyer's benefit until new licenses and permits are obtained.

21.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit (as defined by section 101(27) of the Bankruptcy Code) may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of the Debtor's Chapter 11 Case or the consummation of the Sale contemplated by the Stalking Horse APA.

22.     The Aggregate Purchase Price paid by the Buyer to the Debtor pursuant to the Stalking Horse APA for the Acquired Assets and assumption and assignment of the Assigned Contracts constitutes reasonably equivalent value and fair consideration, and the Sale shall not constitute a fraudulent transfer or fraudulent conveyance under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or under the laws of any state, territory, possession or the District of Columbia.

23.     The Buyer and its Affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) are not and shall not be deemed (a) a "successor" in any respect to the Debtor or its estate as a result of the consummation of the transactions contemplated by the Stalking Horse APA or any other event occurring in the Chapter 11 Case under any theory of law or equity, (b) to have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate, (c) deemed to have a common identity with the Debtor, (d) to have a continuity of enterprise with the Debtor, or (e) to be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor.  The Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of the Debtor and/or its estate including, but not limited to, any Interest or any claim against the Debtor or against an insider of the Debtor, except as otherwise expressly provided in the Stalking Horse APA, and the Sale Motion contains sufficient notice of such limitation in accordance with Local Rule 6004-1.  Except for the Assumed Liabilities, the transfer of the Acquired Assets and the Assigned Contracts to the Buyer under the Stalking Horse APA shall not result in the Buyer and its Affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent), or the Acquired Assets, (a) having any liability or responsibility for any claim

(including, without limitation, any claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code), against, or debt of, the Debtor or an insider of the Debtor, (b) having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity whether by payment, setoff or otherwise, directly or indirectly, any Interests, or (c) having any liability or responsibility to the Debtor except as expressly set forth in the Stalking Horse APA.  In the event that Buyer elects to be treated as a successor employer under the Internal Revenue Code, or makes an election to assume, on an employee by employee basis, any liabilities with respect to former employees of the Debtor hired by the Buyer, the Buyer shall not by reason of any such election be deemed to have assumed any other liabilities or to be a successor for any other purpose.

24.    Without limiting the effect or scope of the foregoing, except to the extent expressly included in the Assumed Liabilities, as of the Closing, the Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtor or any obligations of the Debtor arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to, the Acquired Assets or the Assigned Contracts prior to the Closing.

25.    Except with respect to the Assumed Liabilities, all persons and entities, including, but not limited to, the Debtor, its employees, former employees, debt security holders, equity

holders, administrative agencies, governmental units (as defined in section 101(27) of the Bankruptcy Code), tax and regulatory authorities, secretaries of state, federal, state and local officials, lenders, contract parties, bidders, lessors, warehousemen, customs brokers, freight forwarders, carriers and other parties in possession of any of the Acquired Assets at any time, trade creditors and all other creditors, holding any Interest of any kind or nature whatsoever against or in the Debtor or in the Debtor's interests in the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Acquired Assets, the Assigned Contracts, the operation of the Debtor's business before the Closing, the Sale, or the transfer of the Acquired Assets and the assumption and assignment of the Assigned Contracts to the Buyer, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting, commencing, continuing or otherwise pursuing in any manner any action, claim or other proceeding of any kind, directly or indirectly, against the Buyer, or any Affiliates, predecessor, successors or assigns thereof and each of their respective current and former members, officers, directors, attorneys, employees, partners, principals, Affiliates, shareholders (or equivalent), financial advisors and representatives, their property or the Acquired Assets. Actions that are barred hereby include, without limitation: (a) the commencement or continuation of any action or other proceeding where the Buyer reasonably determines that such action or proceeding could interfere with Buyer's peaceful and profitable enjoyment of the Acquired Assets, (b) the enforcement, attachment, collection or recovery of any judgment, award, decree or order, (c) the creation, perfection or enforcement of any lien, claim, interest or encumbrance, (d) the assertion of any right of setoff, subrogation or recoupment of any kind, (e)

- 23 -

the commencement or continuation of any action that does not comply with, or is inconsistent with, the provisions of this Order, any actions contemplated or taken in respect hereof, or the Stalking Horse APA and (f) the revocation, termination or failure or refusal to renew any license, permit, registration or governmental authorization or approval to operate the Acquired Assets or conduct the businesses associated with such Acquired Assets.

26.     Without limiting the foregoing, as the Buyer has not assumed and is not otherwise obligated for any of the Debtor's liabilities other than the Assumed Liabilities and the Buyer has not acquired any of the Excluded Assets, all persons holding or asserting any liens, security interests or causes of action on the Excluded Assets are hereby enjoined from asserting or prosecuting such lien, security interest or cause of action against the Buyer or the Acquired Assets for any liability associated with the Excluded Assets.

