**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:

                                        CHAPTER 11

TLO, LLC,

                                        CASE NO. 13-20853-PGH

        Debtor.

## RESPONSE AND MOTION TO STRIKE OBJECTION TO CLAIM AND JOINDER OR, IN THE ALTERNATIVE, MOTION TO OVERRULE OBJECTION TO CLAIM SUBJECT TO REFILING AS AN ADVERSARY PROCEEDING

Technology Investors, Inc. ("**Tech Inc.**") timely responds and moves this Court for an order striking the Objection to Proofs of Claim Numbers 35 and 36 Filed by Technology Investors, Inc. (Doc. No. 278) (the "Objection") filed by Thomas H. Glocer and Jules B. Kroll (the "**Claim Objectors**") and the Joinder filed by BJ4M&M, LLC (Doc. No. 419) or, in the alternative, for an Order Overruling the Objection to Claim without prejudice to refiling as an Adversary Proceeding and states as follows:

### Introduction

1.      The Claim Objectors have filed a lengthy Objection based almost exclusively on unsupported allegations by others and mischaracterizations of certain testimony at the Creditors' Meeting.  Most importantly, as detailed further below, the Objection ignores the contingent nature of the Claim Objectors alleged equity interest in the Debtor and makes no mention whatsoever of their explicit written acknowledgements of Tech Inc.'s secured debt.  For the reasons outlined further below, the Claim Objectors have requested the striking of Tech Inc.'s secured claim inappropriately and lack standing to seek such relief.

## Background

2.       The Debtor TLO, LLC (the "**Debtor**" or "**TLO**")[1] filed its voluntary petition under Chapter 11 of the Bankruptcy Code on May 9, 2013 (the "Petition Date").[2]

3.       Tech Inc. is a secured creditor of the Debtor pursuant to a Revolving Promissory Note in the amount of One Hundred Twenty-Five Million Dollars ($125,000,000.00), dated January 31, 2011, and related Security Agreement and UCC-1 Financing Statement as filed with the Florida Secured Transaction Registry.  This Revolving Promissory Note amends, restates, and replaces an existing note, between TLO as borrower and Tech Inc. as lender, dated March 31, 2009 in the original principal amount of $50,000,000.00, which as of January 31, 2011 had an outstanding amount of $50,000,000.00.  Prior to TLO filing for bankruptcy, Tech Inc. funded TLO approximately $81 million.  As further detailed in the filed Tech Inc. proofs of claims and attachments, the documentation for the TLO Loan consists of the following: Revolving Promissory Note[3], Allonge, Security Agreement, and UCC Financing Statement Instrument #201104019777.  Tech Inc. possesses a valid security interest in all of TLO's assets (the "**TLO Collateral**")[4].

---

[1] TLO is a Florida limited liability company formed on March 20, 2009 which provides risk management, due diligence, and fraud prevention information and investigative technology products to public and private sector industries, including collection agencies, financial institutions, insurance companies, and governmental and law enforcement agencies.

[2] Also on May 9, 2013, TLO's affiliate, Greencook Services, LLC, an Ohio limited liability company ("**Greencook Services**"), filed for Chapter 11 in the Southern District of Florida bankruptcy court, Case No. 13-20846-PGH (the "**Greencook Services Case**").  Like TLO, Greencook Services provides risk management, due diligence, and fraud prevention information and investigative technology products to public and private sector industries, such as collection agencies, financial institutions, insurance companies, and governmental and law enforcement agencies.

[3] Events of Default under the Revolving Promissory Note include: (i) TLO fails to pay the full amount of any sums due under this Note; (ii) TLO violates any of the terms or breaches any of the conditions of this Note; (iii) TLO is voluntarily adjudicated bankrupt or insolvent, seeks or consents to the appointment of a receiver, seeks relief under the Bankruptcy Code or other similar laws, makes a general assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they mature; or (iv) If a receiver or trustee is appointed for TLO without its consent and such appointment is not vacated within sixty (60) days, or if a petition is filed against TLO seeking relief under the Bankruptcy Code or other similar laws and such petition is not dismissed within sixty (60) days.

[4] The TLO Collateral includes the following fixtures and personal property: Accounts; As-extracted collateral; Chattel Paper; Cash Proceeds; Deposit Accounts; Documents; Electronic Chattel Paper; Equipment; Fixtures; General Intangibles; Goods; Instruments; Inventory; Investment Property; Letter-of-Credit Rights; Software; Proceeds and products of all of the

46045473v7

4.      Although the Debtor acknowledges Tech Inc.'s secured claim and lien priority,[5] the Claim Objectors objected to Tech Inc.'s claims (Claim. Nos. 35-36) on October 9, 2013 via negative notice (Doc. No. 278).  In addition, BJ4M&M, LLC filed a Joinder in the Objection on November 7, 2013 (Doc. No. 419) (the "**Joinder**").

5.      The Claim Objectors are the principals of Data Acquisition Group, LLC ("**DAG**"), which put forth an unsuccessful bid on September 25, 2013 to be a stalking horse at an auction of Debtor's assets and filed a plan of reorganization on September 27, 2013 which expressly acknowledged the secured "Tech Inc. Note."  (Doc. No. 260 at p. 2, 10.)  In addition DAG previously attempted to purchase the Tech Inc. note for total consideration of approximately $80 million.

6.      As brief background, the Claim Objectors were granted profit interests in TLO shortly prior to Hank Asher's ("**Asher**") death[6] and only months prior to the Petition Date via a letter agreement dated October 29, 2012 (the "Profits Interest Letter").  Pursuant to the Profits Interest Letter, the Claim Objectors were provided profits interests "as described in Revenue Procedure 93-27 and 2001-43"[7] in exchange for services to be rendered.

---

foregoing; All software including TLOxp, all data, intellectual property including patents, trade secrets, tradenames and trademarks, all domain names and all agreements with employees; All ownership interests in any entity, trust, or Registered Organization; All distributions, dividends, interest, and proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution for, TLO's ownership interest in any such entity, trust or Registered Organization (and any security entitlements, as defined in Section 678.1021(1)(q) of the Florida Uniform Commercial Code, with respect thereto); "Proceeds," as such term is defined in the Florida Uniform Commercial Code; and Other amounts from time to time paid or payable under or in connection with any of the foregoing.

[5] Tech Inc. is listed as a secured creditor in Schedule D in the approximate amount of $88,740,000.  Tech Inc.'s claim is not listed as contingent, unliquidated, or disputed.  The only other secured creditor listed in Schedule D is Dell Financial Services, which holds a security interest on all computer equipment.  The total amount owed to secured creditors is reported as $93,380,939.02, and the total amount owed to unsecured nonpriority creditors is reported as $16,544,609.49.  The total amount of liabilities is scheduled as $109,925,548.51.

[6] Asher died on January 11, 2013.  Michael Kuzy is the Personal Representative of the Estate of Hank Asher (the "**Asher Estate**") which owns one hundred percent (100%) of the stock of Technology Investors, Inc. ("**Tech Inc.**"), which in turn owned a 31.7955% membership interest in TLO which has increased as a result of the Price Parties settlement.  The remaining membership interests in TLO are held by approximately 38 different owners.

[7] The recipient of a profits interest generally only has a share in the future profits and appreciation in value of the company following the date of the grant.  Members other than the profits interest holder must be entitled to receive distributions

7.     Not surprisingly,  the Claim Objectors also neglect to mention their explicit acknowledgment of the validity of Tech Inc.'s in the Amended Restated Operating Agreement of TLO, LLC effective November 21, 2012 which provides as follows:

> (c)     Initial Funding.  The Members hereby agree and acknowledge that certain funding of the Company was provided in the form of loans from Tech Inc. to the Company (the "Loans") and that such Loans are secured by a pledge to Tech Inc. of the Company's assets to secure the Loans.  Each of the Members further acknowledges the terms of the Loans and the good and valuable consideration received by each of them in connection with the funding by Tech Inc. of the Loans to the Company.

(emphasis added).  Both Claims Objectors executed the Amended Restated Operating Agreement on page 34.  A true and correct copy of the Amended Restated Operating Agreement is attached hereto as Exhibit "A."  All equity holders signed this document acknowledging the loans.

### Discussion

### I.     THE OBJECTION TO CLAIM MUST BE STRICKEN BECAUSE THE REQUESTED RELIEF IS ONLY AVAILABLE THROUGH AN ADVERSARY PROCEEDING.

8.     There are two basic forms of adversary process within a bankruptcy case: "contested matters" governed by Fed. R. Bank. P. 9014 and Local Rule 9014-1 and "adversary proceedings" governed by Part VII of the Bankruptcy Rules.  Contested matter proceedings are generally designed for the adjudication of simple issues, often on an expedited basis.  *See* 9 Collier on Bankruptcy, P 9014.05 (15th ed. 1992).  "Unlike adversary proceedings, which we have described as 'full blown federal lawsuits within the larger bankruptcy case,' contested

---

at or before the liquidation at least equal to the net fair market value of the company at the time the profit interest is issued.  The letter agreement made clear that the Claim Objectors "will not be entitled to participate in such distributions or payments until the cumulative amount of such distributions and payments to all Members after the date hereof equal the September 30 Liquidation Value.  Pursuant to the Letter Agreement, the September 30 Liquidation Value of the Company means the net equity value of the Company as of September 30, 2012, being the amount (not less than zero) that would be available for distribution to the Members of the Company upon liquidation if all the assets of the Company were sold at fair market value on that date and all liabilities of the Company were discharged or provided for. . . . .  It is intended that the September 30 Liquidation Value will be established no later than December 15, 2012 by an independent valuation firm, the fees and expenses of which will be paid by the Company."

matters are quick motion and hearing type proceedings 'subject to the less elaborate procedures specified in Bankruptcy Rule 9014.' *Matter of Wood & Locker, Inc.*, 868 F.2d 139, 142 (5th Cir. 1989).

9.      Contested matters are typically reserved for less complex disputes, and Fed R. Bank. P. Rule 9014 does not provide for the automatic application of all of the  Part VII Bankruptcy Rules.   Instead, Rule 9014 provides in pertinent part as follows:

> **(c) Application of Part VII Rules.**  Except as otherwise provided in this rule, and unless the court directs otherwise, the following rules shall apply:  7009, 7017, 7021, 7025, 7026, 7028-7037, 7041, 7042, 7052, 7054-7056, 7064, 7069 and 7061.

Fed. R. Bank. P. 9014(c).  Noticeably absent from this list are Rule 7008, incorporating Fed. R. Civ. P. 8 (affirmative defenses); Rule 7013, incorporating Fed. R. Civ. P. 13 (counterclaims); Rule 7017, incorporating Fed. R. Civ. P. 17 (real party in interest) and Rules 7017-7020 and 7022, incorporating Fed. R. Civ. P. 17-20 and 22 (joinder and interpleader).  Without the availability of these Part VII Rules in the context of an adversary proceeding, the efficient litigation of any challenges to the Claim Objectors' putative interests in TLO on avoidable transfer, fraudulent transfer, or contractual rejection grounds or other potential counterclaims would not be available.

10.      In addition, the Claim Objectors seek the disallowance of both Tech Inc.'s secured and unsecured claims.  Fed. R. Bank. P. 3007(b) provides that a party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to claim.  In light of Tech Inc.'s secured claim and the Claim Objectors' request that the claim be disallowed, the Objection challenges the extent and validity of Tech Inc.'s lien.  Pursuant to Fed. R. Bank. P. 7001(2), a proceeding to determine the "validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d)" is an adversary proceeding.

11.     As a result, the Claim Objectors' decision to seek relief through a contested matter is improper.  *In re Ernest Isenhour Torralballa*, No. 08-21352 (Bankr. N.D. Ind. 2008) (concluding that as a general rule, the challenge by a Debtor to the validity of the lien of the claimant through the vehicle of an objection to claim as a contested matter is improper).  What is more, this Court has previously considered recharacterization in the proper context of an adversary proceeding.  In *In re First NLC Fin. Servs., LLC*, 396 B.R. 562 (Bankr. S.D. Fla. 2008), the debtor filed for relief under Chapter 11, and continued to operate its business as a debtor-in-possession after filing its petition. The Creditors Committee filed a Complaint, with relevant exhibits, initiating an adversary action to challenge the validity, extent, enforceability and perfection of the liens, security interests and pledges granted to the Agent for the benefit of Lenders.

12.     Furthermore, Tech Inc. will be prejudiced if this matter proceeds as a contested matter for multiple reasons.  First, Tech Inc. is subject to prejudice if the Court permits the Objection to Claim to proceed as a contested matter since a ruling on the Objection will not provide finality.  For example, even if Tech Inc. is successful, others may challenge the validity of Tech Inc.'s lien in the context of an adversary proceeding.

13.     Second, Tech Inc. is prejudiced by the amorphous nature of the Objection and the Claim Objectors' refusal to plead separate causes of action. Recharacterization is a cause of action.  *See, e.g., Herzog v. Leighton Holdings* (*In re Kids Creek Partners, L.P.*), 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997) (recognizing  recharacterization of debt as equity as a distinct cause of action).  Accordingly, the Claim Objectors should be required to plead distinct causes of action in a complaint challenging the extent and validity of Tech Inc's lien rights and should be required to plead separate counts which Tech Inc. could respond to as appropriate under the

applicable rules.  In the context of an adversary complaint, Tech Inc. could evaluate and respond accordingly to specific allegations supporting particular causes of action in separate counts, as well as any attached exhibits, and assert any available defenses or counterclaims.

14.     Third, requiring an Adversary Proceeding and setting a deadline for affected parties to join in the proceeding will promote the efficient litigation of the issue in a single proceeding and prevent the risk that Tech Inc. will be prejudiced by multiple attacks despite a successful defense of this contested matter.  As an example, another party has already filed a Joinder to the Objection (Doc. No. 419) despite the fact that Federal Rules of Bankruptcy Procedure governing joinders and interpleaders are not applicable to contested matters. Requiring that the proper parties seek relief in the context of an adversary proceeding would immediately remedy such concerns.

## II.     **TO THE EXTENT A RESPONSE ON THE MERITS IS NECESSARY, THE OBJECTION IS NOT SUPPORTED BY THE FACTS AND MOVANTS CANNOT MEET THEIR BURDEN.**

15.     Pursuant to Fed. R. Bankr. P. 3001(f), a proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim, and the Claim Objectors carry the initial burden to produce some evidence to overcome this rebuttable presumption.

16.     Here, the Claim Objectors provide no factual support for their argument that Tech Inc.'s secured loan "fails both disjunctive recharacterization tests established by the Eleventh Circuit in *N&D Prop*" (Objection at para. 21).  "It is the trustee's burden to show that the corporation was initially undercapitalized or show that the loans were made when no other disinterested lender would have extended credit.  *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990).

17.     The argument that TLO was "undercapitalized" as evidenced by the cash that "was transferred from the Claimant to the Debtor and 'reconciled' into an advance with respect to the revolving and restated promissory note" (Objection at para. 23) simply ignores the reality that Tech Inc. had previously funded prior loans to the Debtor all of which were similarly documented as loans and treated as such at all times.  Ironically, if the Claim Objectors believe they may recover on their profit interest in conjunction with the results of the contemplated sale, such a belief underscores that TLO was not undercapitalized.

18.     In addition, the bald allegation that it "is difficult, if not impossible to understand how a disinterested third party would have extended credit to the Debtor" (Objection at para. 24) fails to take into account any of the factors surrounding TLO's operations.  The Claim Objectors' bald assertion that "the borrower had virtually no stated equity capital from its equity founders" (Objection at para. 24), ignores the significant contributions of intellectual property, technology, and Asher's "sweat equity" and also fails to take into account the impact and associated goodwill inherent in Tech Inc.'s and Asher's involvement with TLO.

