Page 1

1          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA
2                 PALM BEACH DIVISION

3

4

5

   In Re:                      CASE NO. 13-20853-BKC-PGH
6                              Chapter 11
   TLO, LLC,
7
            Debtor.
8   _____/

9

10

11

12

              Akerman Senterfitt
13         One Southeast Third Avenue
                 Suite 2500
14             Miami, Florida
       Wednesday, November 20, 2013, 10:08 a.m.
15      to Thursday, November 21, 2013, 6:20 a.m

16

17

18

19

20

            A U C T I O N   S A L E
21

22

                  - - - - -
23

24

25

1          (An appearance list is attached to the back

2    of the transcript.)

3          (Thereupon, Exhibit 1, was marked for

4    Identification.)

5          MR. FURR:  Good morning, everyone.  My name

6    is Robert Furr, I'm co-counsel for the

7    debtor-in-possession, my partner Alvin Goldstein is

8    here, also, and Jason Rigoli from my office is here.

9          Akerman Senterfitt is special counsel

10   doing the contract work and the sale work for the

11   debtor-in-possession, David Ristaino is here and

12   the rest of his team is here with him.

13         This is Case Number 13-20853, TLO, LLC,

14   we are on the record, and all the bidding will

15   take place on the record.  We're here pursuant to

16   a motion to sell free and clear, Docket Entry

17   390, and part of the sales procedures or the

18   sales procedures are actually outlined in a court

19   order or attached to a court order, which is

20   Docket Entry Number 358.

21         If you don't have Docket Entry Number

22   358, I have copies here on the table for you.

23   Does anyone need a copy of the bidding

24   procedures?  I'm glad to give you a copy.  Okay,

25   good.

1          We are recording this.  During the

2   bidding process, I would ask that anyone who

3   wants to make a bid for one of the three bidders,

4   stand up, please, announce your name so the court

5   reporter knows you.  Some of you folks are from

6   out of town, and she doesn't know who you are,

7   and anyone who is speaking just announce who they

8   are when they speak, please, so we have a clear

9   record.

10          I think everyone here knows everyone.

11  I'm going to pass around a sheet of paper, if

12  someone has a pad, and ask everyone just to sign

13  so we have a record of who was here, and that

14  will go around the table.  I appreciate you doing

15  that.

16          We have three qualified bidders, which

17  were selected by the debtor-in-possession, we

18  want to thank all of them here.  The bidders are,

19  TransUnion Acquisition Corporation, which had a

20  bid of $105 million; WP TLO Acquisition

21  Corporation, which had a qualified bid of

22  $108 million; and Lexis Nexis Risk Solutions of

23  Florida, Inc., which had a qualifying bid of

24  $120 million.

25          Pursuant to the bidding procedures, the

1    debtor selected as the starting bid, the bid of

2    Lexis Nexis of $120 million.  The debtors ask

3    that everyone here be familiar with the bidding

4    procedures.  We're going to follow the bidding

5    procedures as set forth in the bidding procedures

6    today.

7              I want to point out some things to you

8    there to make sure you understand it.  One of the

9    paragraphs in the bidding procedures states,

10   quote, "The debtor may, in its absolute and sole

11   discretion, evaluate bids on various grounds,

12   including, but not limited to, any delay,

13   additional risks, including closing risk, and

14   added costs to the debtor, including, without

15   limitation, payment of the break-up fee and

16   expense reimbursement to the proposed buyer."

17             That means that the -- it takes two

18   things to win this, the best and the highest, and

19   the best may not be the highest, so we'll let you

20   know as we go on how that goes.

21             The bidding procedures have certain

22   provisions in them, which we -- which you all,

23   I'm sure, are familiar with, and I'm going to go

24   over some of those with you for a few minutes.

25             First of all, the auction must be

1   governed by the following procedures:  It must be

2   transcribed by a qualified court reporter, we

3   have that here.

4           Only a qualified bidder that has

5   submitted a qualified bid, the proposed buyer,

6   other persons specified in the order, officers

7   and employees of the debtor, and other such

8   persons or entities that the debtor reasonably

9   determines shall be permitted to attend the

10  auction.  We permitted and allowed everyone here

11  to attend the auction.

12          Only a qualified bidder that has

13  submitted a qualified bid and the proposed buyer

14  shall be eligible to participate in the auction,

15  submit any subsequent bids as defined at the

16  auction.

17          We received the qualified bids two days

18  before the auction.  We selected the starting

19  bid, as I said earlier, as Lexis Nexis.

20          Bidding at the auction shall commence

21  at the amount of the starting bid, which is

22  $120 million.  Subsequent bidding shall occur in

23  one or more rounds, with each subsequent bid in a

24  minimum increment of $3 million in cash, if such

25  bid is the bid immediately following a bid by the

1   proposed buyer, or at least one million in cash,

2   if such bid is the bid immediately following the

3   bid by any qualified bidder, other than the

4   proposed buyer, what's called a subsequent bid.

5           Does everybody understand that?  No

6   questions?

7           A round of bidding will conclude after

8   each participating and still-eligible qualified

9   bidder has had the opportunity and turn to submit

10  one subsequent bid with full knowledge of the

11  immediate prior round of bids.

12          All subsequent bids shall be open and

13  made orally in the presence of all parties and

14  shall be transcribed by a court reporter.

15          The bidding will continue in one or

16  more rounds of bidding, so long as during each

17  round at least one subsequent bid is submitted by

18  a qualified bidder.

19          The auction may include individual

20  negotiations by the debtor with qualified

21  bidders.  What that means, we'll break off during

22  the day and we can have negotiations with one of

23  the -- different groups of you.

24          For purposes of evaluating the value of

25  the consideration provided by subsequent bids,

1  the debtor shall take into account the break-up

2  fee and the expense reimbursement payable to the

3  proposed buyer under the stalking horse APA and

4  bidding procedures order if the proposed buyer is

5  not the successful bidder.

6           For the purpose of evaluating

7  subsequent bids, the debtor may require a

8  qualified bidder, other than the proposed buyer

9  submitting a subsequent bid, to submit as part of

10 its subsequent bid additional evidence in the

11 form of financial disclosure or credit-quality

12 support information or enhancement reasonably

13 acceptable to the debtor in its sole discretion,

14 after consultation with Tech, Inc. and the

15 committee, demonstrating such qualified bidder's

16 ability to close a proposed transaction at the

17 amount of the subsequent bid.

18           Finally, the debtor may, in

19 consultation with the committee and Tech, Inc.,

20 employ and announce at the auction additional

21 procedural rules that are reasonable under the

22 circumstances, that is the amount of time allowed

23 to make subsequent bids for conducting the

24 auction, provided that such rules are, A, not

25 inconsistent with these bidding procedures, the

1   Bankruptcy Code, the bidding procedures order,

2   the bankruptcy rules, the local rules or any

3   other order of the Bankruptcy Court entered in

4   connection hereto and disclosed to each qualified

5   bidder.

6           Someone asked me earlier if someone

7   didn't bid in a round, could they bid in a

8   subsequent round?  The answer is yes.  Everybody

9   understands that?  Anyone have any questions

10  about the bidding procedures?  Anyone have any

11  questions about the procedures today?

12          Yes.

13          MR. MILLER:  Robert, a comment.

14  Ray Miller, I represent the D.I.P. lender.  The

15  comment, in the bids from both TransUnion and WP,

16  there's an option provision for the D.I.P. lender.

17  The bidding procedures reflect that option to be

18  exercised before the auction.

19          We've agreed with both TransUnion and

20  WP that that option would actually be exercised,

21  if at all, according to its terms --

22          MR. FURR:  Right.

23          MR. MILLER:  -- which is at the time of the

24  sale.

25          MR. FURR:  Okay.  Thank you.  Does

1    everybody understand that?

2              MR. ANKER:  For TransUnion Acquisition

3    Corp., we can confirm that statement.

4              MR. FURR:  Okay.  Thank you.

5              MR. SLAINE:  WP confirms that.

6              MR. FURR:  Can we get your name, sir?

7              MR. SLAINE:  Mason Slaine.

8              MR. FURR:  Okay.  Thank you.

9              MS. ASHER:  Does Lexis have a

10   representative in the room?

11             MR. FURR:  Pardon?

12             MS. ASHER:  Does Lexis have a

13   representative in the room?

14             MR. BATTISTA:  No.

15             MR. RISTAINO:  Lexis is not in the

16   room.

17             MR. FURR:  I thought they were in the room.

18             (Thereupon, a recess was taken.)

19             MR. FURR:  Back on the record.

20             Again, my name is Robert Furr.  I'm the

21   attorney for the debtor-in-possession.  We were

22   missing one of the groups of buyers, that is the

23   Lexis Nexis folks, they're here now in the room.

24             I'm not going to go back through

25   everything I quoted earlier, I'm just going to

1  ask the Lexis Nexis folks to make sure they have

2  a copy of the bidding procedures, which is Docket

3  Entry Number 358, make sure you have that.  If

4  not, we have copies available for you.

5          We are following the bidding procedures

6  this morning.  I asked if anyone had any

7  questions about the bidding procedures, no one

8  had any questions.

9          I have the same question for the

10  Lexis Nexis folks if they have any questions

11  about the bidding procedures?

12          Yes.  State your name so the court

13  reporter knows who is talking.

14          MS. McLENDON:  Kathrine McLendon,

15  Simpson Thacher & Bartlett.

16          We had discussed earlier that there

17  were a couple of points you were going to state

18  on the record, I apologize if we missed them --

19          MR. FURR:  Right.

20          MS. McLENDON:  -- in terms, just in

21  terms of process issues and ---

22          MR. FURR:  I think I did.  What were those

23  again?

24          MS. McLENDON:  Well, in terms of how

25  the rounds would proceed and the overbids, and

1    also the ability of a bidder --

2            MR. FURR:  Yeah, I did say that.

3            MS. McLENDON:  -- to sit out a bid.

4            MR. FURR:  I did say that.

5            MS. McLENDON:  You did say that.

6            MR. FURR:  Yeah.  I'm reading here -- this

7    was Ray Miller, who is the attorney for the D.I.P.

8    lenders, announced that the bidding procedures order,

9    I think it's the bidding procedures order, or the

10   sale motion says that the D.I.P. lenders can take

11   their option to take stock in one of the bidders,

12   that has to be done as of today?

13           MR. MILLER:  The bidding procedures says

14   before the auction --

15           MR. FURR:  Right.

16           MR. MILLER:  -- both option agreements are

17   at the time following the sale, and both of the

18   bidders, who include the stock option, have -- it

19   doesn't apply to your bid, obviously, but both of

20   them agreed to extend it to the terms of the option,

21   rather than the bidding procedures, which is prior --

22   following the sale.

23           MR. FURR:  I also stated in the initial

24   meeting, Kathrine, your folks, I was quoting from the

25   bidding procedures order, the paragraph that provides

1    the debtor has the absolute and sole discretion to

2    evaluate bids on various grounds, including, but not

3    limited to, any delay, additional risk, including

4    closing risk, and added cost to the debtor,

5    including, without limitation, payment of the

6    break-up fee and expense reimbursement to the

7    proposed buyer.

8            So everyone understands that.  Any

9    questions on that at all?  Anyone have any other

10   comments before we start?

11           Okay.  So we have the opening bid or,

12   excuse me, the starting bid is $120 million from

13   Lexis Nexis.  I'll entertain an offer from the

14   lowest bidder at this point, which is TU.

15           State your name again, Phil.

16           Do you want to stand here?

17           MR. ANKER:  Yeah, I just thought it might

18   be easier.  Is that microphone on?

19           MR. FURR:  No, you have to use your voice.

20           MR. ANKER:  Thank you, Robert.

21           Philip Anker, Wilmer Cutler Pickering

22   Hale & Dorr, outside counsel for TransUnion

23   Acquisition Corporation.

24           I'll just use the acronym TransUnion

25   just for ease of conversation, and obviously

1  we're happy to confirm anything in writing.

2  Indeed, I think that probably in the end is

3  useful so that there's no potential confusion.

4         TransUnion is prepared to increase its

5  bid.  Before providing the dollar amount, let me

6  make some things clear.  First, this is a bid to

7  be accepted by the debtor, with the debtor then

8  on Friday seeking court approval of the bid.  It

9  is not, it is not an agreement to be a backup

10  bidder at all.  We are not agreeing with this bid

11  to be a backup bidder.

12         Secondly, we are prepared to waive

13  various conditions that are set forth in our

14  agreement, those conditions and, again, I'm happy

15  to either on the record or -- ultimately on the

16  record, or later confirm with conversations off

17  the record, to then be confirmed on the record,

18  to the extent that Section 5.1A, as in apple,

19  requires not only the entry of a sale order, but

20  that that sale order become final and

21  nonappealable, we are prepared to close without

22  finality, notwithstanding the pendency of an

23  appeal, as long as the order is in effect and not

24  subject to a stay by any court of competent

25  jurisdiction.

1          Second, we waive Section 5.1B, as in

2     boy; third, we waive 5.1C, as in Charles; 5.1D

3     would remain; 5.1E would remain; 5.1F and G would

4     be waived; 5.1H would remain, although our list

5     of material assigned contracts will change, as

6     I'll note; 5.1J, as in jump, we would waive; I

7     was not in the agreement; 5.1K, we are prepared

8     to have a discussion with the debtor simply to

9     make sure that various third parties, who at

10    times it has been suggested have or might assert

11    property rights, have not, in fact, done so, and

12    if we get comfort on that, I think we will be

13    prepared, but are not prepared as I sit up here

14    now, or as I stand up here now to waive; and then

15    the remaining conditions, 5.1L through O, would

16    remain.  They are pretty basic and standard

17    conditions.

18          Third, we are going to adopt and,

19    again, I think in the end, we would put a -- we

20    would revise the asset purchase agreement so we'd

21    have a complete document, but in the Lexis Nexis

22    bid, there is a new term evidenced or set forth

23    in the Section 1.1A, as in apple, 9, in the

24    whole, unavailable contracts, which as we

25    understand it, is a provision that says if any

1  contracts have been added to the database since

2  November 14, there are provisions for those to be

3  assumed and assigned at the request of the buyer.

