Execution Version

## ESCROW AGREEMENT

This Escrow Agreement dated this 31st day of October, 2013 (the "Escrow Agreement"), is entered into by and among TransUnion Acquisition Corp., a Delaware corporation ("Buyer"), TLO, LLC, a Florida limited liability company ("Seller," and together with Buyer, the "Parties," and individually, a "Party"), and Wells Fargo Bank, National Association, a national banking association, as escrow agent ("Escrow Agent").

RECITALS

A.      Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").

B.      Buyer and Seller entered into an Asset Purchase Agreement, dated as of the date hereof (the "Asset Purchase Agreement"), providing for the sale of substantially all of the Seller's assets free and clear of all liens, claims, encumbrances, liabilities and other obligations and interests, other than Assumed Liabilities, subject to approval of the Bankruptcy Court. Capitalized terms used but not defined in this Escrow Agreement shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

B.      The Asset Purchase Agreement provides (i) that upon execution of the Asset Purchase Agreement, Buyer shall deposit $10,000,000 to be held in escrow pursuant to this Escrow Agreement, and (ii) that upon the Closing, a portion of the purchase price to be paid by the Buyer to the Seller for the Acquired Assets thereunder equal to $1,000,000 shall be held in escrow pursuant to this Escrow Agreement to reimburse the Buyer for the payment of trade accounts payable of the Seller not assumed by the Buyer (the "Accounts Payable") in accordance with Section 6.8(b) of the Asset Purchase Agreement.

C.      Buyer agrees to place in escrow certain funds and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement.

D.      The Parties acknowledge that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under, the Asset Purchase Agreement, that all references in this Escrow Agreement to the Asset Purchase Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement.

In consideration of the promises and agreements of the Parties and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties and the Escrow Agent agree as follows:

ARTICLE 1<br/>ESCROW DEPOSIT

Section 1.1.    <u>Receipt of Escrow Property</u>.  Upon execution hereof, Buyer shall deliver to the Escrow Agent the amount of $10,000,000 (the "Deposit") in immediately available funds.  At the

Closing, Buyer shall deliver to the Escrow Agent the amount of $1,000,000 (the "AP Reimbursement Escrow" and, together with the Deposit, the "Escrow Property").

Section 1.2.    <u>Investments</u>.

(a)    The Escrow Agent is authorized and directed to deposit, transfer, hold and invest the Escrow Property and any investment income thereon as set forth in Exhibit A hereto, or as set forth in any subsequent written instruction signed by Buyer and Seller. Any investment earnings and income on the Deposit shall become part of the Deposit and shall be disbursed with the Deposit. Any investment earnings and income on the AP Reimbursement Escrow shall become part of the AP Reimbursement Escrow, and shall be disbursed in accordance with Section 1.3(b) of this Escrow Agreement.

(b)    The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement. The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement. The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account. The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

Section 1.3.    <u>Disbursements</u>.

(a)    <u>Deposit</u>. Upon the joint written instructions of the Parties that the Closing has been consummated or that the Seller has terminated the Asset Purchase Agreement pursuant to Section 7.1(b) thereof, the Escrow Agent shall disburse the Deposit in full to the Seller. Upon the joint written instructions of the Parties that the Asset Purchase Agreement has been terminated for any reason other than by the Seller pursuant to Section 7.1(b) thereof the Escrow Agent shall disburse the Deposit in full to the Buyer. Any such disbursement shall be made in immediately available funds within two business days of receipt of such instructions. Notwithstanding anything in this Escrow Agreement or the Asset Purchase Agreement to the contrary, and regardless of whether or not the Asset Purchase Agreement has become effective or the Bankruptcy Court has approved the Asset Purchase Agreement, the Escrow Agent shall release all or portions of the Deposit upon the occurrence of one or more of the following events:

(i)    At any time, or from time to time, the Seller and the Buyer may provide a joint written notice to Escrow Agent as to the release of all or a portion of the Deposit. Upon receipt of such notice, the Escrow Agent's only duty shall be to comply with said notice and to release the funds as provided in the notice.

(ii)    Upon Escrow Agent's receipt of a conformed or certified copy of a final order from a court of competent jurisdiction, which specifically instructs Escrow Agent to disburse the Deposit, Escrow Agent will disburse the Deposit as provided in such order.

Any such disbursement shall be made in immediately available funds within two business days of receipt of such notice, order or request.

      (b)    <u>AP Reimbursement Escrow.</u>

        (i)    On the date that is ninety (90) days after the Closing Date (the "AP Reimbursement Escrow Termination Date"), Buyer shall provide the Escrow Agent and the Seller with a statement (the "Reimbursement Statement") signed by Buyer that specifies the aggregate amount of the Accounts Payable paid by the Buyer pursuant to Section 6.8(b) of the Asset Purchase Agreement (the "Reimbursement Amount"), including a list of the amount paid to each payee and the amount of the Buyer Collected Excluded Receivables for which the Buyer has received payment pursuant to Section 6.8(a) of the Asset Purchase Agreement (the "Paid Excluded Receivables"). Buyer shall also promptly provide Seller additional information and documentation as may be reasonably requested by Seller to allow Seller to verify the amounts set forth in the Reimbursement Statement. If the Escrow Agent has not received a written objection to the Reimbursement Statement or any portion thereof or any amounts set forth therein from Seller within thirty (30) calendar days following the Escrow Agent's and Seller's receipt of the Reimbursement Statement, then the Escrow Agent will release to Buyer, from the AP Reimbursement Escrow, an amount equal to the excess (if any) of the Reimbursement Amount over the Paid Excluded Receivables in immediately available funds as specified in such Reimbursement Statement within thirty-five (35) calendar days after the Escrow Agent's and Seller's receipt of the Reimbursement Statement. If Seller delivers to the Escrow Agent and Buyer a written objection to the Reimbursement Statement or any portion thereof or any amounts set forth therein within thirty (30) calendar days following the Escrow Agent's and Seller's receipt of the Reimbursement Statement from Buyer, then the Escrow Agent shall not distribute to Buyer any portion of the AP Reimbursement Escrow until the Escrow Agent receives either (A) joint written instructions signed by Seller and Buyer authorizing the release to Buyer of the portion of the AP Reimbursement Escrow set forth in such joint written instructions as the amount agreed upon by Seller and Buyer to be paid to Buyer or (B) a final and non-appealable order of any court of competent jurisdiction directing the release to Buyer of the portion of the AP Reimbursement Escrow that is determined to be the amount payable to Buyer. Upon the Escrow Agent's receipt of such joint written instructions or such final and non-appealable order, as the case may be, the Escrow Agent shall release to Buyer such amount of the AP Reimbursement Escrow in accordance with such written instructions or final and non-appealable order.

        (ii)    Subject to release of available funds to Buyer set forth in a Reimbursement Statement received by the Escrow Agent, the Escrow Agent shall disburse the remaining AP Reimbursement Escrow, if any, in full to Seller within two (2) business days after receipt of the Reimbursement Statement.

Section 1.4.   <u>Security Procedure For Funds Transfers</u>. The Escrow Agent shall confirm each funds transfer instruction received in the name of a Party by means of the security procedure selected by such Party and communicated to the Escrow Agent through a signed certificate in the

form of Exhibit B-1 or Exhibit B-2 attached hereto, which upon receipt by the Escrow Agent shall become a part of this Escrow Agreement. Once delivered to the Escrow Agent, Exhibit B-1 or Exhibit B-2 may be revised or rescinded only by a writing signed by an authorized representative of the Party. Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent a reasonable opportunity to act on it. If a revised Exhibit B-1 or B-2 or a rescission of an existing Exhibit B-1 or B-2 is delivered to the Escrow Agent by an entity that is a successor-in-interest to such Party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the Party under this Escrow Agreement.

The Parties understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the security procedure selected by such Party may result in a delay in accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

Section 1.5.    Income Tax Allocation and Reporting.

(a)    The Parties agree that, for tax reporting purposes, all interest and other income from investment of the Deposit shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by Buyer, whether or not such income was disbursed during such calendar year. The Parties agree that, for tax reporting purposes, all interest and other income from investment of the AP Reimbursement Escrow shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by Buyer, whether or not such income was disbursed during such calendar year.

(b)    Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request. The Parties understand that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

(c)    Buyer shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent. The indemnification provided by this Section 1.5(c) is in addition to the indemnification provided in Section 3.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 1.6.    Termination. Upon the disbursement of all of the Escrow Property, including any interest and investment earnings thereon, this Escrow Agreement shall terminate and be of no

further force and effect except that the provisions of Sections 1.5(c), 3.1 and 3.2 hereof shall survive termination.

ARTICLE 2
DUTIES OF THE ESCROW AGENT

Section 2.1.    Scope of Responsibility.  Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.   References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

Section 2.2.    Attorneys and Agents.  The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by the Escrow Agent.  The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

Section 2.3.    Reliance.  The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors, or assigns.  The Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority.  Concurrent with the execution of this Escrow Agreement, the Parties shall deliver to the Escrow Agent Exhibit B-1 and Exhibit B-2, which contain authorized signer designations in Part I thereof.

Section 2.4.    Right Not Duty Undertaken.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

Section 2.5.    No Financial Obligation.  No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or

potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

## ARTICLE 3
### PROVISIONS CONCERNING THE ESCROW AGENT

Section 3.1.    Indemnification.  Buyer shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been directly caused by the willful misconduct or gross negligence of the Escrow Agent. The provisions of this Section 3.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 3.2.    Limitation of Liability.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL    MISCONDUCT,    OR    (II)    SPECIAL,    INDIRECT,    PUNITIVE,    OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

Section 3.3.    Resignation or Removal.  The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which the Escrow Agent is entitled through the date of removal.  Such resignation or removal, as the case may be, shall be effective thirty (30) calendar days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following the delivery of such notice of resignation or removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

Section 3.4.    Compensation.  The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as Exhibit C, which compensation shall be paid by Buyer.  The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this

Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Escrow Agent shall be compensated by Buyer for such extraordinary services and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. If any amount due to the Escrow Agent hereunder is not paid within thirty (30) calendar days of the date due, the Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.

Section 3.5.    Disagreements.    If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, retain the Escrow Property until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Property, (ii) receives a written agreement executed by each of the parties involved in such disagreement or dispute directing delivery of the Escrow Property, in which event the Escrow Agent shall be authorized to disburse the Escrow Property in accordance with such final court order, arbitration decision, or agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Property and shall be entitled to recover attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. The Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

Section 3.6.    Merger or Consolidation.    Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 3.7.    Attachment of Escrow Property; Compliance with Legal Orders.    In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such

compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

Section 3.8    Force Majeure.    The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

ARTICLE 4
MISCELLANEOUS

Section 4.1.    Successors and Assigns.    This Escrow Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement. No assignment of the interest of any of the Parties shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld).

