**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov**

In Re:                                                      Case No.  13-20853 (PGH)

                                                            Chapter 11

TLFO, LLC,

      Reorganized Debtor.

_____/

**MOTION TO ENFORCE THE SALE ORDER AND TO HOLD
THE BEST ONE, INC., IN CONTEMPT FOR VIOLATING THE SALE ORDER**

      TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"), the purchaser of

substantially all assets of the above-captioned (now-reorganized) debtor (the "Debtor"[1]), files

this motion (the "Motion"), pursuant to sections 105 and 363 of title 11 of the United States

Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), to enforce the Court's December 13,

2013 order, [ECF No. 610] (the "Sale Order"),[2] approving the sale of substantially all of the

assets of the Debtor (the "Acquired Assets") to TRADS free and clear of all liens, claims,

encumbrances, and other interests (the "Sale").[3]  TRADS seeks entry of an order, substantially in

the form of the proposed order attached hereto as Exhibit 1, confirming that the Sale Order

shields TRADS from the efforts of The Best One, Inc. ("TBO")  to interfere with TRADS's use

and enjoyment of certain of the Acquired Assets (as more fully defined below, the "IP"),

ordering TBO to turn over all copies of the Acquired Assets in its possession or control to

---

[1] At the time of the Sale (as defined below) the Debtor was called TLO, LLC.  It subsequently changed its name to TLFO, LLC.

[2] Capitalized terms not defined herein shall the meaning ascribed to such terms in the Sale Order.

[3] The full terms of the Sale are set forth in that certain asset purchase agreement attached to the Sale Order as Exhibit A (as amended or modified, the "Stalking Horse APA") [ECF No. 610-1].

TRADS, ordering TBO to provide TRADS with any passwords related to any copy of the IP, and ordering that TBO be held in contempt and sanctioned for knowingly violating the Sale Order. In support of this Motion, TRADS respectfully states as follows:

## INTRODUCTION AND RELIEF REQUESTED

1.      On December 13, 2013, this Court approved the Sale, pursuant to which TRADS paid the Debtor $154 million for the Acquired Assets, a sum that permitted the Debtor to pay all allowed creditor claims in full, provide a meaningful return to equity, and obtain confirmation of a plan of liquidation.  *See generally* Sale Order; *Order Confirming Debtor's Amended Plan of Liquidation* [ECF No. 1011].

2.      The core of the Debtor's business was its intellectual property, including the BParser code converter software (the "BParser Code") and the BOLT software language ("BOLT") (collectively, and together with any other intellectual property claimed by TBO, the "IP").  The IP was among the Acquired Assets sold to TRADS pursuant to the Sale.  As this Court determined, without being able to purchase the IP free and clear, TRADS would not have paid $154 million for the Acquired Assets.  Since the Sale, TRADS has relied upon the Sale Order and the fact that it purchased the IP free and clear of all claims and interests in running its business.

3.      Despite the binding and unmodified language of the Sale Order, TBO has asserted, following unrelated commercial disputes between TRADS and two entities related to TBO, that it acquired an ownership interest in the IP from a former equity holder and employee of the Debtor, Ole Poulsen.  *See Defendants' Motion to Dismiss Complaint for Declaratory Judgment* ("Motion to Dismiss"), at 3 [Adv. Proc. No. 14-01793, ECF No. 6].  Along with a number of other employees of the Debtor, Poulsen had worked on the IP while he was employed

by the Debtor.  In return, he received significant compensation from the Debtor, including, as he has already admitted, an equity share in the Debtor.  *See, e.g.*, *Ole Poulsen's Joinder in Glocer and Kroll's First Amended Complaint for Recharacterization of Claim Numbers 35 and 36 Filed by Technology Investors, Inc.* ("Poulsen Joinder"), ¶ 3, at p. 2 [Adv. Proc. No. 13-01943, ECF No. 17].  Thus, Poulsen never had any claim to the IP (other than indirectly through his equity interest in the Debtor).

4.     This Court should enforce its Sale Order against TBO and order it to cease and desist from asserting its spurious claim.  The Sale Order found that Poulsen had received notice of and had consented to the Sale free and clear of his interests, and that the IP was sold to TRADS free and clear of all other interests, including Poulsen's.  Sale Order, at pp. 4 & 11-12.  It is far too late now to modify the Sale Order, and nobody has ever tried to do so.  Accordingly, TBO could not possibly have purchased an interest in the IP from Poulsen because Poulsen had no such interest to sell.  These undisputed facts alone make it appropriate for this Court to enforce its Sale Order and order TBO to cease and desist from asserting its specious claim.