27.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.  The Buyer is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the Sale based upon an arrangement made by or on behalf of the Debtor. Without further order from this Court, the Debtor is authorized and directed to pay Bayshore the Transaction Fee (as defined in Bayshore's retention agreement, and as contemplated by the *Order Granting  Debtor's Application For Authority To Retain Bayshore Partners, LLC As Investment Banker To The Debtor, Nunc Pro Tunc To July 24, 2013* [Docket No. 203] and in accordance with section 328(a) of the Bankruptcy Code) with wired funds at the Closing from the proceeds of the Sale, free and clear of any lien, claim or interest that any creditor or claimant may possess in the Acquired Assets or the proceeds received in connection with the Sale.

28.    Any amounts payable by the Debtor under the Stalking Horse APA or any of the documents delivered by the Debtor in connection with the Stalking Horse APA, including without limitation, any allowed claims for breach thereof, if any, shall be paid in the manner provided in the Stalking Horse APA without further order of this Court, and shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtor, except by written agreement with the Buyer or its successors or assigns (such agreement to be provided in the Buyer's or its successors' or assigns' respective sole discretion).

29.    The Debtor has served all of the non-Debtor parties to the Assigned Contracts, identified on the lists the Debtor has filed with this Court, by overnight courier, hand, or electronic mail, a Notice of Assignment and Cure that included (a) the title of the Assigned Contract to be assumed, (b) the name of the counterparty to the Assigned Contract, (c) any applicable Cure Amounts as determined by the Debtor, (d) that the assignee is the Buyer or its designee, and (e) the deadline by which any counterparty to the Assigned Contract must object (an "Assignment and Cure Objection") to the proposed assumption and assignment.  No other or further notice is required.

30.    Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption and assignment of the Assigned Contracts to the Buyer free and clear of all Interests pursuant to the terms set forth in the Stalking Horse APA, as modified by the terms of any amendments reached directly by the Buyer with the respective non-Debtor counterparty, are hereby approved.  The payment by the Debtor of the applicable Cure Amounts (if any) with regard to Assigned Contracts shall (a) effect a cure of all

defaults existing thereunder as of the Closing Date and (b) compensate the parties entitled to receive such Cure Amounts for any actual pecuniary loss resulting from such default.  Upon Closing, the Debtor shall have assumed the Assigned Contracts and assigned them to the Buyer, and the requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Each non-Debtor party (or parties) to each Assigned Contract is hereby forever barred, estopped, and permanently enjoined from raising or asserting against the Debtor or the Buyer, or the property of either of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated senior or subordinate) arising under or out of, in connection with, or in any way related to, any Assigned Contract, existing or having occurring as of the Closing, or arising by reason of the Closing.

31.    Except as specifically set forth in the Stalking Horse APA, the Debtor shall pay all Cure Amounts and shall be solely responsible for the payment of all Cure Amounts, as set forth on Exhibit [XX] hereto, with respect to all Assigned Contracts.  The Assigned Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms, and no default shall exist under the Assigned Contracts.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Assigned Contracts.  The assumption and assignment of each of the Assigned Contracts is deemed to be made in good faith under, and are entitled to the protections of, section 363(m) of the Bankruptcy Code.

32.     The Buyer has provided adequate assurance of its future performance under each Assigned Contract, as applicable, and within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts have been satisfied.

33.     No section or provision of any Assigned Contract that purports to (a) prohibit, restrict or condition Debtor's assumption and assignment of the Assigned Contract, including, but not limited to, the conditioning of such assignment on the consent of the non-Debtor party (or parties) to such Assigned Contract; (b) authorize the termination, acceleration, cancellation or modification of the Assigned Contract based on the filing of a bankruptcy case, the financial condition of the Debtor or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtor; or (d) provide for assignment fees, additional increases or any other fees or financial accommodations in favor of the non-Debtor party (or parties) to the Assigned Contract, or modification of any term or condition upon the assumption and assignment of an Assigned Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  All Assigned Contracts shall remain in full force and effect, without existing default(s), if any, subject only to payment of the appropriate cure amount, if any, by the Debtor.

34.     All defaults or other outstanding obligations under each Assigned Contract shall be deemed cured by the payment or other satisfaction of the applicable Cure Amount, if any, associated with the Assigned Contract, and payment by the Debtor (except as otherwise

expressly provided in the Stalking HorseAPA) of the Cure Amounts for all Assigned Contracts pursuant to the Stalking Horse APA is hereby authorized. Except for the Cure Amounts, if any, there are no other defaults existing under the Assigned Contracts.