19.     The Claim Objectors also allege that recharacterization is warranted under the thirteen (13) factor approach adopted by other courts.  (Objection at paras. 25-26.)  This Court has noted that other courts utilize a multi-factor approach to recharacterization.  *In re First NLC Fin. Servs., LLC*, 396 B.R. 562, 568 n.7 (Bankr. S.D. Fla. 2008) (citing to *Hedged-Investments Assoc.*, 380 F.3d at 1298) (adopting the comprehensive multi-factor approach, noting that none of the factors is dispositive, and recognizing that too heavy an emphasis on undercapitalization could discourage legitimate efforts to keep a flagging business afloat).  In addition, this Court noted that "no mechanistic scoreboard" suffices and reasoned as follows:

> While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry:  the characterization as debt or equity is a court's attempt to

46045473v7

discern whether the parties called an instrument one thing when in fact they intended it as something else.  That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.  Answers lie in facts that confer context case-by-case.

*First NLC Fin. Servs.,* 396 B.R. at 568 n.7, (citing *Submicron Sys. Corp*., 432 F.3d 448, 456 (3d Cir. 2006)).

20.    However, the Claim Objectors instead ignore the actual factors utilized by various courts and attempt to intertwine their own factors which are not supported by the relevant case law.  (Objection at para. 28.)  Focusing on the actual factors cited by courts adopting a multi-factor approach, with respect to the names given to the certificates evidencing the indebtedness, it cannot be disputed that the documents identify Tech Inc.'s debt as a loan. With respect to the presence or absence of a fixed maturity date, the Revolving Promissory Note includes a January 31, 2014 maturity date.  With respect to the right to enforce payment of principal and interest, the Revolving Promissory Note calls for interest to accrue, permits Tech Inc. to sell or liquidate its collateral upon default (including the technology), and provides for attorneys fees and costs.  With respect to the intent of the parties, it is clear that the debt was intended to be a loan, which is made even more clear by the fact that other equity interests were clearly designated as such.  With respect to whether the loan proceeds were used to acquire capital assets, the Claim Objectors appear to concede that the Debtor used the funds to pay operating expenses of TLO  (Objection at para. 20) which is indicative of a loan, and not a capital contribution.  *See In re Autostyle Plastics, Inc.*, 269 F.3d 726, 752 n.37 (6th Cir. 2001) (reasoning that the use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide debt).  In addition, with respect to the

failure of the debtor to repay on the due date or to seek a postponement, the Revolving Promissory Note had not matured as of the date of Asher's death and does not mature until 2014.

21.     In summary, the Claim Objectors did not invest cash in TLO or provide other consideration for their putative equity interest in the Debtor, yet now seek equitable relief from this Court via recharacterization on the grounds that their brief involvement justifies treatment preferential to TLO's founder.  *See First NLC Fin. Servs.,* 396 B.R. at 567 (recognizing Section 105(a) as the basis for a bankruptcy court's authority to consider recharacterization).  The Claim Objectors simply ignore the significant contributions of intellectual property, technology, and a lifetime of experience and effort from Asher and Tech Inc.

22.     The Court has scheduled a December 3, 2013 status conference on the Objection. Tech Inc. hereby reserves all additional objections to the Objection to Claim.

### III.    THE CLAIM OBJECTORS LACK STANDING TO OBJECT TO THE TECH INC. CLAIM.

23.     Courts routinely cite two policy considerations for limiting the ability to object to claims.  First, the "orderly and expeditious administration of the estate" is the goal of the procedure governing objections to claims.  *In re Sinclair's Suncoast Seafood, Inc.*, 140 B.R. 588, 592 (Bankr. M.D. Fla. 1992) (Recognizing that the demands of orderly and expeditious administration have led to a recognition that the right to object is generally exercised by the trustee and citing to the Editors' Comment to Rule 3007 explaining that if "every creditor were entitled to challenge the claim of another creditor . . . an orderly administration could degrade to chaos.").

24.     Second, standing for a debtor to object is typically limited "because the debtor does not have a pecuniary interest in the distribution of the assets of the estate. … This is because an objection to a proposed distribution only affects how much each creditor will receive

and does not affect the debtor's rights." *In re Walker*, 356 B.R. 834, 848 (Bankr. S.D. Fla. 2006). While the Claim Objectors neglect to include any factual basis or substantiation to establish standing, the Claim Objectors do at least acknowledge that they must be a "party in interest" with a "pecuniary interest in the estate being administered." Creditors and debtors are not considered parties in interest unless (a) they can show that their pecuniary interests are directly affected by a possible distribution or (b) there is no trustee appointed. *See* Collier on Bankruptcy, ¶ 502.02 (Alan N. Resnick et. al. eds., 16th ed. 2009), available at LEXIS, 5-547 Collier on Bankruptcy P 502.02; *Caserta v. Tobin*, 175 B.R. 773, 774 (S.D. Fla. 1994) (applying the same rule in the context of a debtor's right to object to claims).

25.    The Claim Objectors support for their standing to seek relief appears based partly on a theory that Tech Inc. "saw it coming." For example, the Claim Objectors cite to a prior pleading for the proposition that "even the Claimant itself acknowledged that it 'anticipate[d] challenges from others including but not limited to, the Unsecured Creditors' Committee." (Objection at para. 10.) In addition, the Claim Objectors further allege that "multiple parties have indicated their intention to seek recharacterization of the Asserted Loans" and then cite to a number of allegations made by the Price Parties in early pleadings. (Objection at para. 11.) None of these references to prior pleadings filed by others are the basis for standing here. The absence of case law in which equity holders are permitted to seek the recharacterization of debt is indicative of the uniqueness of the Claim Objectors' request for relief under these facts.

26.    The Claim Objectors argue that their request for recharacterization will determine whether the Claim Objectors "and <u>all similarly situated</u> TLO equity holders (including the Claimant on account of its approximate 40% equity interest in the Debtor), sit behind approximately $20 million of prepetition debt or approximately $110 million of prepetition

debt." (Objection at para. 13.) In short, the Claim Objectors assume, without any support, that other equity holders are "similarly situated" to the Claim Objectors and ignore the reality of their contingent profit interest and associated issues.

27. Furthermore, the Claim Objectors lack constitutional standing, which is a separate inquiry from § 502(a) party in interest analysis. Florida bankruptcy courts recognize a standing analysis apart from a § 502(a) party in interest analysis. *See In re Sinclair's Suncoast Seafood, Inc.*, 140 B.R. 588, 591 (Bankr. M.D. Fla. 1992) (reasoning that having determined Sinclair is a party in interest, however, does not end the inquiry since standing requires that the person seeking an adjudication be the proper party to request that adjudication.); *Caserta*, 175 B.R. at 773, 774 (Bankr. S.D. Fla. 1994) (noting that the question of standing generally challenges whether a party is the proper one to request an adjudication of a particular issue.). Here, the Unsecured Creditors Committee currently represents dollars at stake and would be the most appropriate party to bring an adversary proceeding.

28. The Claim Objectors fail to meet constitutional standing requirements. Even in a claims objection context, "[a]nalysis of standing requires the examination of both constitutional requirements and prudential considerations." *Sinclair*, 140 B.R. at 591. The third constitutional standing requirement is that "the relief requested must be likely to redress the injury." *Id.* Here, depending on the results of the contemplated sale and the profit interest nature of the Claim Objectors' "equity" in the Debtor, the Claim Objectors' injury (potentially being "out of the money" by virtue of the Tech Inc. claim) may not be redressed even if the Tech Inc. claim is recharacterized as equity. At the very least, the Claim Objectors must present some substantiation in their pleadings.

**WHEREFORE**, Tech Inc. respectfully requests that this Court enter an order striking the Objection or, in the alternative, overruling the Objection and setting a deadline for the filing of an Adversary Proceeding by the appropriate party seeking such relief, with associated deadlines for responses and the litigation of the Adversary.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

Dated:  November 8, 2013

Respectfully Submitted,

/s/ Darren D. Farfante
Darren D. Farfante
Florida Bar No. 0097802
Scott A. Underwood
Florida Bar No. 0730041
FOWLER WHITE BOGGS P.A.
P.O. Box 1438
Tampa, FL  33601
Tel: (813) 228-7411
Fax: (813) 229-8313
Email: dfarfante@fowlerwhite.com
          scott.underwood@fowlerwhite.com
*Attorneys for Technology Investors, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the above and foregoing has been furnished to those parties registered to receive service via CM/ECF, and by U.S. Mail to the parties in interest listed on the Local Rule 1007-2 matrix attached hereto, this 8th day of November, 2013.

/s/ Darren D. Farfante
Darren D. Farfante
Florida Bar No. 0097802

46045473v7

James F. Carroll
633 S. Federal Hwy., 8th FL
Ft. Lauderdale, FL 33301

E. Cole Fitzgerald, III
515 N. Flagler Dr., #900
West Palm Beach, FL 33401

Frank E. Jaumot
Ahearn Jasco & Company
190 SE 19th Ave.
Pompano Beach, FL 33060

Jeremy C. Kleinman
325 N. LaSalle St., #625
Chicago, IL 60654

R. Lumpkin
100 SE 2nd St., 30th FL
Miami, FL 33131

Paul M. Rosenblatt
1100 Peachtree St., #2800
Atlanta, GA 30309

TW Telecom, Inc.
c/o Linda Boyle
10475 Park Meadows Dr., #400
Littleton, CO 80124

Robert L. Eisenbach, III
Cooley LLP
101 California St.
San Francisco, CA 94111

Matthew J. Williams
Gibson, Dunn & Crutcher LLP
200 Park Ave.
New York, NY 10166-0193

Joshua P. Weisser
Gibson, Dunn & Crutcher LLP
200 Park Ave.
New York, NY 10166-0193

Aileen Ma
Gibson, Dunn & Crutcher LLP
200 Park Ave.
New York, NY 10166-0193

Ronald L. Rowland
307 International Cir., #270
Hunt Valley, MD 21030

Philip D. Anker
Wilmer Cutler Pickering Hale and Dorr
  LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007

Marc M. Allanr
Wilmer Cutler Pickering Hale and Dorr
  LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007

Dennis L. Jenkins
Wilmer Cutler Pickering Hale and Dorr
  LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007

Steven A. Mayans
515 N. Flagler Dr., #900
West Palm Beach, FL 33401

David Ristaino
350 E. Las Olas Blvd., #1600
Ft. Lauderdale, FL 33301

Thomas Santoro
1101 Brickell Ave., #S-503
Miami, FL 33131

# EXHIBIT A

# TLO, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

This Amended and Restated Operating Agreement (the "Agreement"), of TLO, LLC, a Florida limited liability company (the "Company"), effective this 21ˢᵗ day of November, 2012, is entered into by and among the parties listed on the signature page hereto, and as may be amended from time to time by joinder or otherwise, each referred to individually as a "Member" and collectively as the "Members".

WHEREAS, the Company was formed pursuant to the Florida Limited Liability Company Act (the "Act") by the filing on March 20, 2009, of Articles of Organization (as such Articles of Organization may be amended from time to time, the "Articles") in the office of the Florida Department of State; and

WHEREAS, this Agreement amends and restates all prior operating agreements of the Company and any such agreements shall be of no further force or effect, including, without limitation, that certain Amended and Restated Operating Agreement effective as of September 26, 2011.

WHEREAS, capitalized terms used and not otherwise defined have the meanings ascribed to them in Appendix I, incorporated herein and made a part hereof;

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties agree as follows:

1.    **Principal Office; Registered Office and Registered Agent.**  The principal office of the Company shall initially be 4530 Conference Way South, Boca Raton, FL 33431.  The name and address of the registered agent of the Company for service of process pursuant to the Act shall be Derek A. Dubner, Esq., 4530 Conference Way South, Boca Raton, FL 33431.  The Board may, upon compliance with the applicable provisions of the Act, change the Company's principal office, its registered office or registered agent from time to time, all as determined by the Board.

2.    **Purpose; Powers; Partnership Status.**

(a)    Purpose.  The Company is formed for the purpose of engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary, advisable, convenient or incidental thereto.

(b)    Powers.  The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Act.

(c)    Partnership Status.  The Members intend that the Company shall be treated, and irrevocably consent to the treatment of the Company, as a partnership for federal and, to the extent permitted by applicable state law, state income tax purposes (but not for any other purpose), in accordance with, among other legal authorities, Sections 301.7701-1, 301.7701-2 and 301.7701-3 of the Treasury Regulations and the applicable income tax

{25410777;7}

provisions of any applicable state or local law. Accordingly, this Agreement shall be construed in a manner that ensures the Company's classification as a partnership for federal and state income tax purposes at all times, and any provision of this Agreement that would have the effect of preventing the Company from being classified as a partnership for federal and state income tax purposes shall be null and void. The Co-Managers shall take all actions, and execute, acknowledge and deliver all documents, which in the judgment of the Co-Managers, or in the opinion of counsel satisfactory to the Co-Managers, are necessary or desirable to obtain and/or maintain the Company's classification as a partnership for such purposes at all times.

3.    **Management of Company.**

    (a)    <u>Management by the Managing Board.</u>

        (i)    *Authority.* The management of the Company shall be vested in the managing board of the Company (the "Board"). Subject to the provisions of this Agreement which require the consent or approval of one or more Members, and any other limitations contained in this Agreement or imposed by non-waivable provisions of applicable law, the Board shall have the exclusive right, power and authority exercisable in its sole discretion, to manage the business and affairs of the Company, to make all decisions with respect thereto and to do any and all other acts and things necessary, proper, appropriate, advisable, incidental or convenient to effectuate the purposes of this Agreement. To the fullest extent permitted by the Act, but subject to any specific provisions hereof granting rights to the Co-Managers (including, without limitation, the rights granted to the Co-Managers under Section 3(a)(viii)) or the Members and any other limitations contained in this Agreement, the Board shall have the power to do any and all acts, statutory or otherwise, with respect to the Company or this Agreement, which would otherwise be possessed by the Members under the Act. Any action taken by the Board on behalf of the Company in accordance with the foregoing provisions shall constitute the act of and shall serve to bind the Company. The Board may delegate any or all of the foregoing powers. The Board is an agent of the Company and the members of the Board shall be the "managers" of the Company as that term is defined for purposes of the Act. The members of the Board shall only devote such time to the business and affairs of the Company as is reasonably necessary for the performance of their duties.

        (ii)    *Board Composition.* The Board shall be comprised of three individuals (the "Board Members"). The Co-Managers acting by unanimous consent may increase the Board to up to seven individuals. William H. Price and Technology Investors, Inc., a Florida corporation ("Tech Inc."), shall each have the right to designate and appoint one Board Member to sit on the Board for so long as they own an interest in the Company. The Co-Managers acting by unanimous consent shall designate and appoint the Board Members who are not designated by William H. Price and Tech Inc. Each Board Member shall hold such office until his or her earlier resignation, death or removal. Any Board Member may resign at any time by delivering a written resignation to the Company at the Company's principal place of business addressed to the Board. Each Board Member shall be subject to immediate removal at any time by the Person or Persons who designated such Board Member to sit on the Board. Any Person or Persons who has the right to designate a Board Member pursuant to this Section 3(a)(ii) shall have the right to remove and replace, at any time for any reason, the Board Member that

they designated to sit on the Board. Any vacancy in the Board shall be filled by the Person or Persons who designated the Board Member whose resignation, death or removal created the vacancy. As of the date of this Agreement, the Board shall consist of the following individuals:

- William H. Price (William H. Price's designee);

- Hank Asher (Tech Inc.'s designee); and

- Gary Schultheis.