4         We would adopt and modify our agreement

5  to so provide, as well.  We're happy to have a

6  conversation with the debtor, but there have been

7  modifications to the database in the last several

8  days.

9         We would also change Section 1.2A5 in

10  the whole, with respect to Tracers, to match that

11  of Lexis Nexis.

12         We would change Section 2.5, also to

13  match Lexis Nexis with respect to Tracers, which

14  I think takes that issue out of the agreement or

15  out of issue.

16         We would change the contracts that we

17  require or that would be assumed under 1.1A9 in

18  the whole, and to the extent we delete an

19  agreement, it would also obviously be deleted

20  from our list of material contracts that are a

21  condition to closing.

22         The contracts to be deleted are as

23  follows:  On our Schedule 1.1A9 under all data

24  license agreements between seller and the

25  following parties:  Item 8, memorandum of

1  understanding dated September 16, 2011, by and

2  between TLO, LLC and Division of Motor Vehicles

3  Delaware; Number 11, data license agreement dated

4  June 29, 2010, by and between TLO, LLC and

5  Equifax, we are removing all agreements with

6  Equifax from our list of agreements to be assumed

7  and assigned, so that would also include Items

8  12, 13 and 14.

9           I'm happy to read the full titles into

10 the record if you need me to, I think I've

11 created a clear enough record.

12           MR. FURR:  That's okay.

13           MR. ANKER:  The debtor's counsel has said

14 we've created a clear enough record.

15           Can I have one moment, please?  We have

16 a stipulation in place with Experian for the

17 assumption of its agreements.  Although there are

18 parts of it that would be rejected, I think,

19 frankly, it will be complicated for me to explain

20 it orally, we're happy to make a copy, provide it

21 to the debtor and the other parties in interest

22 so you can see it, but I think that's an easier

23 way for me to explain.

24           So the Experian agreements would stay

25 on the list, except to the extent we are seeking

1   to reject them, and I think that's fundamentally

2   the business information services portions of the

3   agreement, but we have an agreement with Experian

4   in place for the assumption of its agreements,

5   the remaining agreements, with an assumption and

6   cure that is lower than the debtor had previously

7   estimated, although they would then be able to

8   file a rejection claim and the debtor would be

9   able to contest it.

10          We would delete Item 17, memorandum of

11  understanding, driver's license and/or motor

12  vehicle record data exchange by and between TLO

13  and Florida Department of Highway and Safety

14  Motor Vehicles.

15          We would delete Item 25, agreement for

16  purchase of driver records database to private

17  entities by and between TLO, LLC and Texas

18  Department of Public Safety.

19          We would delete Item 26, memorandum of

20  understanding by and between TLO, LLC and State

21  of Utah, acting through the Utah State

22  Commission.

23          We would delete Item 27, agreement as

24  to driver privacy protection policy, State of

25  Vermont, Department of Motor Vehicles, by and

1   between TLO, LLC and Vermont Department of Motor

2   Vehicles.

3            Then under all letter agreements

4   between seller and the following parties, we

5   would delete letter dated July 24, 2013 with

6   Bayshore Partners.  We understand that Bayshore

7   is entitled to be paid a fee in this bankruptcy

8   case, but -- and we're not seeking to in any way

9   change or alter its rights vis-a-vis the

10  debtor -- it simply seems to us that there is no

11  ongoing relationship once the deal closes that

12  needs to be the subject of that agreement.

13           Similarly, we would delete the letter

14  dated May 17, 2012, Item 3, with GCA Savion, if

15  I'm pronouncing it correctly, Advisors, and we

16  would also delete under joint venture, joint

17  venture operating agreement for Linebarger

18  Analytics & Investigative Services dated December

19  21, 2011, by and between TLO, LLC and Linebarger

20  Goggan Blaire & Sampson, LLP.

21           I believe I've covered the agreements,

22  that we would delete, and we would not add any

23  agreements, other than to the extent that new

24  agreements have been added to the database, they

25  would be picked up by the unavailable contracts

1   provision that we have added to the agreement.

2           We have contract assumption with Simon,

3   stipulations in place, happy to provide them to

4   the debtor, for substantially all data agreements

5   and we, therefore, do not believe any of them

6   will be an issue for our ability to close.

7           In addition, the Warburg Pincus

8   agreement or Warburg agreement, I should say,

9   contains what might be characterized as a hell or

10  high water provision with respect to antitrust

11  approval.

12          Section 4.12B, as in boy, we are

13  prepared to adopt a substantially similar

14  provision for us.  There may need to be some

15  minor tweaking just for language, but we're

16  prepared to do that.

17          Finally, I understand that the lessor

18  for the real property in Boca takes the position

19  that its agreement is not an executory contract

20  and, therefore, it can't be subject to the

21  provisions of the agreement for executory

22  contracts because it was executed postpetition.

23          To the extent that is right and,

24  therefore, the conditions aren't clear already,

25  it is obviously a condition precedent for us to

1  close that the landlord approve us as the tenant,

2  to the extent that is required.

3           I can represent that I was in contact,

4  and we were in contact with their lawyers

5  repeatedly, including yesterday, and we do not

6  envision any difficulties at all in making that

7  happen.

8           Unless I've left something out, I think

9  I've listed all the changes to our agreement.

10  We're prepared to increase our bid from the

11  current $105 million to $109 million, which puts

12  us a million dollars higher than the Warburg bid.

13           For reasons that we have discussed off

14  the record, but I will state briefly on the

15  record, we do not believe Lexis Nexis has the

16  ability to close in any time that is material to

17  this agreement.

18           We note that they have added specific

19  provisions to their agreement that not only don't

20  have a hell or high water provision, but

21  expressly provide that they are not committing to

22  make any changes, including any divestitures if

23  requested by the antitrust folks, who will be

24  reviewing this.

25           Obviously, the debtor will need to make

1    a judgment, but it is our assessment that our bid

2    is now the highest and best, given the certainty

3    of closing, and that we are higher than the only

4    remaining bid that has a hell or high water

5    provision.

6              We invite Lexis Nexis and other

7    parties, including Warburg, to match us in taking

8    out conditions.  We're prepared to close.

9              Thank you.

10             David.

11             MR. RISTAINO:  Dave Ristaino with

12   Akerman, a couple of questions, Phil.

13             In your opening, you mentioned that TU

14   is not a backup bidder.  The instructions, the

15   bidding instructions, provide that your bid is

16   outstanding for the 30 days.

17             MR. ANKER:  We are -- if the debtor doesn't

18   want to accept our bid -- the bidding procedures

19   allow the debtor to modify the bid procedures in any

20   way it deems appropriate.  Your co-counsel, Mr. Furr,

21   said that orally.

22             We acknowledge that our opening bid of

23   $105 million was a bid subject to the bid

24   procedures.  If the debtor wants to conclude that

25   our bid is not acceptable because of what I said,

1   the debtor can make that judgment and seek to

2   explain it and justify it to the Court.

3            But I want to be absolutely clear, our

4   bid is not to be a backup bidder, our bid is

5   conditioned on the acceptance by the debtor of

6   the bid at the conclusion of this auction,

7   followed by the debtor seeking court approval.

8            MR. RISTAINO:  Okay.  Also, in addition,

9   when you mentioned that you have agreements with the

10  data contracts, except for Equifax, which you are

11  rejecting, the other ones that you reached agreements

12  on, those then come off 5.1H, they come off that

13  schedule?

14           MR. ANKER:  That's right.  Let me be a

15  hundred percent clear, David.  We have agreements

16  with substantially all, and I think if we haven't

17  provided them to you already, it's only because of

18  the flurry of activity, happy to provide them to you

19  today for you to look at them and make sure you agree

20  to them.

21           I think there are three or so where we

22  have no agreement, but they have not filed an

23  objection.  Our position is that having failed to

24  file an objection, they are deemed to have

25  consented, but I think we can satisfy you that we

1  are essentially there on all of the data

2  agreements, so that should not be an issue for

3  our ability to close.

4          MR. RISTAINO:  Same thing with the lessor,

5  that would come off, as well?

6          MR. ANKER:  Well, the -- we do not -- no.

7  Let me just state that again, and I apologize if

8  there was any confusion.

9          It is obviously a condition to our

10 closing that we have real property to run the

11 business.  I was trying to say that the lessor

12 has taken the position, and I think it's

13 requested a provision to be added to the order,

14 that would say, this order does not obligate the

15 lessor to lease the space to the successful

16 bidder.

17         The lessor's position is that the

18 authority of a Bankruptcy Court to do that, I

19 don't want to speak for it, but my understanding

20 of its position, is not applicable here because

21 this is a new postpetition agreement, so it is a

22 condition precedent.

23         But it has been in conversations with

24 us, it has asked for certain things that we have

25 agreed to give it, and I'm happy to represent to

1  you that I would be flabbergasted if in the end

2  we were unable to reach agreement with the

3  lessor, but if that were to happen, does that

4  remain a condition?  Yes, it remains a condition.

5           MR. RISTAINO:  Okay.

6           MR. ANKER:  Can I have one second, please?

7           MR. FURR:  Sure.

8           MR. ANKER:  Have I answered, David, your

9  questions?

10          MR. RISTAINO:  Yes.

11          MR. ANKER:  Robert, do you have any

12 questions?

13          MR. FURR:  I'm fine.

14          MR. ANKER:  We obviously reserve the right

15 to come back in the future, but we hope that this

16 bid, and we think this bid is meaningful and should

17 be acceptable to the debtor.

18          MR. FURR:  Thank you.  Hold your applause,

19 please.  Let me have the next bidder.  Do you want to

20 bid?

21          MS. LEVINE:  Sharon Levine, Lowenstein

22 Sandler, for the Warburg Pincus Group.

23          Can we have a list of those changes in

24 writing?  We understand that the contract

25 language isn't there yet, but just a list of the

1   changes and the stipulation that you referred to,

2   then we're going to need a couple of minutes just

3   to look at it, if that's okay.

4          MR. FURR:  Sure.  I have my notes.  Do you

5   have anything typed out?

6          MR. ANKER:  Can the court reporter hear me

7   from here?

8          MR. FURR:  Yes.

9          THE COURT REPORTER:  Yes.

10          MR. ANKER:  Okay.  I do not have them typed

11   out, I'm happy to try to put something together, it

12   will probably take me on the order of 15 minutes.

13          MR. FURR:  Okay.  Let's take a break.

14          MS. LEVINE:  We're going to caucus, anyway,

15   if you can get that to us that will be great.

16          MR. FURR:  Okay.  We'll take a break for a

17   few minutes and then we'll come back.

18          (Thereupon, a recess was taken.)

19          MR. RISTAINO:  All right.  Dave Ristaino

20   here from Akerman.

21          We're going to reconnect on the

22   bidding.  WP, do you want to make your bid?

23          MR. SLAINE:  I'm Mason Slaine representing

24   the Warburg Pincus Group.  Our new bid is

25   $110 million.  We reject all the Equifax agreements,

```
 1   we confirm we'll agree to be -- we will agree to be
 2   the backup bidder.  We confirm we will accept the
 3   same modifications to the purchase agreement on
 4   Tracers.  We will modify the antitrust provisions of
 5   the asset purchase agreement to confirm we will
 6   request early termination of the HSR waiting period
 7   when we submit our application, that's it.
 8              Questions?
 9              MR. RISTAINO:  If there's no other
10   questions, I think we're going to -- we're going to
11   adjourn.
12              We're going to adjourn for about five
13   or ten minutes and kind of discuss the two bids
14   and come back.
15              (Thereupon, a recess was taken.)
16              MR. FURR:  Starting back on the record.
17              MS. LEVINE:  Two things, Sharon Levine,
18   Lowenstein Sandler, for the Warburg Pincus Group.
19   Number one ---
20              UNIDENTIFIED SPEAKER:  Can you speak
21   louder?
22              MS. LEVINE:  Sharon Levine from Lowenstein
23   Sandler for the Warburg Pincus Group.  Number one ---
24              MR. FURR:  The microphone doesn't work.
25              MR. RISTAINO:  It does not work, you've got
```

1    to speak up.

2              MS. LEVINE:  Sharon Levine, Lowenstein

3    Sandler, for the Warburg Pincus Group -- can you hear

4    me?

5              THE COURT REPORTER:  Yes.

6              MS. LEVINE:  Number one, just for a

7    reservation of right, we're lodging an objection to

8    the off-site conversations that took place.  We think

9    all the bidding and all of the valuing of the bidding

10   should be discussed openly with all the bidders in

11   this room, number one.

12             Number two, we're modifying our last

13   bid, the bid price is 112, but we are withdrawing

14   the offer to be a backup bidder.

15             MR. FURR:  Right now we have 110 million --

16   112 million from Warburg Pincus without being a

17   backup bidder, we have 109 from TU without being a

18   backup bidder, and we have 120 from Lexis Nexis.

19             The debtor does not accept the bids

20   that refuse to be a backup bidder, they're not

21   qualified bids, so that's the end of this round.

22   If you want to come back and make another bid,

23   let us know.  Right now those bids are not

24   acceptable.

25             MR. ANKER:  I just thought I would stand up

1   just so we can try to expedite matters a bit.   I

2   understand the debtor's position.   Notwithstanding

3   the debtor's position, TransUnion increases its bid

4   to 113 million, on the same condition that we are not

5   agreeing to be a backup bidder.

6              In addition, there is at least one

7   other contract that we meant to flag that we

8   would reject.  I don't have it at this instant in

9   time, but we will get it, but it is a data

10  agreement of one type or another.

11             I will also note, we do not lodge an

12  objection to your having conversations with

13  separate parties, the bid procedures explicitly

14  provide that the debtor may have negotiations

15  with various parties.

16             I'm confident that if any bidder tells

17  you anything in confidence, you will not share

18  that with other bidders.