Section 4.2.    Escheat.    The Parties are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  The Escrow Agent shall have no liability to the Parties, their respective heirs, legal representatives, successors and assigns, or any other party, should any or all of the Escrow Property escheat by operation of law.

Section 4.3.    Notices.    All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is mailed, it shall be deemed given five business days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.  In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to Buyer:  TransUnion Acquisition Corp.
      c/o TransUnion Corp.
      555 West Adams Street
      Chicago, Illinois 60661
      Attention: John W. Blenke, Executive Vice President, Corporate
      General Counsel and Secretary
      Telephone: (312) 466 7730
      Facsimile: (312) 466-7706
      E-mail: jblenke@transunion.com

Copy to:   Wilmer Cutler Pickering Hale and Dorr LLP
      7 World Trade Center
      250 Greenwich Street
      New York, NY 10007
      Attention: Philip Anker
      Philip.Anker@WilmerHale.com
      Facsimile: (212) 230-8888

      and

      Wilmer Cutler Pickering Hale and Dorr LLP
      1875 Pennsylvania Avenue, N.W.
      Washington, D.C. 20006
      Attention: Russell Bruemmer
      Russell.Bruemmer@WilmerHale.com
      Facsimile: (202) 663-6363

If to Seller:  TLO, LLC
      4530 Conference Way South
      Boca Raton, FL 33431
      Attention: Eliza Desiree Asher, Co-Chief Executive Officer and Sole
      Manager
      Facsimile: (561) 226-9790

Copy to:   Akerman
      350 East Las Olas Boulevard, Suite 1600
      Fort Lauderdale, FL 33301
      Attention: David Ristaino, Esq.
      david.ristaino@akerman.com
      Facsimile: (954) 463-2241

If to the Escrow Agent:

Wells Fargo Bank, National Association
10 S. Wacker Drive, 13th Floor
Chicago, Illinois 60606

Attention: Connie Feltenberger; Corporate, Municipal and Escrow Solutions
Telephone: (312) 920-9179
Facsimile: (312) 726-2158
E-mail: feltenbergerc@wellsfargo.com

Section 4.4.    Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to its conflict of laws provisions. Each Party and the Escrow Agent (a) submits itself to the jurisdiction of the Bankruptcy Court in and for any action or proceeding arising out of or relating to this Escrow Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and finally determined by the Bankruptcy Court, (c) waives any claim of inconvenient forum or other challenge to venue in the Bankruptcy Court, (d) agrees not to bring any action or proceeding arising out of or relating to this Escrow Agreement in any other court and (e) waives any right it may have to a trial by jury with respect to any action or proceeding arising out of or relating to this Escrow Agreement.

Section 4.5.    Entire Agreement.  This Escrow Agreement and the exhibits hereto and the Asset Purchase Agreement set forth the entire agreement and understanding of the parties related to the Escrow Property.

Section 4.6.    Amendment.  This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

Section 4.7.    Waivers.  The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance. A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

Section 4.8.    Headings.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

Section 4.9.    Counterparts.  This Escrow Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument. A signed copy of this Escrow Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Escrow Agreement.

Section 4.10    Publication; disclosure.  By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of

this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement. The Parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement. If a Party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so. If any Party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure.

[The remainder of this page left intentionally blank.]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

TransUnion Acquisition Corp.

By: _____

Name: _____

Title: _____

TLO, LLC

By: _____

Name: _____

Title: _____

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By: _____

Name: Connie Feltenberger

Title:  Assistant Vice President

EXHIBIT A

**Agency and Custody Account Direction**
**For Cash Balances**
**Wells Fargo Money Market Deposit Accounts**

Direction to use the following Wells Fargo Money Market Deposit Accounts for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Exhibit A is attached.

You are hereby directed to deposit, as indicated below, or as I shall direct further in writing from time to time, all cash in the Account in the following money market deposit account of Wells Fargo Bank, National Association:

Wells Fargo Money Market Deposit Account (MMDA)

I understand that amounts on deposit in the MMDA are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $250,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $250,000.

I acknowledge that I have full power to direct investments of the Account.

I understand that I may change this direction at any time and that it shall continue in effect until revoked or modified by me by written notice to you.

<u>EXHIBIT B-1</u>

TransUnion Acquisition Corp. ("Buyer") certifies that the names, titles, telephone numbers, e-mail addresses and specimen signatures set forth in Parts I and II of this Exhibit B-1 identify the persons authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of Buyer, and that the option checked in Part III of this Exhibit B-1 is the security procedure selected by Buyer for use in verifying that a funds transfer instruction received by the Escrow Agent is that of Buyer.

Buyer has reviewed each of the security procedures and has determined that the option checked in Part III of this Exhibit B-1 best meets its requirements; given the size, type and frequency of the instructions it will issue to the Escrow Agent. By selecting the security procedure specified in Part III of this Exhibit B-1, Buyer acknowledges that it has elected to not use the other security procedures described and agrees to be bound by any funds transfer instruction, whether or not authorized, issued in its name and accepted by the Escrow Agent in compliance with the particular security procedure chosen by Buyer.

<u>NOTICE</u>: The security procedure selected by Buyer will not be used to detect errors in the funds transfer instructions given by Buyer. If a funds transfer instruction describes the beneficiary of the payment inconsistently by name and account number, payment may be made on the basis of the account number even if it identifies a person different from the named beneficiary. If a funds transfer instruction describes a participating financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution. Therefore, it is important that Buyer take such steps as it deems prudent to ensure that there are no such inconsistencies in the funds transfer instructions it sends to the Escrow Agent.

**Part I**

**Name, Title, Telephone Number, Electronic Mail ("e-mail") Address and Specimen Signature for person(s) designated to provide direction, including but not limited to funds transfer instructions, and to otherwise act on behalf of Buyer**

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> | <u>Specimen Signature</u> |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Part II**

**Name, Title, Telephone Number and E-mail Address for person(s) designated to confirm funds transfer instructions**

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

{27498992;1}
ActiveUS 117134020v.7

## Part III

### Means for delivery of instructions and/or confirmations

The security procedure to be used with respect to funds transfer instructions is checked below:

☐  *Option 1.  Confirmation by telephone call-back.*  The Escrow Agent shall confirm funds transfer instructions by telephone call-back to a person at the telephone number designated on Part II above.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-1.

☐  CHECK box, if applicable:
If the Escrow Agent is unable to obtain confirmation by telephone call-back, the Escrow Agent may, at its discretion, confirm by e-mail, as described in Option 2.

☐  *Option 2.  Confirmation by e-mail.*  The Escrow Agent shall confirm funds transfer instructions by e-mail to a person at the e-mail address specified for such person in Part II of this Exhibit B-1.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-1.  Buyer understands the risks associated with communicating sensitive matters, including time sensitive matters, by e-mail.  Buyer further acknowledges that instructions and data sent by e-mail may be less confidential or secure than instructions or data transmitted by other methods. The Escrow Agent shall not be liable for any loss of the confidentiality of instructions and data prior to receipt by the Escrow Agent.

☐  CHECK box, if applicable:
If the Escrow Agent is unable to obtain confirmation by e-mail, the Escrow Agent may, at its discretion, confirm by telephone call-back, as described in Option 1.

☐  *Option 3.  Delivery of funds transfer instructions by password protected file transfer system only - no confirmation.*  The Escrow Agent offers the option to deliver funds transfer instructions through a password protected file transfer system. If Buyer wishes to use the password protected file transfer system, further instructions will be provided by the Escrow Agent.  If Buyer chooses this Option 3, it agrees that no further confirmation of funds transfer instructions will be performed by the Escrow Agent.

☐  *Option 4.  Delivery of funds transfer instructions by password protected file transfer system with confirmation.*  Same as Option 3 above, but the Escrow Agent shall confirm funds transfer instructions by ☐ telephone call-back or ☐ e-mail (must check at least one, may check both) to a person at the telephone number or e-mail address designated on Part II above.  By checking a box in the prior sentence, the party shall be deemed to have agreed to the terms of such confirmation option as more fully described in Option 1 and Option 2 above.

**Dated this** _____ **day of** _____**, 20**__ **.**


**By** _____
**Name:**
**Title:**

{27498992;1}
ActiveUS 117134020v.7

## EXHIBIT B-2

TLO, LLC ("Seller") certifies that the names, titles, telephone numbers, e-mail addresses and specimen signatures set forth in Parts I and II of this Exhibit B-2 identify the persons authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of Seller, and that the option checked in Part III of this Exhibit B-2 is the security procedure selected by Seller for use in verifying that a funds transfer instruction received by the Escrow Agent is that of Seller.

Seller has reviewed each of the security procedures and has determined that the option checked in Part III of this Exhibit B-2 best meets its requirements; given the size, type and frequency of the instructions it will issue to the Escrow Agent. By selecting the security procedure specified in Part III of this Exhibit B-2, Seller acknowledges that it has elected to not use the other security procedures described and agrees to be bound by any funds transfer instruction, whether or not authorized, issued in its name and accepted by the Escrow Agent in compliance with the particular security procedure chosen by Seller.

NOTICE: The security procedure selected by Seller will not be used to detect errors in the funds transfer instructions given by Seller. If a funds transfer instruction describes the beneficiary of the payment inconsistently by name and account number, payment may be made on the basis of the account number even if it identifies a person different from the named beneficiary. If a funds transfer instruction describes a participating financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution. Therefore, it is important that Seller take such steps as it deems prudent to ensure that there are no such inconsistencies in the funds transfer instructions it sends to the Escrow Agent.

### Part I
### Name, Title, Telephone Number, Electronic Mail ("e-mail") Address and Specimen Signature for person(s) designated to provide direction, including but not limited to funds transfer instructions, and to otherwise act on behalf of Seller

| Name | Title | Telephone Number | E-mail Address | Specimen Signature |
|------|-------|------------------|----------------|--------------------|
|      |       |                  |                |                    |
|      |       |                  |                |                    |
|      |       |                  |                |                    |

### Part II
### Name, Title, Telephone Number and E-mail Address for person(s) designated to confirm funds transfer instructions

| Name | Title | Telephone Number | E-mail Address |
|------|-------|------------------|----------------|
|      |       |                  |                |
|      |       |                  |                |
|      |       |                  |                |

## Part III

### Means for delivery of instructions and/or confirmations

The security procedure to be used with respect to funds transfer instructions is checked below:

☐   *Option 1. Confirmation by telephone call-back*. The Escrow Agent shall confirm funds transfer instructions by telephone call-back to a person at the telephone number designated on Part II above. The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-2.