5.     This Court should also hold TBO in contempt of its Sale Order, which not only specifically provided that the Sale was free and clear of any possible claim by Poulsen, but also prohibited any "interfere[nce] with the Buyer's [TRADS] use and enjoyment of the Acquired Assets based on or related to" any pre-sale interest in the Acquired Assets.  Sale Order ¶ 14, at p. 22.  Yet, TBO has not only ignored the binding effect of the Sale Order, but also interfered with TRADS's "use and enjoyment" of the IP.  Additionally, the Sale Order directed "[a]ll persons . . . , presently or after the Closing[] in possession or control of any of the Acquired Assets[] . . . to surrender possession or control of such Acquired Assets as of the Closing . . . ."  Sale Order ¶ 19,

at p. 24. That compels TBO to surrender any IP that it might have purported to acquire from Poulsen to TRADS. To date, TBO has done no such thing, again in violation of the Sale Order.

6.      TBO's violation of this Court's Sale Order is particularly egregious because its purported purchase of an interest in the IP from Poulsen and subsequent assertion of the same against TRADS were actions taken with full knowledge and notice of the Sale and Sale Order. Indeed, TBO has been aware of these facts since its formation.  The Debtor timely served the Sale Order on both Michael Brauser ("Brauser"), the Chairman, Vice-President, and a Director of TBO, and Derek Dubner ("Dubner"), the Debtor's General Counsel up until the Sale, counsel to TRADS after the Sale, and now the Chief Executive Officer of TBO and Interactive Data, LLC ("Interactive"), a TBO subsidiary. The Debtor also served the Sale Order on Interactive. Moreover, after the Sale, Poulsen (TBO's Chief Scientific Officer) and Brauser had extensive and ongoing involvement in the Debtor's bankruptcy case, primarily concerning the division of the Sale proceeds paid by TRADS, further demonstrating their knowledge of (and consent to) the Sale and its effects.

7.      In order to remedy TBO's knowing disregard for this Court's Sale Order, TRADS has brought this Motion to compel it to comply with the Court's Sale Order by (i) directing that TBO cease and desist from further attempting to assert any claims purportedly arising from any interest of Poulsen in the Acquired Assets, (ii) directing TBO to provide TRADS with any and all copies of the IP (including any codes or passwords that would enable TRADS to access such IP) within its possession or control, (iii) directing Poulsen to provide TRADS with any and all information related to the IP (including any codes or passwords that would enable TRADS to access such IP) within its possession or control, including any passwords, and (iv) finding TBO in contempt of this Court for knowingly violating the Sale Order and accordingly sanctioning it,

4

in the form of damages, to be awarded to TRADS in compensation for having to defend against

frivolous claims. [4]

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334, and

venue is proper before this Court pursuant to 28 U.S.C. § 1409(a).  This is a "core" matter under

28 U.S.C. § 157 in that, among other things, it concerns an "order[] approving the sale of

property" of the estate.  28 U.S.C. § 157(n).  Pursuant to paragraph 51 of the Sale Order, this

Court specifically retained jurisdiction to "interpret, implement and enforce the terms and

provisions of th[e Sale] Order."[5]  The statutory predicates for the relief requested herein are

sections 105 and 363 of the Bankruptcy Code.

## BACKGROUND

i.     *The Debtor, its Business, and the Creation and Importance of the IP*

9.     On May 9, 2013 (the "Petition Date"), the Debtor filed a voluntary petition in this

Court for relief under Chapter 11 of the Bankruptcy Code.

10.    The Debtor's business had several components, but, as relevant here, its core

business consisted of collecting and running searches across numerous information databases

simultaneously in order to identify patterns and locate individuals and other information.  BOLT

---

[4] TRADS believes that this Court can award full and complete relief pursuant to this motion.  However, in an abundance of caution, and to avoid any prolonged procedural skirmishes, it is also simultaneously filing an Amended Complaint against TBO in Adv. Proc. No. 14-01793 (the "Adversary Proceeding").

[5] Specifically, the Sale Order provided that the Court "retain[ed] jurisdiction to (a) interpret, implement and enforce the terms and provisions of th[e Sale] Order, the Bidding Procedures Order, and the Stalking Horse APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, and (b) to decide any disputes concerning th[e Sale]  Order, the Bidding Procedures Order or the Stalking Horse APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse APA, the Bidding Procedures Order or th[e Sale] Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Acquired Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets to the Buyer free and clear of all Interests."  Sale Order, at p. 39

is an "[a]pplication component that is comprised of a proprietary language and sets of scripts that are written in BOLT that are the core of the IP that link the disparate data sets together." *See* Stalking Horse APA, Schedule 1.1(a)(ii), [ECF No. 610-4], at 35. The BParser Code is "the 'code converter' application that converts BOLT code to C++," a universal programming language. *Id.* Together, this IP formed a component that served as "binding agent" for the heart of Debtor's business, which is allowing it to manage and analyze diverse data, and was a primary driver of the $154 million in consideration (without any holdback relating to the IP) that TRADS paid in the Sale.