35.     Except as provided herein, all Assignment and Cure Objections (if any) have been overruled, withdrawn, waived, settled or otherwise resolved. Any Assignment and Cure Objections as to applicable Cure Amounts that have not been resolved by the parties will heard at a later date set by the Court. The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Assigned Contract, and the Debtor may proceed with the assumption and assignment of the Assigned Contract, with the Debtor retaining sufficient funds to cure all defaults claimed by the non-Debtor counterparty, and resolve the dispute regarding the Cure Amount at a later date set by the Court.

36.     The entry of this Order constitutes the consent of each non-Debtor party (or parties) to each Assigned Contract that has not timely objected to the assumption and assignment of such Assigned Contract. Any non-Debtor counterparty to an Assigned Contract designated to be assumed and assigned to the Buyer who did not file an Assignment and Cure Objection by the deadline to do so, as set forth in the Notice of Assignment and Cure, is hereby forever barred from objecting or asserting any additional monetary or non-monetary default or Cure Amounts with respect to any such Assigned Contract, and each such Assigned Contract shall be deemed assumed by the Debtor and assigned to the Buyer as of the Closing with each non-Debtor party to such Assigned Contract deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

37.     All non-Debtor parties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not

charge the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

38.    Subject to the terms specified therein, the Stalking Horse APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtor and the Buyer, without further action or order of this Court; ***provided***, ***however***, that any such waiver, modification, amendment, or supplement does not have a material and adverse effect on the Debtor and its estate.  The Debtor and the Buyer are expressly authorized, without further order of this Court, to execute an amendment to the Stalking Horse APA to provide for the Closing to occur on one or more dates.  Any material modification, amendment, or supplement to the Stalking Horse APA that has an adverse effect on the Debtor and its estate must be approved by order of this Court following a motion on notice to all interested parties.

39.    The failure specifically to include any particular provisions of the Stalking Horse APA or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtor and the Buyer that the Stalking Horse APA and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

40.    This Order and the Stalking Horse APA shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtor and the Buyer, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtor's estate or any trustee appointed in a chapter 7 case if the Chapter 11 Case is converted from chapter 11, all creditors of any Debtor (whether known or

- 29 -

unknown), all non-Debtor parties to any Assigned Contracts, filing or officers, title agents, recording agencies, governmental departments, secretaries of state, federal, state and local officials, all other governmental units, as defined in section 101(27) of the Bankruptcy Code and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets.

41.     Nothing contained in any chapter 11 plan confirmed in the Debtor's Chapter 11 Case or any order confirming any such plan or any other order in the Debtor's Chapter 11 Case (including without limitation any order entered after any conversion of these cases into cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from, the provisions of the Stalking Horse APA or this Order and, to the extent of any such conflict, the terms of this Order and the Stalking Horse APA shall control.

42.     All Potential Bidders (as defined in the Bidding Procedures) who have executed confidentiality agreements in connection with the Auction and the Bidding Procedures shall continue to be bound by the provisions of such agreements, and such agreements shall not be terminated without further order of this Court.

43.     The Stalking Horse APA shall not be subject to rejection or avoidance under any circumstances. This Order and the Stalking Horse APA shall inure to the benefit of the Debtor, its estate, creditors, the Buyer and its respective successors and assigns.  In the event the Sale to the Buyer fails to close, the Debtor is hereby authorized to consummate a sale with the Acceptable Alternative Bidder (as defined in the Bidding Procedures and as provided therein) without further order from this Court and with all the rights and protections of the Buyer under this Order.

44.     Except as provided herein and in the Stalking Horse APA (excluding the DIP Loan, which shall be repaid from the cash consideration due to the Debtor at Closing), all rights of the Debtor's estate with respect to the allocation of consideration received from the Buyer in connection with the Sale (including, without limitation, the value of the assumption of any Assumed Liabilities) are expressly reserved for later determination by this Court.

45.     Notwithstanding Bankruptcy Rules 6004 and 6006, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Time is of the essence in closing the Sale, and the Debtor and the Buyer intend to close the Sale as soon as practicable, but in no event, any later than December 31, 2013, and in the Buyer's sole discretion, may close before this Order becomes final and non-appealable. Any party objecting to this Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing, or risk its appeal being foreclosed as moot.

46.     This Court shall retain jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Stalking Horse APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, and (b) to decide any disputes concerning this Order, the Bidding Procedures Order or the Stalking Horse APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse APA, the Bidding Procedures Order or this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Acquired Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets to the Buyer free and clear of all Interests.

47.    From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated under the Stalking Horse APA.

48.    To the extent this Order is inconsistent with any prior order or pleading in this Chapter 11 Case, the terms of this Order shall govern.  To the extent there is any inconsistency with between the terms of this Order and the terms of the Stalking Horse APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

### ###