(iii)    *Meetings.* Meetings of the Board shall be held at such times and locations as may be determined by the Co-Managers, provided that the Board shall meet at least quarterly. Notice of each meeting shall be delivered to each Board Member and shall state the place, date and time of the meeting. Notice of such meeting shall be mailed, postage prepaid, to each Board Member addressed to him or her at his or her address or usual place of business by first class mail, at least three (3) days before the day on which such meeting is to be held, or shall be sent addressed to such Board Member at such place by facsimile, electronic mail or overnight courier, or be delivered to him personally or by telephone, at least one (1) day before the time at which such meeting is to be held; provided, however, that no notice of such meeting shall be required for any meeting of the Board where all the Board Members are present at such meeting and waive notice of such meeting.

(iv)    *Action by the Board.* A majority of the Board Members shall constitute a quorum for the transaction of business. If a quorum shall not be present at any meeting of the Board, the Board Members present thereat may adjourn the meeting to another time and place. Notice of such time and place of the adjourned meeting shall be given to all of the Board Members unless such time and place were announced at the meeting at which the adjournment was taken, in which case such notice shall only be given to the Board Members who were not present thereat. At such adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called. Wherever approval by the Board is required by this Agreement, such approval shall consist of the affirmative vote of a majority of the Board Members; provided, further, that the Members expressly agree that the Board may act by unanimous vote or unanimous written consent pursuant to Section 3(a)(v), both of which shall be considered valid actions of the Board, which none of the Members may later assert as invalid, and none of the Company, any of the Members or any of their respective Affiliates may later claim or assert that any Board Member breached this Agreement by virtue of taking such action. Except as may be required under non-waivable provisions of applicable law or under other provisions of this Agreement requiring or providing for actions to be taken by the Members, the Board is hereby expressly granted the right, power and authority on such terms and conditions as they deem proper:

(A)    to decide any disputes between the Co-Managers;

(B)    to transfer or encumber all or any portion of the assets of the Company, and to purchase or lease property for Company purposes;

(C)    to take all actions appropriate to the liquidation of the Company;

(D)    to pay to the Members and/or their Affiliates any and all fees, reimbursements, interest payments and loan repayments permitted under the terms of this Agreement;

(E)    authorize or effect a dissolution, liquidation of the Company or adoption of a plan for the same under <u>Section 10</u>;

(F)    authorize or effect a sale of all or substantially all of the assets of the Company;

(G)    authorize or effect any merger, consolidation or other form of reorganization or business combination of the Company with or into another Person, or the merger, consolidation or other form of reorganization or business combination of any other Person with or into the Company, in each case to the extent that following such transaction, the Members immediately prior to such transaction own less than fifty percent (50%) of the voting power of the Securities of the surviving Person; and

(H)    authorize or effect an Initial Public Offering or other going public transaction, including a reverse merger.

(v)    *Unanimous Written Consents.*  Any action required or permitted to be taken by the Board may be taken without a meeting if all the Board Members consent in writing. If the Board acts by unanimous written consent, such written consents shall be filed with the minutes of the proceedings of the Company.  Further, one or more Board Members may participate in any meeting of the Board by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in the meeting pursuant to this <u>Section 3(a)(v)</u> shall constitute presence in person at the meeting.

(vi)    *Board Committees.*  The Board may designate one or more committees, each such committee to consist of one or more Board Members, who shall serve on such committee at the pleasure of the Board.  Each committee designated by the Board shall have and may exercise such of the powers of the Board in the management of the business and affairs of the Company as may be provided in such resolution.  Unless the Board shall otherwise provide, upon designation of any committee by the Board, such committee shall elect one of its members as chairman and shall adopt rules of procedure providing for, among other things, the manner of calling committee meetings, giving notices thereof, quorum requirements for such meetings, and the methods of conducting the same. Each committee of the Board shall keep regular minutes of its proceedings and report the same to the Board when requested to do so by the Board.  The Board may remove any member appointed to any committee at any time for any reason and replace

such committee member and also fill any vacancies on any committee. The Board may abolish any committee of the Board at any time for any reason.

(vii)    *Authority to Bind the Company*. Except for the rights of the Co-Managers under <u>Section 3(a)(viii)</u> and as otherwise specifically authorized and empowered by the Board, a Board Member, solely in his or her capacity as such, shall not be authorized to act as an agent for the Company for the purpose of its business and an act of a Board Member, including, but not limited to, the signing of an instrument in the Company's name for apparently carrying on in the ordinary course of the Company's business and executing and delivering any instrument transferring or affecting the Company's interest in real property, shall not bind the Company. A Board Member shall notify each Person with whom he or she is dealing of the foregoing limitation on such Board Member's authority.

(viii)    *Co-Managers*. William H. Price and Hank Asher shall each serve as a co-manager of the Company (each, a "<u>Co-Manager</u>" and, collectively, the "<u>Co-Managers</u>") until their respective earlier death, resignation or removal as a Board Member. Upon the death, resignation or removal from the Board of a Member who also serves as a Co-Manager, the individual designated to replace such Member on the Board in accordance with <u>Section 3(a)(ii)</u> shall also be appointed to serve as a Co-Manager until his or her earlier death, resignation or removal as a Board Member. Subject to the limitations provided in <u>Sections 3(a)(i)</u> and <u>3(b)</u>, and except as may be required under non-waivable provisions of applicable law or under other provisions of this Agreement requiring or providing for actions to be taken by the Board or one or more of the Members, the Co-Managers, acting unanimously, are hereby expressly granted the right, power and authority on such terms and conditions as they deem proper:

(A)    to operate the business of the Company;

(B)    to incur all expenditures and pay all valid obligations of the Company;

(C)    to employ agents, employees, managers, accountants, attorneys, consultants and other Persons, including Affiliates of the Members, necessary or appropriate to carry out the business and operations of the Company, and to pay fees, expenses, salaries, wages and other compensation, to such Persons:

(D)    to open bank accounts on behalf of the Company with such signatories as the Co-Managers shall deem appropriate;

(E)    to execute any and all documents or instruments of any kind which the Co-Managers deem necessary or appropriate to achieve the business purposes of the Company, including, without limitation, contracts, agreements, deeds, notes and other documents or instruments of any kind or character or amendments of any such documents or instruments;

(F)    to borrow money from individuals, banks or other lending institutions for any Company purpose, and mortgage, grant security interests in or

pledge all or any portion of the Company's assets to secure or provide for the repayment of such loans;

(G)    authorize or effect a dissolution, liquidation of any subsidiary of the Company or adoption of a plan for the same;

(H)    to take all actions appropriate to the liquidation of any of the subsidiaries of the Company;

(I)    to take advantage, on behalf of the Company, of any federal or state bankruptcy or insolvency or similar law for the relief of debtors;

(J)    to set aside from the cash receipts of the Company reserves to provide for reasonable working capital needs or other needs of the Company;

(K)    to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend, compromise, or confess judgment upon such terms as they may determine and upon such evidence as they may deem sufficient, any debt obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

(L)    to cause the Company to make or revoke any tax elections provided for under the Code;

(M)    to pay full recourse debts and obligations prior to nonrecourse debts or obligations;

(N)    to invest all funds of the Company;

(O)    to engage in any kind of activity and to perform and carry out contracts of any kind necessary to, in connection with or incidental to, the accomplishment of the purposes of the Company; and

(P)    to take any and all actions on behalf of the Company that are required or permitted to be taken by the Company under this Agreement.

(ix)    *Actions of the Co-Managers.* Any action taken by the Co-Managers pursuant to the rights, powers and authority granted to the Co-Managers under this Agreement must be approved by each Co-Manager at a meeting of the Co-Managers or in writing. The Members expressly agree that any action of the Co-Managers approved by unanimous vote or unanimous written consent of the Co-Managers constitute valid actions of the Co-Managers, which none of the Members may later assert as invalid, and none of the Company, any of the Members or any of their respective Affiliates may later claim or assert that any Co-Manager breached this Agreement by virtue of taking such action. Any action taken by the Co-Managers on behalf of the Company in accordance with the foregoing provisions shall constitute the act of and shall serve to bind the Company. The Co-Managers may delegate any or all of the rights, powers and authority granted to the Co-Managers under this Agreement. In the event the Co-Managers cannot agree on an action, the action shall be decided by the Board.

(b)     Authority of Members; Required Member Approvals.

(i)     Members To Have No Managerial Authority.  Except (A) as expressly authorized by this Agreement or the Articles, (B) as expressly required by the Act or other applicable law, (C) as set forth in the terms of any applicable employment or independent contractor agreements between the Company and any Member or (D) as otherwise delegated to a Member by the Co-Managers, the Members will have no power to participate in the management of the Company.  Unless expressly and duly authorized in writing to do so by the Co-Managers, no Member will have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit or to render it liable for any purpose.

(ii)     Actions Requiring Consent of the Members.  Notwithstanding anything to the contrary in this Agreement, neither the Board nor the Company shall take the following actions without first obtaining the Consent of the Members:

(A)     authorize or effect a dissolution, liquidation of the Company or adoption of a plan for the same under Section 10;

(B)     authorize or effect a sale of all or substantially all of the assets of the Company;

(C)     authorize or effect any merger, consolidation or other form of reorganization or business combination of the Company with or into another Person, or the merger, consolidation or other form of reorganization or business combination of any other Person with or into the Company, in each case to the extent that following such transaction, the Members immediately prior to such transaction own less than fifty percent (50%) of the voting power of the Securities of the surviving Person;

(D)     amend the Articles; or

(E)     as otherwise provided in this Agreement.

(c)     Member Meetings; Approvals.  The annual meeting of the Members shall be held at such time and date as may be fixed by or under the authority of the Board for the transaction of such business that may come before the meeting.  Special Meetings of the Members shall be held at such times and on such dates as either the Board or holders of 15% of the outstanding Member Units shall determine by notice to the Board.  Notice of each annual meeting or special meeting shall be provided by the Board to the Members at least ten (10) days prior to the date of such meeting; provided, however, that no notice of such meeting shall be required for any meeting of the Members where all such Members of the Company are present at such meeting and waive notice of such meeting.  In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act.  For purposes of obtaining any consent of the Members (or a specified percentage in interest thereof) as to any matter proposed by the Board, the Board may, in the notice seeking such consent, require a response within a specified period (which shall not be less than five (5) days).  In addition to meetings called by the Board as set forth above in this Section 3(c), the Board may, with or without formal notice, hold informal informational meetings of the

Board and one or more Members in any manner consistent with the Act at such times and on such dates as the Board may in its sole discretion determine.

    (d)    <u>Delegation; Officers</u>.

    (i)    The Co-Managers may, from time to time, unanimously designate in writing one or more third parties to act for or on behalf of the Company and for the Co-Managers. It is expressly agreed that any action taken by any such designee under or pursuant to this <u>Section 3(d)</u> shall be binding upon the Company and Co-Managers as if performed by the Co-Managers. A delegation of authority pursuant to a designation under this <u>Section 3(d)</u> shall in no case exceed the authority conferred under this Agreement on the Co-Managers.

    (ii)    Without limiting the generality of the foregoing, the Co-Managers may from time to time unanimously designate, if desired, as officers of the Company, a President, a Chief Executive Officer, a Chief Financial Officer, a Chief Operating Officer, one or more Vice Presidents, and such other officers as they determine are necessary and appropriate for the operation and administration of the Company.

    (iii)    The officers designated by the Co-Managers shall have such authority and perform such duties as the Co-Managers may, from time to time, prescribe or as may be provided in this Agreement. Each officer designated by the Co-Managers shall be subject to the oversight of the Co-Managers and to the limitations and restrictions contained in this Agreement. The officers shall perform their duties in the manner prescribed by, and in accordance with the policies and procedures adopted by, the Co-Managers from time to time.

    (iv)    Each officer shall hold office until his or her successor shall be duly designated and qualified or until his or her earlier death, resignation or removal by the Co-Managers. Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Co-Managers. Any officer may be removed at any time, and for any reason whatsoever, by the Co-Managers; provided, however, that any such removal shall be without prejudice to the contract rights, if any, of the Person so removed. Any vacancy in any office may be filled by the Co-Managers.

    (v)    Officers need not be a resident of the State of Florida or a Member. Any two or more offices may be held by the same Person, but no officer shall execute, acknowledge, or verify any instrument in more than one capacity if such instrument is required by law to be executed, acknowledged, or verified by two or more officers. The salaries and any other compensation, if any, including participation in employee benefit plans and certain fringe benefits of the officers of the Company shall be fixed from time to time by the Co-Managers.

    (vi)    The Co-Managers, the Board Members and the officers of the Company shall be reimbursed, for all reasonable expenses incurred by them in connection with the Company's business, <u>provided</u> that they submit to the Company all

reasonably appropriate expense reimbursement documents, consistent with Company policies and procedures.

(vii)   *Initial Officers.*   The Co-Managers may by unanimous consent designate individuals to serve in the capacity as the officers of the Company.  The officers may include a President, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer and Vice Presidents.

(e)   Liability and Indemnification of the Board, Co-Managers and Officers.

(i)   *Limitation on Liability.*   To the fullest extent permitted by law, the Company will indemnify, hold harmless and defend each Member, Board Member, Co-Manager, officer and their respective Affiliates, directors, officers, employees, members, managers, partners, assigns, representatives and agents (individually, an "Indemnitee") from and against any and all Damages and other amounts paid in settlement, incurred or suffered by such Indemnitee, as a party or otherwise, in connection with any threatened, pending or completed claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative, and whether formal or informal, arising out of or in connection with the business or the operation of the Company, if in each of the foregoing cases:  (A) the Indemnitee acted in good faith on behalf of the Company and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company; (B) any such action was reasonably believed to be within the scope of authority conferred on the Indemnitee by this Agreement; and (C) with respect to any criminal action or proceeding, the Indemnitee had no reasonable cause to believe his action or omission was unlawful, except that no Indemnitee shall be entitled to be indemnified in respect of any Damages incurred by such Indemnitee by reason of fraud, gross negligence or willful misconduct with respect to such acts or omissions.

(ii)   An Indemnitee will have the right to employ separate counsel in any action as to which indemnification may be sought under any provision of this Agreement and to participate in the defense thereof, but the fees and expenses of such counsel will be at the expense of such Indemnitee unless (i) the Company has agreed in writing to pay such fees and expenses, (ii) the Company has failed to assume the defense thereof and employ counsel within a reasonable period of time after being given the notice required above or (iii) the Indemnitee has been advised by Company counsel that representation of such Indemnitee and other parties by the same counsel would be inappropriate under applicable standards of professional conduct (whether or not such representation by the same counsel has been proposed) due to actual or potential differing interests between them.  It is understood, however, that the Company shall, in connection with any one such action, or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of only one separate firm of attorneys at any time for all such Indemnitees having actual or potential differing interests with the Company, unless but only to the extent the Indemnitees have actual or potential differing interests with each other.

(iii)   To the fullest extent permitted by law and subject to Section 3(e)(ii), expenses incurred by an Indemnitee in defending any claim, demand,

action, suit or proceeding subject to this <u>Section 3</u> shall be advanced by the Company before the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount unless it is determined that such Indemnitee is entitled to be indemnified therefor pursuant to this <u>Section 3</u>. An Indemnitee will not be denied indemnification in whole or in part under this <u>Section 3</u> merely became the Indemnitee had an interest in the transaction with respect to which the indemnification applies, if the transaction was not otherwise prohibited by the terms of this Agreement and the conduct of the Indemnitee satisfied conditions set forth in <u>Section 3(e)(i)</u>.