19             MR. FURR:  No, we will not.  Thank you.

20             MR. ANKER:  If you want, one second and

21  I'll give you the name of the contract.

22             MR. FURR:  Okay.

23             MR. ANKER:  Philip Anker, again, for

24  TransUnion Acquisition Corporation.  The additional

25  agreement that we would remove from, I think it's

Page 29

1  Schedule 1.1A9, I believe is the assigned contracts,

2  and to the extent it was on our material contract

3  schedule, it would come off, as well, it is Item 3

4  under all distributor agreements between seller and

5  the following parties, and it's titled agreement

6  dated May 7, 2013, by and between TLO, LLC, and LLH

7  Data, LLC.

8            MS. ASHER:  LLH?

9            MR. ANKER:  Yes.

10           MR. FURR:  Does anyone have a response to

11  that bid?

12           MS. ASHER:  It's not a ---

13           MR. SLAINE:  You say that it doesn't

14  count ---

15           MS. ASHER:  It's not a bid.

16           MR. FURR:  I'm just asking if you have a

17  response to it, it's not a bid.

18           MR. SLAINE:  We need a break.

19           MR. FURR:  Okay.

20           (Thereupon, a recess was taken.)

21           MR. FURR:  We're back on the record for the

22  bidding.  We took a break.

23           MR. SLAINE:  Okay.  Well, since the terms

24  of our $112 million bid were rejected, we now stand

25  by our $108 million bid, and agree to remain as

1   backup bidder per our $108 million bid.

2          We want to point out that we have many

3   fewer closing conditions than the two other

4   bidders, including the lease, the building lease,

5   and we have no data contract closing conditions.

6          We believe that this is, in fact, the

7   highest and best bid due to these items and to

8   the conditionality of the Lexis Nexis offer.

9          Thank you.

10          MR. FURR:  Thank you.

11          MR. UNDERWOOD:  I have a question.  The

12   other changes you have made to your contract

13   earlier in connection with larger bids, some of

14   which were just terms of the contract, are you

15   still standing by those changes that were made?

16          MS. LEVINE:  Yes.  It's like the Equifax.

17          MR. SLAINE:  You can respond.

18          MS. LEVINE:  Yes.

19          MR. UNDERWOOD:  Thank you.  Scott

20   Underwood, for the record.

21          MR. FURR:  Okay.  So we're back to the

22   beginning, ten o'clock this morning, we're still in

23   round one, in effect.

24          So does TransUnion have a response?

25          MR. ANKER:  Can we just take a couple of

1   minutes?

2            MR. FURR:  Sure.

3            MR. ANKER:  I suspect it will not be very

4   long --

5            MR. FURR:  Okay.

6            MR. ANKER:  -- so if you want to stay here

7   and it looks like it's going to be longer, we'll be

8   happy to let you know.

9            MR. UNDERWOOD:  Before you leave, I

10  want to ask one more clarifying question to

11  Warburg.

12           You previously announced you were

13  rejecting Equifax.

14           MS. LEVINE:  Yes.

15           MR. UNDERWOOD:  Is that still the case?

16           MS. LEVINE:  Yes.

17           MR. UNDERWOOD:  So all the prior

18  announcements are still the case except for what was

19  just clarified?

20           MS. LEVINE:  Yes.

21           MR. UNDERWOOD:  Thank you.

22           MR. FURR:  And you're still a backup bidder

23  at 108?

24           MS. LEVINE:  Yes.

25           MR. FURR:  Okay.

1           (Thereupon, a recess was taken.)

2           MR. FURR:  Okay.  We're back on the record.

3           TransUnion, Phil.

4           MR. ANKER:  Sure.  Thank you.  Is the mike

5    working now?

6           MR. RISTAINO:  Yes.

7           MR. ANKER:  On behalf of TransUnion

8    Acquisition Corp., we increase our bid to

9    $118 million.  It does, as a legal matter, include

10   the condition that we are not prepared to be a backup

11   bidder, but at $118 million, we are economically

12   higher than the Lexis Nexis bid, since they would

13   have to -- the estate would have to forfeit a two and

14   a half million dollar break-up fee and, in any event,

15   given all the conditionality and lack of reality of

16   the Lexis Nexis bid, seeming lack of reality, I don't

17   think that should be an issue, but it's 118, same

18   terms and conditions as previously specified, period.

19          MR. FURR:  Well, we have a nonqualified

20   bid.  Response.

21          MR. SLAINE:  We need a few minutes.

22          MR. FURR:  Sure.

23          MS. LEVINE:  Okay.  Sorry, actually, we

24   want a valuation before that.  I mean, you're saying

25   it's not qualified because you are assuming it's less

Page 33

1   valuable than the Lexis Nexis bid, I want to

2   understand how you reach that.

3           MR. FURR:  It's not qualified because he's

4   not willing to be a backup.

5           MR. ANKER:  Robert, I'm not -- I don't

6   think today is the occasion.  If we have to go in

7   front of the Judge --

8           MR. SLAINE:  We can't hear.

9           MR. ANKER:  I'm sorry.  I don't think today

10  is the occasion to make oral arguments and debate the

11  law, so I'm not going to.

12          I simply will note that it's

13  demonstrably obvious that our bid is the highest

14  and best bid economically, and so one only gets

15  to an issue of being a backup bidder if you have

16  the second best economics, and I would ask you to

17  make a determination who is the highest and best

18  bid, and the parties can then react.

19          MR. FURR:  Okay.  Thank you.  Do you want a

20  break now?

21          MS. LEVINE:  No, no, we second the request

22  and would like to understand what bid it is you think

23  we would be bidding against.

24          MR. FURR:  Well, we need to talk, I can't

25  do that without --  by myself.

```
 1              (Thereupon, a recess was taken.)
 2         MR. FURR:  Back on the record.
 3         The debtor was asked a question before
 4 we broke, how the debtor evaluated TU's last bid,
 5 which was 118 million, but was not going to be a
 6 backup bid.  If it had a backup bid provision
 7 with it, it would be the best and highest offer
 8 in the debtor's opinion, but it doesn't, and it's
 9 not qualified.
10         MR. SLAINE:  What?  We cannot hear you.
11         MR. FURR:  It's not a qualified bid because
12 it doesn't have the backup bid provision.  If it had
13 the backup bid provision, it would be the best and
14 highest offer in the debtor's opinion.
15         Now we've got, I think, two bids here.
16 Would anyone -- would ---
17         MR. RISTAINO:  I mean, we have to have a
18 backup bid.  There's no two ways about it, we have to
19 have a backup bid, it's in the procedures, it's what
20 everyone -- you know, it's what was agreed to, the
21 Court issued it, you've got to agree to commit to
22 30 days.
23         MR. ZUCKERMAN:  I think -- Steve Zuckerman.
24 We're in a position where it's up to TransUnion to
25 either bid or not bid.  We've got a conforming
```

1    bid ---

2          MR. SLAINE:  Can you go up to the podium so

3    we can all hear you?

4          MR. ZUCKERMAN:  Sure.  I think it's up to

5    TransUnion to either bid or not bid, we have a

6    conforming bid from Warburg, that's where we are.

7          UNIDENTIFIED SPEAKER:  Where are we,

8    108?

9          MR. FURR:  Yeah, 108.

10         MS. McLENDON:  Kathrine McClendon for Lexis

11   Nexis.  I would just like to note for the record that

12   we would request an analysis of the valuation of the

13   TU bid, assuming that condition were removed.

14         Thank you.

15         MR. FURR:  Okay.  Well, I will do my best

16   to do that.  The people on my team can say the same

17   thing.  First of all, there's a break-up fee to be

18   paid from your $120 million offer, that takes it down

19   to $117,500,000, and it's not an unconditional to

20   close bid, TU is ready to close.

21         I think there really are very few

22   conditions, if any, they're qualified otherwise.

23   It's pretty simple.

24         MS. McLENDON:  Can you hear me from here?

25         MR. FURR:  Yes.

1          MS. McLENDON:  We would like your analysis

2     of the impact of the proposed rejection of the

3     Equifax contracts on that for the year, and perhaps

4     we should break and caucus.

5          MR. FURR:  Sure.

6          MR. ZUCKERMAN:  My suggestion is that we

7     not get into an advisory opinion comparing your bid

8     to TransUnion's hypothetical bid.  If TransUnion

9     wishes to bid in a conforming manner, I think it's

10    their opportunity to do so, if we don't, we would

11    like to be advised of that.

12         MR. ANKER:  Why don't we break for a few

13    minutes.

14         MR. FURR:  Sure.

15         (Thereupon, a recess was taken.)

16         MR. FURR:  We're back on the record.

17         Mr. Anker, do you have something you

18    wanted to say?  Phil.

19         MR. ANKER:  TransUnion modifies its last

20    prior bid, which was ---

21         MR. SLAINE:  Can you get closer to the

22    mike, we can't hear?

23         MR. ANKER:  Can you hear me now?

24         MR. FURR:  Sing away.

25         MR. ANKER:   That would be ugly.

1            TransUnion modifies its last prior bid
2    as follows:  The economic terms, the conditions,
3    the contracts, all remain the same, so it's
4    $118 million.  TransUnion will, with respect to
5    this bid, remain a backup bidder in the event
6    that Warburg outbids TransUnion and we do not
7    increase our bid, that is they outbid us by the
8    minimum $3 million.
9            With respect to Lexis Nexis, I don't
10   want to have a long debate on the record, I said
11   that earlier, I don't think this is the
12   appropriate setting for that.
13           Having said that, we firmly believe
14   that their bid is not a real bid, and we will
15   agree to be a backup bidder to Lexis Nexis if,
16   but only if, they match our agreement in removing
17   the conditions that we specified to closing.
18           I think their lettering and numbering
19   is the same as ours, but in ours it was the
20   finality requirement of 5.1A, waiving 5.1B,
21   waiving 5.1C, waiving 5.1F, waiving 5.1G, waiving
22   5.1J.
23           In addition, if they add the provision
24   that is in the Lexis Nexis -- I'm sorry, that is
25   the Warburg bid that we added, the antitrust

1    provision, which in the Warburg agreement is

2    Section 4.12B, and I will read it into the

3    record, without limiting the generality of the

4    buyer's undertakings pursuant to this

5    Section 4.12, buyer agrees to use its reasonable

6    best efforts and to take any and all steps

7    necessary to avoid or eliminate each and every

8    impediment under any antitrust, competition or

9    trade regulation law that may be asserted by any

10   governmental entity, or any other party, so as to

11   enable the parties here to close the transaction

12   contemplated by this agreement as promptly as

13   possible, including proposing, negotiating,

14   committing to, and affecting by consent decree,

15   whole separate orders or otherwise, the sale,

16   divestiture, disposition of any of its assets,

17   properties, business, or the assets, properties

18   or business to be acquired by it pursuant to this

19   agreement as are required to be divested in order

20   to avoid the entry of or to affect the

21   dissolution of any injunction, temporary

22   restraining order or other order of any suit or

23   proceeding, the language goes on, it would have

24   to all be incorporated.

25              In addition, for us to be a backup

1  bidder, of course, that would be on the terms set

2  forth in the agreement and the bid procedures, to

3  a bid by Lexis Nexis, Lexis Nexis would have to

4  delete from its agreement, provisions that are

5  directly contradictory to that, what is the hell

6  or high water provision, including, in

7  particular, Section 8.1F, as in Frank, which in

8  its agreement, and this is not in either our

9  agreement or Warburg's, reads as follows:  For

10  the avoidance of doubt, no provision of this

11  agreement requiring a party to use its

12  commercially reasonable efforts, or commercially

13  reasonable best efforts, shall be deemed to

14  require such party to take an action that would

15  be material and adverse to any business of such

16  party.

17          So under those circumstances, we will

18  have this bid act as a backup bid, subject to the

19  exact terms for backup bids as set forth in the

20  bid procedures, that is a backup bid to Lexis

21  Nexis.

22          With respect to Warburg, we're prepared

23  to have it act as a backup bid if Warburg

24  increases its bid by the requisite $3 million or

25  more.

Page 40

1              MR. FURR:  Any questions?

2              In the debtor's opinion, this is the

3     best and highest bid so far.  Would anyone else

4     like to bid?

5              MS. McLENDON:  Kathrine McLendon for Lexis

6     Nexis.  We want to note an objection, for the record.

7     We do not think that this is a qualifying bid under

8     the bid procedures -- qualified bid, excuse me.  The

9     procedures do not permit what was just proposed and

10    is inconsistent also with the fact that the Lexis

11    Nexis bid was chosen as the starting bid in this

12    auction, and depending on what Ms. Levine is going to

13    say, we would like to request a break to have a

14    discussion.

15             MR. FURR:  Sure.

16             MS. LEVINE:  We join in the objection.

17             MR. FURR:  Okay.  We'll take a break then.

18             (Thereupon, a recess was taken.)

19             MR. FURR:  We're back on the record.

20             The debtor announced that the bid of TU

21    was the highest and best bid so far, and now I

22    welcome anyone that would like to make another

23    bid?

24             MR. BACON:  I'm Doug Bacon, counsel to

25    Lexis Nexis.  Can people hear me?

1          Okay.  Lexis Nexis is willing to bid

2     $121 million.  We are willing to agree to the

3     following revisions to the conditionality

4     provisions of the agreement, and we're referring

5     to the TransUnion proposals.

6            We'd be willing to delete Section 5.1A,

7     the condition there, again, after the words

8     revoked, which is consistent with the TransUnion

9     proposal, we'd be willing to delete 5.1B; we'd be

10    willing to delete 5.1C; we'd be willing to delete

11    5.1J.

12           We note that the request by

13    TransUnion's counsel to delete the HSR condition,

14    nor the injunction condition, would, in fact,

15    potentially put us and the target company in a

16    position of being in violation of the law.

17           As far as the contracts go, again, I'm

18    referring to some of the items in the TransUnion

19    proposal, these are contracts to be removed from

20    the Schedule 1.1 A9 under the data license

21    agreements, that would be Item 17, the same two

22    letter agreements that were proposed by

23    TransUnion, which I believe are Bayshore and GCA,

24    the JB agreement.