☐ CHECK box, if applicable:
   If the Escrow Agent is unable to obtain confirmation by telephone call-back, the Escrow Agent may, at its discretion, confirm by e-mail, as described in Option 2.

☐   *Option 2. Confirmation by e-mail*. The Escrow Agent shall confirm funds transfer instructions by e-mail to a person at the e-mail address specified for such person in Part II of this Exhibit B-2. The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-2. Seller understands the risks associated with communicating sensitive matters, including time sensitive matters, by e-mail. Seller further acknowledges that instructions and data sent by e-mail may be less confidential or secure than instructions or data transmitted by other methods. The Escrow Agent shall not be liable for any loss of the confidentiality of instructions and data prior to receipt by the Escrow Agent.

☐ CHECK box, if applicable:
   If the Escrow Agent is unable to obtain confirmation by e-mail, the Escrow Agent may, at its discretion, confirm by telephone call-back, as described in Option 1.

☐   *Option 3. Delivery of funds transfer instructions by password protected file transfer system only - no confirmation*. The Escrow Agent offers the option to deliver funds transfer instructions through a password protected file transfer system. If Seller wishes to use the password protected file transfer system, further instructions will be provided by the Escrow Agent. If Seller chooses this Option 3, it agrees that no further confirmation of funds transfer instructions will be performed by the Escrow Agent.

☐   *Option 4. Delivery of funds transfer instructions by password protected file transfer system with confirmation*. Same as Option 3 above, but the Escrow Agent shall confirm funds transfer instructions by ☐ telephone call-back or ☐ e-mail (must check at least one, may check both) to a person at the telephone number or e-mail address designated on Part II above. By checking a box in the prior sentence, the party shall be deemed to have agreed to the terms of such confirmation option as more fully described in Option 1 and Option 2 above.

Dated this ____ day of _____, 20__.


**By** _____
**Name:**
**Title:**

## EXHIBIT C

### FEES OF ESCROW AGENT

**Acceptance Fee** **Waived**

A one-time fee for our initial review of governing documents, account set-up and customary duties and responsibilities related to the closing. This fee is payable at closing.

**Annual Administration Fee** **$3,500**

An annual fee for customary administrative services provided by the escrow agent, including daily routine account management; investment transactions; cash transactions processing (including wire and check processing); disbursement of funds in accordance with the agreement; tax reporting for one entity; and providing account statements to the parties. The administration fee is payable annually in advance per escrow account established and is not subject to proration. The first installment of the administrative fee is payable at closing.

**Out-of-Pocket Expenses** **At Cost**

Out of pocket expenses will be billed as incurred at cost at the sole discretion of Wells Fargo.

**Extraordinary Services** **Market Rate**

Fees for services not contemplated at the time the governing documents are executed or not specifically covered elsewhere in this schedule will be determined by market rates for such services.

Assumptions:

This proposal is based upon the following assumptions with respect to the role of Escrow Agent. Should any of the assumptions, duties or responsibilities change, we reserve the right to affirm, modify or rescind this proposal.

- Number of escrow accounts to be established: Two
- Amount of escrow: $11 million
- Number of tax reporting parties: One
- Number of parties to the agreement: Three (including the escrow agent)
- Number of cash transactions: One deposit and up to 5 disbursements
- Term of escrow: One year
- Fees quoted assumes balances will be invested in the Wells Fargo Money Market Deposit Account
- Appointment subject to review and acceptance of the final documents
- Appointment subject to receipt of requested due diligence information as required by the USA Patriot Act

Terms and conditions

- Should this transaction fail to close through no fault of Wells Fargo Bank, N.A., its acceptance fee, as well as legal and out-of-pocket expenses incurred by Wells Fargo Bank, N.A., may be due and payable.
- Counsel fees and expenses are payable at closing.
- Invoices outstanding for over 30 calendar days are subject to a 1.5% per month late payment penalty.

Important information about indentifying our customers

*To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person (individual, corporation, partnership, trust, estate or other entity recognized as a legal person) for whom we open an account.*

*What this means for you: Before we open an account, we will ask for your name, address, date of birth (for individuals), TIN/EIN or other information that will allow us to identify you or your company. For individuals, this could mean identifying documents such as a driver's license. For a corporation, partnership, trust, estate or other entity recognized as a legal person, this could mean identifying documents such as a Certificate of Formation from the issuing state agency.*

EXECUTION VERSION

### Bill of Sale

This Bill of Sale dated December 16, 2013 is executed and delivered by TLO, LLC, a Florida limited liability company (the "Seller"), to TransUnion Risk and Alternative Data Solutions, Inc. (f/k/a TransUnion Acquisition Corp.), a Delaware corporation (the "Buyer"). All capitalized words and terms used in this Bill of Sale and not defined herein shall have the respective meanings ascribed to them in the Amended and Restated Asset Purchase Agreement dated December 12, 2013 between the Seller and the Buyer (the "Agreement").

WHEREAS, pursuant to the Agreement, the Seller has agreed to sell, transfer, convey, assign and deliver to the Buyer substantially all of the assets of the Seller, and the Buyer has agreed to assume certain of the liabilities of the Seller;

NOW, THEREFORE, in consideration of the mutual promises set forth in the Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller hereby agrees as follows:

1.      The Seller hereby sells, transfers, conveys, assigns and delivers to the Buyer, its successors and assigns, to have and to hold forever, all of Seller's right, title and interest in, to and under all of the Acquired Assets, free and clear of all liens, claims, encumbrances, and interests, except for the Assumed Liabilities.

2.      The Seller does hereby irrevocably constitute and appoint the Buyer, its successors and assigns, its true and lawful attorney, with full power of substitution, in its name or otherwise, and on behalf of the Seller, or for its own use, to claim, demand, collect and receive at any time and from time to time any and all of the Acquired Assets, and to prosecute the same at law or in equity and, upon discharge thereof, to complete, execute and deliver any and all necessary instruments of satisfaction and release.

3.      The Seller, by its execution of this Bill of Sale, and the Buyer, by its acceptance of this Bill of Sale, each hereby acknowledges and agrees that neither the representations and warranties nor the rights, remedies or obligations of any party under the Agreement shall be deemed to be enlarged, modified or altered in any way by this instrument.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Seller and the Buyer have caused this instrument to be duly executed under seal as of and on the date first above written.

TLO, LLC

By:_____

Name:_____

Title:_____


ACCEPTED:

TransUnion Risk and Alternative Data Solutions, Inc.


By:_____

Name:_____

Title:_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In Re:                                             Case No.  13-20853-PGH
                                                   Chapter 11
TLO, LLC,

    Debtor.
_____/

**ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
OTHER INTERESTS (OTHER THAN ASSUMED LIABILITIES), (II) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

Upon the *Motion For Entry Of Order: (i) Approving The Sale Of Substantially All Of The*

*Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances And Other Interests (Other*

*Than Assumed Liabilities), (ii) Approving The Assumption And Assignment Of Certain Executory*

*Contracts And Unexpired Leases, And (iii) Granting Related Relief* (the "Sale Motion"), dated

November 1, 2013, of TLO, LLC, as debtor and debtor in possession (the "Debtor"), in the

above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105(a), 362, 363,

and 365 of title 11 of the United States Code (such title, the "Bankruptcy Code"), Rules 2002,

6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern

District of Florida (the "Local Rules"), for, *inter alia*, approval of (i) the sale (the "Sale"), free

and clear of Interests (as defined below), of substantially all assets of the Debtor (the "Acquired

Assets," as such term is defined in that certain asset purchase agreement, dated as of October 31,

2013 (as amended and in the form attached hereto as Exhibit A, the "Stalking Horse APA")[1] by

and between the Debtor and TransUnion Risk and Alternative Data Solutions, Inc. (formerly

known as TransUnion Acquisition Corp., the "Buyer")), (ii) the assumption and assignment of

the Assigned Contracts, and (iii) ancillary relief; and this Court having conducted a hearing on

October 22, 2013 (the "Bidding Procedures Hearing"), and having entered the "Bidding

Procedures Order" [Docket No. 351, as amended by Docket No. 365] approving, *inter alia*, (x)

the procedures (the "Bidding Procedures") used in connection with the Sale and Auction (as

defined below), attached as Exhibit 2 to the Bidding Procedures Order, (y) the form and manner

of notice of the Auction and the Sale Hearing (the "Sale Notice") in the form attached as Exhibit

1 to the Bidding Procedures Order, and (z) the manner in which the notice of the assignment and

proposed cure amounts for the Assigned Contracts (the "Notice of Assignment and Cure") would

be provided, as well as the procedures related to the assumption and assignment of the Assigned

Contracts to the Buyer; and this Court having held a hearing (the "Stalking Horse APA

Objection Hearing") on November 5, 2013 regarding any objection that the Stocking Horse APA

restricted or limited competitive bidding for the Acquired Assets (a "Stalking Horse APA

---

[1] Each capitalized term not defined herein shall have the meaning ascribed to such term in the Stalking Horse APA, attached hereto as Exhibit A. The Stalking Horse APA may be amended, modified, or supplemented after the date of this Order as provided below in this Order and in accordance with the Stalking Horse APA, and all references herein to the "Stalking Horse APA" shall be to the form attached hereto as Exhibit A, as it may be so amended, modified, and/or supplemented from time to time.

- 2 -

Objection") and no such objection having been filed; and the Debtor having conducted an

auction ("Auction") commencing on November 20, 2013 in accordance with the terms and

conditions of the Bidding Procedures and Bidding Procedures Order; and this Court having

conducted a hearing on the Sale Motion on November 22, 2013 (the "Sale Hearing"); and all

parties in interest having been heard, or having had the opportunity to be heard; and the Court

having reviewed and considered the Sale Motion, all objections to the Sale Motion and responses

filed thereto, the arguments of counsel, the Exhibits introduced, the testimony of the Debtor's

principals, E. Desiree Asher, Caroline Asher Yoost, the Debtor's investment banker, Steven

Zuckerman and the Debtor's commercial transaction counsel, David Ristaino, and the evidence

adduced, at the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the

Sale Hearing, and all of the proceedings before the Court; and after due deliberation and

sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:[2]**

      A.      This Court has jurisdiction over the Sale Motion and the Sale contemplated

thereunder pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue of the Chapter 11 Case in this district is proper

under 28 U.S.C. §§ 1408 and 1409.