11.     The IP had been created for the Debtor by a number of the Debtor's employees in the course of their employment at the Debtor, and thus was the exclusive property of the Debtor. *See* Stalking Horse APA, § 2.6(f)(i), [ECF No. 610-1]. In negotiating the Sale, the Debtor informed TRADS that Poulsen had worked on developing the IP in his capacity as a full-time employee of the Debtor with numerous other programmers employed by Debtor; that the IP had been created using the Debtor's hardware, and stored on Debtor's servers; that the development of this IP had been at the heart of the scope of duties of the team of employees who worked on it; and that its members, including Poulsen, had been compensated by the Debtor for their work. Indeed, Poulsen himself has admitted that, from the time of the Debtor's inception, he "agreed to make a contribution of services and time to [the Debtor] . . . in exchange for equity interests in the [Debtor]." *See* Poulsen Joinder, ¶ 3, at p. 2. Thus, any role that Poulsen had in the creation of the IP was as part of his duties as an employee of the Debtor, had been performed in return for significant compensation—including equity—and had been performed with the assistance of other employees and utilizing resources of the Debtor. *See id.*; *see also* Stalking Horse APA, §

2.6(f)(i), [ECF No. 610-1]; *id*. Stalking Horse APA Disclosure Schedules, § 2.6(f) [ECF No. 610-5].

**ii.**    ***The Sale of the IP to TRADS Free and Clear***

12.    The Debtor sold its IP to TRADS as part of the Sale, free and clear of all Interests. Specifically, paragraph T of the Sale Order provided that "[t]he Debtor may sell, convey and assign the acquired Assets to the Buyer free and clear of all Interests . . .". Sale Order, at p. 11. Section 1.9 of the Stalking Horse APA provides that, "except for the Assumed Liabilities" (not applicable here), "[Debtor's] sale, transfer, conveyance, assignment and delivery of the Acquired Assets to [TRADS] shall be free and clear of all Interests . . . of any kind or character . . .". Sale Order, Exhibit D, at 12; *see also id*. at 1-2, § 1.1(a)(ii). In addition, the Stalking Horse APA defined the IP as "Intellectual Property" that is an "Acquired Asset." *See* Stalking Horse APA, Schedule 1.1(a)(ii).

13.    In connection with the Sale, this Court found and determined that:

> [T]o the extent that Ole Poulsen holds or asserts any interests of any kind in the BParser code converter software used or useful by the Debtor in the conduct of the Business (the "BParser Code") or any other Business Assets, such BParser Code and other Business Asset shall be deemed an Acquired Asset and may be sold to the Buyer free and clear of all such interests pursuant to section 363 (f) and/or 363 (h) of the Bankruptcy Code because (among other reasons) such interests are in bona fide dispute and Ole Poulsen has been provided actual notice of and an opportunity to object to and be heard with respect to the Sale and he did not timely file an objection.

Sale Order, at p. 12.

14.    The Sale of the IP free and clear of any purported interest of Poulsen's was a material element of the Sale and the Stalking Horse APA. This Court has already held that TRADS relied upon it in deciding whether to acquire the Acquired Assets at all and in

determining how much to pay for them.  *See* Sale Order, at p. 14 ("The Buyer [TRADS] would not have acquired the Acquired Assets but for the foregoing protections.").  If the core asset of the Debtor were to remain subject to the ownership claims of Poulsen (and others), TRADS certainly would not have paid $154 million.  *Id*.

15.     The Sale of the IP to TRADS, along with all the other Acquired Assets, closed on December 16, 2013 (the "Closing").

### iii.     *Post-Closing Protections in the Sale Order*

16.     Not only was the Sale free and clear of all Interests, the Sale Order provided for TRADS's post-Closing quiet use and enjoyment of the Acquired Assets.  Specifically, the Sale Order provided:

> Following the Closing, no holder of any Interest with respect to the Acquired Assets may interfere with the Buyer's use and enjoyment of the Acquired Assets based on or related to such Interest, or any actions that the Debtor may take in the Chapter 11 Case and, after the Closing, no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale or other transactions contemplated by this Order.

Sale Order ¶ 14, at p. 22-23.

17.     Similarly, the Sale Order also provided:

> All persons or entities, presently or after the Closing, in possession or control of any of the Acquired Assets, are directed to surrender possession or control of such Acquired Assets to the Buyer as of the Closing or at such time thereafter as the Buyer may request, except as provided for in the Tracers Settlement.

*Id*. ¶ 19, at p. 24.

### iv.     *Repeated Service Resulting in Consent to the Sale by Poulsen and Notice to Brauser, Dubner, and Interactive*

18.    The Debtor, through its bankruptcy counsel, Furr & Cohen, P.A. ("Furr & Cohen"), served the Sale Order and other Sale-related documents upon Poulsen. The Sale Order and other Sale-related documents were served on Brauser, Dubner, and Interactive as well.

19.    Specifically, on October 28, 2013, Furr & Cohen caused a copy of the *Order Approving Bidding Procedures and Notice of Bid Deadline, Auction, and Sale Hearing* (the "Order Approving Bidding Procedures"), [ECF. No. 351], to be mailed to Poulsen at his then-address of record (which had been rented for him by the Debtor and/or Hank Asher), or "2633 SO OCEAN BLVD[,]  BOCA RATON, FL 33487" (Poulsen's "Florida Address"). *See Certificate of Service Regarding Order Approving Bidding Procedures*, [ECF No. 369-1] at 5. Furr & Cohen also caused a copy of the *Order Approving Bidding Procedures* to be mailed to Brauser, Dubner, and Interactive. *See Supplemental Certificate of Service Regarding Order Approving Bidding Procedures*, [ECF No. 372], at 8, 10; [ECF No. 369-1], at 2, 21.