(iv)    *No Member Liability.* Any indemnification provided under this <u>Section 3</u> will be satisfied solely out of assets of the Company, as an expense of the Company. No Member will be subject to any personal liability by reason of these indemnification provisions.

(v)    *Settlements.* The Company will not be liable for any settlement of any such action effected without its written consent, but if settled with such written consent, or if there is a final judgment against the Indemnitee in any such action, the Company agrees to indemnify and hold harmless the Indemnitee to the extent provided in this <u>Section 3(e)</u> from and against any Damages by reason of such settlement or judgment.

(vi)    *Reliance on Agents.* The Board may execute any power granted, or perform any duty imposed by, this Agreement either directly or through agents, including any of its Affiliates. The Board may consult with counsel, accountants, appraisers, management consultants, investment bankers and other consultants. The Board and the officers of the Company shall be fully protected against any act or omission by the Board or officers in good faith based upon the records of the Company or upon such information, opinions, reports or statements presented to the Company by any of the other Members, officers, employees or agents or by any other Person, as to matters the Board or officer of the Company reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. The Board will not be responsible for the misconduct, negligence, acts or omissions of any such Person or of any agent, officer or employee of the Company, the Board or any of their Affiliates, except that it must use reasonable care in selecting such Persons.

(vii)    *Continuing Coverage.* Any Person who is an Indemnitee at the time of any action or inaction in connection with the business of the Company shall be entitled to the benefits of this <u>Section 3(e)</u>, regardless whether such Person continues to be within the definition of an Indemnitee at the time of such Indemnitee's claim for indemnification hereunder and such rights shall inure to the benefit of the heirs, successors, assigns and administrators of an Indemnitee.

(viii)    *No Amendment.* Notwithstanding <u>Section 13(b)</u>, no amendment or repeal of this <u>Section 3(e)</u> that adversely affects the rights of any Indemnitee under this <u>Section 3(e)</u> with respect to its acts or omissions at any time prior to such amendment or

repeal shall apply to any Indemnitee without such Indemnitee's prior express written consent.

(ix) *Survival.*  This <u>Section 3(e)</u> shall survive any termination of this Agreement.

## 4. <u>Capital Contributions; Capital Accounts; Liability of Members.</u>

(a) <u>Capital of Members.</u>

(i) Subject to <u>Section 4(a)(ii)</u>, The initial Capital Contributions that each Member made to the Company are as set forth in the books and records of the Company.

(ii) The initial Capital Account balances of Contributing Members are as set forth on <u>Schedule A</u>, based upon the net fair market values of the property contributed by such Members to the Company pursuant to, and calculated in accordance with, the Membership Interest Contribution Agreement. In the event that a Contributing Member makes a payment under Section 10.01 of the Membership Interest Contribution Agreement, the Company will treat such payment as a Capital Contribution made by such Member, and shall make an offsetting adjustment to the Capital Account balance of the such Member immediately prior to such contribution in the amount of such contribution, so that the aggregate value of such Member's contributed property remains unchanged. Solely for illustrative purposes, if a Contributing Member is required to contribute $1,000,000 pursuant to Section 10.01 of the Membership Interest Contribution Agreement, then the Capital Account balance of such Member will be reduced by $1,000,000 immediately prior to such contribution, and will immediately be increased by $1,000,000 as a result of the contribution.

(b) <u>Additional Capital/Funding.</u>  Except as otherwise provided in <u>Sections 4(b) and 8(c)</u>, no Member shall be obligated to or have the right to make loans or any additional Capital Contributions to the Company.

(i) In the event the Co-Managers, in their sole discretion, mutually determine that the Company requires debt financing or additional debt financing to conduct its activities, the Co-Managers may, in their sole discretion, arrange for such debt financing as follows:

(A) the Company may borrow funds from third-party lender(s) on such terms and conditions as are mutually approved by the Co-Managers in their sole discretion;

(B) the Company may borrow funds from any Member or from an Affiliate of any Member, on such terms and conditions as shall be mutually approved by the Co-Managers in their sole discretion (but subject to <u>Section 3(c)</u> hereof); *provided, however,* that no such borrowed funds shall be considered to be Capital Contributions for any purpose of this Agreement;

(ii)　　(A)　　In the event the Co-Managers, in their sole discretion, mutually determine that the Company requires additional capital, the Co-Managers may, upon the receipt of Consent of the Members, give notice to all of the Members (each, a "Call Notice") specifying the aggregate amount of additional Capital Contributions and terms of such additional Capital Contributions to be made to the Company at the time of such Call Notice. In such event, each Member shall have the right (but not the obligation) to make an additional Capital Contribution within 30 days after the date of such Call Notice *pro rata* in accordance with their respective Percentage Interests. If any Member fails to contribute its pro rata share pursuant to this Section 4(b)(ii)(A), all contributing Member(s) shall have the right (but not the obligation) to make further additional Capital Contributions in the amount required to fund the entire additional capital requirement of the Company contemplated by the Call Notice and all of the Members' Percentage Interests in the Company shall be redetermined taking into account the new Capital Contributions (as determined by the Co-Managers); and/or

(B)　　Subject to the provisions of Section 8(c) hereof, the Co-Managers may, in the alternative, seek additional capital from any Member, or third parties (who will be admitted as Members), on such terms and conditions as shall be approved by Consent of the Members and all of the Members' Percentage Interests in the Company shall be redetermined (by the Co-Managers) accordingly.

(c)　　Initial Funding. The Members hereby agree and acknowledge that certain funding of the Company was provided in the form of loans from Tech Inc. to the Company (the "Loans") and that such Loans are secured by a pledge to Tech Inc. of the Company's assets to secure the Loans. Each of the Members further acknowledges the terms of the Loans and the good and valuable consideration received by each of them in connection with the funding by Tech Inc. of the Loans to the Company.

(d)　　Capital Accounts.

(i)　　A separate capital account (each, a "Capital Account") shall be established for each Member and shall be maintained in accordance with applicable regulations ("Treasury Regulations") under Section 704(b) the Internal Revenue Code of 1986, as amended (the "Code"), including, without limitation, the following rules of determination and maintenance:

(A)　　Such account shall be credited with (1) the amounts of such Member's paid-in cash Capital Contributions and the amount of any other money contributed by such Member to the Company in accordance with the terms of this Agreement (including the amount of any Company liabilities assumed by such Member, other than liabilities described in the parenthetical language of clause (B)(2) of this Section 4(d)(i)), (2) the fair market value of any property contributed by such Member to the Company in accordance with the terms of this Agreement (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the

Code), (3) such Member's distributive share of Profits (or items thereof), and (4) except as otherwise set forth herein, any item of income or gain allocated to such Member pursuant to Section 7(b); and

(B)    Such account shall be debited with (1) the amount of money distributed to such Member (including the amount of such Member's liabilities that are assumed by the Company, other than liabilities described in the parenthetical language of clause (A)(2) of this Section 4(d)(i)), (2) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), (3) such Member's distributive share of Losses (or items thereof), and (4) except as otherwise set forth herein, any item of loss or deduction allocated to such Member pursuant to Section 7(b).

(ii)    Each such Capital Account shall reflect all Company Interests owned by such Member. Upon a transfer of all or a part of a Company Interest, the transferee shall succeed to the Capital Account of the transferor to the extent that such Capital Account relates to the transferred Company Interest (or portion thereof). Any reference in this Agreement to a Capital Contribution of, or distribution or allocation to, a Member that has succeeded any other Member shall include any Capital Contributions, distributions, or allocations previously made by or to the former Member on account of the Company Interest of such former Member transferred to such successor Member.

(iii)    The property of the Company shall be revalued on the books of the Company accordance with Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations at the following times: (A) immediately prior to the contribution of more than a *de minimis* amount of money or other property to the Company by a new or existing Member as consideration for an interest in the Company; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for a Company Interest; (C) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations; or (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of being a Member; provided, however, that adjustments pursuant to clauses (A), (B), and (D) above need not be made if the Co-Managers reasonably determine that such adjustments are not necessary or appropriate to reflect the relative economic interest of the Members. In the event that any Company property is revalued on the books of the Company in accordance with the Treasury Regulations, the aggregate adjustment will be taken into account in determining Profits and Losses of the Company in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. In the event that the property of the Company is revalued on the books of the Company, all Company property shall be valued for such purpose at its fair market value, as determined by the Co-Managers.

(iv)    The Members agree that, immediately prior to the Effective Date: (i) Profits or Losses for the portion of the fiscal year ending on the day immediately preceding the Effective Date (determined by using an "interim closing of the books"

method) were allocated among the Members at such time; and (ii) after the allocation of Profits or Losses under clause (i), the property of the Company was revalued on the books of the Company immediately prior to the Effective Date to reflect the fair market value of such property (the "Revaluation"). The Members agree that the resulting Capital Account balance of each Member at the Effective Date (immediately after the Revaluation and taking into account the Capital Contributions described in Section 4(a)(ii)) is the amount set forth on Schedule A attached hereto.

(v)    The provisions of this Section 4(d) are intended to comply with the Treasury Regulations and shall be interpreted in a manner consistent with such regulations. If any of the provisions of this Agreement relating directly or indirectly to Capital Account determination and maintenance at any time conflict with the Treasury Regulations, such Treasury Regulations shall govern Capital Account determination and maintenance.

(e)    Liability of Members. Except as provided in Section 4(b), the liability of a Member for the losses, debts and obligations of the Company shall be limited to its Capital Contributions theretofore made to the Company by such Member (or its predecessor in interest) which have not been previously repaid to or withdrawn by such Member (or its predecessor in interest) in accordance with the terms of this Agreement. Except as provided in Section 4(b), no Member shall have any liability to restore any negative balance in its Capital Account.

(f)    Admission of Additional Members. Subject to any restrictions or other applicable procedures imposed by Section 8 hereof, additional members may be admitted to the Company on such terms and conditions as may be specified by the Co-Managers and approved by the Consent of the Members. Except as otherwise provided below in Section 8(c), no Member shall have any preemptive or similar rights regarding the issuance of Percentages Interests merely by reason of such Member's status as a member of the Company. In connection with any such admission, including any admission due to a Transfer of all or part of a Company Interest under Section 8 hereof, Schedule A shall be amended by the Co-Managers to reflect the inclusion of the additional Member(s).

(g)    Option Plan. The Company has adopted the TLO, LLC, 2011 Option Plan, providing for the issuance of Company Interests to existing and future employees, officers, independent contractors, consultants, members of the Board and advisers of the Company and/or a Subsidiary of the Company. 15,000,000 Member Units (the "Option Plan Reserve"), are authorized and reserved for awards granted under the Option Plan. The Option Plan is administered by the Board or if delegated by the Board, the Option Plan Committee.

(h)    Issuance of Profits Interests. The Company and each Member intend that each Company Interest that is issued to Paul Fichtman and Marco Piovesan on the date hereof qualify as a "Profits Interest" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343.

5.    **Return of Contributions.** No Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any other payment in respect of such Member's Company Interest, including without limitation as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in Section 6 hereof.

6.    **Distributions.**

(a)    <u>In General</u>.  All distributions (including without limitation distributions upon liquidation of the Company) shall be made to the Members at such times and in such manner as shall be determined by the Co-Managers, as follows:

(i)    *First*, until the Unreturned Target A Amount has been reduced to zero, (A) 19% to the Contributing Members, *pro rata* in proportion to their respective Capital Percentages, and (B) 81% to the Existing Members, pro rata in proportion to their respective Percentage Interests;

(ii)    *Second*, until the Unreturned Target B Amount has been reduced to zero, (A) 19% to the Contributing Members, pro rata in proportion to their respective Capital Percentages, and (B) 81% to the Existing Members and Class I Profits Interest Members, *pro rata* in proportion to their respective Percentage Interests; and

(iii)    *Thereafter*, to the Members in proportion to their respective Percentage Interests.

(b)    In determining whether a distribution will be made, the Co-Managers may in their sole discretion pay all or any portion of any outstanding loans to the Company and may consider the Company's current and future cash needs.

(c)    <u>Distributions of Cash and Other Property</u>.  Except as the Co-Managers may otherwise determine, all distributions to Members shall be made in cash.  If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Co-Managers.  Any amounts not distributed upon liquidation of the Company pursuant to <u>Section 6(a)</u> hereof on account of expenses and reserves shall serve to reduce the distributions made to each Member pursuant to <u>Section 6(a)</u> hereof in a manner reasonably determined by the Co-Managers.  Any such reserves as remain after payment of contingent liabilities shall be distributed to the Members in the manner in which they served to reduce the distributions thereto.

(d)    <u>Tax Distributions</u>.  Each taxable year, other than upon a sale of all or substantially all of the assets of the Company or upon the liquidation of the Company, the Co-Managers shall cause the Company to make distributions, to the extent available, in an amount sufficient to enable the Members to pay all United States federal income taxes and state and local income taxes required to be paid by each Member in respect of the items of income, gain, loss, deduction and credit allocated to the Members for such taxable year, as determined in accordance with Code Section 703, and any withholding tax relating thereto, assuming each Member pays the tax at the Assumed Tax Rate (the "<u>Tax Distributions</u>").  Tax Distributions shall be superior in priority to other distributions under this Agreement, and any Tax Distributions made to a Member shall be treated as an advance of and offset the next distribution(s) due to the Member under <u>Section 6(a)</u> on a dollar-for-dollar basis and shall be deemed to have been made under the applicable provision(s) thereof.

(e)    <u>Withholding Taxes</u>.  Each Member authorizes the Company to withhold from amounts due to such Member from the Company such amounts as may be required by applicable laws. If the Company at any time and from time to time withholds and pays any

withholding tax to any federal, state, local or foreign taxing authority in respect of any income or gain allocable to or any distribution to be made to any Member, any tax so withheld shall be charged to the applicable Member's Capital Account as if an amount equal to the amount of such tax had been distributed to such Member. Each Member agrees to provide to the Company such documentation, if any, as may be required in order for such Member to qualify for an exception to, or an exemption from, any such withholding requirement.

7.    **Allocations and Certain Tax Matters.**

(a)    <u>Allocations of Income, Gain, Deduction and Loss</u>. All Profits and Losses (and, to the extent necessary, gross items of income, gain, loss and deduction) of the Company as determined for federal income tax purposes shall be allocated among the Members, and shall be credited or debited to their respective Capital Accounts in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv), so as to ensure to the maximum extent possible that such allocations satisfy the economic effect equivalence test of Treasury Regulation Section 1.704-1(b)(2)(ii)(*i*). In accordance therewith, all Profits and Losses (and, to the extent necessary, gross items of income, gain, loss and deduction) that can have economic effect shall be allocated in such a manner that the balance of each Member's Capital Account at the end of any taxable year of the Company (increased by the *sum* of (i) such Member's "share of partnership minimum gain" as defined in Treasury Regulation Section 1.704-2(g)(1) *plus* (ii) such Member's "share of partner nonrecourse debt minimum gain" as defined in Treasury Regulation Section 1.704-2(i)(5)) would be positive in the amount of cash that such Member would receive if the Company sold all of its assets for an amount of cash equal to the book value (as such term is used pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(g)) of such assets (reduced, but not below zero, by the amount of nonrecourse debt to which property is subject) and all of the cash of the Company remaining after payment of all liabilities (other than nonrecourse liabilities) of the Company were distributed in liquidation of the Company immediately following the end of such taxable year pursuant to <u>Section 6(a)</u> hereof.