25           We'd also reject the LLH agreement, and

1   similar to TransUnion, we would add the

2   Boca Raton lease to Schedule 5.1H.

3           In addition, we would propose moving

4   forward our drop dead date to December 26th.  We

5   would be willing, if we were ultimately not able

6   to complete the transaction by the 26th of

7   December, to forfeit up to -- forfeit, rather,

8   $1 million of our deposit.

9           I would also like to clarify for the

10  record the misstatement that was made earlier in

11  the process, that we have expressly provided that

12  we do not have to make disposals in connection

13  with obtaining the antitrust approval.  The

14  agreement does not expressly disclaim that

15  obligation.

16          I would also, for purposes of the

17  record, like to mention that Lexis Nexis has

18  absolutely every intention, and we do expect to

19  be able to close by the 26th, and complete the

20  HSR process.

21          We've submitted notice to the FTC and

22  are working closely with them, and we have a plan

23  that we believe will result in clearance in

24  connection with the bankruptcy timetable.

25          Thanks.

Page 43

1          MR. FURR:  Thank you.

2          MR. BACON:  I forgot to mention, my

3    colleague Kathrine McLendon's point, that we're

4    making our bid under a reservation of rights based

5    on, in our view, nonqualifying nature of the

6    TransUnion bid in the last round.

7          MR. RISTAINO:  Doug, can you repeat the

8    statement you said about divestitures or what was

9    that statement?

10          MR. BACON:  Well, the statement was made

11    earlier that our agreement -- I believe the statement

12    was made that our agreement provides that we do not

13    have to make divestitures.

14          The agreement that we have obligates us

15    to use certain levels of efforts to get antitrust

16    approvals.  Nowhere in there does it expressly

17    carve out divestitures as one means of being

18    required to get that approval.

19          MR. FURR:  Anyone have any questions on

20    that?  The debtor needs to take a break and discuss

21    this for a few minutes.

22          (Thereupon, a recess was taken.)

23          MR. FURR:  Okay.  We're back on the record

24    for the bidding.  It's 4:30 now, and I appreciate

25    everyone's patience all day.  The debtor still

1   believes that TransUnion's bid is the best and

2   highest bid, and would like to know if Warburg would

3   like to make a bid.

4           MR. SLAINE:  At this time, we are passing,

5   reserve are our right to bid later.

6           MR. FURR:  Okay.

7           MS. McLENDON:  Two points, we would like to

8   request a formal valuation of the bid.  We raised

9   this earlier, we would like to make that request

10  again of the TU bid, and second, just to reiterate

11  our objection to the continuation of the auction on

12  the basis of a nonconforming bid, we think that this

13  is in violation of the bidding procedures.

14          MR. FURR:  Okay.  Well, we're not going to

15  give you a valuation of the bid.

16          MS. McLENDON:  Excuse me, you said you're

17  not going to provide it?

18          MR. FURR:  No, no, no, no.

19          MS. McLENDON:  We'll note another objection

20  for the record --

21          MR. FURR:  Okay.

22          MS. McLENDON:  -- for not providing the

23  valuation.

24          MR. FURR:  Okay.  Anyone want time to talk

25  or can we make a bid at this point?

1          MS. LEVINE:  I just want to clarify, so
2    you're not going to value the TU bid?
3          MR. FURR:  Not the TU bid, her bid.
4          MS. McLENDON:  No, I was asking for the TU
5    bid.
6          MS. LEVINE:  She was asking for the value
7    of the TU bid.
8          MS. McLENDON:  I was asking for the TU bid.
9          MR. FURR:  Oh, no, no.
10          MS. LEVINE:  Okay.  We would, just for the
11    record, object to that, as well.
12          MR. FURR:  Okay.  We're talking about money
13    folks, really, money.
14          MR. SLAINE:  What did you say?
15          MR. FURR:  We're talking about money.
16    We're talking about money, not valuation.  We need
17    better and higher offers, and we need an offer above
18    the offer that TransUnion made.
19          Right now that's the best and highest
20    offer that we have.
21          MS. McLENDON:  Just for the record, we
22    would request how you determine that it's the best
23    and highest offer.  I think you said no --
24          MR. FURR:  I did say no.
25          MS. McLENDON:  -- but I do think it's a

1    money and valuation issue.

2              MR. FURR:  We're not going to do that, so

3    if anyone would like to talk or make another offer?

4              MR. SLAINE:  Yeah, I want to break.

5              (Thereupon, a recess was taken.)

6              MR. FURR:  We are back on the record.

7              MR. SLAINE:  On behalf of the Warburg

8    Pincus Group, I would like to bid $138 million, this

9    will consist of 118 million cash at closing, and

10   $20 million payable upon achievement -- excuse me, of

11   the three-year EBITDA plan prepared by management and

12   deemed by management to be conservative.

13             If the EBITDA plan is achieved prior to

14   the third year, the $20 million will be paid at

15   that time, so our total consideration is

16   $138 million at this time.

17             MR. FURR:  Is this your EBITDA plan, your

18   projected plan?

19             MR. SLAINE:  No, it's management's.

20             MR. FURR:  Oh, okay, management's.  I'm

21   sorry.

22             MR. SLAINE:  It's in the data room.

23             MR. FURR:  Oh, okay.

24             MS. ASHER:  Desiree Asher, Co-CEO of the

25   debtor.

Page 47

1          Just for clarification, all of the

2    stipulations from the previous bids still hold,

3    are there any additional conditions?

4          MS. LEVINE:  The same bid, just the add on

5    on the new dollar number, and the $20 million upon

6    achievement of the business plan.

7          MS. ASHER:  Okay, and the $20 million would

8    go directly to the bankruptcy estate?

9          MR. SLAINE:  Yes.

10          MR. FURR:  Would you agree to be a backup

11    bidder?

12          MS. LEVINE:  Yes, all the other --

13          MR. SLAINE:  Yes.

14          MS. LEVINE:  -- everything else stays.

15    Thank you.

16          MR. UNDERWOOD:  Scott Underwood.  Do you

17    have copies of this business plan?

18          MR. SLAINE:  It's in the data room.

19          MS. LEVINE:  It's in the data room. You

20    have copies of the business plan, you got it from

21    management.

22          MR. UNDERWOOD:  I understand, but you're

23    referring to it as the business plan, I want to make

24    sure we're all referring to the same thing.

25          MR. SLAINE:  It's not a business plan, it's

1    the -- it's the management plan of financial goals

2    and what they expect, what they told us two weeks ago

3    was a conservative plan for achievement in the next

4    three years, management's plan, not our plan.

5              UNIDENTIFIED SPEAKER:  So do you

6    have ---

7              THE COURT REPORTER:  I cannot hear you

8    back there.

9              UNIDENTIFIED SPEAKER:  All right.  I'll

10   yell.

11             THE COURT REPORTER:  I don't know who

12   he is.

13             MR. FURR:  Sir, your name, please.

14             MR. PECK:  Jim Peck, TransUnion.  Have

15   you thought through if you're going to pay it on

16   a graduated scale or it's all or nothing after

17   the third year?

18             MR. SLAINE:  Is that for him to ask?

19             MR. PECK:  I need to understand the

20   value to bid.

21             MS. ASHER:  Okay.  Desiree Asher,

22   co-CEO of the debtor.  Have you evaluated whether

23   or not you are going to pay on a sliding scale or

24   is it an all or nothing plan?

25             MR. SLAINE:  We would have to caucus on

Page 49

1   that.

2             MS. ASHER:  Fair enough.  Thank you.

3             MR. ANKER:  And by the management plan, you

4   mean what was in the confidential information

5   memorandum?

6             MR. SLAINE:  What did he say?  Robert, they

7   need to come up there to talk.

8             MR. FURR:  Come up.

9             MR. HAMOOD:  So the question is --

10  sorry, Al Hamood, TransUnion.

11            So the question is, for clarity

12  purposes, and to make certain it's all on the

13  same basis, you're referring to the

14  confidential -- the SIM document that's in the

15  data room in terms of management's plan?  When

16  you talk about management's plan, what is the

17  basis of that?

18            MR. SLAINE:  It was the plan delivered by

19  the management to us, and the other bidders, as to

20  what they expect to achieve in the business the next

21  three years.

22            MR. HAMOOD:  Okay.  We would like to

23  get that document in the diligence room so we,

24  along with everybody, has the same basis as to

25  what they're referring to, please.

1          MR. ZUCKERMAN:  I would suggest, for ease

2    of valuating this, just tell us what the EBITDA

3    number is you're targeting, as opposed to pointing to

4    a plan.

5          MR. SLAINE:  I don't have it, ask the

6    management company.

7          MR. FURR:  Okay.  We can get that.

8          MS. ASHER:  We're capable of telling them

9    what we provided, it's not a problem.

10          MR. RISTAINO:  Yeah.

11          MR. FURR:  Okay.  We'll break.

12          MR. RISTAINO:  So we'll get copies and

13    submit them to everybody.

14          MR. FURR:  Does TU want to make a competing

15    bid to that?

16          MR. GART:  We want to hear the debtor's

17    response.

18          MR. FURR:  We're not sure yet.  I've

19    personally never seen it, so I can't comment on it.

20          MR. ANKER:  Philip Anker for TransUnion

21    Acquisition Corp.

22          I note that the bid procedures

23    specifies -- I note that the bid procedures

24    specify that all incremental bids must be --

25    where TransUnion is the higher bid, at least

```
 1    $3 million payable in cash.
 2            I would submit that the bid that has
 3    just been given is not in compliance with the bid
 4    procedures, and we would request that the
 5    debtor -- and obviously the debtor may take time
 6    to evaluate it, I'm not asking you to do it on
 7    the spot, but we would ask the debtor to evaluate
 8    it and let us know its position.
 9            MR. FURR:  Thank you.
10            MR. RISTAINO:  15 minutes.
11            MR. FURR:  15 minutes, folks.
12            (Thereupon, a recess was taken.)
13            MR. FURR:  We're back on the record after
14    a few minute break.
15            The response of the debtor to the
16    offer, we really appreciate the offer, is that
17    does not have economic meaning to us, that your
18    bid does not qualify because you didn't bid more
19    than $3 million cash than the TU bid.
20            MS. LEVINE:  Can I ask just for a
21    clarification?
22            MR. FURR:  Sure.
23            MS. LEVINE:  You're saying you're not
24    valuing the earn out at three million?
25            MR. FURR:  We're not valuing it at all.  It
```

1   certainly would be nice if you made an offer with it,

2   but we have to have $3 million cash above their bid

3   to be a qualified bid.

4           MS. LEVINE:  Cash at closing?

5           MR. FURR:  Obviously at closing, yeah.

6           MS. LEVINE:  Okay.  Well, that's not part

7   of the bidding procedures.  The bidding procedures

8   provide at least three million in cash if such bid is

9   the bid immediately following the bid by the proposed

10  buyer.

11          So we're saying we're going to pay you

12  $20 million, just not at closing, which makes it

13  more than $3 million.

14          MR. FURR:  Well, that is intended to mean

15  $3 million in cash per round or per bid, it's not the

16  first round.

17          MS. LEVINE:  Putting aside the irony that

18  you're calling our bid nonconforming ---

19          MR. UNDERWOOD:  Can you talk in the

20  microphone, please.

21          MS. LEVINE:  Sure.  Putting aside the irony

22  that you're calling the bid nonconforming, what I'm

23  trying to understand, and I guess this goes back to

24  the valuation issue with Lexis Nexis, as well, are

25  you saying that there's no value to the $20 million

1   that we just put on the table with regard to the earn

2   out.

3             MR. FURR:  Not for purposes of the bidding,

4   no, not to us.  It may ultimately have value if it

5   was part of the deal, but not for purposes of the

6   bidding.

7             MR. SLAINE:  May I speak?

8             MR. FURR:  Sure.

9             MR. SLAINE:  I want to clarify the

10  proposal.  First of all, it's cash, it's not in kind

11  or furniture or anything, it's really $20 million in

12  cash, as required by the bidding.

13            The formula would be that if the

14  company earns half, half of its projections in

15  the next three years, 50 percent gets paid out.

16  So if you do half of what you expect, I can't

17  imagine you won't, you get $10 million in cash,

18  and that scales up pro rata up to a hundred

19  percent, on which you get 20 million.

20            So it's worth between ten and

21  $20 million.  If it -- the company does what you

22  conservatively expect it to do, it's a full

23  $20 million in cash that goes to the creditors.

24            MR. FURR:  Okay.  Thank you.  We still have

25  the same position.

1           Would anyone else like to make a bid.

2           MS. ASHER:  Can you really clarify the

3     position for them?

4           MR. FURR:  The position is, you're welcome

5     to -- the earn out offer is very nice, but you must

6     bid $3 million more than the last bid of TU, which

7     would be $121 million.  You want to do $121 million

8     plus an earn out, that would be a valid bid with us,

9     but that's not the way you bid.

10          MR. SLAINE:  It's cash, it's not -- it's

11    not ---

12          MR. FURR:  It's not guaranteed cash.

13          MR. SLAINE:  Where does it say guaranteed?

14          MR. FURR:  Well, I think that's what it

15    means.

16          MR. SLAINE:  If we bid a billion dollars in

17    earn out it would be worthless?  That's ridiculous.

18          MR. FURR:  I understand what you're saying.

19    I respect what you're trying to do, I really do, I'm

20    really not making light of it, but we have to follow

21    the procedures here and the procedures say it has to

22    be an increment of cash.

23          MR. SLAINE:  It's cash, though.

24          MR. FURR:  We're still at the situation

25    where the debtor's opinion is the best and highest

1   offer is TransUnion.

2          MS. McLENDON:  I just wanted to note for

3   the record, that Lexis Nexis, we would like to make

4   another bid, but we need a few minutes --

5          MR. FURR:  Okay.

6          MS. McLENDON:  -- if that's permissible.

7          MR. FURR:  Certainly, we'll take a break.

8          MR. RISTAINO:  Ten minutes.

9          MR. FURR:  Ten minutes, if we can do it.

10          (Thereupon, a recess was taken.)