      B.      The statutory predicates for the relief requested in the Sale Motion are Bankruptcy

Code sections 105, 362, 363 and 365, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local

Rule 6004-1.

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

ActiveUS 117116317v.11

C.    The Debtor has provided timely, adequate, and sufficient notice of the Sale

Motion and the relief sought therein (including, without limitation, service of the Sale Notice and

the Notice of Assumption and Cure, including notice of the amount required to cure any

monetary defaults and pay all actual pecuniary losses under the Assigned Contracts ("Cure

Amounts"), in accordance with the Bidding Procedures Order), the Auction, the Sale Hearing,

and the deadlines for filing Stalking Horse APA Objections, objections to the Bidding

Procedures, the Sale and the Sale Motion by U.S. mail (or by electronic mail to TLO's

customers), in accordance with the Bidding Procedures Order.[3]  No further notice is necessary or

required.  The Debtor also published, on October 28, 2013, notice of the Sale in accordance with

the Bidding Procedures Order in the National Edition of *The Wall Street Journal*, the *Sun

Sentinel* and the *Miami Herald*.  A reasonable opportunity to object or be heard regarding the

Sale and the relief requested in the Sale Motion has been afforded to all interested parties,

persons and entities.  Such notice was good and sufficient and appropriate under the

circumstances, and no other or further notice is necessary or shall be required.

D.    A Notice of Assignment and Cure has been provided to each non-Debtor party to

each of the Assigned Contracts that the Debtor proposes to be assumed and assigned to the

Buyer, in accordance with, and as provided by, the Bidding Procedures Order.  The service of the

Notices of Assignment and Cure was sufficient under the circumstances and no further notice is

necessary or shall be required in connection with the assumption and assignment of the Assigned

Contracts (including establishing any cure amounts).  The non-Debtor party (or parties) to each

---

[3] The Debtor mailed the Sale Notice to the vast majority of required parties within three days of entry of the Bidding Procedures Order, as provided for in the Bidding Procedures Order.  To the extent that the Debtor did not mail such Sale Notice to some non-Debtor parties to non-disclosure agreements until five days after entry of the Bidding Procedures Order, this short delay did not prejudice any such parties.  The Court finds that such notice was good, sufficient and appropriate under the circumstances.

- 4 -

Assigned Contract has had an adequate opportunity to object to assumption and assignment of

the Assigned Contract, the cure amount set forth on the Notice of Assignment and Cure, and the

provision of adequate assurance of future performance.

      E.      The Debtor has demonstrated a sufficient basis and compelling circumstances

requiring it to enter into the Stalking Horse APA and assume and assign the Assigned

Contracts.  Such actions constitute an appropriate exercise of the Debtor's business judgment.

The Court specifically finds that the Sale to the Buyer is in the best interests of the Debtor, its

estate, creditors, and its equity interest holders.  Such business reasons include, but are not

limited to, the facts that (i) there is substantial risk of deterioration of the value of the Acquired

Assets if the Sale is not consummated quickly; (ii) the Aggregate Purchase Price to be paid by

the Buyer constitutes the highest or otherwise best offer for the Acquired Assets; (iii) the Sale

presents the best opportunity for the Debtor to realize the value of its business on a going

concern basis and to avoid decline and decay of the Debtor's business; (iv) the Stalking Horse

APA, is substantially free of conditions to closing; and (v) the potential harm to the Debtor's

business from the announcement of a Sale to a competing company, as opposed to the Buyer,

should that competing company not close upon the Sale for any reason, including but not limited

to regulatory approvals of the Sale.  The Court finds that the  risk of one of the competing

bidders not obtaining such regulatory approval in a timely manner is significant, that the weight

accorded such risk by the Debtor need not and cannot be quantified, and that it is a factor wholly

within Debtor's business judgment to provide appropriate consideration.  The Court finds

Debtor's advancement of the Buyer as the highest and best offer to purchase Debtor's assets is a

sound exercise of its business judgment because the Sale to Buyer provides the greatest possible

recovery to Debtor's estate, its creditors, and its equity interest holders.  Entry of this Order and

- 5 -

all provisions hereof is a necessary condition precedent to the Buyer entering into the Stalking
Horse APA.

      F.      The Debtor, through its investment banker, Bayshore Partners, LLC
("Bayshore"), and own management, extensively marketed the acquired assets, both before and
after the Court entered the Bidding Procedures Order.  The Debtor and its professionals
conducted the marketing and sale process for the Acquired Assets in accordance with the
Bidding Procedures and the Bidding Procedures Order.  The Auction was conducted in
accordance with the Bidding Procedures and the Bidding Procedures Order and afforded a full
and fair opportunity for any entity to make a higher or otherwise better offer to purchase the
Acquired Assets.  All creditors and other parties in interest and all prospective purchasers have
been afforded a reasonable and fair opportunity to conduct due diligence and bid for the
Acquired Assets.

      G.      The Auction was conducted at arm's length, without collusion, and in good faith.
The Auction commenced on the morning of November 20, 2013, and lasted over 21 hours,
concluding the morning of November 21, 2013.  The Auction was vigorously competitive, and
featured fierce and determined bidding by three distinct bidders.  After the conclusion of the
Auction, the Debtor declared the Buyer to have made the highest or otherwise best offer for the
Acquired Assets based on a variety of factors, including, but not limited to, the Buyer's ability to
close the Sale.  As a result of the Auction, the Buyer increased its Aggregate Purchase Price from
$105,000,000 to $154,000,000, an amount approximately 47% higher than its original Stalking
Horse Bid (as defined in the Bidding Procedures).  The Aggregate Purchase Price to be paid by
the Buyer to the Debtor constitutes the highest or otherwise best offer received by the Debtor,
and is expected by the Debtor to be sufficient to pay all creditors with allowed claims in full and

- 6 -

provide a material distribution to the Debtor's equity holders. Accordingly, the Buyer is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures and Bidding Procedures Order. The Buyer has complied in all respects with the Bidding Procedures and Bidding Procedures Order.

H.    The Stalking Horse APA has been negotiated by the Debtor and the Buyer (and their respective affiliates, professionals and representatives) in good faith, at arm's length and without collusion or fraud. The terms and conditions of the Stalking Horse APA are fair and reasonable, and the Sale is in the best interest of the Debtor, its creditors and estate. The Buyer is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code with respect to the Sale of the Acquired Assets.

I.    The Stalking Horse APA was not controlled by an agreement between potential or actual bidders within the meaning of sections 363(n) of the Bankruptcy Code. The Debtor and the Buyer have not engaged in any conduct that would cause or permit the Stalking Horse APA or the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

J.    The Debtor has filed on the docket of the Chapter 11 Case [Docket No. 390] the option agreement (the "Option Agreement") between the Buyer and the lenders (the "DIP Lenders") under (i) that certain Super Priority Debtor in Possession Credit Agreement dated as of May 14, 2013, as approved by this Court's orders dated May 17, 2013 and July 15, 2013 [Docket No.'s 57 and 149] (as amended, the "May 2013 DIP Agreement" governing the "May 2013 DIP Loan") and (ii) that certain Super Priority Debtor in Possession Credit Agreement dated as of August 20, 2013, as approved by this Court's orders dated July 15, 2013, October 17, 2013 and November 13, 2013 [Docket No.'s 303, 364 and 453] (as amended, the "August 2013 DIP

- 7 -

Agreement" (together with the May 2013 DIP Agreement, the "DIP Agreement") governing the "August 2013 DIP Loan" (together with the May 2013 DIP Loan, the "DIP Loan")). The Option Agreement is reasonable, appropriate and in the best interests of the Debtor, its estate and creditors, and all other parties in interest, and no further notice of the Option Agreement is necessary or required..

K.      No part of the Acquired Assets constitute personally identifiable information within the meaning of sections 101(41A) and 363(b) of the Bankruptcy Code, and the appointment of a consumer privacy ombudsman is not required pursuant to section 363(b) of the Bankruptcy Code.

L.      The Buyer will be acting in good faith in consummating the Sale at any time following entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

M.      The Buyer is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

N.      Subject to entry of this Order, the Debtor has full corporate power and authority to execute and deliver the Stalking Horse APA, and to perform all of its obligations thereunder, and the Sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts has been duly and validly authorized by all corporate authority necessary for the Debtor to undertake such actions. No consents or approvals, other than as expressly provided for in the Stalking Horse APA and the entry of this Order, are required by the Debtor to undertake such actions.

O.      The transfer of the Assumed Liabilities to the Buyer (as set forth in the Stalking Horse APA) is integral to the Stalking Horse APA and is in the best interests of the Debtor, its

- 8 -

estate and creditors, and represents the reasonable exercise of sound and prudent business judgment by the Debtor. Accordingly, such transfer is reasonable, enhances the value of the Sale to the Debtor's estate and does not constitute unfair discrimination.

P.     The Assigned Contracts are integral to the Acquired Assets, and, accordingly, the assumption and assignment of the Assigned Contracts is integral to the Stalking Horse APA and Sale, and is in the best interests of the Debtor, its estate and creditors, and represents the reasonable exercise of sound and prudent business judgment by the Debtor. Accordingly, such assumption and assignment is reasonable, enhances the value of the Debtor's estate and does not constitute unfair discrimination.

Q.     No provision of any Assumed Contract that purports to prohibit, restrict or condition the use, consideration or assumption and assignment of any such Assigned Contract in connection with the Sale shall have any force or effect. Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision of any Assigned Contract or other restriction purporting to prohibit such assignment or transfer.

R.     The Debtor and Buyer have met all of the requirements of section 365(b) of the Bankruptcy Code with respect to each of the Assigned Contracts. Pursuant to the Stalking Horse APA, on or before the Closing, the Debtor shall have cured or provided adequate assurance of cure of any default existing prior to the Closing under any of the Assigned Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(B). The Buyer has provided adequate assurance of its future

- 9 -

performance of, and under, each of the Assigned Contracts, within the meaning of Bankruptcy

Code section 365(b)(1)(C). Each non-Debtor party (or parties) to each Assigned Contract was

given notice and the opportunity to object the Sale Motion and the proposed assumption and

assignment of the Assigned Contract, including but not limited to, by virtue of notice of the

Notice of Assumption and Cure (including without limitation, to the assignability of the

Assigned Contract, to the proposed Cure Amount (if any), and adequate assurance of future

performance by the Buyer) and all such non-Debtor party (or parties) are deemed to have

consented to such assumption and assignment. Except as otherwise provided in this Order, the

Cure Amounts set forth on Exhibit B hereto with respect to each Assigned Contract on such

Exhibit are the sole amounts necessary under the Bankruptcy Code sections 365(b)(1)(A) and

(B) and section 365(f)(2)(A) to cure all monetary defaults and pay all actual pecuniary losses

under such Assigned Contracts, subject to Buyer's rights to add or delete Assigned Contracts as

provided in the Stalking Horse APA.