20.    On November 4, 2013, Furr & Cohen further caused copies of the *Notice of Filing Stalking Horse APA*, [ECF No. 389], and the *Debtor's Motion for Order Approving Sale*, [ECF No. 390], along with the exhibits thereto, to be mailed to Poulsen at his Florida Address. *See Certificate of Service Regarding Stalking Horse APA and Motion for Order Approving Sale*, [ECF No. 400], at 2. Notably, Exhibit A to the *Debtor's Motion for Order Approving Sale* was a proposed order authorizing, *inter alia*, substantially the same relief as was actually granted by this Court in the Sale Order in paragraphs T and V. *See Debtor's Motion for Order Approving Sale*, (Proposed Sale Order), [ECF No. 390], at pp. 9-10. That Motion thus provided Poulsen with clear and unequivocal notice that the IP would be sold, free and clear of any alleged interests he might claim to hold.

21.    On November 13, 2013, Poulsen contacted Furr & Cohen via email, and

requested (i) a copy of the Debtor's Disclosure Statement and Plan of Liquidation filed on

October 31, 2013 [ECF Nos. 377, 378], and (ii) that his mailing address be updated to 18800

Bull Springs Road, Bend, Oregon 97701 (Poulsen's "Oregon Address") from his Florida

Address.  *See* Declaration of Philip D. Anker in Support of TRADS's Motion to Enforce the Sale

Order and to Hold The Best One, Inc., in Contempt for Violating the Sale Order ("Anker Decl.")

Exhibit A (November 13, 2013, Email from Poulsen to Alvin Goldstein of Furr & Cohen).

22.    In accordance with this request, on January 17, 2014, Furr & Cohen caused a

copy of the Sale Order, as entered by this Court, and the exhibits thereto to be served at Poulsen

at his Oregon Address.  *See Certificate of Service of Sale Order* [ECF No. 694], Ex. A at p. 16.

Similarly, Furr & Cohen also caused the Sale Order to be served on Brauser, Dubner, and

Interactive.  *See id*. at Exhibit A, pp. 2, 5, 6, 10, and 15.

23.    In light of this record, the Sale Order found and determined that "timely,

adequate, and sufficient notice of the Sale Motion and the relief sought therein[,] . . . the

Auction, the Sale Hearing, and the deadlines for filing Stalking Horse APA Objections,

objections to the Bidding Procedures, the Sale and the Sale Motion" had been provided, and that

"no other or further notice [was] necessary or . . . required."  Sale Order, at p. 4.   Neither

Poulsen nor TBO appealed the Sale Order, and neither exercised the "due diligence" in pursuing

such an appeal that was required by Sale Order.  Sale Order, at p. 39.  Nor did either ever object

to the Sale, seek to stay the Sale Order pending the resolution of any appeal (despite the warning

in the Sale Order of the consequences of their failure to do so, *see*, *e.g.*, Sale Order at pp. 38-39),

or ask this Court to vacate or modify the Sale Order.  The time to do so has long since passed,

and the effect of the Sale is final.  *See, e.g., id*. at pp. 11 & 12.

**v.**   ***Brauser and Dubner's Actual Involvement in the Sale Process***

24.     Not only did Brauser and Dubner, senior executives of TBO, receive the notice specified above, they also were actually involved in the Debtor's bankruptcy case prior to the Sale, and accordingly—wholly apart from the notice they received—were unquestionably aware of the Sale and its effects.

25.     Brauser, for example, participated in the due diligence by prospective bidders leading to the Sale.  He executed a non-disclosure agreement, on behalf of Data Acquisition Group, LLC ("DAG"), in which he promised "not to disclose . . . [or] use the [information received] for any purpose other than the evaluation of a possible business transaction between the Parties," in order to receive confidential information in connection with the stalking-horse bidding process leading to the Sale.  Anker Decl. Exhibit B (September 17, 2013, Confidentiality and Non-Disclosure Agreement).  And on September 27, 2013, Brauser, acting through DAG and Applied Data Sciences, LLC ("ADS"), filed a proposed *Joint Plan of Reorganization*, [ECF No. 260], under which Brauser would have made decisions on behalf of those two companies. *See Disclosure Statement in Support of Joint Plan of Reorganization*, [ECF No. 261].

26.     Dubner's involvement was similarly extensive.  At the time of the Sale, he was the Debtor's General Counsel.   *See* Anker Decl. Exhibit C (February 27, 2013, Consulting Agreement between Derek A. Dubner, PLLC, and Debtor).  In that capacity, Dubner was involved in reviewing and approving many of the Sale-related documents.  *See, e.g., Notice of Filing Declaration of Disinterestedness of Derek A. Dubner, Esq., Ordinary Course Professional* [ECF No. 167].  In addition, Dubner attended the auction held on November 20-21, 2013, at which the Debtor declared TRADS to have made the highest and best offer for the Acquired Assets.  In fact, after the Sale was completed Dubner provided legal counsel to TRADS.  *See,*

*e.g.,* Anker Decl. <u>Exhibit D</u> (February 7, 2014, Contract for Services Between TRADS and

Derek A. Dubner, PLLC).