(b)    (i)    *Member Nonrecourse Deductions*. Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with the Treasury Regulations. Such Members shall be specially allocated items of Company income and gain as are required by the "chargeback of partner nonrecourse debt minimum gain" requirements of the Treasury Regulations.

(ii)    *Nonrecourse Deductions*. Nonrecourse Deductions for any fiscal year shall be specially allocated to the Members in proportion to their respective Percentage Interests. Such Members shall be specially allocated items of Company income and gain as are required by the "minimum gain chargeback" requirements of the Treasury Regulations.

(iii)    *Qualified Income Offset*. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the

Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 7(b)(iii) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7 have been tentatively made as if this Section 7(b)(iii) were not in the Agreement.

(iv)     *Section 754 Adjustments.*  To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken in to account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

(v)     *Allocation of Items.*  The allocation of Profits and Losses (not including any items of income, gain, loss or deduction that are specially allocated pursuant to Section 7(b)) to any Member shall be deemed to be an allocation to that Member of the same proportionate part of each separate item of taxable income, gain, loss, deduction or credit that comprises such Profits and Losses.

(vi)     *Member Bonus Payments.*  Items of Company income and gain in an amount equal to the amount of any bonus paid by the Company to a Member for services (which bonus is not treated as a guaranteed payment pursuant to Section 707(c) of the Code) shall be specifically allocated to such Member for the fiscal year in which such bonus is received.

(c)     Section 704(c).

(i)     *Section 704(c) Allocations.*  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its value at the time of contribution to the Company.

(ii)     *Reverse Section 704(c) Allocations.*  In the event that the book value of any Company property is adjusted in accordance with the Treasury Regulations, subsequent allocations of income, gain, loss and deduction with respect to such property shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its book value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder, to the extent required by the Treasury Regulations.

(iii)    *Elections*. Any elections or other decisions relating to allocations described in Sections 7(c)(i) and (ii) shall be made by the Co-Managers in a manner consistent with the Treasury Regulations and in a manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 7(c), Code Section 704(c) and the Treasury Regulations thereunder are solely for tax purposes and shall not be taken into account for purposes of determining "Profits" or "Losses" or adjustments to Capital Accounts.

(d)    Tax Elections. Any elections or other decisions relating to allocations of income, gain, deduction, loss or credit hereunder or any other tax elections (including elections under Code Section 754) that must be made at the Company level (as opposed to by the Members) shall be made (or not made) by the Co-Managers in their sole discretion.

(e)    Company Interests Held During Portion of Taxable Year. For purposes of determining the income, gain, loss, deduction or credit, or any other items allocable to any period, such items shall be determined on a daily, monthly or other basis as determined by the Co-Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(f)    Guaranteed Payments. Any salary paid to a Member for services shall be treated as a guaranteed payment pursuant to Section 707(c) of the Code, and the resulting deduction shall be treated as an item of Company deduction included in the computation of Company Profits or Losses.

(g)    Consistent Reporting. The Members are aware of the income tax consequences of the allocations made by this Section 7 and hereby agree to be bound by the provisions of this Section 7 in reporting their distributive shares of Company income and loss for income tax purposes.

(h)    Issuance of Certain Compensatory Equity Interests.

(i)    *Election*. The Co-Managers are hereby authorized to and may, at their reasonable discretion, cause the Company to make an election to value any Company Interest issued by the Company as compensation for services to the Company (a "Compensatory Interest"), at liquidation value (the "Safe Harbor Election"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Section 1.83-3(l) of the Proposed Treasury Regulations and Internal Revenue Service Notice 2005-43 (collectively, the "Proposed Rules"). A Safe Harbor Election, once made, may be revoked by the Co-Managers as permitted by the Proposed Rules or any applicable successor rule.

(ii)    *Allocations*. The Co-Managers shall cause the Company to make allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) as necessary and appropriate to (i) conform to the treatment prescribed by the Proposed Treasury Regulations concerning "Partnership Equity for Services" as published in the Federal Register at 70 Fed. Reg. 29675 (2005), and (ii) effectuate and maintain the Safe Harbor Election, in the event such election is made.

(iii)    *Tax Returns.* The Co-Managers shall file or cause the Company to file all returns, reports and other documentation as may be required to perfect and maintain the Safe Harbor Election with respect to transfers of Compensatory Interests covered by such Safe Harbor Election, in the event such election is made.

(iv)    *Cooperation.* Each Member (including any person to whom a Compensatory Interest is transferred in connection with the performance of services), by signing this Agreement or by accepting the transfer of a Company Interest, hereby agrees to cooperate with the Co-Managers to perfect and maintain any Safe Harbor Election, and to comply with all requirements of the Safe Harbor Election with respect to all Compensatory Interests transferred while the Safe Harbor Election remains effective.

(v)    *Amendment.* The Co-Managers are hereby authorized and empowered, without further vote or action of the Members, to amend this Agreement as necessary to comply with the Proposed Rules or any applicable successor rule, in order to provide for a Safe Harbor Election and the ability to maintain or revoke the same, and shall have the authority to execute any such amendment by and on behalf of each Member; provided that such amendment does not result in disproportionately adverse treatment of any other Member as compared to the treatment of a Member holding a similar Company Interest.

(vi)    *Transfers.* No transfer of any Company Interest by a Member shall be effective unless prior to such transfer, the transferee, assignee or intended recipient of such Interest shall have agreed in writing to be bound by the provisions of this Section 7(h), in a form satisfactory to the Co-Managers.

8.    **Restrictions on Transfers and Issuances of Company Interests; Drag-Along Rights.**

(a)    Restrictions in General. No Member shall Transfer all or any portion of its Company Interest without the consent of either of the Co-Managers, which consent may be given or withheld in the Co-Managers' sole discretion and further provided, that in the event the proposed sale is to a competitor of the Company such consent shall be by unanimous written consent of the Co-Managers. Any Transfer or attempted Transfer of any Company Interest in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books, and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such Company Interest for all purposes of this Agreement.

(b)    Issuance of Company Interests. During the term of this Agreement, the Company shall not issue any Company Interests to any Person without the Consent of the Members and such Person agrees in writing to be bound by all of the provisions of this Agreement.

(c)    Preemptive Rights.

(i)    *Grant of Preemptive Rights.* If the Company proposes to issue any New Securities, the Company shall grant to each Member who then holds a Percentage Interest equal to or greater than 5% (each, a "Qualifying Member") the right to purchase

(subject to the terms and conditions of this Section 8(c)) up to that number of New Securities equal to the number of New Securities which the Company proposes to issue following the date hereof, multiplied by a fraction, the numerator of which shall be the Percentage Interest then held by such Qualifying Member and the denominator of which shall be the Percentage Interest held by all Members (the "Proportional Share"). The preemptive rights granted to the Qualifying Members pursuant to this Section 8(c) shall terminate immediately prior to an Initial Public Offering or other going public transaction, including a reverse merger.

(ii)     *Notice of Proposed Issuance.* If the Company proposes to issue New Securities, the Company shall at such time deliver to each Qualifying Member written notice of the proposed issuance that describes the amount, type and material terms of such New Securities, the proposed purchase price per New Security (the "New Securities Price") and the other material terms upon which the Company proposes to issue the New Securities, including the expected timing of such issuance, which will in no event be more than one hundred eighty (180) days or less than twenty (20) days after the date upon which such notice is given (the "Preemptive Notice"). For a period of fifteen (15) days following the delivery of the Preemptive Notice, the Company shall be deemed to have irrevocably offered to sell to each Qualifying Member the number of New Securities calculated in accordance with Section 8(c)(i) hereof at the New Securities Price and upon the terms specified in the Preemptive Notice. Each Qualifying Member may exercise such Member's preemptive rights hereunder by giving written notice to the Company (a "Preemptive Exercise Notice") within such fifteen (15) day period and stating therein the quantity of New Securities to be purchased (including any Excess New Securities such Member wishes to purchase if such securities are available) at the New Securities Price and upon the terms specified in the Preemptive Notice. If in connection with such a proposed issuance of New Securities, any Qualifying Member shall for any reason fail or refuse to give such written notice to the Company within such fifteen (15) day period, such Qualifying Member shall, for all purposes of this Section 8(c), be deemed to have refused (with respect to that particular issuance only) to purchase any of such New Securities and to have waived (with respect to that particular issuance only) all of its preemptive rights under this Section 8(c) to purchase any of such New Securities.

(iii)     *Right to Purchase Excess New Securities.* In the event that any Qualifying Member does not exercise all of its preemptive rights with respect to a particular issuance, the New Securities which were not purchased by such Qualifying Member (the "Excess New Securities") shall automatically be deemed to be accepted for purchase by the Qualifying Members who indicated in their Preemptive Exercise Notice a desire to participate in the purchase of New Securities in excess of their Proportional Share. Unless otherwise agreed by all of the Qualifying Members participating in the purchase, each Qualifying Member who indicated in its Preemptive Exercise Notice that it desired to purchase more than its Proportional Share shall purchase a number of Excess New Securities equal to the lesser of (A) the number of Excess New Securities indicated in its Preemptive Exercise Notice, if any, and (B) an amount equal to the product of (x) the number of Excess New Securities and (y) a fraction, the numerator of which is the number of Percentage Interests held at such time by such Qualifying Member and the denominator of which is the aggregate number of Percentage Interests held at such time by all Qualifying Members participating in such purchase of Excess New Securities.

Such process shall repeat until there are no longer unallocated Excess New Securities or no participants desire to purchase any such Excess New Securities. Each party to the purchase and sale of New Securities shall take all such actions as may be reasonably required by the Company to consummate the purchase and sale, including entering into such agreements and executing and delivering such documents as may be necessary or appropriate.

(iv)    *Issuance of New Securities to Third Parties*. If and to the extent that any New Securities are not acquired by the Qualifying Members entitled to subscribe for and purchase such New Securities, the Company shall be free to issue all or some of such New Securities to any Person; provided, that (A) the price per New Security at which such New Securities are being issued to and purchased by such Person is not less than the New Securities Price and (B) the other material terms and conditions pursuant to which such Person purchases such New Securities are not more favorable in any material respect than the terms set forth in the Preemptive Notice. Any New Securities not issued or sold within one hundred eighty (180) days after the date of the Preemptive Notice shall again be subject to the provisions of this Section 8(c).

(d)    Compliance with Securities Laws.    Notwithstanding anything to the contrary herein, the Company shall not issue any Company Interest, and no Member shall Transfer its Company Interest, to the extent that such issuance or Transfer would violate the Securities Act of 1933, as amended, or any other federal or state securities or blue sky laws.

(e)    Right of First Refusal.

(i)    *Offered Company Interest*. Subject to the terms and conditions specified in Section 8(a) and this Section 8(e), the Company, first, and each Member, second, shall have a right of first refusal if any other Member (the "Offering Member") receives a bona fide offer that the Offering Member desires to accept to Transfer all or any portion of the Company Interest it owns (the "Offered Company Interest"). As used herein, the term "Member Rightholders" shall mean all Members other than the Offering Member.

(ii)    *Offering; Exceptions*. Each time the Offering Member receives an offer for a Transfer of any of its Company Interest, the Offering Member shall make an offering of such Company Interest to the Company, *first*, and the Member Rightholders, *second*, all in accordance with the following provisions of this Section 8(e), prior to Transferring such Company Interest to the proposed purchaser.

(iii)    *Offer Notice*.

(A)    The Offering Member shall, within ten (10) days after receipt of the Transfer offer, give written notice (the "Offering Member Notice") to the Company and the Member Rightholders stating that it has received a bona fide offer for a Transfer of its Company Interest and specifying: (1) the Percentage Interest to be Transferred by the Offering Member; (2) the proposed date, time, and location of the closing of the Transfer, which shall not be less than sixty (60) days from the date of the Offering Member Notice; (3) the purchase

price of the Company Interest (which shall be payable solely in cash) and the other material terms and conditions of the Transfer; and (4) the name of the Person who has offered to purchase such Company Interest.

(B)    The Offering Member Notice shall constitute the Offering Member's offer to Transfer the Company Interest to the Company and the Member Rightholders, which offer shall be irrevocable until the end of the Member Rightholder Option Period described in Section 8(e)(iv)(C).

(C)    By delivering the Offering Member Notice, the Offering Member represents and warrants to the Company and each Member Rightholder that: (A) the Offering Member has full right, title, and interest in and to the Company Interest; (B) the Offering Member has all the necessary power and authority and has taken all necessary action to Transfer such Company Interest as contemplated by this Section 8(e); and (C) the Company Interest are free and clear of any and all liens other than those arising as a result of or under the provisions of this Agreement.

(iv)    *Exercise of Right of First Refusal.*

(A)    Upon receipt of the Offering Member Notice, the Company and each Member Rightholder shall have the right to purchase the Company Interest in the following order of priority: *first*, the Company shall have the right to purchase all or any portion of the Company Interest in accordance with the procedures set forth in Section 8(e)(iv)(B), and *thereafter*, the Member Rightholders shall have the right to purchase the Company Interest, in accordance with the procedures set forth in Section 8(e)(iv)(C), to the extent the Company does not exercise its right in full. Notwithstanding the foregoing, the Company and the Member Rightholders may only exercise their right to purchase the Company Interest if, after giving effect to all elections made under this Section 8(e), no less than all of the Company Interest will be purchased by the Company and/or the Member Rightholders.

(B)    The initial right of the Company to purchase any Company Interest shall be exercisable with the delivery of a written notice (the "Company Exercise Notice") by the Company to the Offering Member and the Member Rightholders within ten (10) days after receipt of the Offering Member Notice (the "Company Option Period"), stating the amount (including where such number is zero) of the offered Company Interest the Company elects irrevocably to purchase on the terms and purchase price set forth in the Offering Member Notice. The Company Exercise Notice shall be binding upon delivery and irrevocable by the Company. The Company's decision to exercise or not to exercise its right of first refusal hereunder shall be made by the Board by majority vote.

(C)    If the Company shall have indicated an intent to purchase any less than all of the offered Company Interest, the Member Rightholders shall have the right to purchase the remaining Company Interest not exercised by the

Company. For a period of fifteen (15) days following the receipt of a Company Exercise Notice in which the Company has elected to purchase less than all the offered Company Interest (such period, the "Member Rightholder Option Period"), each Member Rightholder shall have the right to elect irrevocably to purchase all or none of its pro rata portion of the remaining Company Interest by delivering a written notice to the Company and the Offering Member (a "Member Exercise Notice") specifying its desire to purchase its pro rata portion of the remaining Company Interest on the terms and for the purchase price set forth in the Offering Member Notice. In addition, each Member Rightholder shall include in its Member Exercise Notice the number of remaining Company Interest that it wishes to purchase if any other Member Rightholders do not exercise their rights to purchase their entire pro rata portions of the remaining Company Interest. Any Member Exercise Notice shall be binding upon delivery and irrevocable by the Member Rightholder. For purposes of this Section 8(e), "pro rata portion" shall mean for each Member Rightholder a fraction, the numerator of which is the Percentage Interest held by such Member Rightholder immediately prior to the Transfer proposed in the Offering Member Notice and the denominator of which is the total Percentage Interest held by all Member Rightholders immediately prior to the Transfer proposed in the Offering Member Notice.