11          MR. FURR:  Okay.  We're back on the record.

12   It's quarter to 6:00, at this point, dinner is being

13   served outside shortly.  Don't stay for that reason.

14          Anyway, Warburg was taking some time

15   out.  Does Warburg want to make another bid at

16   this point, alter the last bid?

17          MR. SLAINE:  It wasn't our time out.

18          MR. FURR:  It wasn't your turn, okay.  I

19   think it was your time, actually.

20          MS. McLENDON:  Yes.

21          MR. BACON:  Doug Bacon for Lexis Nexis.

22          MR. UNDERWOOD:  Can you please speak up?

23          MR. BACON:  Okay.  Doug Bacon for Lexis

24   Nexis.  I just wanted to remind, for the record, that

25   we are still bidding with a reservation of rights

1   based on declaring the nonqualifying bid by

2   TransUnion the highest and best bid.

3            Lexis Nexis is prepared to increase its

4   bid to $126 million on the basis of the same

5   terms that we outlined previously.  We'd note

6   that the difference in value at the outset of

7   this process when we were named the starting bid,

8   was $12 million based on the way we value the

9   bids, we believe that we are far in excess of

10  that amount, indeed, in excess of $16 million

11  higher than the next highest bid.

12           Thank you.

13           MR. FURR:  David, do you have a question

14  for them?

15           MR. RISTAINO:  It was actually for Warburg

16  Pincus.

17           MR. FURR:  Okay.  Okay.

18           MR. SLAINE:  Excuse me, can I just ask a

19  question?

20           MR. FURR:  Sure.

21           MR. SLAINE:  Just so -- I know you've had a

22  conference, again, we just want to know, are you

23  still valuing our earn out as zero?

24           MR. FURR:  For purposes of the bidding, in

25  terms of the bidding procedures, you need to make a

1   $3 million higher offer.  The earn out may have
2   value, we just can't tell that it really has any
3   value for purposes of the bidding.  It's a big
4   component.  If you came up with another $3 million,
5   that would be a component we would consider, yes.
6            MR. SLAINE:  You're saying if we went up
7   $3 million in cash, you would consider the value of
8   the earn out?
9            MR. FURR:  Yes.
10           MR. SLAINE:  Okay.  Can I make another
11  offer?
12           MR. FURR:  Sure, absolutely.
13           MR. SLAINE:  So on behalf of Warburg
14  Pincus, we now raise the initial part of our cash
15  offer to 121 million, and revise our earn out as
16  previously addressed, this time it's 17 million, so
17  it's still 138 million, but 121 million at closing,
18  17 million upon achievement of the earn out sliding
19  down to eight and a half million achievement upon
20  half the earn out.
21           MR. RISTAINO:  I have a question --
22  Dave Restaino, a question for Sharon.  Sharon, can
23  you confirm for us which conditions to closing your
24  client has waived or what's still in place and,
25  specifically, looking at what TransUnion has waived,

1    can we just go through the list and see where you

2    stand?

3              MS. LEVINE:  Our contract stands.  Our

4    contract, for example, doesn't have the lease as a

5    condition, and other --

6              MR. SLAINE:  No data contracts.

7              MS. LEVINE:  -- no data contacts, you know,

8    the conversation we had before, but our contract

9    stands.  You indicated you might want some other

10   points, tell us what they're valued and we'll

11   consider whether or not they make sense, but if they

12   don't have any value, our contract stands.

13             MR. RISTAINO:  Okay.

14             MR. FURR:  Does TU have a bid?

15             MR. ANKER:  We would like to understand the

16   debtor's valuation at this point of which bid is the

17   highest and best.

18             MR. FURR:  Okay.  We need a couple of

19   minutes.  Don't leave anybody, we'll make it real

20   fast.

21             (Thereupon, a recess was taken.)

22             MR. FURR:  Okay.  We're back on the record.

23             Okay.  The debtor's reaction to the

24   Warburg offer is that it's the best and highest

25   offer.  Anyone else like to make another offer.

1          MR. ANKER:  Philip Anker for TransUnion.

2 TransUnion on the same terms and conditions that have

3 previously been outlined increases its bid to

4 $124 million cash.

5          I would also ask for a clarification

6 and understanding.  My understanding is that the

7 Warburg Pincus bid is on its contract, which as I

8 understand it, has a provision that gives the

9 equity sponsor only an obligation to make a

10 commitment to the special purpose vehicle that is

11 making the acquisition, and gives the debtors no

12 rights to enforce that provision.

13          I would ask for clarification if that

14 is correct.

15          MR. RISTAINO:  That's correct.

16          MR. FURR:  That is correct.

17          MR. ANKER:  That is correct, okay.

18          MR. FURR:  Mr. Anker, I believe that your

19 client has the same situation, you're a special

20 purpose vehicle that you created for your own

21 bidding, I believe.

22          I assume the same is true for Lexis

23 Nexis?

24          MS. LEVINE:  I apologize, could you repeat

25 that?

1           MR. FURR:  Did you create a special-purpose
2    vehicle for purposes of the --
3           MS. McLENDON:  No.
4           MR. FURR:  -- bidding?  No.  Your company
5    is called Risk -- Nexis Lexis Risk Solutions Florida,
6    Inc.
7           MR. ANKER:  TransUnion Corporation, which
8    is the parent of TransUnion, is prepared to guaranty
9    its -- TransUnion Acquisition Corporation's
10   obligations under the asset purchase agreement.
11          MR. FURR:  Okay.  Good, thank you.
12          Well, under the bidding procedures we
13   have been following today, that's a better and
14   higher offer.
15          Would anybody else like to make a
16   higher offer?
17          MR. BACON:  Yes.  Doug Bacon on behalf of
18   Lexis Nexis.
19          Once again, for the record, we'd like
20   to request that we receive a valuation analysis
21   of the Warburg Pincus offer/proposal.  We'd also
22   like to stress, given TransUnion's bid on the
23   same terms that we continue to reserve our rights
24   with respect to its being held, at least in the
25   past rounds, as a qualifying bid.

1        Lexis Nexis is prepared to increase its

2   price to $131 million.  As we mentioned before,

3   it would also agree to forfeit $1 million of its

4   deposit in the event that the agreement is

5   terminated due to antitrust reasons.

6        In the event that our transaction did

7   not close, and for reasons unknown to me, the

8   alternative bidder was not able to close the

9   transaction, and TransUnion were owed a break

10  fee, we would agree to pay that break fee.

11       We would also be willing to pay a

12  ticking fee, a per week fee of $500,000 per week

13  until the earlier of the time that we close or

14  the transaction terminates, which we hope would

15  compensate people for the perceived risk

16  associated with our bid from an antitrust

17  perspective.

18       Those amounts would be payable from the

19  deposit that we're making in the event that the

20  transaction terminated.

21       MR. UNDERWOOD:  This is Scott Underwood for

22  Tech, Inc.  On the ticking fee that you

23  referenced ---

24       MR. RISTAINO:  Why don't you just go up to

25  the podium?

1              MR. UNDERWOOD:  On the ticking fee that you

2    mentioned of $500,000 a week until closing or

3    termination when would that begin, would that begin

4    immediately or is that after a certain date, the

5    ticking fee starts to run?

6              MR. BACON:  Immediately.  I should note,

7    actually, a clarification because I heard you mention

8    something, that in the event that obviously we're

9    keeping a drop dead date -- a drop dead date of the

10   26th of December, but if the transaction unexpectedly

11   were to go past the 26th of December, we would stand

12   behind the ticking fee until the earlier of the time

13   that we close or we terminate the contract.

14             MR. FURR:  Okay.  Thank you.

15             MS. ASHER:  A question.  Desiree Asher,

16   co-CEO of the debtor.

17             Just for clarification, when you say

18   terminate the contract, would that be terminating

19   because you were not approved by the FTC or

20   terminating because you decided you didn't want

21   to do this anymore?

22             MR. BACON:  I would think it would be

23   terminating because we were not approved by the FTC.

24             MS. ASHER:  Okay.  That would be something

25   that I would require as a condition to this, that

1   there wouldn't be drastic termination outs.

2           MR. BACON:  No, I mean, what we're

3   proposing there, is that we're trying to address what

4   we perceive is a concern that you have --

5           MS. ASHER:  I appreciate that.

6           MR. BACON:  -- with our proposal.  There is

7   a serious concern apparently among people, we don't

8   think that it's credible, but there is that we're

9   going to not get the FTC approval.

10          MS. ASHER:  Okay.  I just want to make sure

11  we properly define termination.

12          MR. BACON:  The termination is in the

13  unlikely event that we don't get the FTC approval

14  within the time that we think it's likely to get it.

15          MS. ASHER:  Okay.  Thank you.  I appreciate

16  that.

17          MR. FURR:  While we're here, would Warburg

18  like to make another offer?

19          MR. SLAINE:  I think we would like to hear

20  the valuation.

21          MR. FURR:  So we need to talk for a few

22  minutes.

23          (Thereupon, a recess was taken.)

24          MR. FURR:  We're back on the record.  Lexis

25  Nexis wanted to make an amendment to their bid.  Do

1    you want to announce the clarification?

2           MR. BACON:  Doug Bacon for Lexis Nexis.  A

3    couple of these are just clarifications on our bid as

4    it sits and some amendments, sorry for the delay.

5           One thing we wanted to clarify when

6    asked the question, was that the ticking fee

7    would be incremental to the purchase price if we

8    close, so it would not be an offset, it would be

9    an addition to the purchase price.

10          We've also agreed that we would use

11   commercially reasonable efforts to keep the

12   seller informed of our status with the FTC, to

13   keep them apprised of progress so that, of

14   course, they can prepare if they needed to,

15   which, again, we don't think they will, to have

16   to close with or choose the alternative bidder.

17          We've also agreed to clarify some

18   language in the section addressing obtaining the

19   HSR approval, to provide that we would use

20   commercial, or rather that commercially

21   reasonable best efforts, which is the current

22   standard, would include divestitures and other

23   actions required by the FTC to obtain approval if

24   such divestiture, or other action, would not have

25   a material and adverse impact on the significant

1    business line of LNRS or the business.

2            MR. FURR:  Anyone have any questions about

3    what David just said?

4            MR. BACON:  Doug.

5            MR. FURR:  With that modification, the

6    debtor, at this point, is declaring that the backup

7    bid is Warburg, and that Lexis Nexis is the best bid.

8            MR. DAVIS:  Can you go over what the

9    bids are, in your estimation, and how you

10   determine Lexis Nexis ---

11           MR. SLAINE:  TU was 124.

12           MR. FURR:  No, no, Warburg.  TU can't

13   back -- won't back up this bid, they won't back up

14   Lexis Nexis' bid, so you're the backup bid.

15           MR. SLAINE:  121.

16           MR. DAVIS:  Can you go over what the

17   bids are as you understand it and how you

18   determined Lexis Nexis' bid is the high bid?

19           MR. FURR:  Sure.  Your last bid, Warburg's

20   last bid was 121 million in cash, and that's

21   17 million -- up to a $17 million earn out, with

22   certain terms on that, and you were going to assume

23   the Equifax agreement, I believe.

24           MS. ASHER:  No.

25           MR. FURR:  No, it wasn't?

1          Then TU offered 124 million on its same

2    terms, and they said TU -- TransUnion would

3    guarantee the subsidiary's obligation.

4          Lexis Nexis offered $131 million and

5    gave certain conditions to that guarantee --

6    excuse me, to that amount, and just modified

7    that.

8          With those modifications, we are

9    declaring at this point the highest and best bid

10   is Lexis Nexis and you are the backup bidder.

11          MR. DAVIS:  Okay.  Was there any value

12   given to our earn out?

13          MR. FURR:  Not at this point, but it's

14   still a value to us, but right now, it's not.

15          MR. DAVIS:  I'm sorry, you just said

16   there's no value to it.

17          MR. FURR:  Not for purposes to the bidding.

18          MR. DAVIS:  So there's no value to it.

19          MR. FURR:  For the purpose of the bidding,

20   that's true.

21          MR. DAVIS:  What other purpose is

22   there?

23          MR. FURR:  Well, if you ever earned it,

24   there might be some value some day, but it's not a

25   guaranteed amount.  If you're giving us a promissory

1    note for 17 million, that's different.  I mean, it's

2    a what if.  We don't live on what ifs, but we do a

3    little bit.

4              Anyway, with that being said, would TU

5    like to make a bid?

6              MR. ANKER:  We would like to have a

7    conversation.

8              MR. FURR:  Okay.  Would Warburg like to

9    make a bid at this point?

10             MR. SLAINE:  We'll wait.

11             MR. FURR:  Okay.

12             MR. RISTAINO:  Ten minutes, please.

13             (Thereupon, a recess was taken.)

14             MR. FURR:  We're back on the record.  It's

15   9:40, snacks will be here soon.

16             When we concluded, I was asking TU if

17   they had an offer or a bid to make.

18             MR. ANKER:  I just want to wait for my

19   client.

20             MR. FURR:  Oh, okay.

21             MR. ANKER:  Good evening.  TransUnion

22   Acquisition Corp. modifies its prior bid as follows:

23   It increases the bid by $8 million to $132 million,

24   all cash payable at closing, the same conditions that

25   we put on before, and, indeed, if the debtor wishes,

1    we are prepared to fast forward the drop dead date to

2    December, I believe the 16th is a Monday,

3    December 16th of this year.  That's our bid.

4           MR. FURR:  Thank you.  Does Warburg have a

5    bid to make?

6           MR. SLAINE:  We need to huddle.

7           MR. FURR:  Five minutes.

8           MR. SLAINE:  You just gave them an hour.

9           MS. LEVINE:  How do you value the bids?

10          MR. FURR:  TU's bid is the highest and best

11   without question.

12          MR. DAVIS:  Can you just recap where you

13   see the bids?

14          MR. FURR:  TU's bid is the highest and best

15   without question.

16          MR. ANKER:  I just couldn't hear that.

17          MR. FURR:  Okay.

18          MS. ASHER:  Desiree Asher, co-CEO for the

19   debtor.  TransUnion's bid is the highest and best

20   without question.