      S.     The Debtor is the sole and lawful owner of the Acquired Assets. The Acquired

Assets constitute property of the Debtor's estate, and title thereto is vested in the Debtor's estate

within the meaning of section 541(a) of the Bankruptcy Code. The Sale of the Acquired Assets

to the Buyer will be, as of the Closing, a legal, valid and effective transfer of such assets, and

shall, at Closing, vest the Buyer with all right, title and interest to the Acquired Assets, with any

Interests to attach to the consideration to be received by the Debtor in the same priority and

subject to the same defenses and avoidability, if any, as of the Closing. The Buyer would not

enter into the Stalking Horse APA to acquire the Acquired Assets if the sale of the Acquired

Assets were not free and clear of all Interests (other than the Assumed Liabilities), or if the

Buyer would, or in the future could, be liable on account of any such Interests. A sale of the

Acquired Assets other than one free and clear of Interests would adversely impact the Debtor's estate, and would yield substantially less value for the Debtor's estate, with less certainty than the Sale. Therefore, the Sale contemplated by the Stalking Horse APA is in the best interests of the Debtor, its estate and creditors, and all other parties in interest.

T.       The Debtor may sell, convey and assign the Acquired Assets to the Buyer free and clear of all Interests, because, with respect to each creditor or entity that holds an Interest in the Acquired Assets, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)-(5) has been satisfied. Those holders of Interests who did not object or who withdrew their objections to the Sale are deemed to have consented to the Sale Motion and Sale of the Acquired Assets to the Buyer pursuant to Bankruptcy Code section 363(f)(2). Those holders of Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f), which subsections the Debtor has satisfied.

U.       Without limiting the generality of the foregoing, Technology Investors Inc. ("Tech. Inc.") and Michael Kuzy, as the personal representative of the estate of Hank Asher (the "Personal Representative" of the "Asher Estate") (to whom notice of the Sale Motion was provided in accordance with the Bidding Procedures Order and paragraph C above), have acknowledged that all intellectual property or any of the other assets used or useful by the Debtor in the conduct of the Business of the Debtor (the "Business Assets"), which Business Assets were ever owned by Tech. Inc. or Hank Asher, were intended to be contributed to the Debtor, and were so contributed. Tech. Inc. and the Personal Representative have further acknowledged that neither Tech. Inc. nor the Asher Estate (or any of its beneficiaries), respectively, have any claim or interest whatsoever in any Business Assets. Accordingly, the sale of all Business Assets

- 11 -

to the Buyer as a component of the Acquired Assets shall be free and clear of all and any

interests of Tech. Inc. or the Asher Estate (or any of its beneficiaries).

      V.    Without limiting the generality of the foregoing, to the extent that Ole Poulsen

holds or asserts any interests of any kind in the BParser code converter software used or useful

by the Debtor in the conduct of the Business (the "BParser Code") or any other Business Assets,

such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold

to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h) of the

Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole

Poulsen has been provided actual notice of and an opportunity to object to and be heard with

respect to the Sale and he did not timely file an objection.

      W.    The Sale contemplated under the Stalking Horse APA does not amount to a

consolidation, merger or de facto merger of the Buyer and the Debtor and/or the Debtor's estate,

there is not substantial continuity between the Buyer and the Debtor, there is no common identity

between the Debtor and the Buyer, there is no continuity of enterprise between the Debtor and

the Buyer, the Buyer is not a mere continuation of the Debtor or its estate, and the Buyer does

not constitute a successor to the Debtor or its estate.  Other than the Assumed Liabilities

expressly assumed under the Stalking Horse APA, and to the maximum extent permitted by

section 363 of the Bankruptcy Code, the buyer shall acquire the Acquired Assets at Closing free

and clear of all liens, claims, encumbrances, liabilities and other obligations and interests

(collectively, "Interests"), and the Buyer and its affiliates and their respective predecessors,

successors, assigns, members, partners, directors, officers, principals and shareholders (or

equivalent) shall have no obligations with respect to any liabilities of the Debtor, including,

without limitation, all "Retained Liabilities" as set forth in the Stalking Horse APA, and all

- 12 -

"claims" (as defined in section 101(5) of the Bankruptcy Code), liens or other security interests, liabilities, interests, rights and encumbrances, mortgages, restrictions, hypothecations, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, rights of offset, contract rights, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, regulatory violations, decrees of any court or foreign or domestic governmental or quasigovernmental entity, charges or any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, reclamation rights and claims, demands, guaranties, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Case and whether imposed by agreement, understanding, law, rule, equity or otherwise, and including, without limiting the foregoing: (1) any labor agreements, rights or claims; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitations, any pension plan of the Debtor; (3) any other employee, workers' compensation, occupational disease or unemployment or temporary disability related claim, including, without limitations, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act

- 13 -

of 1988 or any similar state law, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Child Online Privacy Protection Act and Health Information Technology for Economic and Clinical Health Act, (k) state discrimination laws, (l) state unemployment compensation laws or any other similar state laws, or (m) any other state or federal benefits or claims relating to any employment with of the Debtor or any of its predecessors, affiliates or subsidiaries; (4) any bulk sales or similar law; (5) any privacy or consumer protection law (and any possible claim against the Debtor for violation thereof), (6) any federal or state tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (7) any theories of successor liability, including any theories on product liability or tort grounds; (8) any environmental or other liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature arising from existing conditions on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or other state statute; (9) the Federal Trade Commission Act and the Fair Credit Reporting Act; and (10) any interests referenced in paragraphs U and V of this Order.

X.      The Buyer would not have acquired the Acquired Assets but for the foregoing protections.

- 14 -

Y.      The Sale is not intended to hinder, delay or defraud creditors under the Bankruptcy Code or under the laws of any state, territory, possession or the District of Columbia. Neither the Debtor nor the Buyer are or will be entering into the Sale fraudulently.

Z.      The Aggregate Purchase Price constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, section 548 of the Bankruptcy Code or any similar state or federal law), and fair consideration under the Bankruptcy Code and under the laws of any state, territory, possession or the District of Columbia. The Stalking Horse APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Debtor's Chapter 11 Case.

AA.     The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including without limitation Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been or will be complied with in respect of the Sale as of the Closing.

BB.     The Debtor's sale of the Acquired Assets outside of a plan of reorganization pursuant to the Stalking Horse APA neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a chapter 11 plan of reorganization for the Debtor. The Sale does not constitute a *sub rosa* chapter 11 plan.

CC.     Time is of the essence in consummating the Sale. In order to maximize the value of the Debtor's assets, it is essential that the Sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts occur within the time constraints set forth in the Stalking Horse APA. Specifically, the Sale must be approved and consummated promptly in order to preserve the viability of the business subject to the Sale as a going concern, to maximize the

- 15 -

value to the Debtor, its estate, creditors, and all other parties in interest. Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006 and the Buyer may close the Sale before this Order is final and non-appealable, in accordance with the Stalking Horse APA.

DD.    The Sale contemplated by the Stalking Horse APA is in the best interests of the Debtor and it estate, creditors, interest holders and all other parties in interest herein; and it is therefore,

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Sale Motion is granted in its entirety.

2.    All objections and responses, whether filed or asserted in open Court, to the Sale Motion, this Order or the relief requested (including the assumption and assignment of all Assigned Contracts) herein that have not been overruled, withdrawn, waived, settled or otherwise resolved, are hereby overruled and denied on the merits with prejudice. Specifically, the following 11 objections were filed, and are overruled, withdrawn, waived, settled and otherwise resolved for the reasons as set forth on the record of the Sale Hearing and as otherwise set forth below:

- The Objections of Warburg Pincus LLC and Andrew Prozes [Docket Nos. 468, 534] are overruled.

- The Objection of Tracers Information Specialists, Inc. ("Tracers") [Docket No. 479] is resolved pursuant to the terms of the settlement agreement [Docket No. 449] approved by this Court (the "Tracers Settlement"). The Tracers Settlement, and the order approving it, provide that with respect to the data within Debtor's system as of November 11, 2013, and copies of such data, which data files and types are set forth in the list attached as Exhibit A to the Tracers Agreement (the "1/3 Data"), each of Tracers and the Debtor is permitted to use, sell or license the 1/3 Data; *provided, however*, that neither Tracers nor the Debtor (or any person or entity acquiring or obtaining a license of Tracers' or the Debtor's rights in the 1/3 Data) is obligated to provide the other party access to the 1/3 Data in its

- 16 -

possession, except for any access required by Tracers to obtain the confirmation with respect to the 2/3 Data (defined below), and the return of any drives or storage device relating to the 2/3 Data (defined below), as and to the extent provided in the remainder of this paragraph. The Tracers Settlement, and the order approving it, further provide that any other data (beyond the 1/3 Data) provided by Tracers to the Debtor will be removed from the Debtor's systems (the "2/3 Data"), that the Debtor will return any drives or storage device relating to the 2/3 Data to Tracers upon the entry of the order approving the Tracers Settlement, that as soon as reasonably practicable upon the entry of the order approving the Tracers Settlement, the Debtor will permit Tracers to confirm that the 2/3 Data has been removed from the Debtor's system through an independent third party, and that Tracers shall retain exclusive ownership rights in all of the 2/3 Data and the Debtor shall not assert any ownership rights in the 2/3 Data. At Closing, the Debtor shall transfer all its right, title and interest in the 1/3 Data to the Buyer, and such 1/3 Data shall be treated as an Acquired Asset.