27.     Accordingly, it is simply is not credible that Brauser and Dubner did not know of

the Sale and its implications.

**vi.**     ***Involvement of Poulsen and Brauser in the Debtor's Bankruptcy Case Concerning the Sale Proceeds***

28.     The involvement of the Poulsen and Brauser in the Debtors' bankruptcy case did

not end with the Sale.  Shortly after the Closing, Poulsen and Brauser actively participated in the

Debtor's bankruptcy case in the hope of obtaining a significant portion of the $154 million paid

by TRADS for the Debtor's business, including the IP.

29.     After the Sale Order, a single law firm, Salazar Jackson, LLP, came to represent

Poulsen, DAG, ADS, and Dubner.  *See Corrected Supplement to Verified Statement of Salazar*

*Jackson, LLP as to Representation of Multiple Creditors*, [ECF No. 850], at 2.  These parties,

acting effectively in concert, proceeded to object to various aspects of the Debtor's Amended

Plan and the claim for administrative expense status for certain claims made by Mr. Asher's two

daughters, who had run the Debtor's operations following the commencement of the bankruptcy

case.  *See, e.g.*, [ECF Nos. 916 & 1156].  And, several weeks after the Sale Order was mailed to

Poulsen, he joined an adversary proceeding against Technology Investors, Inc. ("<u>Tech Inc.</u>"), the

Debtor's largest secured creditor, seeking to have its secured claims recharacterized as equity.

*See* Poulsen Joinder.

30.     Notably, on April 14, 2014—four months after the entry of the Sale Order—

Poulsen, along with Kroll and Glocer, filed a Limited Objection to the Debtor's amended

liquidation plan in order to preserve his right to continue certain aspects of his adversary

proceeding against Tech Inc.  *See Limited Objection of Jules B. Kroll, Thomas Glocer, and Ole*

*Poulsen to Confirmation of the Debtor's Amended Plan of Liquidation* [ECF No. 916].  In that Limited Objection Poulsen acknowledged the validity and effect of the Sale Order, arguing that Debtor had "no on-going business to manage, and there is no going-concern value to preserve[] [because t]he Debtor has sold substantially all of its assets for the purchase price of $154 million, and it has filed a plan of liquidation."  *Id*. at 2.  Poulsen also made clear that he had no intention of either asserting any purported right to challenge the Sale Order or attempting to unwind any part of the Sale, stating that "[a]ll that remains is to adjudicate remaining estate claims and causes of action . . . and then to distribute any and all such assets to the holders of Allowed unsecured claims, if any, and Allowed Equity Interests."  *Id*.

31.    Given their participation in these post-Sale matters, there simply can be no dispute that Poulsen and Brauser were well aware of the terms of the Sale for over ten months.  Yet, neither Brauser nor Poulsen chose to take any action concerning Poulsen's purported "ownership" of the IP.  To the contrary, Brauser and Poulsen sought to maximize their share of the Sale proceeds.

### vii.    *The Formation of TBO and its Violations of this Court's Sale Order*

32.    TBO was formed on September 22, 2014—more than nine months after this Court issued the Sale Order.  *See* Anker Decl. Exhibit E (Electronic Articles of Incorporation for TBO, filed September 22, 2014).  TBO was fully aware of the Sale and Sale Order since its formation.

33.    Specifically, filings with the Florida Secretary of State reflect the fact that Brauser is a founding Director of TBO, and is also its Vice President and Registered Agent.  *See id*. Exhibit E; *id*. Exhibit F (Articles of Amendment of Articles of Incorporation of TBO, filed October 7, 2014).  Indeed, a recent press release relating to TBO indicates that Brauser is TBO's Chairman as well.  *See id.* Exhibit G (December 15, 2014, Press Release titled "Tiger Media

Announces Agreement to Acquire Interactive Data, LLC; Publicly traded Media Company to enter U.S. data fusion market through strategic acquisition"). As detailed above, Brauser had long been aware of both the Sale and Sale Order.

34.    Similarly, another filing with the Florida Secretary of State reveals that Dubner—Debtor's former General Counsel, and previously counsel to TRADS as well—is now TBO's Chief Executive Officer, and has been since at least eleven days after TBO was formed (if not earlier). *See id.* Exhibit H (Articles of Amendment to Articles of Incorporation of TBO, filed October 3, 2014). This too is confirmed by TBO's recent press release. *See id*. Exhibit F. Thus, TBO has long been aware of the Sale Order through Dubner as well.