        (D)    The failure of the Company or any Member Rightholder to deliver a Company Exercise Notice or Member Exercise Notice, respectively, by the end of the Company Option Period or Member Rightholder Option Period, respectively, shall constitute a waiver of their respective rights of first refusal under this Section 8(e) with respect to the Transfer of Company Interest, but shall not affect their respective rights with respect to any future Transfers.

        (v)    *Allocation of Company Interest.* Upon the expiration of the Member Rightholder Option Period, the Company Interest not selected for purchase by the Company pursuant to Section 8(e)(iv)(B) shall be allocated for purchase among the Member Rightholders as follows:

        (A)    First, to each Member Rightholder having elected to purchase its entire pro rata portion of such Company Interest, such Member Rightholder's pro rata portion of such Company Interest; and

        (B)    Second, the balance, if any, not allocated under clause (A) above (and not purchased by the Company pursuant to Section 8(e)(iv)(B)), shall be allocated to those Member Rightholders who set forth in their Member Exercise Notices a number of Company Interest that exceeded their respective pro rata portions (the "Purchasing Rightholders"), in an amount, with respect to each such Purchasing Rightholder, that is equal to the lesser of: (1) the amount of Company Interest that such Purchasing Rightholder elected to purchase in excess of its pro rata portion; or (2) the product of (x) the number of Company Interest not allocated under clause (A) (and not purchased by the Company pursuant to Section 8(e)(iv)(B)), multiplied by (y) a fraction, the numerator of which is the number of Company Interest that such Purchasing Rightholder was permitted to purchase pursuant to clause (A), and the denominator of which is the aggregate

number of Company Interest that all Purchasing Rightholders were permitted to purchase pursuant to clause (A).

(C)     The process described in clause (B) shall be repeated until no offered Company Interest remains or until such time as all Purchasing Rightholders have been permitted to purchase all Company Interest that they desire to purchase.

(vi)     *Consummation of Sale.* In the event that the Company and/or the Member Rightholders shall have, in the aggregate, exercised their respective rights to purchase all and not less than all of the Company Interest, then the Offering Member shall sell such Company Interest to the Company and/or the Member Rightholders, and the Company and/or the Member Rightholders, as the case may be, shall purchase such Company Interest, within sixty (60) days following the expiration of the Member Rightholder Option Period. Each Member shall take all actions as may be reasonably necessary to consummate the sale contemplated by this Section 8(e), including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate. At the closing of any sale and purchase pursuant to this Section 8(e), the Offering Member shall deliver to the Company and/or the participating Member Rightholders certificates (if any) representing the Company Interest to be sold, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid and stamps affixed, if necessary, against receipt of the purchase price therefor from the Company and/or such Member Rightholders by certified or official bank check or by wire transfer of immediately available funds.

(vii)     *Sale to Proposed Purchaser.* In the event that the Company and/or the Member Rightholders shall not have collectively elected to purchase all of the Company Interest, then, provided the Offering Member has also complied with the provisions of Section 8(g), to the extent applicable, the Offering Member may Transfer all of such Company Interest, at a price not less than that specified in the Offering Member Notice and on other terms and conditions that are not materially more favorable in the aggregate to the proposed purchaser than those specified in the Offering Member Notice, but only to the extent that such Transfer occurs within ninety (90) days after expiration of the Member Rightholder Option Period. Any Company Interest not Transferred within such 90-day period will be subject to the provisions of this Section 8(e) upon subsequent Transfer.

(f)     Drag-Along Rights. Subject to the terms of this Agreement, in the event the Board determines that it is in the best interests of the Company and/or the Members to sell or transfer all of their Company Interests or sell or transfer all or substantially all of the assets of the Company and its subsidiaries pursuant to a transaction or series of related transactions (a "Drag-Along Transaction"), each of the Members hereby agrees to transfer such Member's Company Interests (in the event of a sale of Company Interests), consent to such Drag-Along Transaction and waive any and all appraisal or dissenter rights with respect to such Drag-Along Transaction, all subject to the conditions in this Section 8(f). The Co-Managers shall notify the Members in writing (the "Mandatory Sale Notice") of such intended Drag-Along Transaction at least fifteen (15) days prior to the date for consummation thereof (in the case of a series of related

transactions, such date shall be the proposed date for the consummation of the first transaction of such series). Such Drag-Along Transaction shall be on the same terms and conditions for all Members, provided that the net proceeds from such Drag-Along Transaction shall be allocated in accordance with <u>Section 6</u>. The obligations of the Members pursuant to this <u>Section 8(f)</u> are subject to the satisfaction of the following conditions:

        (i)      Upon the consummation of the Drag-Along Transaction, the net proceeds shall be distributed to the Members in accordance with <u>Section 6</u>;

        (ii)     No Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the proposed transaction (excluding modest expenditures for postage, copies, etc.), and no Member shall be obligated to pay more than his or her "pro-rata share" (based upon Company Interests) of reasonable expenses incurred in connection with a consummated Drag-Along Transaction to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party (costs incurred by or on behalf of a Member for his or her sole benefit will not be considered costs of the transaction hereunder);

        (iii)    In the event that the Members are required to make any representations or indemnities in connection with the proposed Drag-Along Transaction (other than representations and indemnities by a Member concerning the valid ownership of his or her Company Interests, free of all liens and encumbrances (other than those arising under applicable securities laws), and such Member's authority, power and right to enter into and consummate such purchase or merger agreement without violating any other agreement), then each Member shall not be liable for more than his or her "pro-rata share" of any liability for misrepresentation or indemnity and such liability shall be capped at his or her "pro-rata share" of the total purchase price received in such proposed Drag-Along Transaction by the Members for their Company Interests; and

        (iv)    No Member shall be obligated to take any action, or refrain from taking any action, that such Member reasonably believes will result in a violation of any law or order by such Member or any of his or her Affiliates.

        (g)    <u>Tag-Along Rights</u>.

        (i)     *Notice of Proposed Transfer.* If a Member holding a Percentage Interest of more than ten percent (10%) (a "<u>Selling Member</u>") proposes to effect a Transfer of five percent (5%) or more of the Percentage Interest then held by such Member, such Member shall promptly give written notice (the "<u>Transfer Notice</u>") to the Company and each of the other Members (the "<u>Non-Selling Members</u>") at least twenty (20) days prior to the proposed closing date of such Transfer. If any Member has, since the date of this Agreement, Transferred thirty percent (30%) or more of such Member's Percentage Interest as of the date of this Agreement in one transaction or a series of transactions, this <u>Section 8(g)</u> shall apply to all future Transfers by such Member of any Percentage Interest (except as otherwise provided herein). The Transfer Notice shall (A) describe in reasonable detail the proposed Transfer, including the Company Interest to be sold, the identity of the prospective transferee(s), the purchase price of the Company Interest to be sold and the date such proposed sale is expected to be consummated and

(B) include, if available, an executed copy (or a substantially final draft copy) of the agreement pursuant to which the proposed Transfer is to be consummated.

(ii)     *Exercise of Tag-Along Rights.* Each of the Non-Selling Members shall have the right, exercisable within fifteen (15) days of its receipt of the Transfer Notice (the "Response Deadline"), to participate in such proposed Transfer on the same terms and conditions as set forth in the Transfer Notice, including the making of all representations, warranties and covenants and the granting of all indemnifications and similar agreements and arrangements agreed to by the Selling Member in the executed agreement (or substantially final draft agreement) delivered with the Transfer Notice pursuant to Section 8(g)(i) hereof; provided, that, unless such Non-Selling Member otherwise consents (such consent not to be unreasonably withheld), the indemnification obligations of each Non-Selling Member provided with respect to the proposed transferee with respect to the breach of any representation or warranty concerning the Company (other than the breach of those representations and warranties that are not subject to any "cap" as provided for in the sale agreement) shall be limited to the gross proceeds received by, and any amount deposited into escrow on behalf of, each such Non-Selling Member in connection with the Transfer. Each Non-Selling Member electing to participate in the Transfer described in the Transfer Notice (each, a "Participant") shall indicate in its irrevocable notice of election to the Selling Member, the maximum number of Member Units it desires to Transfer. Each such Participant shall be entitled to Transfer a number of Member Units equal to such holder's pro rata portion of the total Percentage Interest to be Transferred, as set forth in the Transfer Notice, up to such maximum number. For purposes of this Section 8(g), "pro rata portion" shall mean for each Participant a fraction, the numerator of which is the Percentage Interest held by such Participant immediately prior to the Transfer proposed in the Transfer Notice and the denominator of which is the total Percentage Interest outstanding immediately prior to the Transfer proposed in the Transfer Notice.

(iii)     *Participation Requirements.* Each Participant shall effect its participation in the Transfer by delivering to the Selling Member (to hold in trust as agent for such Participant), at least five (5) days prior to the date scheduled for such Transfer as set forth in the Transfer Notice: (A) one or more certificates or other instruments, as applicable, in proper form for transfer, which represent the number of Member Units which such Participant is entitled to Transfer in accordance with Section 8(g)(ii), (B) a joinder or other similar agreement pursuant to which such Participant shall agree to be bound by the terms and conditions set forth in the agreement included with the Transfer Notice in form and substance reasonably satisfactory to the Selling Member and (C) executed copies (or signature pages thereof) of such other agreements, documents or certificates as the Selling Member and/or its proposed transferee shall reasonably request. Such certificate or certificates or other instruments, as applicable, shall be delivered by the Selling Member to the permitted transferee on the date scheduled for the consummation of the Transfer pursuant to the terms and conditions specified in the Transfer Notice and such permitted transferee shall remit to each such Participant its pro rata portion of the net sale proceeds (taking into account such permitted transferee's and each Participant's pro rata portion of any transaction costs and expenses incurred by the Selling Member in connection with such Transfer and any transaction costs and expenses incurred by the Selling Member on behalf of the Company in connection with such

Transfer) to which such Participant is entitled by reason of its participation in such sale. For purposes of this Section 8(g)(iii), pro rata portion shall mean for each Participant a fraction, the numerator of which is the number of Member Units to be Transferred by such Participant pursuant to this Section 8(g) and the denominator of which is the total number of Member Units to be Transferred pursuant to this Section 8(g). The Selling Member's sale of Member Units in any sale proposed in a Transfer Notice shall be effected on terms and conditions not more favorable than those set forth in such Transfer Notice and those applicable to the other Participants. The exercise or non-exercise of the rights of any of the Non-Selling Members hereunder to participate in one or more Transfers of Company made by the Selling Member shall not adversely affect their rights to participate in subsequent Transfers of Interest subject to this Section 8(g).

(iv)     *Liability of Selling Member*. Notwithstanding anything contained in this Section 8(g) to the contrary, there shall be no liability on the part of the Selling Member (or any of the Selling Member's Affiliates) to any Non-Selling Member in the event no Percentage Interests are sold notwithstanding the delivery of any Transfer Notice pursuant to Section 8(g)(i) or the compliance with any other provision in this Section 8(g).

(h)     Distributions and Allocations in Respect of Transferred Company Interests. If any Company Interest (or portion thereof) is Transferred during any accounting period in compliance with the provisions of this Section 8, Profits, Losses, each item thereof and all other items attributable to such Company Interest (or portion thereof) for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Co-Managers. Unless otherwise determined by the Co-Managers, all distributions made on or before the date thirty (30) days following the date on which the Company receives written notice of such Transfer (accompanied by the transfer documents) shall be made to the transferor, and all distributions made thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that if the Company does not receive a notice stating the date such Company Interest (or portion thereof) was transferred and such other information as the Co-Managers may reasonably require within 30 days after the end of the accounting period during which the Transfer occurs, then, at the Co-Manager's option, all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Company, on the last day of the accounting period during which the Transfer occurs, was the owner of the Company Interest (or portion thereof). Neither the Company nor any Manager shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 8(h), whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Company Interest (or portion thereof).

9.    **Priorities.** No Member shall have any rights or priority over any other Members as to contributions or as to distributions or compensation by way of income, except as specifically provided in this Agreement.

10.    **Term; Dissolution of the Company.**

(a)    Term.  The term of the Company shall be perpetual, unless sooner terminated as hereinafter provided.

(b)    Events of Dissolution or Liquidation.  The Company shall be dissolved upon the happening of any of the following events:

(i)    the Board adopts a resolution approving dissolution of the Company and the holders of more than fifty percent (50%) of the Member Units shall have agreed in writing to dissolve the Company;

(ii)    the sale of all or substantially all of the assets of the Company; or

(iii)    the entry of a decree of judicial dissolution under the Act.

Following any of the foregoing events, the Co-Managers shall proceed diligently to liquidate the assets of the Company in a manner consistent with commercially reasonable business practices.

(c)    Distributions upon Liquidation.  In connection with the liquidation of the Company, the assets of the Company shall be applied and distributed in the following order of priority:

(i)    to creditors of the Company, including Members, in the order of priority provided by law, and the creation of a reserve of cash or other assets of the Company for contingent liabilities in an amount, if any, determined by the Co-Managers to be appropriate for such purposes; and

(ii)    to the Members in accordance with the provisions of Section 6(a) hereof.

11.    **Financial and Accounting Matters.**

(a)    Books and Records.  The Co-Managers shall keep or cause to be kept complete and accurate books and records of the Company, using the same methods of accounting that are used in preparing the federal income tax returns of the Company to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied. Such books and records shall be maintained and available, in addition to any documents and information required to be furnished to the Members under the Act, at the principal business office of the Company for examination and copying by any Member, or its duly authorized representative, at its reasonable request and at its expense during ordinary business hours.

(b)    Bank Accounts.  Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Co-Managers, and withdrawals shall be made and other activity conducted on such signature or signatures as shall be designated by the Co-Managers.

(c)     Fiscal Year.  Except as otherwise required by the Code, the fiscal year (and taxable year) of the Company shall end on December 31 of each year.

(d)     Tax Matters Member.  The tax matters member (referred to as the "tax matters partner" in Section 6231(a)(7) of the Code) shall be Tech Inc., or any other Member designated in writing from time to time by the Co-Managers (the "Tax Matters Member").  The Tax Matters Member shall represent the Company and the Members, at Company expense, in any administrative or judicial proceeding with the Internal Revenue Service.  Any other Member may, at his own expense, participate in such proceeding to the extent permitted by the Code.  If an administrative proceeding results in the issuance of a "final partnership administrative adjustment" ("FPAA"), as that term is used in Sections 6223 et seq. of the Code, the Tax Matters Member shall determine whether the Company shall seek judicial review of such FPAA.  If the Tax Matters Member determines that the Company shall not seek judicial review, it shall promptly notify all the other Members of this determination and each Member shall be entitled, at his own expense, to pursue whatever rights he may have under the Code.  Any amounts paid by the Tax Matters Member on behalf of the Company in connection with any administrative or judicial proceeding shall be considered a loan to the Company, and not a contribution to capital.  The Tax Matters Member shall not be liable to the Company or the other Members for any action it takes or fails to take in connection with any such judicial or administrative proceeding, including, without limitation, the agreement to or failure to agree to a settlement or the extension of, or failure to extend the relevant statutes of limitations, unless such action or failure constitutes willful misconduct, fraud, negligence or breach of fiduciary duty.

**12.     Other Business.**  The Members, the Co-Managers and any Affiliates of any of them may engage in and possess interests in other business ventures and investment opportunities of every kind and description, independently or with others, including without limitation serving as manager and general partner of other limited liability companies and partnerships; *provided, however*, that no such other business venture or investment opportunity shall be in direct competition with the business and activities of the Company or any of its Affiliates.  Neither the Company nor any other Member shall have any rights in or to such ventures or opportunities or the income or profits therefrom.