21          MR. FURR:  Does Lexis want to make a bid?

22          MS. McLENDON:  We have -- I have a

23   question.

24          MR. FURR:  Okay.  We have a question from

25   Lexis.

1          MS. McLENDON:  Kathrine McLendon for Lexis

2   Nexis.  When Mr. Anker referred to the same

3   conditions, I just want to confirm, Phil, wherever

4   you are, you are maintaining the same condition, that

5   that bid would not be -- you would not accept a

6   second position to Lexis Nexis.

7          MR. ANKER:  Yes.

8          MS. McLENDON:  On that basis, we want to

9   reiterate our prior several objections now, that that

10  bid is not a conforming bid.

11         MR. FURR:  Okay.  Okay.  Thank you.  Break

12  now?

13         MR. SLAINE:  We'll just pass right now.

14         MR. FURR:  Okay.  You're passing, they bid.

15         MS. McLENDON:  We need a caucus.

16         MR. FURR:  They need a caucus, okay.

17         (Thereupon, a recess was taken.)

18         MR. FURR:  For the record, it's about

19  10:00 p.m.  Warburg, do you have a bid you want to

20  make?

21         MR. SLAINE:  We passed to Lexis.

22         MR. FURR:  Oh, okay.  Lexis.  That's right,

23  you did.

24         MR. BACON:  Doug Bacon for Lexis Nexis.  We

25  reiterate our reservation to declaring the TransUnion

1   bid as a qualified bid.  Lexis Nexis is prepared to

2   increase its offer to $135 million.

3           MS. ASHER:  I'm sorry, what was that?

4           MR. BACON:  135.

5           MR. FURR:  135 million.

6           Warburg, would you like to bid?

7           MR. MILLER:  Does it still include all the

8   other provisions?

9           MR. FURR:  All the other provisions are the

10  same?

11          MR. BACON:  Correct.

12          MS. LEVINE:  Is TransUnion the backup

13  bidder or they're not the backup bidder?

14          MR. FURR:  TransUnion has never been a

15  backup bidder -- hold on -- not on Lexis.

16          MR. SLAINE:  Warburg Pincus increases its

17  cash offer to 124 million, the earn out has been

18  subscribed no value.  Importantly, we are assuming

19  the Equifax contract with an agreed cure value of

20  $8 million.  Our understanding is that this increases

21  the value of our bid significantly on the order of

22  $25 million.

23          We understand that with this

24  adjustment, and the increase in the cash amount,

25  that the unsecured traders are paid in full.

Page 71

1          All the terms and conditions previously

2   agreed to are the same.

3          MR. FURR:  Okay.  Thank you.  We need a

4   minute.

5          (Thereupon, a recess was taken.)

6          MR. FURR:  Back on the record.

7          It's 10:20, we were short that time.

8   In reviewing the last three bids, the TransUnion

9   bid of $132 million, all cash, same conditions,

10  prepared to fast forward to December 16th, the

11  Lexis bid of 135 million, and the Warburg bid of

12  124 million, with an assumption of Equifax and a

13  certain amount of cure costs that were told to us

14  of $8 million, the debtor concludes that the

15  Warburg offer is the best offer, highest and best

16  offer currently.

17         MS. LEVINE:  We did agree to an amendment

18  with the committee to close in 28 days, I did want to

19  get that on the record.

20         MR. FURR:  Close in 28 days.

21         MR. BACON:  We request the valuation of the

22  cure costs relative to your -- relative to Warburg

23  cash bid, we don't fully understand.

24         MR. FURR:  Sure, we will be glad to do it

25  for you on the record or we can do it for you with

1    our financial advisors, if you'd like to see.

2            MR. GART:  Bob, we'd like to hear it, too,

3    so why don't you do it on the record?

4            MR. FURR:  Okay.  Let me get my advisors

5    up.

6            MS. SMITH:  Okay.  For the record, on the

7    TransUnion bid, the cure costs are just under

8    $6 million; the Lexis Nexis bid, the cure costs are

9    about $19 million; and on the Warburg bid, the cure

10   costs, resetting Equifax at eight million, comes in

11   right around $14 million, that's just the cure

12   number?

13           MR. ANKER:  Could you repeat that, please?

14           MS. SMITH:  The cure number for TransUnion

15   is just under $6 million, they rejected Equifax in

16   full; the Lexis Nexis bid, the cure costs are $19

17   million; and the Warburg bid, the cure costs are

18   $14 million.

19           MR. BACON:  Excuse me, how are you valuing

20   rejection claims?

21           MS. SMITH:  Okay.  On Lexis Nexis, the

22   rejection claims plus the unsecured -- well, the

23   rejection damage claim on Lexis Nexis and Warburg

24   would be $2 million because that's the GCA, which

25   both parties have rejected; and TransUnion's

1    rejection damages come in around 26 million, and

2    that's with our numbers on Equifax, not on what we

3    understand Equifax may or may not assert.

4           MR. FURR:  So the bottom line is that the

5    Warburg bid pays the unsecured creditors in full.

6           MS. ASHER:  Susan, just for clarification,

7    can you go through and explain the entire unsecured

8    amounts for each bidder?

9           MS. SMITH:  Well, the unsecured trade

10   payables are sitting around 825,000, that's the same

11   for everybody.  Then the only other number added to

12   it is the contract rejection damages, which I just

13   went through --

14          MS. ASHER:  Okay.

15          MS. SMITH:  -- of 26 million for

16   TransUnion; two for Lexis Nexis; and two for Warburg,

17   and that's with our estimation of two as the GCA

18   Savian damage rejection claim.

19          MR. CURTIS MILLER:  Can you give us a

20   calculation for TransUnion's 26, please?

21          MS. SMITH:  We've got 3.3 for your Experian

22   stipulation, there's about -- there's two for GCA

23   Savian, and the rest of it is Equifax.

24          MR. FURR:  In light of that, would anyone

25   like a few minutes to talk to their group, not you

 1  folks, but ---

 2          MS. McLENDON:  We would like to have a

 3  conversation just to go through these numbers again,

 4  the math, we're not finding it to be adding up.

 5          MR. FURR:  Okay.  Sure.

 6          MS. McLENDON:  And I think I'll also note a

 7  reservation in the determination of Warburg as the

 8  highest and best based on this calculation that's

 9  just gone through because, again, we don't think the

10  math adds up.

11          MR. FURR:  Okay.  We'll take a break and

12  you can meet with Susan, and perhaps Tom would meet

13  with you also.

14          Let's try to get back together again at

15  10:45.

16          (Thereupon, a recess was taken.)

17          MR. FURR:  We're back on the record, it's

18  11:25 p.m.

19          Does TransUnion wish to make a bid?

20          MR. ANKER:  Good evening.  TransUnion

21  modifies its bid, all the same conditions, modifies

22  it in two respects, first the cash is $137 million;

23  secondly, you should assume that we are simply

24  assuming the Experian contracts as they are without

25  the stipulation.  The stipulation is no longer on the

1   table.

2          Susan, by my calculations, we are now

3   substantially the highest bid.  I'm happy to go

4   through my math, either on the record or off the

5   record with you.

6          MR. RISTAINO:  It would be helpful if Susan

7   would walk through what the math is.

8          MR. MILLER:  Maybe you can project your

9   spreadsheet on the screen, except the screen is

10  turned off, I think we used up our time.

11         MS. SMITH:  Okay.  The way the numbers come

12  out now, TransUnion's bid nets about $27 million to

13  the unsecureds pool of 24.6, so they're over the

14  unsecured pool by about two million plus dollars.

15         MR. BATTISTA:  Paul Battista for the

16  committee.  Does that include the additional

17  $10 million rejection damage claim that Equifax is

18  asserting?

19         MR. FURR:  No.

20         MS. SMITH:  No.  Warburg's doesn't either,

21  it breaks even.

22         MR. BATTISTA:  But they're assuming the

23  contract.

24         MS. SMITH:  But they are assuming the

25  contract.

1          MR. FURR:  So there is none.

2          MR. DAVIS:  So is the $2 million spread

3    to the Warburg's bid based on that spreadsheet?

4          MR. UNDERWOOD:  It's also based on the

5    presumption that Equifax' claim, rejection claim, is

6    $10 million less than what we understand may be

7    asserted.

8          MR. FURR:  That's Scott Underwood, so you

9    know.  That's TU's bid.  Who would be next on a bid,

10   Warburg?

11         MR. SLAINE:  I think Lexis is next.

12         MR. FURR:  This is off the record.

13         (Thereupon, a recess was taken.)

14         MR. FURR:  Back on the record.  It is now

15   about ten minutes to midnight or so, and Lexis Nexis

16   would like to say something.

17         MS. McLENDON:  Kathrine McLendon for Lexis

18   Nexis.  We would like to pass on bidding this round,

19   per the instructions this morning.  We reserve the

20   opportunity to bid in subsequent rounds.

21         I will also note my objection with

22   respect to the TransUnion bid and with

23   Mr. Anker's permission, I would like to just make

24   that a standing objection, as long as you're

25   continuing to bid with the conditions regarding a

1  second place position to Lexis Nexis, so I don't

2  have to repeat this every time.

3        MR. ANKER:  We obviously don't believe the

4  objection is meritorious, but you may have a standing

5  objection --

6        MS. LEVINE:  Thank you.

7        MR. ANKER:  -- so we can hopefully get home

8  sooner.

9        MR. FURR:  Thank you.  So that leaves

10 Warburg.

11       MR. DAVIS:  Where are you?

12       MR. FURR:  Well, we have one bid in this

13 round, I don't have to announce the best and highest

14 bid.  So I'm going to ask you, the best and the

15 highest bid last time was the TU bid, and now it's

16 your turn if you would like to bid.

17       MS. LEVINE:  We would like to hear where

18 things stand after the TU bid.

19       MR. FURR:  I don't have to do that, so I'm

20 not going to do that.  If you would like to make a

21 bid, we invite you to make a bid.

22       MR. SLAINE:  We will pass for now.

23       MR. FURR:  Okay.  May we have a second?

24       MR. ANKER:  Robert, if both other bidders

25 have passed, then there is one standing bid and ours

1   is the highest bid.

2           MR. FURR:  Well, we haven't announced that,

3   give us a second to talk.

4           MR. ANKER:  Well, you should announce who

5   the highest bid is, but I would submit that if we are

6   the highest bid, the auction is now over.

7   Respectfully, I think that's the right result.

8           MS. LEVINE:  Well, just for the record, our

9   understanding was that he was asking if we wanted to

10  bid before valuing the bids, but that we would have

11  an opportunity to consider our position after we

12  understand what the value of the bids are.

13          MR. FURR:  Would you like to withdraw your

14  position and come bid?

15          MR. SLAINE:  We still believe we are the

16  highest and best.  I just want to say we still

17  believe we're the highest and best offer.

18          MR. FURR:  I understand, just give us a

19  second.

20          Based upon the negotiated agreement

21  Warburg has with Equifax, we still believe that

22  Warburg is the best and highest bid.  There is no

23  risk with the debtor, there is risk with your

24  bid, there is still a $10 million possible claim

25  by Equifax, which we have to deal with, that

Page 79

1   concludes that round.

2          MS. LEVINE:  Excuse me, could you state

3   who's in the second position based on the debtor's

4   assessment, please?

5          MR. FURR:  Well, TU would be in the second

6   position because TU agreed to be a backup bid to

7   Warburg.

8          Would you like a second before we start

9   another round?

10         MR. ANKER:  Yeah, I would like to have a

11  conversation, but ---

12         MR. SLAINE:  Why is this open now based on

13  what he just said before?

14         MR. FURR:  Because it was two bids, you

15  still have a chance to bid.

16         MR. ANKER:  Because we bid.

17         (Thereupon, a recess was taken.)

18         MS. McLENDON:  I would like to ask another

19  question on the record.  Could you please clarify the

20  statement you just made with respect to the

21  TransUnion bid, that did not seek to take into

22  account the dollar amounts of the bids, the current

23  analysis of those?

24         MR. FURR:  I don't understand what you're

25  saying.  We still believe it's the best backup bid,

1    the TU bid at $132 million --

2              MR. RISTAINO:  137.

3              MR. ZUCKERMAN:  137.

4              MR. FURR:  -- excuse me, 137.

5              MS. McLENDON:  Based on the analysis that

6    we all just went through.

7              MR. FURR:  And based on the risk with your

8    deal.

9              MS. ASHER:  Robert.

10             (Thereupon, a recess was taken.)

11             MR. FURR:  We're back on the record.

12   Lexis Nexis would like to make a statement.

13             MS. McLENDON:  Kathrine McLendon again for

14   Lexis Nexis.

15             MR. SLAINE:  Speak up, please.

16             MS. McLENDON:  Yes, sorry.

17   Kathrine McLendon again for Lexis Nexis.

18             MR. RISTAINO:  A little closer to the mike.

19             MR. FURR:  She's fired.

20             MS. McLENDON:  Yes, we just want to note a

21   formal objection to the determination that TransUnion

22   is the second place bidder as just stated by the

23   debtor.

24             MR. FURR:  Thank you.

25             MS. McLENDON:  Thank you.

1            MR. FURR:  We can do another round now, if

2   anyone would like to make -- would TransUnion like to

3   make a bid?

4            MR. ANKER:  TransUnion will modify or is

5   prepared to modify its bid as follows:  All the

6   components of the bid remain exactly as they were

7   previously, but we will also assume the Equifax

8   contract at an $8 million cure.

9            MS. ASHER:  Just for clarification, is that

10  something that Equifax has agreed to?

11           MR. ANKER:  We are in discussions with

12  Equifax, I certainly cannot represent that Equifax

13  has agreed.  I do note that the debtor has taken the

14  position on the record in pleadings that the

15  assumption can occur over the objection of Equifax.

16           MR. FURR:  Okay.

17           MR. ANKER:  And we certainly take the

18  position that in bidding that is supposed to be with

19  all bidders having the same rights and same options,

20  Equifax being a member of the committee, I strongly

21  believe that this issue will not be one that stands

22  in the way.