- The Objection of eMerges.com, Inc. ("eMerges") [Docket No. 487] is resolved as follows: To the extent that any data or other information (collectively, the "eMerges Data") provided by eMerges to the Debtor pursuant to the Data License Agreement, entered in as of December 1, 2010, by and between eMerges and the Debtor (the "eMerges Agreement"), was previously transferred to the Debtor by sale, assignment, or a perpetual or other comparable license or conveyance, all right, title and interest of the Debtor in and to such eMerges Data, may, and shall at the Closing, be transferred by the Debtor to the Buyer free and clear of all Interests, and shall be treated as an Acquired Asset. All claims of eMerges that any portion of the eMerges Data was not transferred to the Debtor by such a sale, assignment, or a perpetual or other comparable license or conveyance are hereby explicitly preserved, and all defenses of the Debtor and the Buyer to such claims, and all rights of the Debtor and the Buyer as against eMerges, are also hereby explicitly preserved. To the extent that the eMerges Agreement is executory and may otherwise be assumed by the Debtor and assigned to Buyer under applicable law, it may and shall, at Closing, be so assumed by the Debtor and assigned to the Buyer as an Assigned Contract. All claims by eMerges that the eMerges Agreement was not a sale of assets, and/or the eMerges Agreement may not be assumed and/or assigned are hereby reserved to be determined by separate Court order, and all defenses to any such claims are also fully preserved.

- The Objection of Linebarger Goggan Blair & Sampson, LLP ("Linebarger") [Docket No. 493] is resolved by the removal of the Joint Venture Operating Agreement for Linebarger Analytics & Investigative Services, LLC, dated December 21, 2011, by and between the Debtor and Linebarger (the "Linebarger Joint Venture Agreement"), from the schedule of Assigned Contracts to be assumed and assigned set forth on schedule 1.1(a)(ix) to the Stalking Horse APA, and otherwise in accordance with the terms set forth in paragraph 37 of this Order.

- 17 -

- The Objection of Equifax Information Services LLC [Docket No. 497] (the "Equifax Objection," filed by "Equifax") is resolved consensually as set forth below in paragraph 36 of this Order.

- The Objection of GCA Savvian Advisors, LLC ("GCA") [Docket No. 498] is resolved by the removal of the Letter Agreement, dated May 17, 2012, by and between the Debtor and GCA from the schedule of Assigned Contracts to be assumed and assigned set forth on schedule 1.1(a)(ix) to the Stalking Horse APA, and is otherwise overruled.

- The Objection of Experian Information Solutions, Inc. ("Experian") [Docket No. 500] is resolved by the removal of all contracts between the Debtor and Experian referenced in Experian's Objection from the schedule of Assigned Contracts to be assumed and assigned set forth on schedule 1.1(a)(ix) to the Stalking Horse APA (the "Experian Contracts"), and in accordance with the terms set forth in paragraph 39 of this Order.

- The Objection of Wells Fargo Bank, N.A. ("Wells") [Docket No. 501] is withdrawn by Wells [Docket No. 506].

- The Objection of CoreLogic Solutions, LLC ("Solutions") and Teletrack, LLC ("Teletrack" and collectively, "CoreLogic") [Docket No. 502] is resolved as follows: the contracts by and between CoreLogic and the Debtor, identified as items 4-5 on the list of "All Data License Agreements" on schedule 1.1(a)(ix) to the Stalking Horse APA (the "CoreLogic Contracts"), may, and shall at Closing, be assumed by the Debtor and assigned to the Buyer. The Debtor shall reserve any disputed portion of the Cure Amounts claimed by CoreLogic pending determination by the Court or agreement by the parties of the appropriate Cure Amounts (and any arrears payments) due to CoreLogic. In the event that the Court determines, or the parties reach an agreement, that the Cure Amounts due CoreLogic exceeds the amounts proposed by the Debtor ($902,083.32 as to Solutions the and $361,250.00 as to Teletrack), the "Fee Exhibits" attached to the CoreLogic Contracts shall be modified by reducing the "Total Outstanding Balance" due Solutions and Teletrack, respectively, by an amount equal to the increase in the Cure Amounts and the remainder of the "Fee Exhibits" shall remain in force.

- The Objection of LexisNexis Risk Solutions FL Inc. [Docket No. 530] is overruled.

3.    Notice of the Sale Motion, the Auction, and the Sale Hearing (including without limitation, the notice provided by the Sale Notice (including without limitation the timing of such notice, as specified in footnote 3 above), and Notice of Assumption and Cure) was fair and

- 18 -

equitable under the circumstances and complied in all respects with Bankruptcy Code sections 102(1), 363 and 365, Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007 and Local Rule 6004-1.

4.      This Court's findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures Hearing and Stalking Horse APA Objection Hearing, are incorporated herein by reference.

5.      The Stalking Horse APA and the Sale pursuant to the Stalking Horse APA are hereby approved and authorized in all respects, ***provided however***, that prior to the Closing, the Debtor and Buyer may, without further order of this Court and in accordance with the terms of the Stalking Horse APA, and in accordance with modifications made on the record as part of the Successful Bid, revise, amend, modify and/or supplement the Stalking Horse APA to make non-material changes to the Stalking Horse APA.  The Debtor shall provide any such modifications to the Stalking Horse APA to Tech. Inc. and the statutory committee of unsecured creditors appointed in the Chapter 11 Case (the "Committee").  The Stalking Horse APA, with all such revisions, amendments, modifications and/or supplements, shall be deemed the Stalking Horse APA approved by this Order.  The Debtor is hereby authorized and empowered and directed to enter into, and to perform its obligations under, the Stalking Horse APA and to execute and perform such agreements or documents, and take such other actions, as are necessary or desirable to effectuate the terms of the Stalking Horse APA, including, without limitation, the execution of deeds, assignments, stock powers, transfers of membership interests and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to its possession, any or all of the Acquired Assets, without any further corporate or limited

- 19 -

liability company action or orders of this Court. To the extent that any subscriber agreements are in the name of Greencook Services LLC, but under which the Debtor has been providing the services to the subscribers and receiving the payments, such agreements and all rights thereunder shall be Acquired Assets and shall be transferred to Buyer at Closing as provided in the Stalking Horse APA.

6.      The Buyer is a good faith purchaser of the Acquired Assets, free and clear of Interests, and is hereby granted and entitled to all of the protections provided to such a good faith purchaser under section 363 of the Bankruptcy Code, and shall be entitled to such protection even before this Order becomes final and non-appealable. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of the Sale or any sale, transfer or assignment under the Stalking Horse APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing), and notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment shall be governed in all respects by the original provisions of this Order or the Stalking Horse APA, as the case may be.

7.      The Sale approved by this Order is not subject to avoidance or any recovery or damages pursuant to section 363(n) of the Bankruptcy Code.

8.      No part of the Acquired Assets constitute personally identifiable information pursuant to section 363(b) of the Bankruptcy Code, and no consumer privacy ombudsman need be appointed.

9.      The Debtor is authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all

- 20 -

certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Stalking Horse APA, any related agreements and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtor may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

10.     The Buyer shall have no obligation to proceed with the Closing until all conditions precedent to its obligations to do so have been met, satisfied or waived in accordance with the terms of the Stalking Horse APA.

11.     Upon the Closing, and to the extent provided in the Stalking Horse APA, the Debtor shall be, and hereby is, authorized, empowered, and directed, to sell the Acquired Assets and assume the Assigned Contracts and assign them to the Buyer, and this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Acquired Assets, including, without limitation, the assumption and assignment of the Assigned Contracts and/or a bill of sale or assignment transferring indefeasible title and interest in the Acquired Assets, including the Assigned Contracts, to the Buyer upon the Closing.

12.     The Sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts to the Buyer shall vest the Buyer with all right, title and interest of the Debtor to the Acquired Assets free and clear of any and all Interests and other liabilities of any kind or nature whatsoever (other than the Assumed Liabilities), however imposed, with any such

- 21 -

Interests to attach only to the proceeds of the Sale of the Acquired Assets with the same priority, validity, force, and effect as they now have in or against the Acquired Assets.

13.     The Option Agreement is approved in its entirety, to the extent the Court's approval of the Option Agreement is necessary or required. Notwithstanding any prior order of this Court to the contrary, at the Closing, (i) the DIP Lenders shall execute all such documents reasonably requested by the Buyer to release all liens, claims, interests and encumbrances of the DIP Lenders in, on or to the Acquired Assets, and (ii) the DIP Lenders shall be paid from the proceeds of the Cash Purchase Price paid by Buyer an amount equal to the outstanding and unpaid obligations due and owing to them under the DIP Agreement, ***provided, however***, that nothing contained herein shall have any impact on the $1,000,000 Carve Out (as defined in the *Order Granting Debtor's Motion to Compromise Controversy and Approve Settlement Agreement* [Docket No. 239] (the "Carve Out Order") and as provided therein) granted in favor of the holders of allowed general unsecured claims against the Debtor, with such Carve Out to be paid from the proceeds of the Cash Purchase Price paid by the Buyer to the Debtor in accordance with the terms of the Carve Out Order.

14.     The filing of the Sale Motion and the service of the Sale Notice and the Notice of Assignment and Cure in accordance with the Bidding Procedures Order shall be deemed to provide sufficient notice as to the Sale of the Acquired Assets free and clear of all Interests in accordance with Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1. Following the Closing, no holder of any Interest with respect to the Acquired Assets may interfere with the Buyer's use and enjoyment of the Acquired Assets based on or related to such Interest, or any actions that the Debtor may take in the Chapter 11 Case and, after the Closing, no interested

- 22 -

party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale or other transactions contemplated by this Order.

15.     The Debtor and its estate are hereby permanently enjoined from prosecuting and continuing to prosecute and permanently waive any avoidance actions of the Debtor's bankruptcy estate arising under the Bankruptcy Code, including sections 542 through 550 of the Bankruptcy Code, against such parties and to the extent provided for in the Stalking Horse APA.

16.     The provisions of this Order authorizing the Sale of the Acquired Assets free and clear of Interests shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

17.     Notwithstanding the forgoing, as of the Closing, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to confirm the release of its liens or other security interests in the Acquired Assets, if any.  If any person or entity that has filed financing statements, mortgages, mechanics liens, *lis pendens* or other documents, instruments, notices or agreements evidencing any lien or other security interest against or in the Acquired Assets shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Acquired Assets, (a) the Debtor and/or the Buyer are authorized to execute and file such termination statements, releases, instruments of satisfaction or other documents on behalf of the person or entity with respect to the Acquired Assets, and (b) the Debtor and/or Buyer are authorized to file, register or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens or

- 23 -

other security interests against the Acquired Assets. This Order shall be deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

18.     Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other persons and entity who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse APA and this Order. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded liens or other security interests against the Acquired Assets from their records.

19.     All persons or entities, presently or after the Closing, in possession or control of any of the Acquired Assets, are directed to surrender possession or control of such Acquired Assets to the Buyer as of the Closing or at such time thereafter as the Buyer may request, except as provided for in the Tracers Settlement.