35.    TBO "owns . . . Interactive Data, LLC," Motion to Dismiss, at 3. *See also* Anker Decl. Exhibit G (TBO is the "parent company of . . . Interactive"). Dubner is also Interactive's CEO. *See Declaration of Derek Dubner* [Adv. Proc. No.14-01793, ECF No. 6-1], ¶ 1, at p. 1 ("I am the CEO of Interactive Data, LLC."); Anker Decl. Exhibit G. As detailed above, Interactive has long been aware of the Sale and Sale Order. Accordingly, TBO is aware of the Sale Order through Interactive as well.

36.    Finally, Poulsen is the "Chief Scientific Officer of TBO . . . ." Anker Decl. Exhibit G. As detailed above, Poulsen has long been aware of the Sale Order. Accordingly, TBO is aware of the Sale Order through Poulsen as well.

37.    In sum, not only is TBO presently aware of this Court's Sale Order and TRADS's resulting ownership of the IP free and clear of any purported interest of Poulsen, but TBO was aware of these facts at the time that it engaged in the purported purchase of the IP from Poulsen. *Cf. id.* Exhibit E.

38.     Thus, Poulsen's purported "sale" to TBO was entirely ineffective, and TBO's subsequent assertion of that ownership interest was itself a violation of this Court's Sale Order. TBO has interfered and continues to "interfere with [TRADS's] use and enjoyment of the" IP, Sale Order ¶14, at 22.  *See also* Motion to Dismiss, at 3 (asserting that TBO "acquired an interest in the" IP).  These actions are taken despite this Court's Order to "surrender possession or control of" the IP to TRADS, Sale Order ¶ 19, at p. 24, which obligated TBO, upon acquiring any interest in, or files or information related to, the IP from Poulsen, to turn any of the IP in its possession, control or custody over to TRADS.  Yet TBO still has not done so, despite TRADS's assertion of its rights, most notably in the form of its lawsuit against Brauser, TBO's Chairman, Vice-President, Director, and Registered Agent, and Interactive, TBO's subsidiary.  *See Complaint for Declaratory Judgment* [Adv. Proc. No. 14-01793, ECF No. 1].

**viii.**     *Events Leading to TBO's Harassment of TRADS*

39.     TBO's knowing violation of this Court's Sale Order is, in fact, nothing more than a cynical act of retaliation against TRADS for its unrelated assertion of its contractual rights against certain former employees who now work for Interactive (TBO's subsidiary) and Marlin Capital Partners I, LLC ("Marlin"), an entity managed by Brauser.  *See Declaration of Michael Brauser*, ¶ 1, at p. 1 [Adv. Proc. No. 14-01793, ECF No. 6-2].

40.     As explained in greater detail in ¶¶ 52-54 of TRADS's *First Amended Complaint* in the Adversary Proceeding [Adv. Proc. No. 14-01793, ECF No. 21], in late September and early October of 2014, Interactive hired Dubner and James Reilly ("Reilly"), and Marlin hired Daniel MacLachlan ("MacLachlan").  All three were subject to nondisclosure agreements with TRADS, and Reilly and MacLachlan were subject to noncompetition agreements as well.  It was only after TRADS wrote to Reilly and MacLachlan, reminding them of their obligations to

TRADS, that TBO asserted that it owned the IP. *See* Anker Decl. Exhibit I (October 9, 2014,

Letter from John W. Blenke of TransUnion to Reilly); *id*. Exhibit J (October 9, 2014, Letter from

John W. Blenke of TransUnion to MacLachlan). Thus, far from being an innocent-but-mistaken

good-faith purchaser of the IP from Poulsen, TBO's actions are cynical in the extreme, seeking

to use the "leverage" of an empty "claim" to force TRADS to forgo its contractual rights.

Indeed, the very name of Defendant—"The Best One"—is an obvious and improper attempt to

steal the name of the Debtor that TRADS acquired—TLO or "The Last One"—and confuse

consumers. Equity demands that such bald-faced gamesmanship be appropriately sanctioned.

## **BASIS FOR RELIEF REQUESTED**

41.     TBO may not ignore the Sale Order. Pursuant to the Sale Order, the Debtor sold

the IP to TRADS free and clear of any purported interest of Poulsen. The Sale Order further

prohibits disturbance of TRADS's use and enjoyment of the Acquired Assets. *See* Sale Order, at

pp. 12, 22-23. And the Sale Order also directs any individual or company with possession or

control of the IP to "surrender" it to TRADS. Sale Order ¶ 19, at p. 24. The Court should

enforce the terms of the Sale Order; hold TBO in contempt for knowingly violating the explicit

terms of the Sale Order; order TBO to turn over all copies of the IP source code and any other

documents or information related to the IP that are within TBO's possession or control; and

award TRADS damages as compensation for TBO's violations of the Sale Order.

42.     A "Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own

prior orders." *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). This authority

encompasses sale orders following the closing of the sale. *See In re Fountain Imaging of N.

Miami Beach, LLC*, 392 B.R. 508, 514 (Bankr. S.D. Fla. 2008) ("a bankruptcy court always

retains jurisdiction to consider the enforceability of its own orders"). Consistent with these

authorities, this Court retains subject matter jurisdiction to enforce its Sale Order.  Sale Order, at

p. 39; *see supra* at n.5.