**13.     Miscellaneous.**

(a)     Binding Effect.  Subject to the restrictions on Transfers set forth herein, the terms of this Agreement shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs and assigns; and each and every successor-in-interest to any Member, whether such successor acquires a Company Interest by way of inheritance, gift, purchase, foreclosure or any other method, shall hold such Company Interest subject to all of the terms and provisions of this Agreement.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any Person not a party hereto, including without limitation any creditor of the Company (including any Member acting in its capacity as a creditor of the Company) or any creditor of any Member.

(b)     Amendment.  No amendment of this Agreement shall be valid or binding unless such amendment is made with the Consent of the Members.  Notwithstanding the foregoing, this Agreement may be amended from time to time by action of the Co-Managers, without the consent of any Member:  (i) to cure any ambiguity, to correct or supplement any

provision hereof which may be inconsistent with any other provision hereof, or to add any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the provisions of this Agreement; (ii) to preserve the status of the Company as a "partnership" for federal income tax purposes; and (iii) to execute such joinders and to amend Schedule A to reflect the admission or withdrawal of Members as authorized by this Agreement.

(c)     Governing Law.  This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Florida, notwithstanding any choice of law rules to the contrary.  Any disputes regarding this Agreement will be adjudicated in the Fifteenth Judicial Circuit Court in and for Palm Beach County, Florida.

(d)     Counterparts.  This Agreement may be executed in any number of counterparts, including by facsimile transmission or by e-mail transmission in Adobe portable document format, all of which together shall for all purposes constitute one Agreement, binding on all the Members notwithstanding that all Members have not signed the same counterpart.

(e)     Notices.  All notices under this Agreement shall be effective (i) on the fifth business day after being sent by certified mail, return receipt requested, postage prepaid, (ii) when received, if delivered by hand, (iii) the following business day after having been timely sent by reputable overnight courier service for priority, next-day delivery, or (iv) upon confirmation of receipt by the recipient after having been sent by electronic mail or fax (but on the next business day after confirmation of receipt if such receipt is after business hours at the time and place of receipt).  All such notices in order to be effective shall be in writing and shall be addressed (to the recipient's street address, electronic mail address or fax number, as the case may be), if to the Company at its principal office address, electronic mail address or fax number, as the case may be, set forth in Section 1 hereof and if to a Member at the last street address, electronic mail address or fax number, as the case may be, of record on the Company's books, and copies of such notices shall also be sent to the last such address for the recipient which is known to the sender, if different from the address so specified.

(f)     Interpretation.  As used herein, the singular shall include the plural, and the masculine gender shall include the feminine and neuter, and vice-versa, unless the context otherwise requires.

(g)     Entire Agreement.  This Agreement, including all Schedules and Appendices attached hereto and the Articles, which are hereby incorporated herein, embodies the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

(h)     Severability.  If any provision of this Agreement is held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (iii) the balance of this Agreement shall be enforceable in accordance with its terms; *provided, however,* that this Agreement continues to reasonably and substantially reflect the intent of the parties expressed herein taking into account the exclusion of such unenforceable provision.

(i)    <u>Further Assurances</u>.  Each party to this Agreement agrees to execute, with acknowledgment or affidavit if required, deliver, file and record such further documents and writings, and to do all such other acts and things, as may be required by applicable law or under the Act or as, as reasonably determined and in good faith by the Board or the Co-Managers, may be necessary or advisable to carry out the intent and purposes of this Agreement.

(j)    <u>Cumulative Remedies</u>.   The remedies of the Members under this Agreement are cumulative and will not exclude any other remedies to which any Member may be lawfully entitled.

(k)    <u>No Waiver</u>.  A Member's failure to insist on the strict performance of any covenant or duty required by this Agreement, or to pursue any remedy under this Agreement, will not constitute a waiver of the breach or the remedy.

(l)    <u>Advice from Independent Counsel/Voluntary Agreement</u>.   Each Member represents and warrants that (i) it is represented by legal and tax counsel of its choice, (ii) it has consulted with such counsel regarding this Agreement, (iii) it is fully aware of the meaning and the tax and other consequences of the provisions contained herein, (iv) it has not relied in any way on any representation or other statement made by the Company, any other Member (except as explicitly set forth in this Agreement) or its legal or tax counsel or by any other Person, (v) it has entered into this Agreement voluntarily and without coercion or duress of any kind and (vi) it agrees that this Agreement shall be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted.

*(Signatures on Next Page)*

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first above written. By executing this Agreement, each Member hereby adopts this Agreement as the "operating agreement" of the Company pursuant to the Act.

Members:

TECHNOLOGY INVESTORS, INC.

By: _____
Name: _Hank Asher_____
Title: _President_____


_____
JOHN WALSH

_____
OLE POULSEN


THE JUDITH W. REDDEN TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By: _____
        Hank Asher

By: _____
        Judith W. Redden

By: _____
        Caroline James Yoost


THE ELIZA DESIREE ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By: _____
        Hank Asher

By: _____
        Eliza Desiree Asher

By: _____
        Caroline James Yoost

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first above written. By executing this Agreement, each Member hereby adopts this Agreement as the "operating agreement" of the Company pursuant to the Act.

Members:

TECHNOLOGY INVESTORS, INC.

By:_____
Name:_____
Title:_____


_____

JOHN WALSH


_____

OLE POULSEN


THE JUDITH W. REDDEN TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
    Hank Asher
By:_____
    Judith W. Redden
By:_____
    Caroline James Yoost


THE ELIZA DESIREE ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
    Hank Asher
By:_____
    Eliza Desiree Asher
By:_____
    Caroline James Yoost


{25410777;7}                    32

THE CAROLINE J. ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By: _____
    Hank Asher

By: _____
    Caroline James Yoost

By: _____
    Eliza Desiree Asher


_____

JAY H. BERNSTEIN


BJ4M&M, LLC

By: _____
Name: _____
Title: _____


JHBTLO, LLC

By: _____
Name: _____
Title: _____


_____

BRIAN BACHMAN


HUNTER CREEK, LLC

By: _____
Name: _____
Title: _____

THE CAROLINE J. ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
Hank Asher

By:_____
Caroline James Yoost

By:_____
Eliza Desiree Asher


_____
JAY H. BERNSTEIN


BJ4M&M, LLC

By:_____
Name:_____
Title:_____


JHBTLO, LLC

By:_____
Name:_____
Title:_____


_____
BRIAN BACHMAN


HUNTER CREEK, LLC

By:_____
Name:_____
Title:_____

THE CAROLINE J. ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
     Hank Asher

By:_____
     Caroline James Yoost

By:_____
     Eliza Desiree Asher

_____
JAY H. BERNSTEIN


BJ4M&M, LLC

By:_____
Name:_____
Title:_____


JHBTLO, LLC

By:_____
Name:_____
Title:_____


_____
BRIAN BACHMAN


HUNTER CREEK, LLC

By:_____
Name:_____
Title:_____

THE CAROLINE J. ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
　　　Hank Asher

By:_____
　　　Caroline James Yoost

By:_____
　　　Eliza Desiree Asher


_____
JAY H. BERNSTEIN


BJ4M&M, LLC

By:_____
Name:_____
Title:_____


JHBTLO, LLC

By:_____
Name:_____
Title:_____


_____
BRIAN BACHMAN


HUNTER CREEK, LLC

By:_____
Name:_____
Title:_____

THE CAROLINE J. ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
     Hank Asher

By:_____
     Caroline James Yoost

By:_____
     Eliza Desiree Asher


_____
JAY H. BERNSTEIN


BJ4M&M, LLC

By:_____
Name:_____
Title:_____


JHBTLO, LLC

By:_____
Name:___IAY H-BAKER_____
Title:___President_____


_____
BRIAN BACHMAN


HUNTER CREEK, LLC

By:_____
Name:_____
Title:_____

THE CAROLINE J. ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
    Hank Asher

By:_____
    Caroline James Yoost

By:_____
    Eliza Desiree Asher


_____
JAY H. BERNSTEIN


BJ4M&M, LLC

By:_____
Name:_____
Title:_____


JHBTLO, LLC

By:_____
Name:_____
Title:_____

_____  12-11-12
BRIAN BACHMAN


HUNTER CREEK, LLC

By:_____
Name:_____
Title:_____

THE CAROLINE J. ASHER TRUST,
UNDER AGREEMENT DATED
FEBRUARY 4, 1999

By:_____
    Hank Asher

By:_____
    Caroline James Yoost

By:_____
    Eliza Desiree Asher


_____
JAY H. BERNSTEIN


BJ4M&M, LLC

By:_____
Name:_____
Title:_____


JHBTLO, LLC

By:_____
Name:_____
Title:_____


_____
BRIAN BACHMAN


HUNTER CREEK, LLC

By:_____
Name:_____
Title:_____

PETER & BARBARA RIPP - JOINT
TENANTS

By: _____
Peter Ripp

By: _____
Barbara Ripp


_____
JULES KROLL


_____
THOMAS GLOCER


_____
SHAWN SMITH


_____
GARY SCHULTHEIS


GREENCOOK MANAGEMENT, LLC

By: _____
Name: _____
Title: _____


_____
WILLIAM H. PRICE

PETER & BARBARA RIPP - JOINT
TENANTS

By:_____
     Peter Ripp

By:_____
     Barbara Ripp


_____
JULES KROLL


_____
THOMAS GLOCER


_____
SHAWN SMITH


_____
GARY SCHULTHEIS


GREENCOOK MANAGEMENT, LLC

By:_____
Name:_____
Title:_____


_____
WILLIAM H. PRICE

PETER & BARBARA RIPP - JOINT
TENANTS

By:_____
     Peter Ripp

By:_____
     Barbara Ripp

_____
JULES KROLL

_____
THOMAS GLOCER

_____
SHAWN SMITH

_____
GARY SCHULTHEIS

GREENCOOK MANAGEMENT, LLC

By:_____
Name:_____
Title:_____

_____
WILLIAM H. PRICE

{25410777;7}                    34

PETER & BARBARA RIPP - JOINT
TENANTS

By:_____
     Peter Ripp

By:_____
     Barbara Ripp


_____
JULES KROLL


_____
THOMAS GLOCER

_____
SHAWN SMITH


_____
GARY SCHULTHEIS


GREENCOOK MANAGEMENT, LLC

By:_____
Name:_____
Title:_____


_____
WILLIAM H. PRICE

{2541:0777,7}                                    34

PETER & BARBARA RIPP - JOINT
TENANTS

By:_____
    Peter Ripp

By:_____
    Barbara Ripp


_____
JULES KROLL


_____
THOMAS GLOCER


_____
SHAWN SMITH


_____
GARY SCHULTHEIS


GREENCOOK MANAGEMENT, LLC

By:_____
Name:_____
Title:_____


_____
WILLIAM H. PRICE

PETER & BARBARA RIPP - JOINT
TENANTS

By:_____
     Peter Ripp

By:_____
     Barbara Ripp


_____
JULES KROLL


_____
THOMAS GLOCER


_____
SHAWN SMITH


_____
GARY SCHULTHEIS


GREENCOOK MANAGEMENT, LLC

By:_____
Name:_____
Title:_____


_____
WILLIAM H. PRICE

_____
JOHN O. SCHAEFFER


_____
MARCO PIOVESAN


_____
PAUL FICHTMAN


_____
COLLEEN CAROLE HOWELL


SEDGLEY COHESIVE COMPANY
PTY LIMITED


By:_____
Name:_____
Title:_____


CAJA COHESIVE COMPANY
PTY LIMITED


By:_____
Name:_____
Title:_____

{25410777;5}                    35

JOHN O. SCHAEFFER

_____

MARCO PIOVESAN

_____

PAUL FICHTMAN

_____

COLLEEN CAROLE HOWELL

SEDGLEY COHESIVE COMPANY
PTY LIMITED

By:_____
Name:_____
Title:_____

CAJA COHESIVE COMPANY
PTY LIMITED

By:_____
Name:_____
Title:_____

JOHN O. SCHAEFFER

MARCO PIOVESAN

PAUL FICHTMAN

COLLEEN CAROLE HOWELL

SEDGLEY COHESIVE COMPANY
PTY LIMITED

By:_____
Name:_____
Title:_____

CAJA COHESIVE COMPANY
PTY LIMITED

By:_____
Name:_____
Title:_____

{25410777,5}                                    35

_____
JOHN O. SCHAEFFER


_____
MARCO PIOVESAN


_____
PAUL FICHTMAN


_____
COLLEEN CAROLE HOWELL


SEDGLEY COHESIVE COMPANY
PTY LIMITED

By: _____
Name: _____
Title: _____


CAJA COHESIVE COMPANY
PTY LIMITED

By: _____
Name: CAREY ANDERSON
Title: DIRECTOR


_____
GENE M. BERNSTEIN


35

_____

JOHN O. SCHAEFFER


_____

MARCO PIOVESAN


_____

PAUL FICHTMAN


_____

COLLEEN CAROLE HOWELL


SEDGLEY COHESIVE COMPANY
PTY LIMITED

By:_____
Name:_____
Title:_____


CAJA COHESIVE COMPANY
PTY LIMITED

By:_____
Name:_____
Title:_____


_____
GENE M. BERNSTEIN

SCHEDULE A
TO
AMENDED AND RESTATED OPERATING AGREEMENT
OF
TLO, LLC
(as of the Effective Date)

| MEMBER | MEMBER UNITS[1] | CAPITAL ACCOUNT | PERCENTAGE INTEREST |
|---|---|---|---|
| *Technology Investors, Inc.*<br>4530 Conference Way South<br>Boca Raton, FL 33431 | 58,331,000 | (2) | 33.9334% |
| *John Walsh*<br>16030 Ventura Boulevard – Suite 380<br>Encino, CA 91436 | 8,333,000 | (2) | 4.8476% |
| *Ole Poulsen*<br>2633 South Ocean Blvd<br>Highland Beach, FL 33487 | 16,666,000 | (2) | 9.6953% |
| *The Judith W. Redden Trust, under Agreement dated February 4, 1999*<br>Wells Fargo Trust Operations<br>Account 65845200<br>PO Box 1450 – NW 7595<br>Minneapolis, MN 55485-7595 | 3,334,000 | (2) | 1.9395% |
| *The Eliza Desiree Asher Trust, under Agreement dated February 4, 1999*<br>Wells Fargo Trust Operations<br>Account 65845100<br>PO Box 1450 – NW 7595<br>Minneapolis, MN 55485-7595 | 6,668,000 | (2) | 3.8791% |
| *The Caroline J. Asher Trust, under Agreement dated February 4, 1999* Wells Fargo Trust Operations<br>Account 65845000<br>PO Box 1450 – NW 7595<br>Minneapolis, MN 55485-7595 | 6,668,000 | (2) | 3.8791% |
| *Jay H. Bernstein*<br>C/O NIC Holding Corp.<br>25 Melville Park Road<br>Melville, NY 11747 | 5,000,000 | (2) | 2.9087% |
| *BJ4M&M, LLC*<br>C/O Proskauer<br>Attention: Sandi Rogacki<br>2255 Glades Road – Suite 421A<br>Boca Raton, Florida 33431 | 2,800,000 | (2) | 1.6289% |

| MEMBER | MEMBER UNITS[1] | CAPITAL ACCOUNT | PERCENTAGE INTEREST |
|---|---|---|---|
| *JHBTLO, LLC*<br>C/O Godfrey Kahn<br>Attention: Peter M. Sommerhauser<br>780 North Water Street<br>Milwaukee, WI 53202 | 5,000,000 | (2) | 2.9087% |
| *Brian Bachman*<br>40 Parkside Drive<br>Jericho, NY 11753 | 250,000 | (2) | 0.1455% |
| *Hunter Creek, LLC*<br>C/O NIC Holding Corp<br>25 Melville Park Road – Suite 210<br>Melville, NY 11747 | 750,000 | (2) | 0.4363% |
| *Peter & Barbara Ripp - Joint Tenants*<br>11 Cobb Island Drive<br>Greenwich, CT 06830 | 125,000 | (2) | 0.0727% |
| *Gene M. Bernstein*<br>170 East End Avenue – Apartment 9A<br>New York, NY 10128 | 250,000 | (2) | 0.1455% |
| *Jules Kroll* | 9,746,646 | (3) | 5.67% |
| *Thomas Glocer* | 9,746,646 | (3) | 5.67% |
| *Shawn Smith* | 2,784,756 | (3) | 1.62% |
| *Gary Schultheis* | 2,784,756 | (3) | 1.62% |
| *William H. Price* | 18,707,894 | $45,322,166 | 10.8831% |
| *Greencook Management, LLC* | 5,047,564 | $10,747,089 | 2.9364% |
| *John O. Schaeffer* | 3,365,043 | $7,164,726 | 1.9576% |
| *Colleen Carole Howell* | 1,673,119 | $3,562,343 | 0.9733% |
| *Sedgley Cohesive Company Pty Limited* | 644,311 | $1,371,844 | 0.3748% |

| MEMBER | MEMBER UNITS[1] | CAPITAL ACCOUNT | PERCENTAGE INTEREST |
|---|---|---|---|
| *Caja Cohesive Company Pty Limited* | 644,311 | $1,371,844 | 0.3748% |
| *Paul Fichtman* | 1,289,239 | $0 | 0.75% |
| *Marco Piovesan* | 1,289,239 | $0 | 0.75% |
| **Totals** | **171,898,524** | | **100.0000%** |

(1)    15,000,000 Units have been authorized and reserved for awards pursuant to the TLO, LLC 2011 Option Plan.