23           MS. ASHER:  Does the committee care to

24  comment on that?

25           MR. FURR:  We have a bid from TU, would

1    Lexis Nexis like to make a bid?

2            MR. BACON:  Can we caucus for a moment?

3            MR. FURR:  Sure.

4            (Thereupon, a recess was taken.)

5            MR. FURR:  We're back on the record.  It is

6    now 12:30 in the morning.  We stopped because Lexis

7    Nexis asked for a moment to caucus.

8            Does Lexis Nexis wish to make a bid?

9            MR. BACON:  Doug Bacon for Lexis Nexis.

10   Lexis Nexis would like to increase its bid to

11   $140 million.  We'd note for the record, that the

12   ticking fee we proposed earlier, has approximately

13   $2.5 million of value based on the likely closing

14   date or approximation of the likely closing date, but

15   otherwise the same terms apply that we previously

16   have given.

17           MR. FURR:  Everybody got that?  Okay.

18           So we've got a bid from TU, and a bid

19   from Lexis Nexis.

20           Would Warburg like to make a bid?

21           MR. SLAINE:  Warburg Pincus continues to

22   believe we are the highest and best offer.

23           MR. FURR:  You're passing?

24           MR. SLAINE:  We're passing right now.

25           MR. FURR:  Okay.  All right.  Let's have a

1    minute.  Don't go anywhere.

2            (Thereupon, a recess was taken.)

3            MR. FURR:  Back on the record.

4            The debtor has a question for TU, this

5    is Robert Furr.  Does the deal you announced

6    earlier, the assumption of the Equifax contract

7    at eight million, is that a done deal?

8            MR. ANKER:  It is not a done deal, we will

9    keep our cash offer exactly where it was, and we will

10   simply, obviously, less attractive in this respect,

11   but obviously better than the Warburg Pincus offer,

12   we will simply have the estate pay whatever the cure

13   is, which I understand you believe to be 13 million.

14           So we're making exactly the same bid in

15   that regard as Lexis Nexis, which is taking that

16   contract.

17           MS. ASHER:  You're assuming the contract --

18           MR. ANKER:  Yes.

19           MS. ASHER:  -- with the 13 million cure?

20           MR. ANKER:  Whatever the cure is, the cure

21   will be paid by the estate out of the funds, but my

22   understanding, your position is it's 13.

23           MR. UNDERWOOD:  Scott Underwood of Tech,

24   Inc.  While there may not be an agreement on the cure

25   amount, do you have an agreement from Equifax as to

1    not objecting to assumption if the full allowed cure

2    is allowed, was paid?

3              MR. ANKER:  I'll let Equifax speak to that

4    question, but we -- I don't understand there to be

5    any agreement with Lexis Nexis, but I'll let Equifax

6    speak to that question on the record.

7              MR. ROSENBLATT:  Paul Rosenblatt for

8    Equifax.  At this time, unless an agreement has

9    expressly been stated on the record, Equifax

10   stands by the objection that it filed with the

11   Court on Monday.

12             Paul Rosenblatt for Equifax, I would

13   like to clarify a statement I just made.  Equifax

14   will not assert its objection to Lexis Nexis

15   assuming its agreements if Equifax' full cure is

16   paid.

17             However, at this time, Equifax would

18   still assert an objection to TransUnion seeking

19   to assume Equifax' agreements.

20             MS. ASHER:  Excuse me, just for

21   clarification, could you state for the record what

22   you believe your full cure to be?

23             MR. ROSENBLATT:  As of November 22nd, the

24   full cure is approximately $14.1 million, which is

25   set forth in the objection we filed on Monday, and

1   continues to accrue from November 22nd forward at

2   approximately 35 or $36,000 per day, which number is

3   set forth in the objection.

4        However, we are agreeable to fixing the

5   amount of the cure as of November 22nd at

6   $13 million, plus the daily run rate from

7   November 22nd going forward until closing.

8        MS. ASHER:  At the 36,000 per day?

9        MR. ROSENBLATT:  Correct, whatever the

10  amount is that is set forth in the objection, which

11  is approximately $36,000 per day, which comes out to

12  somewhere between one and $1.1 million per month, the

13  stated amounts in the contracts.

14       MS. ASHER:  Just to go over this one more

15  time, I apologize.  You are offering assignability to

16  Lexis Nexis, not to TransUnion, and you will assign

17  the contract to them under the condition that they

18  cure in the amount of 13 million, which stops on

19  November 22nd, and continues at the $36,000 a day

20  until closing?

21       MR. ROSENBLATT:  Correct.  The $36,000

22  number is approximate, it's the number that is set

23  forth in the objection.

24       MS. ASHER:  I understand.  Okay.  Thank

25  you.  Could I also get a clarification on what you

1    anticipate rejection damages would look like?

2            MR. ROSENBLATT:  Paul Rosenblatt for

3    Equifax.  Equifax has not yet calculated what its

4    rejection damages will be.  As guidance, we believe

5    it is somewhere above $30 million, but we have not

6    yet calculated the exact amount and we reserve our

7    rights to calculate that exact amount, if and when

8    the Equifax agreements are rejected.

9            (Thereupon, a recess was taken.)

10           MR. FURR:  Let's go back on the record.  I

11   would like to next know if Warburg would like to make

12   a bid?

13           MR. SLAINE:  We pass at the present time.

14           (Thereupon, a recess was taken.)

15           MR. FURR:  We're back on the record.  The

16   debtor has determined that the best and highest bid

17   is Lexis Nexis and the backup bid is Warburg.  That

18   being said, would anyone like to make another bid?

19           MR. SLAINE:  We need a few minutes here.

20           MR. FURR:  Sure.

21           (Thereupon, a recess was taken.)

22           MR. FURR:  Okay.  We're back on the record.

23   TU, do you have a bid?

24           MR. ANKER:  Yes, one second.  On the same

25   terms as before, Equifax -- Equifax, you're on my

1   mind, Paul -- TransUnion Acquisition Corporation will

2   modify its bid to reject the Equifax agreements and

3   to increase the cash to $150 million.

4           MR. FURR:  Okay.  Would Equifax like to

5   make a bid -- Lexis Nexis?

6           MR. ZUCKERMAN:  Maybe they would like to

7   make a bid.

8           MS. ASHER:  I believe Warburg would like to

9   make a bid.

10          MR. ROSENBLATT:  Can we credit bid?

11          MS. ASHER:  No, we tried that.

12          MR. FURR:  Would you like to make a bid?

13          MR. BACON:  Not right now.

14          MR. FURR:  Not right now, you're passing.

15          Warburg, would you like to make a bid?

16          MR. SLAINE:  We need a break.

17          (Thereupon, a recess was taken.)

18          MR. FURR:  We're back on the record.  We

19  had a bid from TransUnion, 150 million in the same

20  terms of the previous bid, and they were going to

21  reject Equifax.

22          Do I have another bid from Lexis Nexis?

23          MR. BACON:  Pass.

24          MR. FURR:  Warburg?

25          MR. SLAINE:  Warburg would like to increase

1    its offer to $129 million, which we believe is the

2    best and highest offer due to the conditionality of

3    the Lexis Nexis bid.

4              MR. FURR:  Would Lexis Nexis like to make a

5    bid now?

6              (Thereupon, a recess was taken.)

7              MR. FURR:  We're going to go back on the

8    record for a second.

9              MR. ROSENBLATT:  This is Paul Rosenblatt

10   for Equifax.  Under our arrangement with Warburg, if

11   Warburg increased their bid above $124 million, the

12   agreed amount of cure claim that Equifax would accept

13   would increase by 50 cents for each dollar they

14   increased their bid over $124 million, until such

15   time as their bid reached $128 million, at which

16   time, Equifax's cure claim would increase to

17   $10 million, and cap out at that number, regardless

18   of how much above $128 million Warburg bid.

19             Given their bid of $129 million,

20   Equifax has an agreement that their cure claim

21   would be capped at $10 million and would be

22   $10 million under that -- under that bid.

23             MR. FURR:  Thank you.

24             MS. LEVINE:  Sharon Levine, Lowenstein

25   Sandler, that's confirmed for the Warburg Pincus

1   Group.

2           MS. ASHER:  Can I ask for clarification why

3   you didn't see fit to announce that with your prior

4   bid when you announced your deal with Equifax, why

5   we're just finding out about this?

6           MR. ROSENBLATT:  Because at that time they

7   bid $124 million, so there was -- there was no shift

8   in the cure at that time, it was just an $8 million

9   cure at $124 million.  It was only if they needed to

10  raise their bid that the cure would shift up and cap

11  out at $10 million.

12          They raised their bid, I guess they

13  forgot to mention that when they asserted their

14  bid of $129 million, but I previously discussed

15  this with several people in the room that I

16  believe we're aligned with the debtor, and I

17  guess they did not discuss it with you, but that

18  was part of our original deal.

19          MS. ASHER:  All right, and that is -- that

20  is it, right, that's the extent of it?

21          MR. ROSENBLATT:  Regardless of how much

22  above $128 million Warburg bids, our agreement is our

23  cure will be a flat $10 million.

24          MS. ASHER:  Okay.  Great.  Thank you.

25          (Thereupon, a recess was taken.)

1           MR. FURR:  Back on the record.  It's

2    two o'clock in the morning, at the end of this round,

3    the debtor declares that TransUnion has the best and

4    highest offer.

5           Would anyone like to start a new round

6    and make an offer?  Obviously not to you, but

7    would Warburg or would Lexis?

8           MS. ASHER:  UT is welcomed to bid.

9           MR. FURR:  Come on, Phil, give me a bid.

10           MR. SLAINE:  We have an offer to make.

11           Warburg would like to raise its offer

12    to $132 million, which, again, we believe is the

13    highest and best offer.

14           MR. FURR:  Okay.  Would Lexis like to make

15    a bid?

16           MR. BACON:  We need to caucus very quickly.

17           MR. FURR:  Okay.  Well, while they are

18    doing that, would TU like to make a bid?  We can get

19    out of here.  You want to caucus?  Okay.

20           (Thereupon, a recess was taken.)

21           MR. FURR:  Back on the record.

22           MR. ANKER:  Philip Anker for TransUnion.

23    We are not increasing our bid.  We would ask,

24    however, and echo what I think Desiree said, that to

25    the extent there is any other deals that a member of

1   the committee, Equifax, has with any bidder, we want

2   to know about them, and we want them on the record

3   now, including going forward terms.

4            You can't have bids that are not

5   public.  We put our stip with Experian, including

6   all terms on the table up front, and I think it

7   is completely inappropriate that a member of the

8   committee is not offering everyone the same

9   terms, but I will ask now, that at least those

10  terms be put on the record with specificity.

11           MR. FURR:  Any comment from Equifax?

12           MR. ROSENBLATT:  Paul Rosenblatt for

13  Equifax.  First, I would like to reject any

14  allegation that Equifax has acted inappropriately in

15  this case.

16           Second, I would like to state that

17  Equifax has no agreements with any bidder that

18  have not been revealed to the parties at this

19  time.

20           To the extent that Equifax has any

21  business terms with any bidder on a going forward

22  basis, those are confidential and those do not

23  impact the bankruptcy estate in any way.  The

24  agreed amount of cure that Equifax is willing to

25  take with regard to the Lexis Nexis bid has been

1    stated on the record, and the agreed amount of

2    cure that Equifax has agreed to accept with

3    regard to Warburg has already been stated on the

4    record.

5              Thank you.

6              MR. ANKER:  So you're not prepared to state

7    what your going forward terms are with Warburg?

8              MR. ROSENBLATT:  That is correct, those are

9    confidential bankruptcy -- those are confidential

10   business terms, which the Bankruptcy Code protects,

11   we're not prepared to disclose those, we do not

12   believe we need to disclose those, and we will assert

13   whatever rights that we have to protect those terms

14   going forward.

15             MR. ANKER:  I would submit to the debtor

16   that all terms and all bids according to the bid

17   procedures were supposed to be on the record, and

18   terms going forward are, in my judgment, part of the

19   bid.  It's obviously your judgment to make in the

20   first instance, but this is not the way the process

21   is supposed to run.

22             MR. FURR:  Does Lexis have a bid?

23             MR. BACON:  We just need to consult

24   quickly.

25             (Thereupon, a recess was taken.)

```
 1              MR. FURR:  We're back on the record.  I
 2    last asked Lexis Nexis if they would like to make a
 3    bid.
 4              MR. BACON:  Yes.  Doug Bacon for Lexis
 5    Nexis.  Lexis Nexis will increase its bid to
 6    $143 million, all terms otherwise the same.
 7              Thanks.
 8              MS. ASHER:  I'm sorry, can you repeat your
 9    bid?
10              MR. BACON:  $143 million.
11              MS. ASHER:  Okay.
12              MR. FURR:  That's the end of the round, one
13    minute, we'll get right back to you.
14              (Thereupon, a recess was taken.)
15              MR. FURR:  Back on the record.
16              The debtor declares that Warburg is the
17    best and highest bid.  We would like to try
18    another round, and like to try to make this
19    hopefully the last round, if we can get there.
20              MR. BACON:  Excuse me, who's the backup
21    bidder?
22              MR. FURR:  At this point, we don't have to
23    announce it.  We were doing it earlier, but not right
24    now we're not going to announce a backup bidder.  So
25    would anyone like to make a new offer, TransUnion?
```

Page 94

```
 1              MR. ANKER:  Let us talk for a minute.

 2              MR. FURR:  Three minutes.

 3              (Thereupon, a recess was taken.)

 4              MR. FURR:  Back on the record.

 5              Would TransUnion like to make another

 6    bid?

 7              MR. ANKER:  We'll pass.

 8              MR. FURR:  Pass, okay.  Would Lexis Nexis

 9    like to make another bid?  Actually you made the last

10    bid.

11              MR. GOLDSTEIN:  No, Warburg made the

12    last bid.

13              MR. FURR:  Excuse me.  Nexis Lexis.

14              MR. BACON:  Doug Bacon for Lexis Nexis.

15    Lexis Nexis will increase its bid to $144 million,

16    all terms otherwise the same.

17              MR. FURR:  Would Warburg like to make a

18    bid?

19              MR. SLAINE:  We pass.

20              MR. FURR:  TU.

21              MR. SLAINE:  I'd like to hear the debtor's

22    valuation.

23              MR. FURR:  We're not at the end of a round,

24    so I can't really do that right now, so please come

25    and bid if you want to bid.
```

Page 95

1           MR. SLAINE:  We'll pass.

2           MR. FURR:  You'll pass.  Warburg is still

3    the number one bid.