20.     To the extent provided in the Stalking Horse APA and as permitted under applicable law, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and any other governmental authorization or approval of the Debtor with respect to the Acquired Assets and the Assigned Contracts, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing. To the extent any license or permit necessary for the operation of the Debtor's business is determined not to be an executory

- 24 -

contract assumable and assignable under section 365 of the Bankruptcy Code, the Buyer shall

apply for and obtain any necessary license or permit promptly after the Closing and such licenses

or permits of the Debtor shall remain in place for the Buyer's benefit until new licenses and

permits are obtained.

21.    To the extent provided by section 525 of the Bankruptcy Code, no governmental

unit (as defined by section 101(27) of the Bankruptcy Code) may revoke or suspend any permit

or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the

Buyer on account of the filing or pendency of the Debtor's Chapter 11 Case or the

consummation of the Sale contemplated by the Stalking Horse APA.

22.    The Aggregate Purchase Price paid by the Buyer to the Debtor pursuant to the

Stalking Horse APA for the Acquired Assets and assumption and assignment of the Assigned

Contracts constitutes reasonably equivalent value and fair consideration, and the Sale shall not

constitute a fraudulent transfer or fraudulent conveyance under the Bankruptcy Code, Uniform

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or under the laws of any state,

territory, possession or the District of Columbia.

23.    The Buyer and its Affiliates and their respective predecessors, successors, assigns,

members, partners, officers, directors, principals and shareholders (or equivalent) are not and

shall not be deemed (a) a "successor" in any respect to the Debtor or its estate as a result of the

consummation of the transactions contemplated by the Stalking Horse APA or any other event

occurring in the Chapter 11 Case under any theory of law or equity, (b) to have, de facto or

otherwise, merged or consolidated with or into the Debtor or its estate, (c) deemed to have a

common identity with the Debtor, (d) to have a continuity of enterprise with the Debtor, or (e) to

be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor.  The

- 25 -

Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of the Debtor and/or its estate including, but not limited to, any Interest or any claim against the Debtor or against an insider of the Debtor, except as otherwise expressly provided in the Stalking Horse APA, and the Sale Motion contains sufficient notice of such limitation in accordance with Local Rule 6004-1. Except for the Assumed Liabilities, the transfer of the Acquired Assets and the Assigned Contracts to the Buyer under the Stalking Horse APA shall not result in the Buyer and its Affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent), or the Acquired Assets, (a) having any liability or responsibility for any claim (including, without limitation, any claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code), against, or debt of, the Debtor or an insider of the Debtor, (b) having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity whether by payment, setoff or otherwise, directly or indirectly, any Interests, or (c) having any liability or responsibility to the Debtor except as expressly set forth in the Stalking Horse APA. In the event that Buyer elects to be treated as a successor employer under the Internal Revenue Code, or makes an election to assume, on an employee by employee basis, any liabilities with respect to former employees of the Debtor hired by the Buyer, the Buyer shall not by reason of any such election be deemed to have assumed any other liabilities or to be a successor for any other purpose.

24.    Without limiting the effect or scope of the foregoing, except to the extent expressly included in the Assumed Liabilities, as of the Closing, the Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) shall have no successor or vicarious liabilities of any

- 26 -

kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtor or any obligations of the Debtor arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to, the Acquired Assets or the Assigned Contracts prior to the Closing.

25. Except with respect to the Assumed Liabilities, all persons and entities, including, but not limited to, the Debtor, its employees, former employees, debt security holders, equity holders, administrative agencies, governmental units (as defined in section 101(27) of the Bankruptcy Code), tax and regulatory authorities, secretaries of state, federal, state and local officials, lenders, contract parties, bidders, lessors, warehousemen, customs brokers, freight forwarders, carriers and other parties in possession of any of the Acquired Assets at any time, trade creditors and all other creditors, holding any Interest of any kind or nature whatsoever against or in the Debtor or in the Debtor's interests in the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Acquired Assets, the Assigned Contracts, the operation of the Debtor's business before the Closing, the Sale, or the transfer of the Acquired Assets and the assumption and assignment of the Assigned Contracts to the Buyer, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting, commencing, continuing or otherwise pursuing in any manner any action, claim or other proceeding of any kind, directly or indirectly, against the Buyer, or any Affiliates,

- 27 -

predecessor, successors or assigns thereof and each of their respective current and former members, officers, directors, attorneys, employees, partners, principals, Affiliates, shareholders (or equivalent), financial advisors and representatives, their property or the Acquired Assets. Actions that are barred hereby include, without limitation: (a) the commencement or continuation of any action or other proceeding where the Buyer reasonably determines that such action or proceeding could interfere with Buyer's peaceful and profitable enjoyment of the Acquired Assets, (b) the enforcement, attachment, collection or recovery of any judgment, award, decree or order, (c) the creation, perfection or enforcement of any lien, claim, interest or encumbrance, (d) the assertion of any right of setoff, subrogation or recoupment of any kind, (e) the commencement or continuation of any action that does not comply with, or is inconsistent with, the provisions of this Order, any actions contemplated or taken in respect hereof, or the Stalking Horse APA and (f) the revocation, termination or failure or refusal to renew any license, permit, registration or governmental authorization or approval to operate the Acquired Assets or conduct the businesses associated with such Acquired Assets.

26.     Without limiting the foregoing, as the Buyer has not assumed and is not otherwise obligated for any of the Debtor's liabilities other than the Assumed Liabilities and the Buyer has not acquired any of the Excluded Assets, all persons holding or asserting any liens, security interests or causes of action on the Excluded Assets are hereby enjoined from asserting or prosecuting such lien, security interest or cause of action against the Buyer or the Acquired Assets for any liability associated with the Excluded Assets.

27.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale. The Buyer is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the

consummation of the Sale based upon an arrangement made by or on behalf of the Debtor.

Without further order from this Court, the Debtor is authorized and directed to pay Bayshore the

Transaction Fee (as defined in Bayshore's retention agreement, and as contemplated by the

*Order Granting Debtor's Application For Authority To Retain Bayshore Partners, LLC As*

*Investment Banker To The Debtor, Nunc Pro Tunc To July 24, 2013* (the "Bayshore Retention

Order") [Docket No. 203] and in accordance with section 328(a) of the Bankruptcy Code) with

wired funds at the Closing from the proceeds of the Sale, in an amount equal to $5,333,750, free

and clear of any lien, claim or interest that any creditor or claimant may possess in the Acquired

Assets or the proceeds received in connection with the Sale. The Transaction Fee is calculated

by multiplying 3.5% times the cash purchase price of $154,000,000 and then subtracting a credit

of 50% of the monthly fees received by Bayshore to date, which amounts to $56,250. Pursuant

to the Bayshore Retention Order, parties in interest have 10 days from the date of the entry of

this Order to object to the method by which Bayshore's Transaction Fee has been calculated as

set forth in the preceding sentence, after which the Transaction Fee shall not be subject to any

dispute or challenge. The foregoing shall not impact the timing of the payment of Bayshore's

Transaction Fee at the time of Closing. All amounts paid or payable to Bayshore in this case,

including the Transaction Fee and all monthly fees in the amount of $112,500 are approved

hereby. Pursuant to the Bayshore's Retention Order, Bayshore is not required to file fee

applications and this paragraph shall constitute a final award of all of Bayshore's fees and

expenses.

28.     Any amounts payable by the Debtor under the Stalking Horse APA or any of the

documents delivered by the Debtor in connection with the Stalking Horse APA, including

without limitation, any allowed claims for breach thereof, if any, shall be paid in the manner

- 29 -

provided in the Stalking Horse APA without further order of this Court, and shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtor, except by written agreement with the Buyer or its successors or assigns (such agreement to be provided in the Buyer's or its successors' or assigns' respective sole discretion).

29.    The Debtor has served all of the non-Debtor parties to the Assigned Contracts, identified on the lists the Debtor has filed with this Court, by overnight courier, hand, or electronic mail, a Notice of Assignment and Cure that included (a) the title of the Assigned Contract to be assumed, (b) the name of the counterparty to the Assigned Contract, (c) any applicable Cure Amounts as determined by the Debtor, (d) that the assignee is the Buyer or its designee, and (e) the deadline by which any counterparty to the Assigned Contract must object (an "Assignment and Cure Objection") to the proposed assumption and assignment. No other or further notice is required.

30.    Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption and assignment of the Assigned Contracts to the Buyer free and clear of all Interests pursuant to the terms set forth in the Stalking Horse APA, as modified by the terms of any amendments reached directly by the Buyer with the respective non-Debtor counterparty, are hereby approved. The payment by the Debtor of the applicable Cure Amounts (if any) with regard to Assigned Contracts shall (a) effect a cure of all defaults existing thereunder as of the Closing Date and (b) compensate the parties entitled to receive such Cure Amounts for any actual pecuniary loss resulting from such default. Upon Closing, the Debtor shall have assumed the Assigned Contracts and assigned them to the Buyer,

- 30 -

and the requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code with respect thereto are hereby deemed satisfied. Each non-Debtor party (or parties) to each Assigned Contract is hereby forever barred, estopped, and permanently enjoined from raising or asserting against the Debtor or the Buyer, or the property of either of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated senior or subordinate) arising under or out of, in connection with, or in any way related to, any Assigned Contract, existing or having occurring as of the Closing, or arising by reason of the Closing.

31.    Except as specifically set forth in the Stalking Horse APA, the Debtor shall pay all Cure Amounts from the proceeds of the Aggregate Purchase Price at or substantially contemporaneously with the Closing, and shall be solely responsible for the payment of all Cure Amounts, as set forth on Exhibit B hereto, with respect to all Assigned Contracts. The Assigned Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms, and no default shall exist under the Assigned Contracts. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Assigned Contracts. The assumption and assignment of each of the Assigned Contracts is deemed to be made in good faith under, and are entitled to the protections of, section 363(m) of the Bankruptcy Code.

32.    The Buyer has provided adequate assurance of its future performance under each Assigned Contract, as applicable, and within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. All other requirements and conditions under sections 363

- 31 -

and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts have been satisfied.

33.     No section or provision of any Assigned Contract that purports to (a) prohibit, restrict or condition Debtor's assumption and assignment of the Assigned Contract, including, but not limited to, the conditioning of such assignment on the consent of the non-Debtor party (or parties) to such Assigned Contract; (b) authorize the termination, acceleration, cancellation or modification of the Assigned Contract based on the filing of a bankruptcy case, the financial condition of the Debtor or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtor; or (d) provide for assignment fees, additional increases or any other fees or financial accommodations in favor of the non-Debtor party (or parties) to the Assigned Contract, or modification of any term or condition upon the assumption and assignment of an Assigned Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code. All Assigned Contracts shall remain in full force and effect, without existing default(s), if any, subject only to payment of the appropriate cure amount, if any, by the Debtor.