43.     Included in this retention of jurisdiction by a bankruptcy court is "the inherent

power to sanction contempt of its orders."  *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 970

(11th Cir. 2012) ("Moreover, the court that enters an injunctive order retains jurisdiction to

enforce its order.  In this respect, a bankruptcy court is no different than any other federal court,

which possesses the inherent power to sanction contempt of its orders," *citing Chambers v.

NASCO, Inc.,* 501 U.S. 32, 50 (1991)); *see also United States Lines, Inc. v. GAC Marine Fuels,

Ltd. (In re McClean Indus., Inc.)*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("[a]ll courts,

whether created pursuant to Article I or Article III, have inherent contempt power to enforce

compliance with their lawful orders. The duty of any court to hear and resolve legal disputes

carries with it the power to enforce the order.").  In addition, section 105(a) of the Bankruptcy

Code provides that "[t]he court may issue any order, process, or judgment that is necessary or

appropriate to carry out" the Bankruptcy Code's provisions, and this section "codif[ies] the

bankruptcy court's inherent power to enforce its own orders."  *Back v. LTV Corp. (In re

Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y. 1997); 11 U.S.C. § 105(a).

44.     Bankruptcy courts have not hesitated to enforce their sale orders and hold parties

who have knowingly violated them in contempt, and, as sanctions, award compensation to the

aggrieved party for its attorney's fees and costs.  *See, e.g.*, *FirstBank Puerto Rico v. Barclays

Capital Inc. (In re Lehman Bros. Holdings Inc.)*, No. 10-04103, 2013 WL 6283572, at *5

(Bankr. S.D.N.Y. Dec. 3, 2013) (awarding "reasonable counsel fees and costs incurred in

defending against [] litigation that has been pursued knowingly by FirstBank in violation of the

Sale Order. This award of civil contempt sanctions will serve to shift the cost of litigation to a

sophisticated financial institution that understood the risks and should have known better than to

go after the purchaser of the Purchased Assets" and dismissing the defendant's argument that "it

was entitled to test its legal theories in court . . . [because] the persistent pursuit of a collateral

attack on the Sale Order comes with a price."), *aff'd,* 2014 WL 7229473 (S.D.N.Y. Dec.18,

2014) (as corrected Dec. 29, 2014); *see also Bronson v. CHC Indus. Inc. (In re CHC Indus.,*

*Inc.)*, 389 B.R. 767, 775 (Bankr. M.D. Fla. 2007) ("The claims are impermissible collateral

attacks on the Sale Order, and the Debtor is barred from asserting the claims . . . By asserting the

claims . . . the Debtor is attempting to unravel the economic integrity of the sale, a result which §

363(m) of the Bankruptcy Code is intended to prevent.  Further, the relief requested by the

Debtor cannot be granted without effectively overruling certain key findings in the Sale Order . .

. [which] constitute significant components of the Order that were never appealed and are final

determinations of the Court."); *see generally, DeLauro v. Porto (In re Porto*, 645 F.3d 1294,

1303 (11th Cir. 2011) (bankruptcy court has the "power to take any action 'to prevent an abuse

of process.' *See* 11 U.S.C. § 105(a). This power includes the authority to impose sanctions,

including an award of attorney's fees, if a party violates a court order or rule.").

      45.     Consistent with this authority, the Court should enforce the terms of its Sale

Order.  In particular, it should order TBO, its officers, employees, and subsidiaries, and any other

persons within TBO's control or acting in concert with TBO, to cease and desist from further

interfering with TRADS's use and enjoyment of the Acquired Assets, and to surrender

possession, custody, and control of any of the Acquired Assets, including, specifically and

without limitation, any of the BOLT or BParser Code in TBO's possession, custody, or control

(or the possession, custody, or control of TBO's officers, employees, or subsidiaries, or of any

other persons within TBO's control or acting in concert with TBO),  and any other information

that forms part of the IP purchased by TRADS (including any codes or passwords that would enable TRADS to access such IP). In the exercise of its power to enforce the Sale Order, the Court should further hold TBO in contempt and, as sanctions, require it to compensate TRADS for the actual attorney's fees and costs it has incurred, and continues to incur, in defending against their knowing violation of the Sale Order. *See In re Porto*, 645 F.3d at 1303 (a bankruptcy court may "award [] attorney's fees, if a party violates a court order or rule"). TRADS will provide documentation of its attorney's fees and costs in response to any order issued by this Court directing it to do so.

## NOTICE

46.     Notice of this Motion has been provided to (a) TBO, (b) the Debtor, (c) the United States Trustee for the Southern District of Florida and (d) all parties that have requested service in the Debtor's bankruptcy case. TRADS submits that such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUESTS

47.     No prior request for the relief sought in this Motion has been made to this or any other Court.

**WHEREFORE**, TRADS respectfully requests that this Court: (i) enter an order substantially in the form set forth as Exhibit 1 hereto, granting the relief sought herein; and (ii)

grant such other and further relief as the Court may deem just and proper.