(2)    Effective Date Capital Account balance is equal to:  ((Target A Amount)*(Member's Percentage Interest)/(81% - 14.58%)) – (($366,000,000 – Target A Amount – $69,540,000)*(Member's Percentage Interest)/(81%)).

(3)    Effective Date Capital Account balance is equal to: (($366,000,000 – Target A Amount – $69,540,000)*(Member's Percentage Interest)/(81%))

APPENDIX I

<u>DEFINED TERMS</u>

Capitalized terms used in this Agreement shall have the meanings specified in this Appendix I.

"<u>Act</u>" has the meaning set forth in the first recital to this Agreement.

"<u>Adjusted Capital Account Deficit</u>" means the deficit balance, if any, in a Member's Capital Account at the time in question, after (i) reducing the amount of such deficit by the amount, if any, that such Member is treated as obligated to restore pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) and the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) increasing the amount of such deficit by the amount, if any, of the items described in paragraphs (4), (5) and (6) of Treasury Regulation Section 1.704-1(b)(2)(ii)(d). The determination of a Member's Adjusted Capital Account Deficit is made for purposes of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be made consistently therewith.

"<u>Affiliate</u>" means, with respect to a specified Person, any other Person that directly or indirectly controls, is under common control with, or is controlled by, the specified Person. As used herein, the term "control" means the possession by a Person, directly or indirectly, of the power to direct or cause the direction of the management and policies of another Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble to this Agreement.

"<u>Articles</u>" has the meaning set forth in the first recital to this Agreement.

"<u>Assumed Tax Rate</u>" means 35% or such higher rate established by the Co-Managers.

"<u>Board</u>" has the meaning set forth in <u>Section 3(a)(i)</u> hereof.

"<u>Board Members</u>" has the meaning set forth in <u>Section 3(a)(ii)</u> hereof.

"<u>Call Notice</u>" has the meaning set forth in <u>Section 4(b)(ii)</u> hereof.

"<u>Capital Account</u>" has the meaning set forth in <u>Section 4(d)(i)</u> hereof.

"<u>Capital Contributions</u>" means with respect to a Member, the amount of money, and the fair market value (as determined by the Co-Managers if not otherwise provided in this Agreement) of other property contributed by that Member to the capital of the Company in respect of that Member's Company Interest, reduced by the amount of any liabilities of the Member that (a) the Company assumes (under the standards provided in the last sentence of Treasury Regulation Section 1.704-1(b)(2)(iv)(c)) in connection with that transaction or (b) are secured by the property when it is contributed to the Company (and, therefore, the Company takes the property subject to those liabilities), excluding the extent to which those secured liabilities are included in clause (a) of this definition of Capital Contribution or exceed the fair

market value of the contributed property.  The assumption of a liability of the Company by a Member, other than in connection with the contribution of property to the capital of the Company, will be included in that Member's Capital Account in accordance with Section 4(d)(i)(A) but, unless the Co-Managers determine otherwise, will not be included in that Member's Capital Contributions to the Company until (and only to the extent that) the Member makes payments on that liability.

"Capital Percentage" means the respective percentage that the Contributing Members hold in the capital of the Company as of the Effective Date, which is 12.3831% in the case of William H. Price, 2.9364% in the case of Greencook Management, LLC 1.9576% in the case of John O. Schaeffer, 0.9733% in the case of Colleen Carole Howell, 0.3748% in the case of Sedgley Cohesive Company Pty Limited, and 0.3748% in the case of Caja Cohesive Company Pty Limited.

"Change in Control" means (i) a sale, merger or similar transaction or series of related transactions involving the Company or any of its subsidiaries, as a result of which those persons who held 100% of the voting power of the Company immediately prior to such transaction do not hold (either directly or indirectly) more than 50% of the voting power of the Company (or the surviving or resulting entity thereof) after giving effect to such transaction; or (ii) the sale of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, in a transaction or series of related transactions.

"Class 1 Profits Interest Members" means Jules Kroll, Thomas Glocer, Shawn Smith and Gary Schultheis.

"Code" has the meaning set forth in Section 4(d)(i) hereof.

"Company" has the meaning set forth in the first recital to this Agreement.

"Company Exercise Notice" has the meaning set forth in Section 8(e)(iv)(B) hereof.

"Company Interest" means the entire interest of a Member in the Company including, without limitation, all economic and non-economic rights and duties including voting or consent rights (if any) and any other rights and duties appertaining to such limited liability company interest under this Agreement.

"Company Minimum Gain" means "partnership minimum gain" as set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"Company Option Period" has the meaning set forth in Section 8(e)(iv)(B) hereof.

"Compensatory Interest" has the meaning set forth in Section 7(h)(i) hereof.

"Co-Managers" has the meaning set forth in Section 3(a)(viii) hereof.

"Consent of the Members" means the prior affirmative written consent or approval of Members holding more than 50% of the Percentage Interests.

"Contributing Member" means William H. Price, John O. Schaeffer, Colleen Carole Howell, Sedgley Cohesive Company Pty Limited, Caja Cohesive Company Pty Limited and Greencook Management, LLC.

"Depreciation" means, for each taxable year of the Company, an amount equal to the depreciation, amortization or cost recovery deduction allowable for federal income tax purposes for such taxable year, unless the book value for an asset differs from the adjusted basis of such asset for federal income tax purposes, in which case Depreciation shall mean (i) an amount that bears the same ratio to the book value at the beginning of the taxable year as the federal income tax depreciation, amortization or cost recovery deduction bears to the adjusted tax bases at the beginning of the taxable year (provided, however, that if the adjusted basis of an asset is zero at the beginning of a taxable year, Depreciation shall be determined by the Co-Managers, using any reasonable method), or (ii) an amount determined pursuant to Section 1.704-3(d)(2) of the Treasury Regulations in the event that the remedial method of allocation under Section 704(c) of the Code is applied.

"Drag-Along Transaction" has the meaning set forth in Section 8(d) hereof.

"Effective Date" means November 21, 2012.

"Excess New Securities Price" has the meaning set forth in Section 8(c)(iii) hereof.

"Existing Members" means the Members as of the Effective Date, as reflected on Schedule A, other than (i) the New Members, and (ii) the Class I Profits Interest Members.

"FPAA" has the meaning set forth in Section 11(d) hereof.

"Indemnitee" has the meaning set forth in Section 3(e)(i) hereof.

"Initial Public Offering" means an initial public offering of securities of the Company or successor to the Company, which class of capital stock or other equity interests are registered pursuant to Section 12 of the United States Securities Exchange Act of 1934, as amended.

"Loans" has the meaning set forth in Section 4(c) hereof.

"Losses" has the meaning set forth in the definition of Profits and Losses.

"Mandatory Sale Notice" has the meaning set forth in Section 8(d) hereof.

"Member" and "Members" have the respective meanings set forth in the Preamble to this Agreement.

"Member Exercise Notice" has the meaning set forth in Section 8(e)(iv)(C) hereof.

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt" as set forth in Treasury Regulation Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as set forth in Treasury Regulation Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Member Rightholders" has the meaning set forth in Section 8(e)(i) hereof.

"Member Rightholder Option Period" has the meaning set forth in Section 8(e)(iv)(C) hereof.

"Member Units" means the number of Member Units issued to the Members evidencing such Member's Percentage Interest. Member Units may be certificated as determined by the Manager.

"Membership Interest Contribution Agreement" means that certain Membership Interest Contribution Agreement, dated as of October 22, 2012, by and among William H. Price, Greencook Management, LLC, John O. Schaeffer and TLO, LLC, as amended by that certain Amendment to Membership Interest Contribution Agreement dated November 21, 2012.

"New Members" shall mean William H. Price, John O. Schaeffer, Greencook Management, LLC, Colleen Carole Howell, Sedgley Cohesive Company Pty Limited, Caja Cohesive Company Pty Limited, Marco Piovesan and Paul Fichtman.

"New Securities" means any Member Units, and any rights, options or warrants to purchase Member Units, issued or granted after the date of this Agreement; provided, however, that New Securities shall not include the following: (i) a grant to any existing or prospective consultants, employees, officers, Board Members or Co-Managers pursuant to any profits interest plan or similar equity-based plans or other compensation agreement; (ii) the conversion or exchange of any securities of the Company into an equity interest, or the exercise of any warrants or other rights to acquire an equity interest; (iii) any acquisition or transaction by the Company of any equity interests, assets, properties or business of any entity, including in connection with any pricing collar pursuant to the terms of such acquisition or transaction; (iv) any merger, consolidation or other business combination involving the Company; (v) any transaction or series of related transactions involving a Change in Control; (vi) a split of equity interests or payment of distributions or any similar recapitalization; or (vii) any private placement of warrants to purchase equity interests to lenders or other institutional investors (excluding the members) in any arm's length transaction providing debt financing to the Company or any of its subsidiaries (the "Financing Warrants") where such Financing Warrants, together with all then outstanding Financing Warrants, are not equal to and not convertible into an aggregate of more than 10% of the outstanding equity interests on a fully diluted basis at the time of the issuance of such Financing Warrants.

"New Securities Price" has the meaning set forth in Section 8(c)(ii) hereof.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(1) and 1.704-2(c).

"Non-Selling Members" has the meaning set forth in Section 8(f)(i) hereof.

"Offered Company Interest" has the meaning set forth in Section 8(e)(i) hereof.

"Offering Member" has the meaning set forth in Section 8(e)(i) hereof.

"Offering Member Notice" has the meaning set forth in Section 8(e)(iii)(A) hereof.

"Option Plan Reserve" has the meaning set forth in Section 4(g) hereof.

"Participant" has the meaning set forth in Section 8(f)i(i) hereof.

"Percentage Interests" means the respective percentage interests that the Members hold in the Company as adjusted from time to time pursuant to this Agreement and as set forth on Schedule A (as Schedule A may be amended from time to time).

"Person" means any natural person or any general partnership, limited partnership, limited liability partnership, limited liability limited partnership, corporation, joint venture, trust, business trust, cooperative, association, limited liability company or other entity, including the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"Preemptive Exercise Notice" has the meaning set forth in Section 8(c)(ii) hereof.

"Preemptive Notice" has the meaning set forth in Section 8(c)(ii) hereof.

"Profits" has the meaning set forth in the definition of Profits and Losses.

"Profits and Losses" means, for each taxable year of the Company, an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

      (i)     any income of the Company that is exempt from federal income tax shall be added;

      (ii)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or required by the Treasury Regulations to be treated as so described shall be subtracted;

      (iii)   if the property of the Company is revalued on the books of the Company pursuant to Section 4(d)(iii), the amount of such adjustment shall be taken into account, immediately prior to the event giving rise to such adjustment, as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

      (iv)   gain or loss resulting from the disposition of an asset shall be computed by reference to the book value of such asset;

      (v)    a deduction for Depreciation shall be taken in lieu of a deduction for depreciation, amortization or cost recovery;

(vi)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Company Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(vii)    any items that are specially allocated pursuant to Section 7(b) shall not be taken into account in computing Profits and Losses, but the amounts of those items are to be determined by applying rules comparable to those provided in subparagraphs (i) through (vi) above.

"Proportional Share" has the meaning set forth in Section 8(c)(i) hereof.

"Proposed Rules" has the meaning set forth in Section 7(h)(i) hereof.

"Purchasing Rightholders" has the meaning set forth in Section 8(e)(v)(B) hereof.

"Qualifying Member" has the meaning set forth in Section 8(c)(i) hereof.

"Response Deadline" has the meaning set forth in Section 8(f)(ii) hereof.

"Revaluation" has the meaning set forth in Section 4(d)(iv) hereof.

"Safe Harbor Election" has the meaning set forth in Section 7(h)(i) hereof.

"Securities" means, with respect to: (i) any corporation, any of the equity securities of such corporation and any obligations to purchase or options or warrants to acquire such equity securities, but excluding debt instruments which are not convertible into equity securities; and (ii) any limited liability company, partnership, trust or other business entity, whether incorporated or not, any ownership interest or right or obligation to acquire such ownership interest, whether or not evidenced by a written instrument, but excluding debt instruments which are not convertible into such ownership interests.

"Selling Member" has the meaning set forth in Section 8(f)(i) hereof.

"Target A Amount" means the net equity value of the Company as of September 30, 2012, as determined by an independent valuation firm to be obtained by the Company.

"Tax Distributions" has the meaning set forth in Section 6(d) hereof.

"Tax Matters Member" has the meaning set forth in Section 11(d) hereof.

"Tech Inc." has the meaning set forth in Section 3(a)(ii) hereof.

"Transfer" (and corresponding grammatical variations thereof) means, when used as a noun, any disposition of all or any portion of a Company Interest, for value or otherwise,

including, without limitation, any sale, gift, bequest, assignment, pledge or encumbrance, and whether effected by contract, by operation of law or otherwise. "Transfer" (and corresponding grammatical variations thereof) when used as a verb, shall have a correlative meaning.

"Transfer Notice" has the meaning set forth in Section 8(f)(i) hereof.

"Treasury Regulations" has the meaning set forth in Section 4(d)(i) hereof.

"Unreturned Target A Amount" means, as of any date, the Target A Amount reduced by the aggregate amount distributed through such date to the Existing Members pursuant to Section 6(a)(i) (including, for the avoidance of doubt, through the application of Section 6(d) or Section 10(c)(ii)).

"Unreturned Target B Amount" means, as of any date, $366,000,000 reduced by the aggregate amount distributed through such date to the Members pursuant to Section 6(a)(i) and 6(a)(ii) (including, for the avoidance of doubt, through the application of Section 6(d) or Section 10(c)(ii)).