4           Would anyone like to make a bid?

5           MR. ANKER:  Philip Anker for TransUnion

6    Acquisition Corporation.  We increase our bid to

7    150 -- $154 million, all the same terms that we have

8    specified before, which includes the rejection of the

9    Equifax claims -- Equifax contracts, excuse me.

10          MR. FURR:  Thank you.  Would Lexis Nexis

11   like to make a bid?

12          MR. BACON:  Can we have a break?

13          MR. FURR:  Please make it less than five

14   minutes, if you can.

15          (Thereupon, a recess was taken.)

16          MR. FURR:  We're back on the record.

17          We had a bid from TransUnion of

18   $154 million.  I want to know if Lexis Nexis

19   wants to make another bid.

20          MR. BACON:  We will.  Doug Beacon for Lexis

21   Nexis.  Lexis Nexis will increase its bid to

22   $150 million, all terms otherwise the same.

23          MR. FURR:  Thank you.

24          Would Warburg like to make a bid?

25          MR. SLAINE:  Warburg Pincus would like to

1    increase its offer to $135 million.

2              (Thereupon, a recess was taken.)

3              MR. FURR:  All right.  We're back on the

4    record.  The debtor has determined the highest and

5    best bid is TransUnion.

6              MR. DAVIS:  Is TransUnion?

7              MR. FURR:  Yes.  More bids if anyone would

8    like to bid?

9              MS. LEVINE:  Can you go through the math

10   with us?

11             MR. FURR:  You know the bids, the debtor

12   just feels that TransUnion is the better bid for us,

13   it has more upside for us.

14             Do we have anymore bids coming in?

15             MS. LEVINE:  We need to understand what

16   happened.

17             MR. SLAINE:  We're working on it.

18             (Thereupon, a recess was taken.)

19             MR. FURR:  We're back on the record.

20   Everyone here?

21             Does Lexis Nexis wish to make a bid?

22             MR. BACON:  Lexis Nexis increases its bid

23   to $151 million, all terms otherwise remaining the

24   same.

25             MR. FURR:  Okay.  Does Warburg wish to make

1   a bid?

2          MR. SLAINE:  Yeah.  We increase our bid to

3   $145 million, consisting of 135 million in cash, and

4   $10 million on an earn out, the same basis as

5   previously proposed.

6          MR. FURR:  To TU.

7          MR. ANKER:  We'll pass.  I mean, we are

8   going to pass for this round.

9          I do note that the bid procedures

10  require that each competing bidder bid three

11  million in cash above the prior bid of TransUnion

12  where we're the high bidder, and I will

13  acknowledge it's getting very late, and I may be

14  doing my math incorrectly, but I just think in

15  terms of the cash, these are plainly not bids

16  that are three million higher than ours.

17         MR. FURR:  Objection noted.

18         Debtor declares that TU is still the

19  highest and best bid.

20         Would anyone like to make a bid?

21  Warburg, no?  Lexis Nexis?

22         MR. BACON:  I need to quickly check on

23  authority.

24         MR. FURR:  Okay.

25         (Thereupon, a recess was taken.)

Page 98

```
 1              MR. FURR:  We're back on the record.  Does

 2   Lexis Nexis wish to make another bid?

 3              MR. BACON:  Yes.  Lexis Nexis wishes to

 4   increase its bid to $165 million, all terms otherwise

 5   the same.

 6              MR. FURR:  That was more than a $3 million

 7   change.  All right.  Would TransUnion like to make a

 8   bid?

 9              MR. ANKER:  Pass.

10              MR. FURR:  Would Warburg like to make a

11   bid?

12              MR. SLAINE:  Pass.

13              THE COURT:  Well, this round the best

14   highest bid is clearly ---

15              MR. ZUCKERMAN:  Wait.

16              MR. RISTAINO:  Wait.  We need to talk about

17   that.

18              (Thereupon, a recess was taken.)

19              MR. FURR:  Back on the record.  The last

20   offer we received was from Lexis Nexis for

21   165 million.  I think Warburg passed and TransUnion I

22   think passed, too, didn't you?

23              MR. ANKER:  Yes.

24              MR. FURR:  While the $165 million is a very

25   large offer, the debtor has to consider in the
```

1   situation where we are now, where we're paying money

2   to equity, and we're paying unsecured creditors in

3   full, and paying the secured creditor, that we have

4   an obligation to them and we can't take a risk that

5   Lexis poses for us and, therefore, we determine that

6   the TU bid is still the highest and best bid.

7            Okay.  Would anyone like to make a bid,

8   I'm entertaining bids?  Warburg, you're out?

9            MR. SLAINE:  We're out.

10            MR. FURR:  Lexis Nexis, are you out or in?

11            MR. BACON:  We have to caucus very quickly.

12            MR. FURR:  Okay.  Please.

13            (Thereupon, a recess was taken.)

14            MR. FURR:  Can we go back on the record,

15   please.  It's 4:30 a.m., and we are waiting on Nexis

16   Lexis.  Does Nexis Lexis have a bid, Mr. Bacon?  Do

17   you have a bid, Mr. Bacon?

18            MR. BACON:  We do.

19            MR. FURR:  Come on up.

20            MR. BACON:  This is a revised bid from

21   Lexis Nexis.  We're trying very hard to address some

22   of the equity holders' and debtors' concerns

23   regarding our bid.  As we bid last time, we would

24   propose a $165 million purchase price.  In addition,

25   and this is also in addition to almost all the terms

Page 100

1   that we've mentioned before, but one that I'm going

2   to get to, we would be willing to pay $10 million

3   liquidated damages, if Lexis Nexis were unable to

4   close for antitrust reasons, payable if Warburg

5   Pincus is the alternative bidder and closes.

6               In exchange, we would like our drop

7   dead date to be extended to December 31st.  We

8   would expect Warburg Pincus to extend the period

9   when they are bound as the alternative bidder,

10  December 31st.  And agree to close then if

11  required.

12              MS. LEVINE:  We agree.

13              MR. FURR:  Okay.  Does TU have a bid?

14              MR. ANKER:  Pass.

15              MR. FURR:  You guys are out?

16              MR. SLAINE:  We're not out.

17              MS. LEVINE:  We're the backup bidder.

18              MR. FURR:  You're the backup bidder.

19              MR. RISTAINO:  Dave Ristaino.

20              Doug, can I just clarify one thing,

21  that the ten million liquidated damages is paid

22  if you don't close because you don't have

23  approval from HSR -- from FTC by December 31st?

24              MR. BACON:  Correct.

25              MR. RISTAINO:  Okay.

Page 101

1          MR. BACON:  And just also make especially

2     clear incremental additional to the ticking fee,

3     which we had already proposed.

4          MR. RISTAINO:  So it's not a deduct from in

5     the purchase price, it's a ---

6          MR. BACON:  Absolutely not.

7          MR. RISTAINO:  Okay.

8          MR. BACON:  Sorry, this wouldn't apply if

9     we have a closing.

10         MR. RISTAINO:  Correct.

11         MS. ASHER:  Can we talk?

12         (Thereupon, a recess was taken.)

13         MR. FURR:  We're back on the record.  About

14    an hour ago, Lexis made an offer to the debtor of

15    $165,000 million with certain conditions, and I think

16    they want to clarify that offer or supplement it.

17         MR. BACON:  Small clarification.  The offer

18    for the payment of the liquidated damages break fee

19    would be $10 million payable to the debtor in the

20    event that Warburg Pincus closes the transaction, if

21    for some reason our transaction is terminated due to

22    antitrust reasons.

23         If our transaction is terminated due to

24    antitrust reasons, and Warburg Pincus does not

25    close the transaction, we pay $5 million, which

Page 102

1    together with the amount we've already agreed to

2    pay in the way of the ticking fee, and the

3    payment to TU of their break fee, would cost

4    about $10 million.

5           MR. FURR:  Everybody understand that offer?

6    And I believe the drop dead date was going to be

7    changed to -- the closing date for Warburg would be

8    January ---

9           MS. LEVINE:  Warburg Pincus agrees to

10   extend its closing date to January 4.

11          Sorry.  Sharon Levine, Lowenstein

12   Sandler for the record.

13          MR. UNDERWOOD:  Can you repeat that, we

14   couldn't hear it?

15          MR. FURR:  We have an offer of 165 million,

16   we're still in a round.  I would like to know if TU

17   would like to make a bid.

18          MR. ANKER:  We'll pass and hear the

19   debtor's judgment.

20          MR. FURR:  Okay.  You're not in on it.  The

21   debtor's judgment is the $165 million offer from

22   Lexis is a higher and better bid.

23          MR. ANKER:  Philip Anker for TransUnion

24   Acquisition Corporation.

25          We maintain our bid at the cash

Page 103

1   $154 million level.  However, we have reached

2   agreement, which counsel for Equifax can confirm,

3   that we would assume the Equifax agreements for

4   an agreed cure to be paid by the estate of

5   $8 million.  We would then reject the Experian

6   agreement -- I'm sorry, $10 million, it's a long

7   night, $10 million is the agreed cure price, my

8   apologies, and we would then reject the Experian

9   agreement, which by our calculations is a net

10  benefit to the estate of around $12 millions.

11           MR. FURR:  Thank you.

12           MR. ANKER:  I would ask counsel for Equifax

13  to confirm.

14           MR. ROSENBLATT:  Paul Rosenblatt for

15  Equifax.  That is correct with one clarification.

16  That the $10 million cure claim would be paid at the

17  closing of the transaction.

18           MR. ANKER:  That's correct.

19           MR. FURR:  Five minute recess.

20           (Thereupon, a recess was taken.)

21           MR. FURR:  Thank you, again.  It's 6:15 in

22  the morning, I appreciate everyone's hard work,

23  effort in staying with us all night long.  It's been

24  hard on all of us, I really appreciate all the people

25  who came from around the country and around the world

1    to participate in this auction.

2              I'd like to announce the debtor has

3    selected TransUnion's bid as its highest and best

4    bid.  This is done in connection with

5    consultation with the committee, with the secured

6    creditor.  Since this provides money to equity,

7    we don't have to go any further with the bidding

8    and we're closing the bidding, and we can go

9    home.

10             We also select Warburg as our backup

11   bidder.

12             MR. ZUCKERMAN:  Do you want to recite the

13   bid?

14             MR. FURR:  The bid is -- from TransUnion is

15   $154 million, it's going to assume the Equifax

16   agreements with a $10 million cure, reject the

17   Experian agreements.

18             MR. ANKER:  That is confirmed.  For

19   TransUnion, we have a $154 million cash bid, we will

20   assume the Equifax agreements with a $10 million cure

21   to be paid at closing.  We reject the Experian

22   contracts in total.

23             You know, there were miscellaneous

24   contracts we talked about and provisions 20-some

25   hours ago.  We will work diligently with you to

1   paper the APA, and we join Mr. Furr in thanking

2   everyone, including the debtor's professionals

3   and the professionals for the committee, and most

4   importantly, the principals for the debtor and

5   their employees for all their extraordinary work

6   over these days, and we also thank the competing

7   bidders for making this a long and arduous

8   process, nevertheless an interesting one.

9        MS. McLENDON:  Kathrine McLendon for Lexis

10  Nexis.  We want to note a further objection for the

11  record in the fact that the bidding has been closed.

12  The bidding procedures provide the bidding will

13  continue in one or more rounds of bidding so long as

14  during each round at least one subsequent bid is

15  submitted by a qualified bidder, and we have not been

16  afforded the opportunity to put in another subsequent

17  bid in accordance with the procedures, so we wanted

18  to note that.

19       MR. FURR:  Thank you.  Let me also note for

20  the record while we're doing that, the bid procedures

21  order, which says, in selecting the successful bid,

22  the debtor reserves the right to reserve any

23  subsequent -- to reject any subsequent bid, other

24  than a bid by the proposed buyer, that the debtor, in

25  its reasonable discretion, after consultation with

Page 106

1   the committee and Tech, Inc. deems to be inadequate

2   or insufficient, or otherwise in conformity with the

3   requirements of the Bankruptcy Code, bankruptcy

4   rules, local rules or the bidding procedures as set

5   forth herein, or are contrary to the best interest of

6   the debtor or its estate, and that's the basis for

7   the debtor's decision.

8            Thank you all.

9                 (Off the record.)

10           MR. BACON:  Doug Bacon, Lexis Nexis, noting

11  that we were willing to make an offer of $180

12  million, same terms as previously described, and that

13  offer was not considered as the auction had been

14  terminated by the debtor.

15               (Thereupon, the Auction Sale was concluded

16  on Thursday, November 21, 2013 at 6:40 a.m.)

17

18

19

20

21

22

23

24

25

Page 107

1

2                          CERTIFICATION

3

4    STATE OF FLORIDA:

5    COUNTY  OF  DADE:

6

7              I, Margaret Franzen, Shorthand Reporter

8    and  Notary  Public in  and for the State of Florida

9    at  Large,  do  hereby  certify  that  the  foregoing

10   proceedings  were  taken  before  me  at the date and

11   place  as  stated  in  the caption hereto on  Page 1;

12   that the  foregoing  computer-aided transcription  is

13   a true record of  my  stenographic notes taken at

14   said  proceedings.

15              WITNESS  my  hand  this  21st  day  of

16   November, 2013.

17

18

19        _____

                  Margaret  Franzen

20           Court  Reporter  and  Notary  Public
          in and for the State of Florida at Large

21         My  Commission  Expires:  April 14, 2014

22

23

24

25