34.     All defaults or other outstanding obligations under each Assigned Contract shall be deemed cured by the payment or other satisfaction of the applicable Cure Amount, if any, associated with the Assigned Contract, and payment by the Debtor (except as otherwise expressly provided in the Stalking Horse APA) of the Cure Amounts for all Assigned Contracts pursuant to the Stalking Horse APA is hereby authorized. Except for the Cure Amounts, if any, there are no other defaults existing under the Assigned Contracts.

- 32 -

35.      Except as provided in this Order, all Assignment and Cure Objections (if any)
have been overruled, withdrawn, waived, settled or otherwise resolved. Any Assignment and
Cure Objections as to applicable Cure Amounts that have not been resolved by the parties will
heard at a later date set by the Court. The pendency of a dispute relating to the Cure Amount
will not prevent or delay the assumption and assignment of any Assigned Contract, and the
Debtor may proceed with the assumption and assignment of the Assigned Contract, with the
Debtor retaining sufficient funds to cure all defaults claimed by the non-Debtor counterparty, and
resolve the dispute regarding the Cure Amount at a later date set by the Court.

36.      Notwithstanding anything herein to the contrary, the Equifax Objection is hereby
resolved as set forth in this paragraph. At Closing, the Debtor shall assume and assign to the
Buyer the four contracts identified as items 10-13 on the list of "All Data License Agreements"
on schedule 1.1(a)(ix) to the Stalking Horse APA (collectively, the "Equifax Contracts"), on the
terms and conditions memorialized between the Buyer and Equifax, and the Equifax Contracts
shall be deemed Assigned Contracts. The Cure Amount for the Equifax Contracts shall be
$10,000,000, and shall be paid by the Debtor to Equifax by wire transfer at the Closing on the
Closing Date, and promptly following the Closing, the Debtor shall withdraw *Debtor's Motion to
Reject Unexpired Executory Contracts (Equifax Information Services LLC)* [Docket No.
41]. Upon timely payment of the Cure Amount to Equifax in accordance with this paragraph,
any remaining claims of Equifax against the Debtor and its estate, including any scheduled or
filed claims (including Proof of Claim No. 25), will be deemed satisfied in full.

37.      The Buyer has elected not to acquire the Debtor's equity interest in the Linebarger
Joint Venture Agreement; *provided*, *however*, that nothing contained in this Order or the
Stalking Horse APA shall (i) effect a rejection or other termination of the Linebarger Joint

- 33 -

Venture Agreement; (ii) alter or otherwise affect any rights of first refusal that Linebarger may have under the Linebarger Joint Venture Agreement with respect to any intellectual property that could revert to or may otherwise be property of the Debtor under or pursuant to the Linebarger Joint Venture Agreement (and all such rights shall be preserved); or (iii) alter or otherwise affect any right of the Debtor to the reversion of any intellectual or other property, or any other right, under the Linebarger Joint Venture Agreement or applicable law. All rights, claims, and defenses of the Debtor and Linebarger under the Linebarger Joint Venture Agreement and applicable law are preserved, including but not limited to all rights of the Debtor to challenge and defend against any alleged rights of Linebarger under or with respect to the Linebarger Joint Venture Agreement, including but not limited to the aforementioned rights of first refusal. Subject to such rights of first refusal, if any and to the extent applicable, the Buyer may, and shall, acquire all right, title and interest of the Debtor in and to all intellectual and other property that could revert to or may otherwise be property of the Debtor under or pursuant to the Linebarger Joint Venture Agreement, and such intellectual and other property shall be transferred to Buyer in accordance with section 6.10 of the Stalking Horse APA.

38.    The entry of this Order constitutes the consent of each non-Debtor party (or parties) to each Assigned Contract that has not timely objected to the assumption and assignment of such Assigned Contract. Any non-Debtor counterparty to an Assigned Contract designated to be assumed and assigned to the Buyer who did not file an Assignment and Cure Objection by the deadline to do so, as set forth in the Notice of Assignment and Cure, is hereby forever barred from objecting or asserting any additional monetary or non-monetary default or Cure Amounts with respect to any such Assigned Contract, and each such Assigned Contract shall be deemed assumed by the Debtor and assigned to the Buyer as of the Closing with each non-Debtor party

- 34 -

to such Assigned Contract deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

39.    To the extent that any data license agreement is not assumed by the Debtor and assigned to the Buyer pursuant to the terms of the Stalking Horse APA and is rejected by the Debtor, the data provided to the Debtor pursuant to such rejected data license agreement shall be extracted (and, in the case of the Experian Contracts, returned to Experian) or otherwise destroyed or deleted to the extent requested by the counterparty and required by the terms of the data license agreement, in a reasonable time following the later of the Closing or such rejection.

40.    Notwithstanding anything to the contrary provided for herein, the Debtor shall not assign the office lease dated August 6, 2008 (the "Office Lease"), as amended by the First Amendment to Lease and Consent to Assignment effective November 8, 2013  (the "Amendment") and assigned to the Debtor pursuant to the Assignment and Assumption of Lease effective November 8, 2013 (the "Assignment") (the Office Lease, Amendment and Assignment shall be referred to collectively as the "Lease"), without the written consent of BRE/Boca Corporate Center, LLC ("Landlord"), which consent shall not be unreasonably withheld. If the Landlord consents to an assignment of the Lease to the Buyer, the Landlord, Debtor and Buyer shall execute assignment documents, including but not limited to an Assignment and Assumption of Lease, Landlord's Consent to Assignment and Assumption of Lease, and Subordination, Non-Disturbance and Attornment Agreement (collectively, the "Assignment Documents"), on or prior to the Closing, in a form reasonably acceptable to the Landlord and in accordance with the Lease; *provided, however,* that the Buyer shall have no obligation to Close unless the Landlord consents to an assignment of the Lease to the Buyer and the Assignment Documents are in a form reasonably acceptable to the Buyer. Nothing in this Order shall waive, release or abridge

- 35 -

any duties, obligations and liabilities of the Debtor as provided for in the Lease. To the extent this Order is inconsistent with the terms of the Lease, Assignment Documents or any subsequent documents executed by the Landlord, the Debtor or the Buyer in connection therewith (collectively, the "Lease Documents"), the Lease Documents shall control.

41.     All non-Debtor parties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

42.     Subject to the terms specified therein, the Stalking Horse APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtor and the Buyer, without further action or order of this Court; *provided, however,* that any such waiver, modification, amendment, or supplement does not have a material and adverse effect on the Debtor and its estate, and the Debtor shall provide any such modifications to the Stalking Horse APA to Tech. Inc. and the Committee. The Debtor and the Buyer are expressly authorized, without further order of this Court, to execute an amendment to the Stalking Horse APA to provide for the Closing to occur on one or more dates. Any material modification, amendment, or supplement to the Stalking Horse APA that has an adverse effect on the Debtor and its estate must be approved by order of this Court following a motion on notice to all interested parties.

43.     The failure specifically to include any particular provisions of the Stalking Horse APA or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtor and the Buyer that the Stalking Horse

- 36 -

APA and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

44.    This Order and the Stalking Horse APA shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtor and the Buyer, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtor's estate or any trustee appointed in a chapter 7 case if the Chapter 11 Case is converted from chapter 11, all creditors of any Debtor (whether known or unknown), all non-Debtor parties to any Assigned Contracts, filing or officers, title agents, recording agencies, governmental departments, secretaries of state, federal, state and local officials, all other governmental units, as defined in section 101(27) of the Bankruptcy Code and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets.

45.    Nothing contained in any chapter 11 plan confirmed in the Debtor's Chapter 11 Case or any order confirming any such plan or any other order in the Debtor's Chapter 11 Case (including without limitation any order entered after any conversion of these cases into cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from, the provisions of the Stalking Horse APA or this Order and, to the extent of any such conflict, the terms of this Order and the Stalking Horse APA shall control.

46.    All Potential Bidders (as defined in the Bidding Procedures) who have executed confidentiality agreements in connection with the Auction and the Bidding Procedures shall

- 37 -

continue to be bound by the provisions of such agreements, and such agreements shall not be terminated without further order of this Court.

47.     The Stalking Horse APA shall not be subject to rejection or avoidance under any circumstances. This Order and the Stalking Horse APA shall inure to the benefit of the Debtor, its estate, creditors, the Buyer and its respective successors and assigns.

48.     In the event the Sale to the Buyer fails to close, the Debtor is hereby authorized to consummate a sale with Warburg Pincus LLC (the "Acceptable Alternative Bidder," which made the "Acceptable Alternative Bid") (as defined in the Bidding Procedures and as provided therein) without further order from this Court, in accordance with the terms of the Acceptable Alternative Bid as modified on the record at the Auction and subject to final documentation acceptable to the Acceptable Alternative Bidder and the Debtor. In such event, the Acceptable Alternative Bidder shall be entitled to all the rights and protections of the Buyer under this Order.

49.     Except as provided herein and in the Stalking Horse APA (excluding the DIP Loan, which shall be repaid from the cash consideration due to the Debtor at Closing), all rights of the Debtor's estate with respect to the allocation of consideration received from the Buyer in connection with the Sale (including, without limitation, the value of the assumption of any Assumed Liabilities) are expressly reserved for later determination by this Court.

50.     Notwithstanding Bankruptcy Rules 6004 and 6006, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Time is of the essence in closing the Sale, and the Debtor and the Buyer intend to close the Sale as soon as practicable, but in no event, any later than December 16, 2013, and the Buyer may close before this Order becomes final and non-appealable. Any party objecting to this Order must exercise

- 38 -

due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing, or risk its appeal being foreclosed as moot.

51.    This Court shall retain jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Stalking Horse APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, and (b) to decide any disputes concerning this Order, the Bidding Procedures Order or the Stalking Horse APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse APA, the Bidding Procedures Order or this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Acquired Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets to the Buyer free and clear of all Interests.

52.    From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated under the Stalking Horse APA.

53.    To the extent this Order is inconsistent with any prior order or pleading in this Chapter 11 Case, the terms of this Order shall govern.  To the extent there is any inconsistency with between the terms of this Order and the terms of the Stalking Horse APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

### 

- 39 -