Dated: January 13, 2015

/s/ Brian K. Gart
Brian K. Gart
BERGER SINGERMAN LLP
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, Florida 33301
Phone (954) 712-5130 (Direct)
Fax: (954) 523-2872 (Fax)
Florida Bar No. 381152
bgart@bergersingerman.com


-and-

Philip D. Anker (admitted *pro hac vice*)
Douglas F. Curtis
Marc M. Allon (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007 USA
Phone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for TransUnion Risk and*
*Alternative Data Solutions, Inc.*

# **<u>Exhibit 1</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In Re:                                                    Case No.  13-20853 (PGH)

                                                          Chapter 11

TLFO, LLC,

      Reorganized Debtor.
_____/

**ORDER ENFORCING THE SALE ORDER**
**AND HOLDING TBO IN CONTEMPT FOR VIOLATING THE SALE ORDER**

      Upon the *Motion to Enforce the Sale Order and to Hold Brauser, Marlin and Interactive*

*in Contempt for Violating the Sale Order*, dated January 13, 2015 (the "Motion"),[1] of

TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"), the purchaser of substantially

---

[1] Capitalized terms not defined herein shall have the same means ascribed to such terms in the Motion.

all assets of the Debtor; upon consideration of any response thereto filed by The Best One, Inc.

("TBO"), and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334; and the Court having determined that the

relief sought in the Motion is appropriate and necessary to enforce this Court's Sale Order; and it

appearing that the notice of the Motion has been sufficient, adequate, and timely under the

circumstances of this case and that no other or further notice need be provided; and a reasonable

opportunity to object or be heard regarding the Motion having been given to all parties in

interest; and a full and fair opportunity having been afforded to litigate all issues raised in all

objections, or which might have been raised; and upon all of the proceedings before the Court;

and after due deliberation and sufficient  cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     This Court has jurisdiction to consider the Motion and the relief requested therein,

in accordance with 28 U.S.C. §§ 157 and 1334.  Venue of the Motion in this Court is proper

under 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157.

B.     The statutory predicates for the relief requested in the Motion are Bankruptcy

Code sections 105 and 363.

C.     TRADS has provided due and proper notice of the Motion, and the relief sought

therein and no further notice is necessary. A reasonable opportunity to object or be heard

regarding the relief requested in the Motion has been afforded to all interested parties.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is granted.

2.     Any objections to the Motion or the relief requested therein that have not been

adjourned, withdrawn or resolved are overruled in all respects on the merits.

3.      In accordance with the Sale Order, TBO, and all persons and entities acting in conjunction with them, including, without limitation, Ole Poulsen, Michael Brauser, Derek Dubner, and Interactive Data, LLC, shall cease and desist from asserting any interest in any and all of the Acquired Assets (including without limitation the IP), and shall take no other steps to attempt to interfere with TRADS's quiet use and enjoyment of the Acquired Assets.

4.      TBO shall, within three (3) business days, surrender possession, custody and control over the IP and any other Acquired Asset to TRADS, including, without limitation, any and all copies of the IP (including any codes or passwords that would enable TRADS to access such IP), whether any such items are in the possession, custody, or control of TBO, in the possession, custody, or control of TBO's officers, employees, or subsidiaries, or in the possession, custody, or control of any other person within TBO's control or acting in concert with TBO.

5.      After surrendering possession or control over the IP and any other Acquired Asset to TRADS, TBO shall not retain any copies of the IP in its possession, custody or control.

6.      TBO is hereby found in contempt of this Court for knowingly violating the Sale Order, and shall be sanctioned so as to compensate TRADS for the costs it incurred defending against this knowing violation of the Sale Order.  Accordingly, within five (5) business days of the entry of this Order, TRADS shall submit to the Court (and serve on TBO) copies of the invoices or other statements (which may be redacted, as appropriate, to preserve any privilege or protection), documenting the attorneys' fees and costs it actually has incurred in defending against TBO's knowing violation of the Sale Order (including, without limitation, the costs of the Motion and the Adversary Proceeding).  TBO shall have three (3) business days to file an

objection, solely with respect to the reasonableness of TRADS's fees.  Thereafter, the Court shall

enter a separate order awarding such actual costs incurred to TRADS.

      7.     The Court shall retain jurisdiction over any matters related to or arising from the

implementation or interpretation of this Order.

###

**SUBMITTED BY:**

Brian K. Gart
BERGER SINGERMAN LLP
350 East Las Olas Blvd.
Suite 1000
Fort Lauderdale, Florida 33301
Phone (954) 712-5130 (Direct)
Fax: (954) 523-2872 (Fax)

     -and-

Philip D. Anker (admitted *pro hac vice*)
Douglas F. Curtis
Marc M. Allon (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007 USA
Phone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for TransUnion Risk and*
*Alternative Data Solutions, Inc.*

**COPY FURNISHED TO:**
Brian K. Gart, Esq.
*(Attorney Gart is directed to serve a conformed copy of this Order upon all interested parties,*
*and to file a Certificate of Service).*